# In The Matter Of:

*Valencia Colon v.*
*Richard Roundtree et al*

---

*Chrislynne Kuhlke*
*February 4, 2022*

---

*Kellie K. Rodman, LLC*
*Certified Court Reporters*
*P. O. Box 500*
*Homer, Georgia  30547*
*678-614-8109*

Original File 020422Cauthorn_Kuhlke.txt
Min-U-Script® with Word Index

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF GEORGIA
2                      AUGUSTA DIVISION

3
   Valencia Colon,               )
4                                )
   Plaintiff,                    )
5                                )
                                 )      Civil Action File No.
6   v.                           )      1:21-cv-00149-JRH-BKE
                                 )
7                                )
   Richard Roundtree, et al.,    )
8                                )
   Defendants.                   )
9

10

11

12        The videotaped videoconference deposition of

13        CHRISLYNNE KUHLKE, taken for purposes of discovery,

14        cross-examination, and all other purposes allowed

15        under the Civil Practice Act of Georgia; all

16        formalities waived; the reading and signing of the

17        deposition waived; before Jennifer A. Gerber, CCR

18        6241-2465-4151-2704, Certified Court Reporter, in

19        and for the State of Georgia; commencing at

20        9:13 a.m., February 4th, 2022, Augusta, Georgia.

21

22

23                    Kellie K. Rodman, LLC
                    Certified Court Reporters
24               rodmanreporting@gmail.com
                        678-614-8109
25
```

```
1                    APPEARANCES (Remote)

2

3    ON BEHALF OF THE PLAINTIFF:

4    J. WICKLIFFE CAUTHORN, ATTORNEY AT LAW
     The Cauthorn Firm
5    201 Cherokee Street
     Marietta, Georgia 30060
6    404-991-2700

7

8    ON BEHALF OF THE DEFENDANTS:

9    TAMEKA HAYNES & RANDOLPH FRAILS, ATTORNEYS AT LAW
     Frails & Wilson, LLC
10   211 Pleasant Home Road, Suite A1
     Augusta, Georgia 30907
11   800-413-9005

12

13   ALSO IN ATTENDANCE:

14   ERIC GEORGE, VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25
```
2

1                          I N D E X

2

3   CROSS-EXAMINATION BY MR. CAUTHORN . . . . . . . . . . .  Page 5

4   DIRECT EXAMINATION BY MS. HAYNES . . . . . . . . . . .  Page 50

5

6

7

8                        E X H I B I T S

9

10  EXHIBIT              DESCRIPTION                    PAGE MARKED/
    NUMBER                                             IDENTIFIED
11

12  D                   Event Contract 1/31/22         20/20

13  E                   Event Contract 1/16/19         24/24

14  A                   Open Records Request Production 25/26

15  C                   Title 6 License and Business
                        Regulations                    39/39
16

17

18

19

20                       TRANSCRIPT LEGEND

21  . . . (ellipsis)    Halting speech or an unfinished sentence
                        in dialogue or an omission when reading
22                      written material
    --    (dashes)      Break in speech continuity
23  (ph)                Spelled phonetically
    (sic)               In its original form
24

25

                                                                   3

P R O C E E D I N G S

                                                          9:13 a.m.

    (Whereupon, the court reporter complied with the
requirements of O.C.G.A. 9-11-28(c).)

    BY THE VIDEOGRAPHER:  This is the deposition of
Chrislynne Kuhlke for Colon versus Roundtree.  Today's
date is February 4th, 2022.  The time is 9:13 and we are
on the record.

    THE COURT REPORTER:  Okay.  And, again, today's date
is February 4th, 2022 and the time is 9:13.  This is the
case of Colon versus Roundtree.  At this time, can
everyone state their name and who they represent, please?

    MR. CAUTHORN:  Yes.  My name is Wick Cauthorn.  I
represent the Plaintiff, Valencia Colon.

    MS. HAYNES:  Tameka Haynes.  I'm from Frails and
Wilson representing the Defendant.

    THE WITNESS:  Oh, Chrislynne Kuhlke.  I represent the
City of Augusta.

    THE COURT REPORTER:  Thank you very much.  And my
name is Jennifer Gerber.  I am the court reporter.  We are
all appearing via Zoom today.  Do all parties agree to
have the witness sworn remotely?

    MR. CAUTHORN:  Yes.

    MS. HAYNES:  Yes.

    THE COURT REPORTER:  Thank you.

1          (Whereupon, the witness was sworn remotely by the court

2                    reporter per agreement of counsel.)

3      Whereupon,

4                              CHRISLYNNE KUHLKE

5          Was called as a witness herein and, having been first duly

6          sworn, was deposed and testified as follows:

7                            CROSS-EXAMINATION

8      BY MR. CAUTHORN:

9          Q     Ms. Kuhlke, can you, for the record, say your full

10     name and -- and spell it for me?

11         A     Mary, M-A-R-Y, Chrislynne, C-H-R-I-S-L-Y-N-N-E,

12     Kuhlke, K-U-H-L-K-E.

13         Q     Okay.  And where are you employed?

14         A     I'm employed with Augusta Recreation and Parks

15     Department.

16         Q     What is your position with the -- with the -- with

17     the parks department?

18         A     I'm with -- the rentals and facilities coordinator.

19         Q     How long have you been there?

20         A     I got my pin yesterday, 35 years.

21         Q     Oh, my God.  That's -- that's fantastic.

22         A     Yes.

23         Q     Not a lot of people have been anywhere for 35 years

24     nowadays, so that's -- that's --

25         A     Yes, uh-huh (affirmative).

5

1       Q    It must be a good environment to work in.

2       A    Uh-huh (affirmative), okay.

3       Q    So you were identified by defense counsel in this

4  case as someone -- we discussed some topics that would be --

5  that would be covered during some depositions.  And, you know,

6  when you take a deposition of an -- of an entity -- you know,

7  Augusta doesn't have a mouth and it can't talk for itself, so

8  it has to have -- have people designated to speak for it.

9  And -- and so you have been identified by defense counsel as

10  someone who is authorized to talk about the parks and

11  recreation department policies with regard to planning of

12  events and the planning of events at the public facilities.  Is

13  that -- is that your understanding about what you're here for?

14      A    Correct.

15      Q    Okay, okay.  And so we'll -- we'll stick to that, and

16  specifically I wanna talk -- we'll talk generally about --

17  about planning of events, and then specifically I would like

18  to -- I'm gonna have some questions about an event that was

19  June 14th of 2019 at the Julian Smith Casino.  And then --

20  and then we'll talk about -- about policies and ordinances and

21  how they -- how the parks department interacts with other

22  departments and things like that with regard to the planning

23  and permitting process, okay?

24      A    Okay.

25      Q    Okay.  So can -- if -- let's say that I wanted to

1    have an event at Julian Smith Casino.  Well -- well, let me ask

2    you first: Has the process changed today -- is the process any

3    different today than it was in -- in June of 2019?

4          A    No.

5          Q    Okay.  So let's suppose I wanted to have an event at

6    Julian Smith Casino where I was gonna have -- rent the -- rent

7    the place from the county and I was gonna serve beer and wine

8    to my guests and things like that.  How would I approach the

9    county?  And walk me through that process with -- with the

10   parks department and how -- how we get that planned and done

11   and scheduled.

12         A    Okay.  Basically, you would come straight to me.  And

13   I have a contract and -- we do a lot of this now online, so

14   I -- I don't know if you consider that a change, but it --

15   it -- we do some of this online, but I still go through the

16   policies and procedures with whoever's renting.

17         When it comes to alcohol, the first question I ask: Are

18   you -- are you -- are you giving this alcohol away?  Are you

19   selling it?  Because you have to have a day license if you're

20   selling that alcohol or, you know, in any way selling it to the

21   people that are coming.

22         And once they tell me, no, I'm -- I'm giving it away, or I

23   am, you know, selling it; I direct them to either the -- the

24   license department -- which they have to have in writing with

25   the license department that they are having to go get a one-day

7

1   license -- or, no, we're giving it away.  So I go from there

2   and I -- and I let them know that they will have to have a

3   police officer if you are having alcohol on the premises.  It

4   doesn't matter if you have 150 people, 200 people, or 2 people.

5   You still will have to have a police officer if you are having

6   alcohol.

7        Q    Okay.  And when you say a police officer, is that --

8   do they -- is that -- can it be a -- a special duty off duty

9   police officer, or did they have to be on the clock and in

10  uniform and -- and all of that?

11       A    What we do is we contact the police department and --

12  and we give them a copy of the contract and tell them that --

13  whatever that -- they are -- need for that event.  And they

14  email us back in -- in writing.  They let us know who -- who is

15  needed and they give us the name of the person that will be

16  working that event.  We have contacts with the police

17  department that we go to.

18       Q    Understood, because they have people that they --

19  they will -- all that kind of scheduling on their side; is --

20       A    Correct, correct.

21       Q    Okay.  And -- and when you say the police department,

22  do you work with just the police department, or do you also

23  work with the sheriff's office?

24       A    Well, I work with the sheriff's office -- I mean, the

25  police department, and we do have some marshals that do work

1    the events also, along with firemen.  You know, we have firemen

2    that you have to get to -- also.  And I have a --

3        Q    So you work --

4        A    So I --

5        Q    You broke up.

6        A    -- contacts with the firemen and the police officers

7    and the marshals.

8        Q    Understood.

9        A    Yeah, I --

10       Q    Okay.  How -- how long does that process take?  Let's

11   say that from contacting you, and then you helping them

12   understand what they need to do as far as licensing and

13   approval goes, how long does that process typically take?

14       A    Well, I mean, if you have to get a license, you --

15   for -- you know, if you're selling, it takes about -- at least

16   three months in advance to get one.  Now, if you've already got

17   a license to sell alcohol, you have -- still have to get a day

18   license.  And -- and if you have a license, you can get that

19   real quick.  You can get that within a week.  But if you're

20   like giving it away or -- you know, or bringing it yourselves,

21   then -- then you don't have to have anything --

22       Q    Okay.

23       A    -- far as license-wise.

24       Q    Okay.  So if you're giving it away, that would be

25   like a wedding reception without -- it doesn't have a cash bar?

1       A    Correct.

2       Q    Okay.  Or a -- or a --

3       A    -- anything like that.

4       Q    Okay.  And they -- they don't have to get a day

5   license -- can you explain to me what a day license is, when

6   you say a day license?

7       A    Basically -- basically it's -- it's -- we've been

8   working with the licensing department a long time.  So it's --

9   basically, it is if they're selling on the premises and money

10  is being exchanged, they have to have a day license showing

11  that they have bought a day license for that actual event.  It

12  has to be out on the wall showing that they have a day license.

13  In that case -- inspection department, so I don't understand

14  the whole thing about it, but that's -- you have to have one.

15      Q    Okay, understood.

16           MR. CAUTHORN:  And -- and I actually -- Jennifer, did

17      we swear in the witness?

18           THE COURT REPORTER:  (Nods head.)

19  BY THE WITNESS:  (Resuming)

20      A    Yeah.

21      Q    I'm sorry, I was looking at my notes, I think, when

22  you were getting sworn in.  Okay.

23      A    Yeah.

24      Q    So I -- I wanna make sure that I understand this.

25  Okay, so -- so there is just a general county license that

                                                              10

1   allows someone to sell alcohol, correct?  And that's just a

2   general license where they can sell it at their location,

3   right?

4        A    Right, correct.

5        Q    Okay.  But if they're using a park property for a

6   single event for one day, even if they've got one of those

7   licenses to sell alcohol generally, they still have to get a

8   day license to serve it at the --

9        A    Right.

10       Q    -- at the event at the park property?

11       A    Right.  It has to have Julian Smith Casino on the

12  license.

13       Q    Okay, okay.  And so that's what you mean, when you

14  say a day license, you're talking literally about the same type

15  of a license that a restaurant or bar would have except that it

16  is specifically for one day at a park property?

17       A    Correct.  At a -- at a building.

18       Q    Okay.  And if you don't have a general bigger

19  license, that means you have to go through the whole process

20  of -- of -- and that's why you said it would take three months

21  or so, because you've got to go through a whole licensing

22  process --

23       A    Right.  You have to be a nonprofit -- you have to be

24  a nonprofit to get a -- to get a day license if you don't have

25  another license.  You cannot just -- you know, Joe Smith can go

11

1   out there and get a day license.  You can't do that.  It has to

2   be a nonprofit.

3       Q    Okay.

4       A    Correct.

5       Q    So if my daughter was getting married -- if my

6   daughter was getting married at Julian Smith, we'd have to have

7   a -- an open bar.  We couldn't have a cash bar if we wanted

8   to --

9       A    Pretty much.  Pretty much.

10      Q    -- because -- because --

11      A    Unless you've got someone --

12      Q    -- nobody --

13      A    -- who already had an alcohol license.  Like let's

14  say -- alcohol license --

15      Q    Okay.

16      A    And so they could serve alcohol and sell it.

17      Q    So a caterer could do it?

18      A    A caterer, correct.

19      Q    Okay.  So I could have an event where I had a caterer

20  running the bar, and the caterer could get the license -- the

21  day license --

22      A    Correct, correct.

23      Q    -- using their own license?

24      A    Correct.

25      Q    Okay, understood.  And who has to sign off on that

12

1    license?  Does the sheriff have to review that license and sign

2    off on it?

3         A    No, the sheriff does not.  The -- the license

4    inspection gives them a day license and it has to be signed and

5    put on the wall -- and we have to have it on the wall before

6    they can sell.

7         Q    Okay.  And is -- is that something that would be in a

8    file for a -- for an event?

9         A    Not necessarily, no.  We don't -- we don't file them,

10   no.  We just have to have them on the wall before they -- we --

11   to be honest with you, we don't have a lot of -- of cash bars.

12   We really don't.

13        Q    Understood, understood.  If -- let's say an event is

14   selling tickets and giving out wristbands for drinks, does that

15   count as selling alcohol?

16        A    It is -- it does.  If -- if the ticket includes

17   alcohol, that -- that -- that is -- is -- is a -- is a selling

18   event, so, yeah -- yes, that is.

19        Q    Okay, okay.  So that's -- that -- that's kind of what

20   I was asking.  Because, you know, I know a lot of people would

21   say, okay, well, it's gonna be $20 a ticket and we've got a

22   plate of barbeque and -- and you get a beer -- you know, two --

23   two beer coupons with it.  So that would be a -- that would be

24   a selling event?

25        A    Correct.

                                                                    13

1      Q      Okay, okay.

2      A      Now, if you bring your own or whatever, that is not

3   selling.  We do have BYOB, bring your own.

4      Q      And that's where the individual guests bring their

5   own?

6      A      Correct.

7      Q      Okay.  The -- if individual guests are bringing their

8   own alcohol, does -- do they still have to get all the approval

9   for alcohol, or -- or is that just a -- just it -- it -- go

10  ahead and explain that.

11     A      It should -- you don't have to have a license if

12  you're bringing your own.

13     Q      Okay.  What if the alcohol is free?  What's the

14  process that has to -- has to be gone through if you're just

15  providing alcohol for free at your event?

16     A      You just -- I just have to -- I have to assign a

17  police officer.  They cannot, I do.  I go through my --

18     Q      Okay.  And that --

19     A      I send the contract.  They send me a person.  And

20  then we -- we have the police officer.

21     Q      Okay.  Who pays -- who pays for the police officer?

22     A      The -- the people that are renting.

23     Q      Okay, all right.  And my understanding is Julian

24  Casino -- Julian Smith Casino is -- is an Augusta parks and rec

25  property where there are these types of events.

                                                              14

1        A       Right.

2        Q       Okay.  Do you know, or have you ever heard of 25

3    Gents?

4        A       I sure have.

5        Q       Okay.

6        A       Twenty-five Gents has been with us over 30 years.

7        Q       Okay.

8        A       So --

9        Q       What is 25 Gents?

10       A       It's -- it's a club.  I mean, it's -- it's like a --

11   it's like any of the fraternity-type -- it's just a club.

12       Q       Okay.  Just a social club?

13       A       Yes.

14       Q       Okay.  Who were the people that -- or your contacts

15   at 25 Gents?

16       A       For a long time I've worked with Willie Washington.

17   And he's gotten a little bit older, so I work a little bit with

18   Randy Knox now.  And I'm very close to that group because I've

19   been with them that long.

20       Q       And when you say that long, is that -- are -- are you

21   a member of 25 Gents, or do --

22       A       Oh, no.

23       Q       -- they use the property all the time?

24       A       They have used that facility as long as I have been

25   in my position.  Every year pretty much at the same time.

                                                              15

1    Q    Okay, okay.  And what type of -- of an event do they

2    have.  You just said they use it every year.  What's the event

3    that they have?

4    A    I mean, they have an event right before Father's Day

5    and it's just a Father's Day get together.  And then they have

6    one in November.  I think it's something like a white party.

7    They're just parties.

8    Q    Okay, okay.

9    A    Yeah, parties -- get together --

10    Q    Do they have a standing permit or any kind of

11    standing application with the parks department, or do they get

12    a -- they go through the process individually each time they

13    wanna --

14    A    No.  Everybody has to go through the process each

15    time -- each time, every time.

16    Q    Okay.  Do they usually sell alcohol, or do they just

17    provide it for free?

18    A    They -- they -- they -- well, they have a BYOB, which

19    is bring their own.

20    Q    Okay.  Is sheriff or police security required at a

21    BYOB?

22    A    Yes, sir.  Anytime alcohol is on the premises you

23    have to have police officers.

24    Q    Okay.  So they have to go through you to get the

25    security, but they -- they don't go through that licensing

16

1    process when they have their event?

2         A    Correct.

3         Q    Okay.  Do you know if they sell tickets to their

4    event?

5         A    I don't -- I -- I am not sure.  I don't -- I don't --

6    I think they -- I'm not sure.  I'm not positive.  I would have

7    to go back.  Some of -- they have before in the past, but -- I

8    think they do.

9         Q    Okay.  Do you know what's included in the ticket?

10        A    I -- I think just the -- just the food and the -- and

11   they have to pay for the building and all that, but it sure --

12   it's not -- I know it's not alcohol because the people bring

13   their own alcohol.

14        Q    Okay.  And you -- by the people -- when you say the

15   people, you mean the individual guests to the event?

16        A    Correct, correct.

17        Q    Okay.  And I looked -- I was provided from you

18   guys -- y'all provided a pretty substantial open records

19   response to me.  I sent an open records request to -- to y'all

20   and it's a pretty substantial response.  And it -- the -- the

21   request was for documents related to the permitting of events

22   in the year of 2019.

23        A    Uh-huh (affirmative).

24        Q    And I did not see any -- any paperwork related to any

25   event at -- for the 25 Gents or for Julian Smith Casino on June

                                                                17

1  14th of 2019.  Do you know where that paperwork would be?

2      A    Are you speaking of the contract?

3      Q    Yes.  Whatever documents would be in a file at

4  Augusta -- at -- with you guys.  I didn't get -- in the -- in

5  the documents produced, I didn't see anything related to an

6  event at Julian Smith Casino.  And -- and -- and the reason I'm

7  asking about this is because I'm getting ready to start asking

8  you about a specific event on June 14th of 2019.

9      A    Uh-huh (affirmative).

10     Q    And I didn't see anything related to an event that

11  day at all.  And then I didn't see any paperwork related to 25

12  Gents at all.  And I was --

13     A    I did -- I can -- I can give you that contract right

14  now.  It's in my --

15     Q    Okay.

16     A    -- computer.

17     Q    Okay.

18     A    Yeah, uh-huh (affirmative).

19     Q    Okay.  In about -- in -- in -- in -- I'm gonna ask

20  you some questions in about -- and then -- can we take a five

21  minute break and you -- and you can email Tameka that -- that

22  contract?  And then I -- and then -- because I'm -- because I'd

23  like to talk to you.

24     A    Okay, sure.

25     Q    Okay.  And I'm not -- you know, I -- y'all produced

18

1   like a hundred and -- almost 200 pages worth of -- worth of

2   documents that -- I went through it multiple times and I never

3   saw anything about 25 Gents or an event at -- on June 14th,

4   2019 or anything at Julian Smith Casino with 25 Gents or

5   June 14th, 2019.  So if you could find that -- those documents

6   and email them to Tameka and she can email them to me.

7        A    Okay.

8        Q    We can take a few minutes to do that and then I can

9   ask you questions about that and I'll have those documents in

10  front of us.

11       A    Sure.

12       Q    Okay.

13       A    Yes, June 14th, two thousand -- what was is,

14  nineteen?

15       Q    Nineteen.

16       A    Okay.

17            THE VIDEOGRAPHER:  And we were off --

18            MR. CAUTHORN:  All right --

19            THE VIDEOGRAPHER:  Off --

20            MR. CAUTHORN:  Let's --

21            THE VIDEOGRAPHER:  I'm sorry, go ahead.

22            MR. CAUTHORN:  Yeah, let's -- let's mute up until

23       about 9:45, and then we'll come back and -- and -- and --

24       and look at these documents.

25            THE VIDEOGRAPHER:  And we are off the record at 9:33.

1          (Whereupon, a brief recess ensued.)

2          THE VIDEOGRAPHER:  And we are back on the record at

3      9:48.

4   BY MR. CAUTHORN:  (Resuming)

5      Q    Okay.  Ms. Kuhlke, you just -- my understanding is

6   you just provided your -- well, you just provided defense

7   counsel with a copy of a document that's in the parks and

8   recreation department's computer files; is that right?

9      A    (No audible response.)

10     Q    You're muted.

11     A    That's correct.

12     Q    Okay.  And this is a document that reflects the --

13  the event held by 25 Gents Inc. at the Julian Smith Casino on

14  June 14th of 2019; is that correct?

15          (Whereupon, Plaintiff's Exhibit D was marked for

16      identification.)

17  BY THE WITNESS:  (Resuming)

18     A    Correct, correct.

19     Q    All right.  I'm -- I'm gonna share my screen and

20  we'll -- let me see -- okay, can you see this?

21     A    Yes -- well --

22     Q    It sometimes takes a second.

23     A    Okay, I see it on --

24     Q    Okay.  It looks like it's two pages long; is that

25  right?

                                                              20

1      A      Correct.

2      Q      Okay.  And this is a true and accurate copy of the --

3  of the contract between 25 Gents Inc. and Augusta-Richmond

4  County for the event that we have been talking about?

5      A      Correct.

6      Q      Okay.  Can you walk me through -- just kind of walk

7  me through the first page, what everything means and -- and --

8  and how the information in it is created?

9      A      Okay.  First off, I get -- I already have all the

10  information -- we -- we use -- it's called ACTIVE Net -- and I

11  already have all the information for the organization of the

12  25 Gents.  And I go in and put their name in, which you see on

13  the left here, organization name.  And then the agent's name,

14  which is Willie Washington, who I was telling you about.  And

15  then I go in -- down -- and I put the date, which is June

16  14th, 2019 -- down there, and I put what time they wanna come

17  in, and what time they wan to end the party.  Now -- now,

18  it's -- it's not 11:30 because -- because our computer does

19  not -- it goes up to 11:30, but the party -- it should have

20  probably ended at 12 midnight -- because our computer doesn't

21  go up to 12 midnight -- I don't know why, but it doesn't.

22      Q      Okay.

23      A      And then it -- huh?

24      Q      I just said okay.

25      A      Okay.  And then how many are attending.  And then

21

1   that -- that -- that might not be accurate either, because once

2   they come in and they -- and I put this in, which I -- I -- I

3   have a contract -- yeah, it's -- where it says -- where I put

4   it in -- January 16, 2019 -- which I don't know why that other

5   one doesn't say that -- that I sent you -- but I've got the

6   original one here in front of me.  I found it.  And if that

7   changes, then -- then, basically, what they do is tell the --

8   the guy that's over the casino, look, I said I was having 300,

9   but I'm having 250 -- or I'm having 215, or something like

10  that.

11      And then once you go down under customer questions, are

12  you selling tickets -- and they did sell tickets to this event,

13  and it -- they sold advance tickets -- and are you having

14  alcohol, yes.  And then it says here, are you -- requires a

15  security officer, and it says, yes.  And then -- and then --

16  then they have to pay.  And if you see on the back, you see

17  that March 22nd they paid the full amount, eleven --

18      Q    I'm scrolling to the second page because I think

19  you're now talking about something on the second page.

20      A    Oh, yes.  Then you'll see where they paid the check

21  March the 22nd, 2019.

22      Q    Okay.  And what's the June 21st, 2019 entry in

23  there?  What does that mean?

24      A    That is when the -- that is after their event, they

25  are given back the deposit if they cleaned up.  That's what

                                                            22

1    that means.  They cleaned up, so I gave them back --

2         Q    But --

3         A    The deposit.

4         Q    Understood.  So -- so -- so if they clean up their

5    own events and there's no problem, they get their deposit back

6    just like any other kind of a --

7         A    Correct, correct.

8         Q    Okay.  Can you explain -- I'm gonna just ask you --

9    under the -- it says contract number R4769 and then status

10   completed up in the right hand corner.  And then it's got a

11   date of January 31st, 2022 at 12:23 p.m.

12        A    I -- I have -- I'm gonna be honest with you, I have

13   no idea.  I have the original contract here and it says date,

14   January 16th, 2019, if -- if you'd like me to send you that.

15   I have -- I --

16        Q    Yeah, can -- yeah, let's take another break so you

17   can scan that original contract and --

18        A    It'll take a few seconds, I'm sorry.

19        Q    I -- no, I appreciate it, thank you.

20        A    Okay.

21             THE VIDEOGRAPHER:  Would you like to go off the

22        record?

23             MR. CAUTHORN:  Yeah.  Let's -- We'll -- we'll just

24        meet up for about five minutes.  This is not gonna take

25        long.

                                                              23

1          THE VIDEOGRAPHER:  Excellent.  And we are off the

2     record at 9:53.

3          (Whereupon, a brief recess ensued after which

4     Mr. Randolph Frails joined the proceedings.)

5          THE VIDEOGRAPHER:  All right, and we are back on the

6     record at 9:58.

7  BY MR. CAUTHORN:  (Resuming)

8     Q    I'm gonna share my screen again.

9     A    Okay.

10    Q    And this is gonna be Exhibits E to this deposition.

11         (Whereupon, Plaintiff's Exhibit E was marked for

12    identification.)

13 BY MR. CAUTHORN:  (Resuming)

14    Q    And this is the document you just sent me here with a

15 different -- and -- and it appears to be the same document

16 except for the fact that instead of having a date of January

17 31st of 2022, it's got a date of January 16th of 2019.

18    A    Correct.

19    Q    Okay.  Do you know why the first document you

20 produced to me had a date of January 31st of 2022?

21    A    I have know earthly idea.

22    Q    Okay.  And it wasn't -- it wasn't created on January

23 31st of 2022, was it?

24    A    No, sir, it sure wasn't.  It was created on -- on

25 January's the 16th, 2019.

                                                          24

1    Q    Okay.  Well, I -- that's -- let's talk about Exhibit

2    E.  That's the one you just sent that's dated January 16th,

3    2019.  How did -- how did the -- how did the date populate --

4    how does the date populate in the -- in this contract when

5    you -- when you fill it out?

6    A    That -- that means -- that means when it was formed.

7    I -- I -- I put this in the computer on January the 16th, 2019.

8    And I have no idea why it has that two thousand --

9    Q    Okay.

10   A    -- January -- I have no idea.

11   Q    Okay.  But for some reason for this event on January

12   14th -- or June the 14th of 2019, you have two contracts with

13   the same number and one of them is dated January 16th of 2019

14   and the other one is dated January 31st of 2022?

15   A    I -- yes.

16   Q    Okay.  I'm gonna show you Exhibit A that I have right

17   here.

18        (Whereupon, Plaintiff's Exhibit A was marked for

19        identification.)

20   BY MR. CAUTHORN:  (Resuming)

21   Q    And I sent this to your attorney.  And this is why,

22   to be honest with you, I -- if I'd known that those two

23   contracts -- the one from January -- from last week and the one

24   from 2019 existed, we would've -- I would've -- I would've

25   asked you for them before.  But we had -- we sent an open

1    records request to the parks department some time ago and got

2    139 pages back, and that -- that contract wasn't in it.

3    Neither one of those contracts -- the one from January 31st,

4    2022 or January of 2019 -- neither -- are you there?  Your

5    phone --

6         A    Yeah.  I -- I don't know what I did.

7         Q    Oh, you might have accidentally hit the -- hit the --

8    the -- the -- there's a camera logo.

9         A    Yeah, but it's saying --

10        Q    Let's go off the record for technical issues.

11             THE VIDEOGRAPHER:  And we are off the record at

12        10:01.

13             (Whereupon, a brief recess ensued.)

14             THE VIDEOGRAPHER:  All right, and we're back on the

15        record at 10:03.

16   BY MR. CAUTHORN:  (Resuming)

17        Q    Okay, all right.  Do you -- I'm gonna show you --

18        A    Okay.

19        Q    -- Exhibit A.  This is what we received in -- more

20   than a year ago from the parks department as part of an open

21   records request.  Do you know who fulfills the parks

22   departments open records requests?

23        A    I was just told to get all the contracts I had --

24   from the director, my boss, of all I had in 2019 at the casino.

25        Q    Okay, so you -- so you're the one --

```
 1       A    I --

 2       Q    -- prepared --

 3       A    I -- yeah -- so I did.  I got all the ones that I

 4  had.

 5       Q    Okay.  And do you know why the -- the one -- the --

 6  the -- the one from -- that we just looked at for Exhibit D and

 7  Exhibit E, do you know why that wasn't in the production?

 8       A    I -- I -- I -- I have no idea.  I -- you know, I told

 9  them that, you know -- I mean, we didn't know what we were

10  doing it for, and I don't know why that one wasn't in there.

11  But it's -- it's been in the computer.  I -- I don't -- I don't

12  know.  See, I file them.  I -- I don't know why it wasn't in

13  there.

14       Q    Okay.  Did you -- did you pull paper files out and

15  copy them --

16       A    Yes --

17       Q    -- and scan them --

18       A    Yes, correct.

19       Q    Let me -- let me finish my question.  Just --

20       A    Okay.

21       Q    Okay.  I'm not -- I don't wanna be rude.  I'm just

22  trying to make sure that I finish my question, so that when

23  you're answer --

24       A    Yeah.

25       Q    -- is made, it's the answer that needs to go to my
```

27

1    question.  I know that we're -- that you're anticipating what

2    I'm asking, but some -- but for deposition purposes, I need --

3    need it to be pretty clear in the transcript, okay?

4         A    Uh-huh (affirmative).

5         Q    Okay.  So when you created the open records request

6    that you provided to our law firm, did you pull paper files and

7    scan them, or did you print from a computer electronically

8    stored documents from a computer?

9         A    I pulled all my paper files.  I did not go to the

10   computer.

11        Q    Okay.  So does that mean that there was not a paper

12   file related to the June 14th 25 Gents event?

13        A    There was -- there was one in the computer.  I don't

14   know why it wasn't in my file, if you did not receive it.  But

15   there was one in the computer.

16        Q    Okay.  Did you -- and when you just produced

17   Exhibit D and Exhibit E to me, how did you produce those?

18        A    You mean the one I just gave you?

19        Q    Yes, ma'am, the ones --

20        A    I -- yeah -- I went on the computer and -- I went to

21   June 14th in -- on my computer on the Julian Smith Casino

22   page -- and I went to June 14th, 2019, and it's right there.

23        Q    Okay.  And there --

24        A    And it has the --

25        Q    Okay.  And it -- so there's -- there are two separate

1  documents stored in that computer for June 14th, 2019?

2      A    No.  I just printed you the one out -- the first

3  one -- I printed it off the computer.  And then I had another

4  copy of it in a file -- when all this was going on I had

5  another copy of it because -- I don't know how that date

6  changed.  I'm -- I -- I have no idea.

7      Q    Okay.  Did -- did you print a copy of it on January

8  31st of 2022?

9      A    It's -- I have -- I -- I don't think I did.  Somebody

10 else could have, but I -- I don't think I did.

11     Q    When did you create the paper file for the June

12 14th, 2019 event?

13     A    When did I do the -- do the contract?

14     Q    No.  You just said that you had one that's on the

15 computer and one that's on paper.  And I was gonna ask -- and I

16 was asking you --

17     A    Oh, Oh.  I -- when -- when all this was going on and

18 we had to have all the -- all the things, I just -- I just -- I

19 had -- I had one in my -- in a -- in a file.

20     Q    All right.  And when you say all this was going on,

21 are you talking about this lawsuit?

22     A    It was in the paper.  They asked us about the

23 situation that was in the paper, and they wanted to know what

24 went on June 14th.  So I -- I made a copy of that -- of that

25 contract when -- when it was first in the paper.  Because when

                                                              29

1   you look in the paper and it says Julian Smith Casino, you're a

2   little concerned about what's going on at Julian Smith

3   Casino -- which it didn't have anything really to do with us,

4   because this thing -- you know, this thing happened off our

5   grounds -- so they asked us to get all the information.  So I

6   made a copy of the contract from the computer so I could have a

7   file of what was in the paper.  I have copies of what was in

8   the paper about Julian Smith Casino.

9       Q    Okay.  And who asked you about -- about what was in

10  the paper?

11      A    My boss --

12      Q    Okay.  And what was in the paper?  I don't -- I don't

13  know --

14      A    Augusta Press -- Augusta Press -- let me get -- I

15  don't even know where my file is -- Augusta Press had it in

16  there, and then a couple of days later it was in the -- this is

17  it -- this was August 2021.  It says, lawsuit claims deputy off

18  book detail rape.  And he was not off book, so that -- and then

19  I had another one that was in the Augusta -- it was from the

20  Augusta Press.  It says, Richmond County Sheriff assaulted

21  woman at Julian Smith Casino.

22      Q    Gotcha, okay.

23      A    And that was a big concern with us that it was at

24  Julian Smith Casino.  And then if you read the article, it says

25  it did not happen at Julian Smith Casino.

                                                              30

1        Q    Okay, okay.  Now, when I -- have you read the

2    complaint in this case?

3        A    Yes.

4        Q    Okay.  And I don't think we allege that the -- that

5    the rape happened at Julian Smith, did we?

6        A    No, you did not.  But it was all in the paper that it

7    happened at Julian Smith in the big -- in the big headlines, so

8    I had to look into it.

9        Q    Okay.  So did -- did you guys -- with this event on

10   June 14th of 2019, did you guys -- and I say you guys, I

11   mean -- I mean the parks and recreation department -- did y'all

12   have any communications with Deputy Charlie Walker?

13       A    I didn't.  I don't even know who he is.

14       Q    Okay, okay.  And I think I may have asked this

15   before, but I wasn't -- I'm not sure the answer was clear to

16   me.  When a sheriff's deputy provides security at an event at

17   Julian Smith Casino, does -- is -- is that sheriff's deputy

18   supposed to be -- is -- is that sheriff's deputy working, or is

19   that extra duty, like private security duty that the sheriff's

20   deputy provides on his own time?

21       A    Well, they're getting paid, so I'm just assuming it's

22   extra duty because I -- you can't get -- you can't get paid

23   twice.

24       Q    Okay.  Does the parks department communicate with the

25   sheriff's office to find out who is gonna be the -- the officer

31

1  providing security?

2     A    Yes.  They send us a name back and let us know by

3  email.

4     Q    Okay.  And do y'all have emails from June 14th

5  from -- for this event?

6     A    That -- that's something that I wouldn't receive.  It

7  would be Darrell Mayle.  He receives that.

8     Q    Can you spell that name for me?

9     A    D-A-R-R-E-L (sic) M-A-Y-L-E.  He is over the Julian

10 Smith Casino.

11    Q    So for -- and I'm gonna ask a general question, and

12 then I'm gonna ask a smaller -- a more -- more refined

13 question.  So generally, when there is -- there is security

14 provided by the sheriff's department at a parks and recreation

15 facility where there is a private event being held, the

16 communications about the -- who the officer is gonna be and all

17 that is transmitted directly to the person who's in charge of

18 that facility?

19    A    Correct.

20    Q    Okay.  So was -- specifically to Julian Smith Casino,

21 when there is an event where the sheriff's department is

22 providing security, the sheriff's department communicates

23 directly with Darrell Mayle -- Mayle?

24    A    Correct.

25    Q    Did you say correct to Darrell Mayle, or correct that

1  they communicate directly with him?

2      A    They -- correct -- they -- they communicate directly

3  with him.  It is his job to make sure that he communicates with

4  the police officers and the firemen.

5      Q    Okay, understood.  At the actual event, are there any

6  parks department people at the -- who -- who are required to

7  attend events at the -- at the facilities?

8      A    Yes.

9      Q    Okay.  And how -- how does that work?  Explain to me

10  how that -- how that works and -- and -- and what the

11  department does with regard to their personnel being at events.

12      A    Every one of our buildings that are indoor buildings

13  does have to have a staff person, or more than one staff

14  person, there during the event.  That's to make sure everybody

15  is doing what they're supposed to be doing, you know.  And if

16  there's lights or anything that needs to be done there, they

17  have to be there during the entire event, even setting up and

18  cleaning up.  This event with the 25 Gents was over 200 people,

19  so it would require two staff people to be there.

20      Q    Okay.  Do you know who was working there on June

21  14th?

22      A    I do.

23      Q    Who was working there?

24      A    Alzater Johnson and Gerald Smith.

25      Q    How do I spell Alzater?

33

1        A     A-L-Z-A-T-E-R.

2        Q     And Gerald Smith?

3        A     Gerald Smith.

4        Q     Okay.  Who is Alzater Johnson?

5        A     She works with us part time at the Julian Smith

6   Casino.

7        Q     Okay.  Who is Gerald Smith?

8        A     Gerald Smith is a full-time employee with us that

9   works at McDuffie Woods and he helps out with rentals.

10       Q     And when you say he helps out with rentals, what --

11  can you -- can you be -- can you elaborate on that?

12       A     You can -- you can assign any staff.  They don't

13  necessarily have to work at Julian Smith Casino.

14       Q     You just have to fill in with coverage?

15       A     Correct.

16       Q     Okay, I understand.  So when there's an event that's

17  big and you have two people, you gotta find two people to -- to

18  work at it?

19       A     Correct.

20       Q     Okay, all right.  So Alzater Johnson and Gerald Smith

21  were at Julian Smith Casino working for the parks department on

22  June 14th, 2019?

23       A     Correct.

24       Q     Okay.  Is it -- do you know if anybody that works in

25  the parks department is a member of 25 Gents?

                                                              34

1      A    Of my knowledge, no.

2      Q    Okay.  Do you know if anybody that works at the parks

3  department goes to the 25 Gents events as a -- as a guest, not

4  working, but as a participant in the festivities?

5      A    I -- I have no idea, but as far as I know, no.  But

6  I -- I do not know.

7      Q    Okay.  What is Darrell Mayle's email?

8      A    JMayle@augustaga.gov

9      Q    Okay.  And that's M -- J-M-A-Y-L-E?

10     A    Correct.

11     Q    Okay.  What is your email -- your work email?

12     A    CKuhlke@augustaga.gov

13     Q    Okay.  When did -- when did the parks department

14  first find out about the -- the allegations made by Ms. Colon?

15     A    When it was in -- I -- I found out when it was in the

16  Augusta Press, and it said rape -- I'm not sure, but it -- it

17  listed Julian Smith Casino.  And that's when we -- that's when

18  they wanted to know who -- who was that date and everything.

19  That's -- that's how I got that contract.

20     Q    Okay.  Were you ever made aware of a -- of a -- of

21  a -- of a letter sent to the county commissioners and the

22  sheriff and the -- and the mayor back in 2020 -- in April

23  of 2020?

24     A    No, sir.

25     Q    Have there ever been any other allegations of any

                                                              35

1   kind of improper behavior or injury of a guest at a Julian

2   Smith Casino event?

3       A    Not of my knowledge.

4       Q    Are the -- are the people who rent the facilities

5   required to purchase any kind of insurance for the event?

6       A    No, sir.

7       Q    Okay.

8       A    I mean, it all depends on what kind of event, which

9   we -- they can't have over a certain amount of -- of people at

10  the casino because it only holds 350.

11      Q    So 350 is the maximum number of -- of --

12      A    Well, you can have -- you can have up to 400, but we

13  say 350.

14      Q    Okay.  But what I mean is the -- is the -- the county

15  doesn't require any kind of certificate of insurance for

16  hosting any -- any events at Julian Smith Casino?

17      A    If you are selling tickets and you are having a huge

18  event, at the door you would have to have insurance.  But we

19  don't have very many of them because you have to have four

20  police officers, two firemen, and four staff members --

21      Q    How many --

22      A    -- contract.

23      Q    How many -- how many -- how many law enforcement

24  officers -- police or sheriff -- were working at the June

25  14th event?

                                                           36

1      A    One.

2      Q    Okay.  And how do you decide how many are supposed to

3  work a particular event?

4      A    You would have to have -- you would have to have --

5  it's -- it's over 300, you would have to have two police

6  officers.

7      Q    Okay, so if it's under 300, it's one?  And if it's

8  over 200, its two?

9      A    Correct.

10     Q    And if you're --

11     A    Over 300.

12     Q    Okay, over 300 its two, right?

13     A    Yes.

14     Q    And if you're selling tickets at the door, it's four?

15     A    Correct.  And it all depends on what kind of event it

16  is really.  That's when the director decides, if you're selling

17  tickets at the door.  Because if it's a bridal show and you're

18  selling tickets at the door, you don't need four police

19  officers.  So it's basically up to the director.  He has to --

20  he has to tell you exactly how many people you would have to

21  have.

22     Q    And you mean -- are you referring to the director of

23  the parks and recreation department?

24     A    Correct, uh-huh (affirmative).

25     Q    What's that person's name?

1      A     Maurice McDowell.

2      Q     Who was the director in -- on June 14th of 2019?

3      A     Oh, what's his name -- I'm sorry, I'm -- I'm going

4  blank -- I'm going blank -- you're gonna have to give me -- I

5  can't remember his name.  Can I call somebody?

6      Q     Phone a friend?  No, that's --

7      A     I -- can I phone a friend?

8      Q     No, that's okay.  That's okay.  That's a piece of

9  information I can get somewhere else.  If you knew it, I was

10  gonna --

11     A     We've had -- we've has so many, so.

12     Q     How long has the current director been in their

13  position?

14     A     About two years.

15     Q     Okay.  So -- so the director in June of 2019 was the

16  immediate predecessor of the current director?

17     A     Correct, correct.

18     Q     Do you know why the director left the parks

19  department?

20     A     I have -- no, sir.

21     Q     Okay.  Any rumors about why the director left?

22     A     No, sir.  No, sir.

23     Q     Okay.  I'm gonna share my screen again.  Let's see.

24  This has been labeled Exhibit C for this deposition.

25            (Whereupon, Plaintiff's Exhibit C was marked for

                                                              38

1     identification.)

2  BY MR. CAUTHORN:   (Resuming)

3     Q    This is a -- Title 6 of the Augusta-Richmond County

4  Code of Ordinances, and I wanted to just kind of -- just point

5  out a couple of things and see if that is consistent with the

6  park's policies.  And I believe they are, because what you

7  described to me in general terms earlier appear to be what is

8  included in these regulations.  Are you there?

9     A    Yes, God, darn it.

10     Q    Okay.  All right, first I wanna -- these are Bates

11  numbered.  Richmond Code Title 60001, do you see that on the

12  bottom right of that first page?

13     A    Yes -- 001 -- I see that, yes.

14     Q    We're gonna go to page 43, and this is Section

15  6-2-77.  Do you see that on there?

16     A    Wait a minute.

17     Q    Uh-huh (affirmative).

18     A    Wait -- I'm sorry, I'm making it bigger --

19  information provided -- no -- which number is it -- four,

20  five --

21     Q    6-2-77.  Do you see that?

22     A    Hold on a second.

23     Q    Uh-huh (affirmative).

24     A    It's not -- I can't see it -- I --

25     Q    Are you on your phone?

1          A     I'm on my phone.

2          Q     All right.  Well, I will -- what I'll do is I'll just

3     represent to you that this reads to me like what you were

4     talking about as the application for an occasional, single

5     event license for on-premises consumption of alcoholic

6     beverages.

7          A     Uh-huh (affirmative).

8          Q     And it says that a nonprofit may apply for a license

9     whether or not they possess a -- an alcohol license.  And

10    that's -- that's what you were talking about before, that a

11    nonprofit --

12         A     That's what --

13         Q     -- a license?

14         A     Uh-huh (affirmative), correct.

15         Q     Right?

16         A     Right.

17         Q     Okay.

18         A     You have to be nonprofit, yes.

19         Q     Okay.  And then I'm gonna go to page 21 real quick.

20    Do you see right here where it says Section 6-2-4 -- sorry,

21    Section 6-2-5?

22         A     Yes.  I see it in -- in general, okay.

23         Q     Okay.  And this is about -- this is a part of the

24    code of ordinances.

25         A     Okay.

                                                              40

1      Q    Are you familiar with this part of the code of

2  ordinances where it's -- it's the -- the -- the consumption of

3  alcohol at public parks and public areas?

4      A    No -- to sell or offer to sell -- are you talking

5  about number B?

6      Q    No.  I'm talking about Section 6-2-5, sorry.

7      A    Oh, okay.

8      Q    Do you see that section?

9      A    Uh-huh (affirmative).

10      Q    Okay.

11      A    That means outdoor, correct?

12      Q    I -- well, I read it as all -- as public space.  It

13  says, it shall be unlawful for any one -- any person to serve

14  or consume alcohol or offer for the purpose of consumption to

15  anyone else or to be in possession of beer, wine, or any type

16  of intoxicating liquor or beverage, in and on any public park,

17  playground, or public building thereon, or other public area

18  owned or operated by Augusta, at any time whatsoever, with the

19  exception of -- and the first one there listed is Julian Smith

20  Casino.  Do you see that?

21      A    Where -- where are you?  Okay, I --

22      Q    I'm at the top right.  Do you see that?

23      A    I don't -- okay, yeah -- okay --

24      Q    Okay.

25      A    Yes, I see.

                                                              41

1      Q    And is that consistent with what you understand the

2    park policies to -- the parks and recreation policies to be,

3    that -- that --

4      A    Correct.

5      Q    Okay, okay.  And then if you look at subsection (B)

6    down here it says that, prior written approval must be obtained

7    from the Sheriff of Richmond County, Georgia, and the Director

8    of the Recreation Department, when alcoholic beverages are

9    served or consumed at Julian Smith Casino.  Do you see that?

10     A    Uh-huh (affirmative).

11     Q    Okay.  And that seems consistent with the park

12   policy -- or with the parks and rec policy that you were just

13   describing to me; is that -- is that right?  Is that the park

14   policy that y'all have to get approval from the sheriff and

15   from the director of the recreation department before there can

16   be alcoholic beverages consumed or served at Julian Smith

17   Casino?

18     A    Correct.

19     Q    Okay.  Now I'm gonna show you page 105 here.  Okay,

20   and this is about -- this is Chapter 8 -- this is Attendance of

21   Deputies and Firefighters, Section 6-8-1 --

22     A    Uh-huh (affirmative).

23     Q    -- and it's when they're required.  And it says, the

24   manager of, or any person giving, any public amusement show,

25   exhibition or performance, any public ball, any dances either

42

1  public or private, or any gathering at public facilities when

2  alcohol is being served, or any occasion where the chief of the

3  fire department and/or sheriff determine in their sole

4  discretion that due to the nature of the function and/or

5  facility, attendance of sheriff's deputies and/or firefighters

6  is necessary, shall have in attendance such number of deputies

7  and/or firefighters as shall be assigned by the chiefs of the

8  respective departments.

9       I read that to say that if you're having a dance where

10  there's alcohol, you are required to provide firefighters and

11  deputies as -- as designated by the -- by the sheriff's

12  department and the fire department.  Is that consistent with

13  what you understand parks and recreational policy to be?

14       A    Yes.

15       Q    Okay.  And it says that the person -- the manager or

16  other person mentioned in the preceding section shall apply to

17  the sheriff's department and the fire department to learn

18  whether or not the attendance of deputies and/or firefighters

19  is required.

20       Now, you said they -- they -- that -- that you talk to the

21  fire department.  Do you talk to the fire department and the

22  sheriff's office -- or the police on their behalf, or do they

23  talk directly to the sheriff's office and the fire department

24  on their own behalf as a part of the application process?

25       A    They don't call, but we do.  We -- we -- we get it

                                                                      43

1   assigned.

2        Q    Okay.  And then you find out about the assignment of

3   the police and then you let the person planning the event know?

4        A    Correct.

5        Q    Okay.  This says -- on Section 6-8-3 it says

6   generally that the -- that the person who's hosting the event

7   is responsible for paying the sheriff's deputy and the -- and

8   the firefighter.  Do they -- do they pay the -- the sheriff's

9   deputy through the parks department, or do they pay them

10  directly?

11       A    They pay them directly.  They pay them cash the day

12  of.

13       Q    Okay.  So literally when a -- when a sheriff's deputy

14  provides security at an event at Julian Smith Casino, at the

15  end of the event whoever is in charge of the event gives them a

16  check or -- or cash?

17       A    No.  They get cash.  And they get it before the event

18  is over.

19       Q    Okay, okay.  And they get it right there, like at the

20  event at the facility?

21       A    Right, correct.

22       Q    Okay.  Do you know who would have paid Charlie Walker

23  on June 14th of 2019?

24       A    I -- I have no idea.

25       Q    Okay.  And do you know if Charlie Walker was there

                                                              44

1    providing security on June 14th of 2019 at the 25 Gents

2    event?

3         A    I was told he was, but I wasn't there.

4         Q    I understand.  And that would be -- Darrell Mayle

5    would have been the one who -- who -- who got that -- received

6    that information, correct?

7         A    Correct.

8         Q    Okay.  So somewhere Darrell Mayle would have an email

9    from the sheriff's department saying that Charlie Walker is

10   gonna be assigned security at the June 14th, 2019 event at

11   Julian Smith Casino?

12        A    He should have -- he -- he should have had an email,

13   or he could have talked to him.  I don't know.  You'd have to

14   ask him.

15        Q    Understood.

16        A    But you're supposed to get an email, yes.

17        Q    Understood.  You don't -- you don't get in the weeds

18   at that level?

19        A    I mean, I -- I do if I have to because I'm his

20   supervisor.  But he -- he does a good job and I let him do

21   that.

22        Q    Understood.  So this is gonna be Exhibit C to the --

23   to the deposition, this 105 pages that is -- that is Title 6 of

24   the Richmond County Code.  We're gonna have an Exhibit A, C, D,

25   and E.  I don't believe we're gonna have an Exhibit B.

                                                            45

1     So I'm gonna show you page 44 of this same Title --

2  Title 6.  And this is -- this is from Section 62-77 (sic) --

3  6-277 (sic) and it's the -- and -- and I wanna show you

4  subparagraph (9).  And a. under a subparagraph (9) -- can you

5  see what I'm looking at?  And I'll read it and see if -- see if

6  that's consistent with y'all's policy.

7     A    I see that, yeah.  I see that nine,

8  uh-huh (affirmative).

9     Q    It says, the Director of License and Inspection shall

10  forward the application to the Recreation Department Director,

11  if applicable, then forward to the Richmond County Sheriff, who

12  shall indicate his approval or disapproval of the application.

13     And with the application, they're talking about the

14  application for the alcohol permit.

15     A    Okay.

16     Q    Is that consistent with your understanding of how

17  that works?

18     A    Well, I know that we received it before the event,

19  yes.

20     Q    Okay.  And --

21     A    And that would be -- who received it, if they need

22  one.

23     Q    And -- and the approval comes through the director of

24  license and inspection and the sheriff's department, not

25  through the parks department, right?

1     A    Correct.

2     Q    Okay.

3     A    If -- if they -- permit.

4     Q    That's -- I --

5     A    I --

6     Q    Correct.  Yeah, I -- I'm not --

7     A    -- need it, yes.

8     Q    Yeah.  And -- and it's the parks department position
that the 25 Gents did not need a permit because they were
having a bring your own alcohol event?

11     A    Correct.

12     Q    Okay, okay.  And that's the parks department
understanding for decades, that the 25 Gents events has been a
bring your own alcohol event?

15     A    Correct.

16     Q    Okay.  So they never -- so y'all didn't -- so y'all
didn't ask for any kind of permit, and no permit was applied
for, and no permit was given; is that right?

19     A    Correct.

20     Q    Okay.  What is the significance of the -- the
permitting process?  And -- and -- and let me explain to you
what I mean.  So you've got a bring your own beer event versus
a -- versus a provided alcohol event.

24     A    Uh-huh (affirmative).

25     Q    Why does the parks department distinguish between a

47

1   bring your own beer event versus a provide alcohol event?

2        A    If you're providing alcohol and there's -- there is

3   money on the premises and they are selling it, that goes to a

4   whole 'nother level.  You will have to have a permit.  If you

5   bring your own and they have it, you know, right there at the

6   table and everything else, then -- and you're not exchanging

7   money, it's totally different.  Now, that's what is -- was

8   explained to us from the license and inspection department.

9        Q    Okay.  Are there any security requirements that are

10  different if you are providing alcohol versus if you are

11  bringing your own?

12       A    No.

13       Q    Okay.  So if you have fewer than 300 people and

14  you're providing alcohol, you're still only going to have one

15  sheriff's deputy working security?

16       A    Correct.

17       Q    Okay.  Let me look at my notes real quick and -- and

18  we'll take ten.  And then I'll have a few more question, but

19  we're approaching the end of -- the end of my questioning.  So

20  just give me a few minutes, Ms. Kuhlke, and -- and I'll come

21  back and we'll finish this thing up, okay?

22       A    Okay, thank you.

23            THE VIDEOGRAPHER:  We are off the record at 10:37.

24            (Whereupon, a brief recess ensued.)

25            THE VIDEOGRAPHER:  We are back on the record at

48

1        10:41.

2              THE WITNESS:   Okay.

3     BY MR. CAUTHORN:   (Resuming)

4        Q    I've got follow-up -- a couple of follow-up questions

5     just to clarify some things.   When -- when you -- you've used

6     the phrase bring your own alcohol a couple of times in this

7     deposition.   And you have said that when you bring your own

8     alcohol, you don't have to apply for a permit or license for

9     alcohol.   That's -- that's my understanding.   Is that -- is

10    that a fair statement of what -- of what you have -- you said?

11       A    Correct.

12       Q    Okay.   So when you say bring your own alcohol, who

13    are you referring to bringing their own alcohol?   Are you

14    referring to the host of the event, or are you referring to the

15    individual guests of the event?

16       A    Individual guest.

17       Q    Okay.   Do you understand why I'm trying to

18    distinguish that?

19       A    Correct.

20       Q    Okay.

21       A    Uh-huh (affirmative).

22       Q    So if I'm hosting a -- if I am hosting a party like

23    the one on June 14th and I've got an open bar --

24       A    That's --

25       Q    -- I'm not selling alcohol -- just a minute -- I'm

                                                              49

1  not selling alcohol --

2      A    Right.

3      Q   -- but I am providing alcohol.  Would I be required

4  to get a permit?

5      A   If you are providing alcohol and you do not charge

6  for that alcohol, you would not need a permit.  But if you are

7  charging and you're charging -- even in -- let's say a

8  ticket -- you would have to have alcohol -- I mean, an alcohol

9  license because you are selling that alcohol.  And that person

10  that's giving the party is providing it, and it is provided on

11  that ticket.

12      Q   Okay, thank you.  I think that's -- I think that's

13  all the questions I have for you, Ms. Kuhlke, subject to any

14  kind of follow ups if -- if Ms. Haynes or Mr. Frails have any

15  questions.

16      A    Okay.

17                  DIRECT EXAMINATION

18  BY MS. HAYNES:

19      Q   I just have one question, Ms. Kuhlke, I just want to

20  clarify.  You've been using like the word police and police

21  department.  When you say that, are you referring to the

22  Richmond County Sheriff's Office?

23      A    Correct, correct, yes.

24      Q    Okay, thank you.

25           MR. CAUTHORN:  Thanks for clearing that up because I

1      actually was -- I trying to figure out if she meant both

2      of them or the sheriff.  Because the ordinance says

3      sheriff, not police, and I -- and there is a difference,

4      so thanks.

5           MS. HAYNES:  Yeah.  We don't have police.

6           MR. CAUTHORN:  I -- I -- I -- I didn't -- I was

7      wondering.

8           THE WITNESS:  It's the same.

9           MR. CAUTHORN:  No, I mean, I understand for purposes

10     of someone who lives in Augusta-Richmond County, that's

11     basically the same thing.  Because when the sheriff

12     provides the police protection, that -- the -- in your --

13     in the -- in an individual's mind, there's not much of a

14     difference.  But for purposes of this lawsuit, there is

15     a -- there is a difference.

16          THE WITNESS:  Okay.

17          MR. CAUTHORN:  Okay.  So thank you for clarifying.

18     And I hope that you have a good weekend and thank you for

19     your time.

20          THE WITNESS:  Okay, thank you.

21          MR. CAUTHORN:  We are -- do y'all -- Ms. Haynes, are

22     y'all gonna read and sign?

23          MS. HAYNES:  No.  And I will call Ms. Johnson and see

24     if she can come early.

25          THE WITNESS:  I don't know how to turn this off.

                                                              51

1          MR. CAUTHORN:  Okay.  Let me -- I'm gonna email you

2     my cell phone --

3          THE COURT REPORTER:  Ms. Kuhlke --

4          MR. CAUTHORN:  -- because I'm -- I'm gonna step away

5     from my desk for about 15 minutes or so.  So I'm gonna

6     email you my cell phone, and you can call me or text me --

7     or whatever you wanna do -- and let me know if she's gonna

8     be ready by -- say like 11:30 or 11:15 or 11:00.

9          MS. HAYNES:  Okay.

10          MR. CAUTHORN:  Okay?

11          MS. HAYNES:  All right.

12          MR. CAUTHORN:  All right, thank you.

13          MS. HAYNES:  Uh-huh (affirmative).

14          THE VIDEOGRAPHER:  We are off the record at 10:45.

15          (Whereupon, the deposition concluded at 10:45 a.m.)

16

17

18

19

20

21

22

23

24

25

                                                              52

1                    C E R T I F I C A T E

2

3   STATE OF GEORGIA       )

4   COUNTY OF FULTON       )

5

6           I, JENNIFER A. GERBER, Certified Court Reporter in and
    for the State of Georgia, do hereby certify that the foregoing
7   proceedings were taken down by me; that the foregoing
    proceedings were reduced to print by me; that the foregoing
8   pages represent a true, correct, and complete transcript of the
    testimony given by the witness, who was first duly sworn by me;
9   that I am not a relative, employee, attorney or counsel of any
    of the parties; that I am not a relative or employee of
10  attorney or counsel for any of said parties; nor am I
    financially or otherwise interested in the outcome of the
11  action.

12          This certification is expressly withdrawn and denied
    upon the disassembly, photocopying, reproduction of electronic
13  copies, and/or distribution of the foregoing transcript, or any
    part thereof, including exhibits, unless said disassembly,
14  photocopying, reproduction, and/or distribution is done by me
    and my signature and original seal is attached thereto.

15
            I further certify that the original of said deposition
16  shall be filed under seal with J. Wickliffe Cauthorn, Attorney
    at Law; The Cauthorn Firm, 201 Cherokee Street, Marietta,
17  Georgia.

18          This, the 14th day of February, 2022.

19

20

21          JENNIFER A. GERBER

22          CERTIFIED COURT REPORTER # 6241-2465-4151-2704

23

24

25
                                                              53

1                    COURT REPORTER DISCLOSURE STATEMENT

2

3    STATE OF GEORGIA        )

4    COUNTY OF FULTON        )

5

6         I, JENNIFER A. GERBER, Certified Court Reporter,
     pursuant to Article 10.B of the Rules and Regulations of the
7    Board of Court Reporting of the Judicial Council of Georgia, I
     make the following disclosure:

8
     1.    I am not disqualified for a relationship of interest
9    under the provisions of O.C.G.A. Sec. 9-11-28(c).

10   2.    I am a Georgia Certified Court Reporter

11   3.    I am an independent contractor of Kellie K. Rodman, LLC,
     d/b/a Rodman Reporting.

12
     4.    Rodman Reporting was contacted by the office of the
13   deposing counsel to provide court reporting services for this
     deposition.

14
     5.    I will not be taking this deposition under any contract
15   prohibited by Georgia law, O.C.G.A. 15-14-37(a).  I will charge
     usual and customary rates to all parties in the case.

16

17

18

19                    JENNIFER A. GERBER

20                    CERTIFIED COURT REPORTER # 6241-2465-4151-2704

21

22

23

24

25
                                                              54

**$**

**$20 (1)**
13:21

**A**

**accidentally (1)**
26:7
**accurate (2)**
21:2;22:1
**ACTIVE (1)**
21:10
**actual (2)**
10:11;33:5
**actually (2)**
10:16;51:1
**advance (2)**
9:16;22:13
**affirmative (18)**
5:25;6:2;17:23;
18:9,18;28:4;37:24;
39:17,23;40:7,14;
41:9;42:10,22;46:8;
47:24;49:21;52:13
**again (3)**
4:9;24:8;38:23
**agent's (1)**
21:13
**ago (2)**
26:1,20
**agree (1)**
4:21
**agreement (1)**
5:2
**ahead (2)**
14:10;19:21
**alcohol (48)**
7:17,18,20;8:3,6;
9:17;11:1,7;12:13,14,
16;13:15,17;14:8,9,
13,15;16:16,22;17:12,
13;22:14;40:9;41:3,
14;43:2,10;46:14;
47:10,14,23;48:1,2,
10,14;49:6,8,9,12,13,
25;50:1,3,5,6,8,8,9
**alcoholic (3)**
40:5;42:8,16
**allegations (2)**
35:14,25
**allege (1)**
31:4
**allows (1)**
11:1
**almost (1)**
19:1
**along (1)**
9:1
**Alzater (4)**
33:24,25;34:4,20
**A-L-Z-A-T-E-R (1)**

34:1
**amount (2)**
22:17;36:9
**amusement (1)**
42:24
**and/or (5)**
43:3,4,5,7,18
**anticipating (1)**
28:1
**appear (1)**
39:7
**appearing (1)**
4:21
**appears (1)**
24:15
**applicable (1)**
46:11
**application (7)**
16:11;40:4;43:24;
46:10,12,13,14
**applied (1)**
47:17
**apply (3)**
40:8;43:16;49:8
**appreciate (1)**
23:19
**approach (1)**
7:8
**approaching (1)**
48:19
**approval (6)**
9:13;14:8;42:6,14;
46:12,23
**April (1)**
35:22
**area (1)**
41:17
**areas (1)**
41:3
**article (1)**
30:24
**assaulted (1)**
30:20
**assign (2)**
14:16;34:12
**assigned (3)**
43:7;44:1;45:10
**assignment (1)**
44:2
**assuming (1)**
31:21
**attend (1)**
33:7
**Attendance (4)**
42:20;43:5,6,18
**attending (1)**
21:25
**attorney (1)**
25:21
**audible (1)**
20:9
**August (1)**
30:17

**Augusta (12)**
4:18;5:14;6:7;
14:24;18:4;30:14,14,
15,19,20;35:16;41:18
**Augusta-Richmond (3)**
21:3;39:3;51:10
**authorized (1)**
6:10
**aware (1)**
35:20
**away (6)**
7:18,22;8:1;9:20,
24;52:4

**B**

**back (15)**
8:14;17:7;19:23;
20:2;22:16,25;23:1,5;
24:5;26:2,14;32:2;
35:22;48:21,25
**ball (1)**
42:25
**bar (6)**
9:25;11:15;12:7,7,
20;49:23
**barbeque (1)**
13:22
**bars (1)**
13:11
**Basically (7)**
7:12;10:7,7,9;22:7;
37:19;51:11
**Bates (1)**
39:10
**beer (6)**
7:7;13:22,23;41:15;
47:22;48:1
**behalf (1)**
43:22,24
**behavior (1)**
36:1
**beverage (1)**
41:16
**beverages (3)**
40:6;42:8,16
**big (4)**
30:23;31:7,7;34:17
**bigger (2)**
11:18;39:18
**bit (2)**
15:17,17
**blank (2)**
38:4,4
**book (2)**
30:18,18
**boss (2)**
26:24;30:11
**both (1)**
51:1
**bottom (1)**
39:12
**bought (1)**

10:11
**break (2)**
18:21;23:16
**bridal (1)**
37:17
**brief (4)**
20:1;24:3;26:13;
48:24
**bring (13)**
14:2,3,4;16:19;
17:12;47:10,14,22;
48:1,5;49:6,7,12
**bringing (5)**
9:20;14:7,12;48:11;
49:13
**broke (1)**
9:5
**building (3)**
11:17;17:11;41:17
**buildings (2)**
33:12,12
**BYOB (3)**
14:3;16:18,21

**C**

**call (4)**
38:5;43:25;51:23;
52:6
**called (2)**
5:5;21:10
**camera (1)**
26:8
**can (37)**
4:11;5:9;6:25;8:8;
9:18,19;10:5;11:2,25;
13:6;18:13,13,20,21;
19:6,8,8;20:20;21:6;
23:8,16,17;32:8;
34:11,11,11,12,12;
36:12,12;38:5,7,9;
42:15;46:4;51:24;
52:6
**case (4)**
4:11;6:4;10:13;
31:2
**cash (6)**
9:25;12:7;13:11;
44:11,16,17
**Casino (34)**
6:19;7:1,6;11:11;
14:24,24;17:25;18:6;
19:4;20:13;22:8;
26:24;28:21;30:1,3,8,
21,24,25;31:17;32:10,
20;34:6,13,21;35:17;
36:2,10,16;41:20;
42:9,17;44:14;45:11
**caterer (4)**
12:17,18,19,20
**CAUTHORN (25)**
4:13,13,23;5:8;
10:16;19:18,20,22;

20:4;23:23;24:7,13;
25:20;26:16;39:2;
49:3;50:25;51:6,9,17,
21;52:1,4,10,12
**cell (2)**
52:2,6
**certain (1)**
36:9
**certificate (1)**
36:15
**change (1)**
7:14
**changed (2)**
7:2;29:6
**changes (1)**
22:7
**Chapter (1)**
42:20
**charge (3)**
32:17;44:15;50:5
**charging (1)**
50:7,7
**Charlie (4)**
31:12;44:22,25;
45:9
**check (2)**
22:20;44:16
**chief (1)**
43:2
**chiefs (1)**
43:7
**Chrislynne (4)**
4:6,17;5:4,11
**C-H-R-I-S-L-Y-N-N-E (1)**
5:11
**City (1)**
4:18
**CKuhlke@augustagagov (1)**
35:12
**claims (1)**
30:17
**clarify (2)**
49:5;50:20
**clarifying (1)**
51:17
**clean (1)**
23:4
**cleaned (2)**
22:25;23:1
**cleaning (1)**
33:18
**clear (2)**
28:3;31:15
**clearing (1)**
50:25
**clock (1)**
8:9
**close (1)**
15:18
**club (3)**
15:10,11,12
**Code (5)**
39:4,11;40:24;41:1;

45:24
**Colon (4)**
4:6,11,14;35:14
**coming (1)**
7:21
**commissioners (1)**
35:21
**communicate (3)**
31:24;33:1,2
**communicates (2)**
32:22;33:3
**communications (2)**
31:12;32:16
**complaint (1)**
31:2
**completed (1)**
23:10
**complied (1)**
4:3
**computer (17)**
18:16;20:8;21:18,
20;25:7;27:11;28:7,8,
10,13,15,20,21;29:1,
3,15;30:6
**concern (1)**
30:23
**concerned (1)**
30:2
**concluded (1)**
52:15
**consider (1)**
7:14
**consistent (6)**
39:5;42:1,11;43:12;
46:6,16
**consume (1)**
41:14
**consumed (2)**
42:9,16
**consumption (3)**
40:5;41:2,14
**contact (1)**
8:11
**contacting (1)**
9:11
**contacts (3)**
8:16;9:6;15:14
**contract (18)**
7:13;8:12;14:19;
18:2,13,22;21:3;22:3;
23:9,13,17;25:4;26:2;
29:13,25;30:6;35:19;
36:22
**contracts (4)**
25:12,23;26:3,23
**coordinator (1)**
5:18
**copies (1)**
30:7
**copy (9)**
8:12;20:7;21:2;
27:15;29:4,5,7,24;
30:6

**corner (1)**
23:10
**counsel (4)**
5:2;6:3,9;20:7
**count (1)**
13:15
**county (13)**
7:7,9;10:25;21:4;
30:20;35:21;36:14;
39:3;42:7;45:24;
46:11;50:22;51:10
**couple (4)**
30:16;39:5;49:4,6
**coupons (1)**
13:23
**court (8)**
4:3,9,19,20,25;5:1;
10:18;52:3
**coverage (1)**
34:14
**covered (1)**
6:5
**create (1)**
29:11
**created (4)**
21:8;24:22,24;28:5
**CROSS-EXAMINATION (1)**
5:7
**current (2)**
38:12,16
**customer (1)**
22:11

**D**

**dance (1)**
43:9
**dances (1)**
42:25
**darn (1)**
39:9
**D-A-R-R-E-L (1)**
32:9
**Darrell (6)**
32:7,23,25;35:7;
45:4,8
**date (12)**
4:7,9;21:15;23:11,
13;24:16,17,20;25:3,
4;29:5;35:18
**dated (3)**
25:2,13,14
**daughter (2)**
12:5,6
**day (20)**
7:19;9:17;10:4,5,6,
10,11,12;11:6,8,14,
16,24;12:1,21;13:4;
16:4,5;18:11;44:11
**days (1)**
30:16
**decades (1)**
47:13

**decide (1)**
37:2
**decides (1)**
37:16
**Defendant (1)**
4:16
**defense (3)**
6:3,9;20:6
**Department (50)**
5:15,17;6:11,21;
7:10,24,25;8:11,17,
21,22,25;10:8,13;
16:11;26:1,20;31:11,
24;32:14,21,22;33:6,
11;34:21,25;35:3,13;
37:23;38:19;42:8,15;
43:3,12,12,17,17,21,
21,23;44:9;45:9;
46:10,24,25;47:8,12,
25;48:8;50:21
**departments (3)**
6:22;26:22;43:8
**department's (1)**
20:8
**depends (2)**
36:8;37:15
**deposed (1)**
5:6
**deposit (3)**
22:25;23:3,5
**deposition (8)**
4:5;6:6;24:10;28:2;
38:24;45:23;49:7;
52:15
**depositions (1)**
6:5
**Deputies (5)**
42:21;43:5,6,11,18
**deputy (10)**
30:17;31:12,16,17,
18,20;44:7,9,13;48:15
**described (1)**
39:7
**describing (1)**
42:13
**designated (2)**
6:8;43:11
**desk (1)**
52:5
**detail (1)**
30:18
**determine (1)**
43:3
**difference (3)**
51:3,14,15
**different (4)**
7:3;24:15;48:7,10
**direct (2)**
7:23;50:17
**directly (7)**
32:17,23;33:1,2;
43:23;44:10,11
**director (15)**

26:24;37:16,19,22;
38:2,12,15,16,18,21;
42:7,15;46:9,10,23
**disapproval (1)**
46:12
**discretion (1)**
43:4
**discussed (1)**
6:4
**distinguish (2)**
47:25;49:18
**document (5)**
20:7,12;24:14,15,
19
**documents (9)**
17:21;18:3,5;19:2,
5,9,24;28:8;29:1
**done (2)**
7:10;33:16
**door (4)**
36:18;37:14,17,18
**down (4)**
21:15,16;22:11;
42:6
**drinks (1)**
13:14
**due (1)**
43:4
**duly (1)**
5:5
**during (3)**
6:5;33:14,17
**duty (5)**
8:8,8;31:19,19,22

**E**

**earlier (1)**
39:7
**early (1)**
51:24
**earthly (1)**
24:21
**either (3)**
7:23;22:1;42:25
**elaborate (1)**
34:11
**electronically (1)**
28:7
**eleven (1)**
22:17
**else (4)**
29:10;38:9;41:15;
48:6
**email (13)**
8:14;18:21;19:6,6;
32:3;35:7,11,11;45:8,
12,16;52:1,6
**emails (1)**
32:4
**employed (2)**
5:13,14
**employee (1)**

34:8
**end (4)**
21:17;44:15;48:19,
19
**ended (1)**
21:20
**enforcement (1)**
36:23
**ensued (4)**
20:1;24:3;26:13;
48:24
**entire (1)**
33:17
**entity (1)**
6:6
**entry (1)**
22:22
**environment (1)**
6:1
**even (5)**
11:6;30:15;31:13;
33:17;50:7
**event (68)**
6:18;7:1,5;8:13,16;
10:11;11:6,10;12:19;
13:8,13,18,24;14:15;
16:1,2,4;17:1,4,15,25;
18:6,8,10;19:3;20:13;
21:4;22:12,24;25:11;
28:12;29:12;31:9,16;
32:5,15,21;33:5,14,
17,18;34:16;36:2,5,8,
18,25;37:3,15;40:5;
44:3,6,14,15,15,17,
20;45:2,10;46:18;
47:10,14,22,23;48:1,
1;49:14,15
**events (12)**
6:12,12,17;9:1;
14:25;17:21;23:5;
33:7,11;35:3;36:16;
47:13
**Everybody (2)**
16:14;33:14
**everyone (1)**
4:12
**exactly (1)**
37:20
**EXAMINATION (1)**
50:17
**Excellent (1)**
24:1
**except (2)**
11:15;24:16
**exception (1)**
41:19
**exchanged (1)**
10:10
**exchanging (1)**
48:6
**Exhibit (15)**
20:15;24:11;25:1,
16,18;26:19;27:6,7;

28:17,17;38:24,25;
45:22,24,25
**exhibition (1)**
42:25
**Exhibits (1)**
24:10
**existed (1)**
25:24
**explain (5)**
10:5;14:10;23:8;
33:9;47:21
**explained (1)**
48:8
**extra (2)**
31:19,22

**F**

**facilities (5)**
5:18;6:12;33:7;
36:4;43:1
**facility (5)**
15:24;32:15,18;
43:5;44:20
**fact (1)**
24:16
**fair (1)**
49:10
**familiar (1)**
41:1
**fantastic (1)**
5:21
**far (3)**
9:12,23;35:5
**Father's (2)**
16:4,5
**February (2)**
4:7,10
**festivities (1)**
35:4
**few (4)**
19:8;23:18;48:18,
20
**fewer (1)**
48:13
**figure (1)**
51:1
**file (11)**
13:8,9;18:3;27:12;
28:12,14;29:4,11,19;
30:7,15
**files (4)**
20:8;27:14;28:6,9
**fill (2)**
25:5;34:14
**find (5)**
19:5;31:25;34:17;
35:14;44:2
**finish (3)**
27:19,22;48:21
**fire (6)**
43:3,12,17,21,21,23
**firefighter (1)**

**44:8**
**Firefighters (5)**
42:21;43:5,7,10,18
**firemen (5)**
9:1,1,6;33:4;36:20
**firm (1)**
28:6
**first (12)**
5:5;7:2,17;21:7,9;
24:19;29:2,25;35:14;
39:10,12;41:19
**five (3)**
18:20;23:24;39:20
**follow (1)**
50:14
**follows (1)**
5:6
**follow-up (2)**
49:4,4
**food (1)**
17:10
**formed (1)**
25:6
**forward (2)**
46:10,11
**found (2)**
22:6;35:15
**four (5)**
36:19,20;37:14,18;
39:19
**Frails (3)**
4:15;24:4;50:14
**fraternity-type (1)**
15:11
**free (3)**
14:13,15;16:17
**friend (2)**
38:6,7
**front (2)**
19:10;22:6
**fulfills (1)**
26:21
**full (2)**
5:9;22:17
**full-time (1)**
34:8
**function (1)**
43:4

**G**

**gathering (1)**
43:1
**gave (2)**
23:1;28:18
**general (6)**
10:25;11:2,18;
32:11;39:7;40:22
**generally (4)**
6:16;11:7;32:13;
44:6
**Gents (19)**
15:3,6,9,15,21;

17:25;18:12;19:3,4;
20:13;21:3,12;28:12;
33:18;34:25;35:3;
45:1;47:9,13
**Georgia (1)**
42:7
**Gerald (6)**
33:24;34:2,3,7,8,20
**Gerber (1)**
4:20
**given (2)**
22:25;47:18
**gives (2)**
13:4;44:15
**giving (8)**
7:18,22;8:1;9:20,
24;13:14;42:24;50:10
**God (2)**
5:21;39:9
**goes (4)**
9:13;21:19;35:3;
48:3
**gonna (34)**
6:18;7:6,7;13:21;
18:19;20:19;23:8,12,
24;24:8,10;25:16;
26:17;29:15;31:25;
32:11,12,16;38:4,10,
23;39:14;40:19;
42:19;45:10,22,24,25;
46:1;51:22;52:1,4,5,7
**good (3)**
6:1;45:20;51:18
**Gotcha (1)**
30:22
**gotta (1)**
34:17
**grounds (1)**
30:5
**group (1)**
15:18
**guest (3)**
35:3;36:1;49:16
**guests (5)**
7:8;14:4,7;17:15;
49:15
**guy (1)**
22:8
**guys (5)**
17:18;18:4;31:9,10,
10

**H**

**hand (1)**
23:10
**happen (1)**
30:25
**happened (3)**
30:4;31:5,7
**Haynes (11)**
4:15,15,24;50:14,
18;51:5,21,23;52:9,

11,13
**head (1)**
10:18
**headlines (1)**
31:7
**heard (1)**
15:2
**held (2)**
20:13;32:15
**helping (1)**
9:11
**helps (2)**
34:9,10
**herein (1)**
5:5
**hit (2)**
26:7,7
**Hold (1)**
39:22
**holds (1)**
36:10
**honest (3)**
13:11;23:12;25:22
**hope (1)**
51:18
**host (1)**
49:14
**hosting (4)**
36:16;44:6;49:22,
22
**huge (1)**
36:17
**huh (1)**
21:23
**hundred (1)**
19:1

**I**

**idea (8)**
23:13;24:21;25:8,
10;27:8;29:6;35:5;
44:24
**identification (4)**
20:16;24:12;25:19;
39:1
**identified (2)**
6:3,9
**immediate (1)**
38:16
**improper (1)**
36:1
**Inc (2)**
20:13;21:3
**included (2)**
17:9;39:8
**includes (1)**
13:16
**indicate (1)**
46:12
**individual (5)**
14:4,7;17:15;49:15,
16

**individually (1)**
16:12
**individual's (1)**
51:13
**indoor (1)**
33:12
**information (7)**
21:8,10,11;30:5;
38:9;39:19;45:6
**injury (1)**
36:1
**inspection (5)**
10:13;13:4;46:9,24;
48:8
**instead (1)**
24:16
**insurance (3)**
36:5,15,18
**interacts (1)**
6:21
**into (1)**
31:8
**intoxicating (1)**
41:16
**issues (1)**
26:10

**J**

**January (17)**
22:4;23:11,14;
24:16,17,20,22;25:2,
7,10,11,13,14,23;
26:3,4;29:7
**January's (1)**
24:25
**Jennifer (2)**
4:20;10:16
**J-M-A-Y-L-E (1)**
35:9
JMayle@augustagagov (1)
35:8
**job (2)**
33:3;45:20
**Joe (1)**
11:25
**Johnson (4)**
33:24;34:4,20;
51:23
**joined (1)**
24:4
**Julian (34)**
6:19;7:1,6;11:11;
12:6;14:23,24;17:25;
18:6;19:4;20:13;
28:21;30:1,2,8,21,24,
25;31:5,7,17;32:9,20;
34:5,13,21;35:17;
36:1,16;41:19;42:9,
16;44:14;45:11
**June (28)**
6:19;7:3;17:25;
18:8;19:3,5,13;20:14;

21:15;22:22;25:12;
28:12,21,22;29:1,11,
24;31:10;32:4;33:20;
34:22;36:24;38:2,15;
44:23;45:1,10;49:23

## K

kind (13)
  8:19;13:19;16:10;
  21:6;23:6;36:1,5,8,
  15;37:15;39:4;47:17;
  50:14
knew (1)
  38:9
knowledge (2)
  35:1;36:3
known (1)
  25:22
Knox (1)
  15:18
Kuhlke (10)
  4:6,17;5:4,9,12;
  20:5;48:20;50:13,19;
  52:3
K-U-H-L-K-E (1)
  5:12

## L

labeled (1)
  38:24
last (1)
  25:23
later (1)
  30:16
law (2)
  28:6;36:23
lawsuit (3)
  29:21;30:17;51:14
learn (1)
  43:17
least (1)
  9:15
left (3)
  21:13;38:18,21
letter (1)
  35:21
level (2)
  45:18;48:4
license (43)
  7:19,24,25;8:1;
  9:14,17,18,18;10:5,5,
  6,10,11,12,25;11:2,8,
  12,14,15,19,24,25;
  12:1,13,14,20,21,23;
  13:1,1,3,4;14:11;40:5,
  8,9,13;46:9,24;48:8;
  49:8;50:9
licenses (1)
  11:7
license-wise (1)
  9:23

licensing (4)
  9:12;10:8;11:21;
  16:25
lights (1)
  33:16
liquor (1)
  41:16
listed (2)
  35:17;41:19
literally (2)
  11:14;44:13
little (3)
  15:17,17;30:2
lives (1)
  51:10
location (1)
  11:2
logo (1)
  26:8
long (11)
  5:19;9:10,13;10:8;
  15:16,19,20,24;20:24;
  23:25;38:12
look (6)
  19:24;22:8;30:1;
  31:8;42:5;48:17
looked (2)
  17:17;27:6
looking (2)
  10:21;46:5
looks (1)
  20:24
lot (4)
  5:23;7:13;13:11,20

## M

ma'am (1)
  28:19
making (1)
  39:18
manager (2)
  42:24;43:15
many (9)
  21:25;36:19,21,23,
  23,23;37:2,20;38:11
March (2)
  22:17,21
marked (4)
  20:15;24:11;25:18;
  38:25
married (2)
  12:5,6
marshals (2)
  8:25;9:7
Mary (1)
  5:11
M-A-R-Y (1)
  5:11
matter (1)
  8:4
Maurice (1)
  38:1

maximum (1)
  36:11
may (2)
  31:14;40:8
Mayle (6)
  32:7,23,23,25;45:4,
  8
M-A-Y-L-E (1)
  32:9
Mayle's (1)
  35:7
mayor (1)
  35:22
McDowell (1)
  38:1
McDuffie (1)
  34:9
mean (19)
  8:24;9:14;11:13;
  15:10;16:4;17:15;
  22:23;27:9;28:11,18;
  31:11,11;36:8,14;
  37:22;45:19;47:22;
  50:8;51:9
means (6)
  11:19;21:7;23:1;
  25:6,6;41:11
meant (1)
  51:1
meet (1)
  23:24
member (2)
  15:21;34:25
members (1)
  36:20
mentioned (1)
  43:16
midnight (2)
  21:20,21
might (2)
  22:1;26:7
mind (1)
  51:13
minute (3)
  18:21;39:16;49:25
minutes (4)
  19:8;23:24;48:20;
  52:5
money (3)
  10:9;48:3,7
months (2)
  9:16;11:20
more (5)
  26:19;32:12,12;
  33:13;48:18
mouth (1)
  6:7
much (5)
  4:19;12:9,9;15:25;
  51:13
multiple (1)
  19:2
must (2)

6:1;42:6
mute (1)
  19:22
muted (1)
  20:10

## N

name (13)
  4:12,13,20;5:10;
  8:15;21:12,13,13;
  32:2,8;37:25;38:3,5
nature (1)
  43:4
necessarily (2)
  13:9;34:13
necessary (1)
  43:6
need (9)
  8:13;9:12;28:2,3;
  37:18;46:21;47:7,9;
  50:6
needed (1)
  8:15
needs (2)
  27:25;33:16
Neither (2)
  26:3,4
Net (1)
  21:10
nine (1)
  46:7
nineteen (2)
  19:14,15
nobody (1)
  12:12
Nods (1)
  10:18
nonprofit (6)
  11:23,24;12:2;40:8,
  11,18
notes (2)
  10:21;48:17
nother (1)
  48:4
November (1)
  16:6
nowadays (1)
  5:24
number (6)
  23:9;25:13;36:11;
  39:19;41:5;43:6
numbered (1)
  39:11

## O

obtained (1)
  42:6
occasion (1)
  43:2
occasional (1)
  40:4

OCGA (1)
  4:4
off (18)
  8:8;12:25;13:2;
  19:17,19,25;21:9;
  23:21;24:1;26:10,11;
  29:3;30:4,17,18;
  48:23;51:25;52:14
offer (2)
  41:4,14
office (6)
  8:23,24;31:25;
  43:22,23;50:22
officer (10)
  8:3,5,7,9;14:17,20,
  21;22:15;31:25;32:16
officers (7)
  9:6;16:23;33:4;
  36:20,24;37:6,19
older (1)
  15:17
once (3)
  7:22;22:1,11
one (39)
  9:16;10:14;11:6,6,
  16;16:6;22:5,6,25:2,
  13,14,23,23;26:3,3,
  25;27:5,6,10;28:13,
  15,18;29:2,3,14,15,
  19;30:19;33:12,13;
  37:1,7;41:13,19;45:5;
  46:22;48:14;49:23;
  50:19
one-day (1)
  7:25
ones (2)
  27:3;28:19
online (2)
  7:13,15
only (2)
  36:10;48:14
on-premises (1)
  40:5
open (8)
  12:7;17:18,19;
  25:25;26:20,22;28:5;
  49:23
operated (1)
  41:18
ordinance (1)
  51:2
ordinances (4)
  6:20;39:4;40:24;
  41:2
organization (2)
  21:11,13
original (3)
  22:6;23:13,17
out (14)
  10:12;12:1;13:14;
  25:5;27:14;29:2;
  31:25;34:9,10;35:14,
  15;39:5;44:2;51:1

**outdoor (1)**
41:11
**over (10)**
15:6;22:8;32:9;
33:18;36:9;37:5,8,11,
12;44:18
**own (21)**
12:23;14:2,3,5,8,
12;16:19;17:13;23:5;
31:20;43:24;47:10,
14,22;48:1,5,11;49:6,
7,12,13
**owned (1)**
41:18

**P**

**page (9)**
21:7;22:18,19;
28:22;39:12,14;
40:19;42:19;46:1
**pages (4)**
19:1;20:24;26:2;
45:23
**paid (5)**
22:17,20;31:21,22;
44:22
**paper (15)**
27:14;28:6,9,11;
29:11,15,22,23,25;
30:1,7,8,10,12;31:6
**paperwork (3)**
17:24;18:1,11
**park (7)**
11:5,10,16;41:16;
42:2,11,13
**Parks (30)**
5:14,17;6:10,21;
7:10;14:24;16:11;
20:7;26:1,20,21;
31:11,24;32:14;33:6;
34:21,25;35:2,13;
37:23;38:18;41:3;
42:2,12;43:13;44:9;
46:25;47:8,12,25
**park's (1)**
39:6
**part (5)**
26:20;34:5;40:23;
41:1;43:24
**participant (1)**
35:4
**particular (1)**
37:3
**parties (3)**
4:21;16:7,9
**party (5)**
16:6;21:17,19;
49:22;50:10
**past (1)**
17:7
**pay (6)**
17:11;22:16;44:8,9,

11,11
**paying (1)**
44:7
**pays (2)**
14:21,21
**people (22)**
5:23;6:8;7:21;8:4,4,
4,18;13:20;14:22;
15:14;17:12,14,15;
33:6,18,19;34:17,17;
36:4,9;37:20;48:13
**per (1)**
5:2
**performance (1)**
42:25
**permit (11)**
16:10;46:14;47:3,9,
17,17,18;48:4;49:8;
50:4,6
**permitting (3)**
6:23;17:21;47:21
**person (12)**
8:15;14:19;32:17;
33:13,14;41:13;
42:24;43:15,16;44:3,
6;50:9
**personnel (1)**
33:11
**person's (1)**
37:25
**phone (5)**
26:5;38:6,7;39:25;
40:1;52:2,6
**phrase (1)**
49:6
**piece (1)**
38:8
**pin (1)**
5:20
**place (1)**
7:7
**Plaintiff (1)**
4:14
**Plaintiff's (4)**
20:15;24:11;25:18;
38:25
**planned (1)**
7:10
**planning (5)**
6:11,12,17,22;44:3
**plate (1)**
13:22
**playground (1)**
41:17
**please (1)**
4:12
**pm (1)**
23:11
**point (1)**
39:4
**police (27)**
8:3,5,7,9,11,16,21,
22,25;9:6;14:17,20,

21;16:20,23;33:4;
36:20,24;37:5,18;
43:22;44:3;50:20,20;
51:3,5,12
**policies (6)**
6:11,20;7:16;39:6;
42:2,2
**policy (5)**
42:12,12,14;43:13;
46:6
**populate (2)**
25:3,4
**position (4)**
5:16;15:25;38:13;
47:8
**positive (1)**
17:6
**possess (1)**
40:9
**possession (1)**
41:15
**preceding (1)**
43:16
**predecessor (1)**
38:16
**premises (4)**
8:3;10:9;16:22;
48:3
**prepared (1)**
27:2
**Press (5)**
30:14,14,15,20;
35:16
**Pretty (6)**
12:9,9;15:25;17:18,
20;28:3
**print (2)**
28:7;29:7
**printed (2)**
29:2,3
**prior (1)**
42:6
**private (3)**
31:19;32:15;43:1
**probably (1)**
21:20
**problem (1)**
23:5
**procedures (1)**
7:16
**proceedings (1)**
24:4
**process (7)**
6:23;7:2,2,9;9:10,
13;11:19,22;14:14;
16:12,14;17:1;43:24;
47:21
**produce (1)**
28:17
**produced (4)**
18:5,25;24:20;
28:16
**production (1)**

27:7
**property (5)**
11:5,10,16;14:25;
15:23
**protection (1)**
51:12
**provide (3)**
16:17;43:10;48:1
**provided (9)**
17:17,18;20:6,6;
28:6;32:14;39:19;
47:23;50:10
**provides (4)**
31:16,20;44:14;
51:12
**providing (10)**
14:15;32:1,22;45:1;
48:2,10,14;50:3,5,10
**public (11)**
6:12;41:3,3,12,16,
17,17;42:24,25;43:1,1
**pull (2)**
27:14;28:6
**pulled (1)**
28:9
**purchase (1)**
36:5
**purpose (1)**
41:14
**purposes (3)**
28:2;51:9,14
**put (7)**
13:5;21:12,15,16;
22:2,3;25:7

**Q**

**quick (3)**
9:19;40:19;48:17

**R**

**R4769 (1)**
23:9
**Randolph (1)**
24:4
**Randy (1)**
15:18
**rape (3)**
30:18;31:5;35:16
**read (6)**
30:24;31:1;41:12;
43:9;46:5;51:22
**reads (1)**
40:3
**ready (2)**
18:7;52:8
**real (3)**
9:19;40:19;48:17
**really (3)**
13:12;30:3;37:16
**reason (2)**
18:6;25:11

**rec (2)**
14:24;42:12
**receive (2)**
28:14;32:6
**received (4)**
26:19;45:5;46:18,
21
**receives (1)**
32:7
**reception (1)**
9:25
**recess (4)**
20:1;24:3;26:13;
48:24
**record (13)**
4:8;5:9;19:25;20:2;
23:22;24:2,6;26:10,
11,15;48:23,25;52:14
**records (6)**
17:18,19;26:1,21,
22;28:5
**Recreation (10)**
5:14;6:11;20:8;
31:11;32:14;37:23;
42:2,8,15;46:10
**recreational (1)**
43:13
**referring (5)**
37:22;49:13,14,14;
50:21
**refined (1)**
32:12
**reflects (1)**
20:12
**regard (3)**
6:11,22;33:11
**regulations (1)**
39:8
**related (6)**
17:21,24;18:5,10,
11;28:12
**remember (1)**
38:5
**remotely (2)**
4:22;5:1
**rent (3)**
7:6,6;36:4
**rentals (3)**
5:18;34:9,10
**renting (2)**
7:16;14:22
**reporter (8)**
4:3,9,19,20,25;5:2;
10:18;52:3
**represent (4)**
4:12,14,17;40:3
**representing (1)**
4:16
**request (5)**
17:19,21;26:1,21;
28:5
**requests (1)**
26:22

**require (2)**
33:19;36:15
**required (7)**
16:20;33:6;36:5;
42:23;43:10,19;50:3
**requirements (2)**
4:4;48:9
**requires (1)**
22:14
**respective (1)**
43:8
**response (3)**
17:19,20;20:9
**responsible (1)**
44:7
**restaurant (1)**
11:15
**Resuming (9)**
10:19;20:4,17;24:7,
13;25:20;26:16;39:2;
49:3
**review (1)**
13:1
**Richmond (6)**
30:20;39:11;42:7;
45:24;46:11;50:22
**right (38)**
11:3,4,9,11,23;
14:23;15:1;16:4;
18:13;19:18;20:8,19,
25;23:10;24:5;25:16;
26:14,17;28:22;
29:20;34:20;37:12;
39:10,12;40:2,15,16,
20;41:22;42:13;
44:19,21;46:25;
47:18;48:5;50:2;
52:11,12
**Roundtree (2)**
4:6,11
**rude (1)**
27:21
**rumors (1)**
38:21
**running (1)**
12:20

## S

**same (7)**
11:14;15:25;24:15;
25:13;46:1;51:8,11
**saw (1)**
19:3
**saying (2)**
26:9;45:9
**scan (3)**
23:17;27:17;28:7
**scheduled (1)**
7:11
**scheduling (1)**
8:19
**screen (3)**

20:19;24:8;38:23
**scrolling (1)**
22:18
**second (4)**
20:22;22:18,19;
39:22
**seconds (1)**
23:18
**Section (9)**
39:14;40:20,21;
41:6,8;42:21;43:16;
44:5;46:2
**security (13)**
16:20,25;22:15;
31:16,19;32:1,13,22;
44:14;45:1,10;48:9,
15
**seems (1)**
42:11
**sell (11)**
9:17;11:1,2,7;
12:16;13:6;16:16;
17:3;22:12;41:4,4
**selling (20)**
7:19,20,20,23;9:15;
10:9;13:14,15,17,24;
14:3;22:12;36:17;
37:14,16,18;48:3;
49:25;50:1,9
**send (4)**
14:19,19;23:14;
32:2
**sent (7)**
17:19;22:5;24:14;
25:2,21,25;35:21
**separate (1)**
28:25
**serve (4)**
7:7;11:8;12:16;
41:13
**served (3)**
42:9,16;43:2
**setting (1)**
33:17
**shall (6)**
41:13;43:6,7,16;
46:9,12
**share (3)**
20:19;24:8;38:23
**sheriff (13)**
13:1,3;16:20;30:20;
35:22;36:24;42:7,14;
43:3;46:11;51:2,3,11
**sheriff's (22)**
8:23,24;31:16,17,
18,19,25;32:14,21,22;
43:5,11,17,22,23;
44:7,8,13;45:9;46:24;
48:15;50:22
**show (7)**
25:16;26:17;37:17;
42:19,24;46:1,3
**showing (2)**

10:10,12
**sic (3)**
32:9;46:2,3
**side (1)**
8:19
**sign (3)**
12:25;13:1;51:22
**signed (1)**
13:4
**significance (1)**
47:20
**single (2)**
11:6;40:4
**situation (1)**
29:23
**smaller (1)**
32:12
**Smith (40)**
6:19;7:1,6;11:11,
25;12:6;14:24;17:25;
18:6;19:4;20:13;
28:21;30:1,2,8,21,24,
25;31:5,7,17;32:10,
20;33:24;34:2,3,5,7,8,
13,20,21;35:17;36:2,
16;41:19;42:9,16;
44:14;45:11
**social (1)**
15:12
**sold (1)**
22:13
**sole (1)**
43:3
**Somebody (2)**
29:9;38:5
**someone (5)**
6:4,10;11:1;12:11;
51:10
**sometimes (1)**
20:22
**somewhere (2)**
38:9;45:8
**sorry (7)**
10:21;19:21;23:18;
38:3;39:18;40:20;
41:6
**space (1)**
41:12
**speak (1)**
6:8
**speaking (1)**
18:2
**special (1)**
8:8
**specific (1)**
18:8
**specifically (4)**
6:16,17;11:16;
32:20
**spell (3)**
5:10;32:8;33:25
**staff (5)**
33:13,13,19;34:12;

36:20
**standing (2)**
16:10,11
**start (1)**
18:7
**state (1)**
4:12
**statement (1)**
49:10
**status (1)**
23:9
**step (1)**
52:4
**stick (1)**
6:15
**still (6)**
7:15;8:5;9:17;11:7;
14:8;48:14
**stored (2)**
28:8;29:1
**straight (1)**
7:12
**subject (1)**
50:13
**subparagraph (2)**
46:4,4
**subsection (1)**
42:5
**substantial (2)**
17:18,20
**supervisor (1)**
45:20
**suppose (1)**
7:5
**supposed (4)**
31:18;33:15;37:2;
45:16
**sure (13)**
10:24;15:4;17:5,6,
11;18:24;19:11;
24:24;27:22;31:15;
33:3,14;35:16
**swear (1)**
10:17
**sworn (4)**
4:22;5:1,6;10:22

## T

**table (1)**
48:6
**talk (10)**
6:7,10,16,16,20;
18:23;25:1;43:20,21,
23
**talked (1)**
45:13
**talking (9)**
11:14;21:4;22:19;
29:21;40:4,10;41:4,6;
46:13
**Tameka (3)**
4:15;18:21;19:6

**technical (1)**
26:10
**telling (1)**
21:14
**ten (1)**
48:18
**terms (1)**
39:7
**testified (1)**
5:6
**Thanks (2)**
50:25;51:4
**thereon (1)**
41:17
**thousand (2)**
19:13;25:8
**three (2)**
9:16;11:20
**ticket (5)**
13:16,21;17:9;50:8,
11
**tickets (9)**
13:14;17:3;22:12,
12,13;36:17;37:14,17,
18
**times (2)**
19:2;49:6
**Title (5)**
39:3,11;45:23;46:1,
2
**today (3)**
4:21;7:2,3
**Today's (2)**
4:6,9
**together (2)**
16:5,9
**told (3)**
26:23;27:8;45:3
**top (1)**
41:22
**topics (1)**
6:4
**totally (1)**
48:7
**transcript (1)**
28:3
**transmitted (1)**
32:17
**true (1)**
21:2
**trying (3)**
27:22;49:17;51:1
**turn (1)**
51:25
**Twenty-five (1)**
15:6
**twice (1)**
31:23
**two (16)**
13:22,23;19:13;
20:24;25:8,12,22;
28:25;33:19;34:17,
17;36:20;37:5,8,12;

38:14
**type (3)**
11:14;16:1;41:15
**types (1)**
14:25
**typically (1)**
9:13

## U

**under (4)**
22:11;23:9;37:7;
46:4
**Understood (11)**
8:18;9:8;10:15;
12:25;13:13,13;23:4;
33:5;45:15,17,22
**uniform (1)**
8:10
**unlawful (1)**
41:13
**Unless (1)**
12:11
**up (15)**
9:5;19:22;21:19,21;
22:25;23:1,4,10,24;
33:17,18;36:12;
37:19;48:21;50:25
**ups (1)**
50:14
**use (3)**
15:23;16:2;21:10
**used (2)**
15:24;49:5
**using (3)**
11:5;12:23;50:20
**usually (1)**
16:16

## V

**Valencia (1)**
4:14
**versus (6)**
4:6,11;47:22,23;
48:1,10
**via (1)**
4:21
**VIDEOGRAPHER (14)**
4:5;19:17,19,21,25;
20:2;23:21;24:1,5;
26:11,14;48:23,25;
52:14

## W

**Wait (2)**
39:16,18
**walk (3)**
7:9;21:6,6
**Walker (4)**
31:12;44:22,25;
45:9

**wall (4)**
10:12;13:5,5,10
**wan (1)**
21:17
**wanna (8)**
6:16;10:24;16:13;
21:16;27:21;39:10;
46:3;52:7
**Washington (2)**
15:16;21:14
**way (1)**
7:20
**wedding (1)**
9:25
**weeds (1)**
45:17
**week (2)**
9:19;25:23
**weekend (1)**
51:18
**What's (7)**
14:13;16:2;17:9;
22:22;30:2;37:25;
38:3
**whatsoever (1)**
41:18
**Whereupon (12)**
4:3;5:1,3;20:1,15;
24:3,11;25:18;26:13;
38:25;48:24;52:15
**white (1)**
16:6
**whoever's (1)**
7:16
**whole (4)**
10:14;11:19,21;
48:4
**who's (2)**
32:17;44:6
**Wick (1)**
4:13
**Willie (2)**
15:16;21:14
**Wilson (1)**
4:16
**wine (2)**
7:7;41:15
**within (1)**
9:19
**without (1)**
9:25
**WITNESS (12)**
4:17,22;5:1,5;
10:17,19;20:17;49:2;
51:8,16,20,25
**woman (1)**
30:21
**wondering (1)**
51:7
**Woods (1)**
34:9
**word (1)**
50:20

**work (12)**
6:1:8:22,23,24,25;
9:3;15:17;33:9;34:13,
18;35:11;37:3
**worked (1)**
15:16
**working (9)**
8:16;10:8;31:18;
33:20,23;34:21;35:4;
36:24;48:15
**works (6)**
33:10;34:5,9,24;
35:2;46:17
**worth (2)**
19:1,1
**wristbands (1)**
13:14
**writing (2)**
7:24;8:14
**written (1)**
42:6

## Y

**y'all (10)**
17:18,19;18:25;
31:11;32:4;42:14;
47:16,16;51:21,22
**y'all's (1)**
46:6
**year (4)**
15:25;16:2;17:22;
26:20
**years (4)**
5:20,23;15:6;38:14
**yesterday (1)**
5:20

## Z

**Zoom (1)**
4:21

## 0

**001 (1)**
39:13

## 1

**10:01 (1)**
26:12
**10:03 (1)**
26:15
**10:37 (1)**
48:23
**10:41 (1)**
49:1
**10:45 (2)**
52:14,15
**105 (2)**
42:19;45:23
**11:00 (1)**

52:8
**11:15 (1)**
52:8
**11:30 (3)**
21:18,19;52:8
**12 (2)**
21:20,21
**12:23 (1)**
23:11
**139 (1)**
26:2
**14th (26)**
6:19;18:1,8;19:3,5,
13;20:14;21:16;
25:12,12;28:12,21,22;
29:1,12,24;31:10;
32:4;33:21;34:22;
36:25;38:2;44:23;
45:1,10;49:23
**15 (1)**
52:5
**150 (1)**
8:4
**16 (1)**
22:4
**16th (6)**
23:14;24:17,25;
25:2,7,13

## 2

**2 (1)**
8:4
**200 (4)**
8:4;19:1;33:18;
37:8
**2019 (32)**
6:19;7:3;17:22;
18:1,8;19:4,5;20:14;
21:16;22:4,21,22;
23:14;24:17,25;25:3,
7,12,13,24;26:4,24;
28:22;29:1,12;31:10;
34:22;38:2,15;44:23;
45:1,10
**2020 (2)**
35:22,23
**2021 (1)**
30:17
**2022 (9)**
4:7,10;23:11;24:17,
20,23;25:14;26:4;
29:8
**21 (1)**
40:19
**215 (1)**
22:9
**21st (1)**
22:22
**22nd (2)**
22:17,21
**25 (18)**
15:2,9,15,21;17:25;

18:11;19:3,4;20:13;
21:3,12;28:12;33:18;
34:25;35:3;45:1;47:9,
13
**250 (1)**
22:9

## 3

**30 (1)**
15:6
**300 (6)**
22:8;37:5,7,11,12;
48:13
**31st (7)**
23:11;24:17,20,23;
25:14;26:3;29:8
**35 (2)**
5:20,23
**350 (3)**
36:10,11,13

## 4

**400 (1)**
36:12
**43 (1)**
39:14
**44 (1)**
46:1
**4th (2)**
4:7,10

## 6

**6 (3)**
39:3;45:23;46:2
**60001 (1)**
39:11
**6-2-4 (1)**
40:20
**6-2-5 (2)**
40:21;41:6
**62-77 (1)**
46:2
**6-277 (1)**
46:3
**6-2-77 (2)**
39:15,21
**6-8-1 (1)**
42:21
**6-8-3 (1)**
44:5

## 8

**8 (1)**
42:20

## 9

**9 (2)**
46:4,4

**9:13 (3)**
  4:2,7,10
**9:33 (1)**
  19:25
**9:45 (1)**
  19:23
**9:48 (1)**
  20:3
**9:53 (1)**
  24:2
**9:58 (1)**
  24:6
**9-11-28c (1)**
  4:4