# In The Matter Of:

*Valencia Colon v.*
*Richard Roundtree et al*

---

*Kimberly Lee*
*February 4, 2022*

---

*Kellie K. Rodman, LLC*
*Certified Court Reporters*
*P. O. Box 500*
*Homer, Georgia  30547*
*678-614-8109*

Original File 020422Cauthorn_Lee.txt
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

Valencia Colon,                    )
                                   )
Plaintiff,                         )
                                   )
                                   )        Civil Action File No.
v.                                 )        1:21-cv-00149-JRH-BKE
                                   )
                                   )
Richard Roundtree, et al.,         )
                                   )
Defendants.                        )

        The videotaped videoconference deposition of

        KIMBERLY LEE, taken for purposes of discovery,

        cross-examination, and all other purposes allowed

        under the Civil Practice Act of Georgia; all

        formalities waived; the reading and signing of the

        deposition waived; before Jennifer A. Gerber, CCR

        6241-2465-4151-2704, Certified Court Reporter, in

        and for the State of Georgia; commencing at

        2:00 p.m., February 4th, 2022, Augusta, Georgia.


                    Kellie K. Rodman, LLC
                   Certified Court Reporters
                  rodmanreporting@gmail.com
                       678-614-8109

1                      APPEARANCES  (Remote)

2

3   ON BEHALF OF THE PLAINTIFF:

4   J. WICKLIFFE CAUTHORN, ATTORNEY AT LAW
    The Cauthorn Firm
5   201 Cherokee Street
    Marietta, Georgia 30060
6   404-991-2700

7

8   ON BEHALF OF THE DEFENDANTS:

9   RANDOLPH FRAILS & TAMEKA HAYNES, ATTORNEYS AT LAW
    Frails & Wilson, LLC
10  211 Pleasant Home Road, Suite A1
    Augusta, Georgia 30907
11  800-413-9005

12

13  ALSO IN ATTENDANCE:

14  ERIC GEORGE, VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25

                                                          2

```
 1                        I N D E X

 2

 3  CROSS-EXAMINATION BY MR. CAUTHORN . . . . . . . . . . .  Page 5

 4

 5

 6                       E X H I B I T S

 7

 8  EXHIBIT              DESCRIPTION                  PAGE MARKED/
    NUMBER                                           IDENTIFIED
 9

10  C                    Open Records Request Production
                         for Charlie T. Walker           23/23
11
    H                    Open Records Request Response
12                       Letter March 2021               24/24

13  G                    Open Records Request Response
                         Letter March 2020               25/25
14
    B                    Online Articles March 2017      26/26
15
    F                    Online Articles April/May 2017  27/28
16
    A                    YouTube Video                   30/30
17
    D                    Charlie T. Walker's Work Schedule
18                       June 2019                        36/36

19  E                    Approved Off Duty Requests Letter 36/36

20

21                       TRANSCRIPT LEGEND

22  . . .  (ellipsis)    Halting speech or an unfinished sentence
                         in dialogue or an omission when reading
23                       written material
    --     (dashes)      Break in speech continuity
24  (ph)                 Spelled phonetically
    (sic)                In its original form
25
                                                              3
```

1                    P R O C E E D I N G S

2                                                    2:00 p.m.

3          (Whereupon, the court reporter complied with the

4     requirements of O.C.G.A. 9-11-28(c).)

5          THE VIDEOGRAPHER:  This is the deposition of

6     Sergeant Lee in the matter Colon versus Roundtree.

7     Today's date is February 4th, 2022.  The time is

8     2:00 p.m. and we are officially on the record.

9          THE COURT REPORTER:  And, again, today's date is

10    February 4th, 2022.  The time is 2:01 p.m.  This is the

11    case of Colon versus Roundtree.  At this time, can

12    everyone please state their name and who they represent?

13         MR. CAUTHORN:  My name is Wick Cauthorn.  I represent

14    the Plaintiff.

15         MR. FRAILS:  Randy Frails on behalf of the

16    Defendants.  And Tameka Haynes on behalf of the

17    Defendants.

18         THE WITNESS:  I'm Sergeant Kimberly Lee.  I am with

19    the Richmond County Sheriff's Office.

20         THE COURT REPORTER:  Thank you.  My name is Jennifer

21    Gerber.  I'm the court reporter.  We are all appearing via

22    Zoom today.  Do all parties agree to have the witness

23    sworn remotely?

24         MR. CAUTHORN:  Yes.

25         MS. HAYNES:  Yes.

                                                           4

```
1              MR. FRAILS:  Yes.
2              THE COURT REPORTER:  Okay.
3        (Whereupon, the witness was sworn remotely by the court
4              reporter per agreement of counsel.)
5    Whereupon,
6                         KIMBERLY LEE
7        Was called as a witness herein and, having been first duly
8        sworn, was deposed and testified as follows:
9                       CROSS-EXAMINATION
10   BY MR. CAUTHORN:
11       Q    Sergeant Lee, I -- I believe you and I have probably
12   communicated already.  I believe you responded to several open
13   records requests that I sent to the sheriff's department, so I
14   appreciate the cooperation you've already given to us.  So
15   thank you for being here this afternoon.
16       A    You're welcome.
17       Q    So you're here this afternoon because we communicated
18   with defense counsel about specific areas of knowledge that we
19   needed to depose people on, and they identified you as someone
20   who would be able to testify about the sheriff's department
21   internal affairs policy and investigations.  Is that your
22   understanding about what you're here to testify about today?
23       A    Yes.
24       Q    Okay, good.  Can you say your full name for the
25   record and spell it for the court reporter?
```

1          A     Okay.   My first name is Kimberly.   That's

2     K-I-M-B-E-R-L-Y.   My last name is Lee, L-E-E.

3          Q     Do you have a middle name?

4          A     Yes.

5          Q     What's your middle name?

6          A     That's Washonda, W-A-S-H-O-N-D-A.

7          Q     Okay.   What is your occupation?

8          A     I am an investigator sergeant in the internal affairs

9     division.

10         Q     Of the Augusta-Richmond County Sheriff's Department?

11         A     Yes.

12         Q     Okay.   How long have you been in that position?

13         A     Since March 27th, of 2018.

14         Q     March 2018 or 2017, sorry?

15         A     2018.

16         Q     Okay.   And how long have you been with the Richmond

17    County Sheriff's Department?

18         A     November the 9th, 2013.

19         Q     All right.   What was your position immediately prior

20    to the current position?

21         A     I was a violent crimes investigator.

22         Q     How long were you a violent crimes investigator?

23         A     From the time I was hired until I was promoted to

24    internal affairs.

25         Q     How long have you been in law enforcement?

6

1      A     When I started with the Richmond County Sheriff's

2 Office in 2013.

3      Q     Okay.  What is your highest level of education?

4      A     A bachelor's degree.

5      Q     Where did you -- where did you get your degree from?

6      A     The University of South Carolina in Aiken, South

7 Carolina.

8      Q     When did you graduate?

9      A     December of 2000.

10     Q     All right.  What did you do for a living between

11 the -- December 2000 and beginning with the sheriff's

12 department?  And, you know -- and I know that's a broad

13 question, but just do your best.  I'm just trying to get an

14 idea.

15     A     Okay.  When I -- after I graduated I received a job

16 with the Georgia Department of Corrections as a counselor.  And

17 I did that -- I started that in 2001, and I stayed there for

18 about a year and a half.  After that I worked at Therapeutic

19 Foster Care Agency as a family consultant, and I worked there

20 for about -- maybe two, three years.  And then after that I

21 worked at the Child Advocacy Center as a forensic interviewer

22 for about six years.  After that I worked -- I went back to

23 Therapeutic Foster Care as a recruiting licensing manager.  And

24 then I started at the sheriff's office.

25     Q     Okay.  What is your training for your law enforcement

1    job?

2         A    I'm POST certified, so I received my certification,

3    actually, in 2014.  And then, you know, that training with

4    Georgia POST to get your initial -- and then after that, just

5    various types of training.

6         Q    Okay.  Based on your experience -- and I forgot to

7    ask you, I'm guessing your undergraduate degree was in

8    psychology or -- or social work?

9         A    Psychology.

10        Q    All right.  And so part of your job with internal

11   affairs -- do you conduct investigations into policy violations

12   by employees of the sheriff's department?

13        A    I do.

14        Q    Okay.  And do you -- did you -- does that include use

15   of force violations and things like that?

16        A    Yes.

17        Q    Okay.  I wanna kind of have a -- go to the big

18   picture before we go to a small picture, so can you --

19        A    Okay.

20        Q    -- generally describe to me, you know, what prompts

21   you to get involved in investigation into a -- an employee's

22   conduct.  And then how it proceeds, and then -- and -- and --

23   and who does it.  So just kind of walk me through that process.

24        A    Okay.  Well, all of the internal affairs

25   investigations, they are -- the sheriff or the colonel or the

8

1   chief will let the internal affairs division know that there is

2   a case that they want us to investigate.  And that usually goes

3   to our lieutenant and he will assign a case from there.  And it

4   really depends on where the case is.  So if there is a criminal

5   investigation that is also going on as well as an internal

6   affairs investigation, that criminal investigation goes first

7   before we get involved into the internal affairs investigation.

8        We also handle complaints too.  So those we may look into,

9   but they usually go back to the -- the -- or the immediate

10  supervisor.  But as far as the big investigations, those are --

11  we're told to do those by the sheriff.

12       Q    Okay.  And when you say you wait for the criminal

13  investigation, does not mean you wait until a criminal

14  investigation and prosecution is completely ended before you

15  begin the -- the --

16       A    Well, it will depend.  Every case is different.  So

17  if there is a criminal investigation, it depends on where it

18  lands as far as statements given to law enforcement.  If -- if

19  they're finished with that portion of it, we'll start our

20  investigation, or at least interviews.  So everyone -- it just

21  depends where it is in that criminal investigation.  So it

22  doesn't have to totally complete itself for us to get involved,

23  but it has to be at some point where the criminal investigator

24  is finished with their portion with that -- with that deputy.

25       Q    Okay.  The -- how is the -- is the internal affairs

1   investigation conducted?  How -- how does the investigation

2   itself typically proceed?

3       A    Well, after we receive notice that it's something

4   that we're going to investigate, like it's -- one of the three

5   investigators are assigned to that case.  And we'll collect any

6   information that we'll need for our investigation.  And usually

7   we'll interview the deputy that is involved.

8       Q    Beyond the deputy involved, who else would you

9   interview?

10      A    It would just depend, because we want to keep our

11  investigation separate from the criminal investigation.  And

12  then what -- the information that we receive from them -- they

13  are under Garrity -- we don't share that information with law

14  enforcement.  So it -- like I said, every -- I mean, yeah,

15  every one is kind of different.  So it would just depend on the

16  allegation, who's available at the time, and what information

17  that we already have.

18      Q    How was -- how are the -- how are interviews recorded

19  or -- and conducted?  How do you do those?

20      A    Those are done down here in the internal affairs

21  division, and they're usually done by audio recording.

22      Q    Okay.  Are -- are they ever -- are they ever not

23  recorded at all?

24      A    There are some where they have not been recorded.

25      Q    Okay.  And what would be the reason for not recording

10

1   an interview?

2       A    Like I -- it would just depend on the information

3   that we've already received.  Sometimes we may receive a

4   written statement prior to the deputy coming down, so we will

5   review that.  And if it has anything outside of what they've

6   already provided to us, that could be a reason why we didn't

7   record.  But like I said, every one is different.

8       Q    Okay.  If it's not audio -- if an interview is not

9   audio recorded, how is it otherwise documented?

10      A    Notes.

11      Q    Okay.  Who usually conducts the interviews?

12      A    One of the three sergeants in internal affairs or our

13  lieutenant.

14      Q    All right.  Can you name all of those people for me?

15      A    I can.  Sergeant Caleb Lee, Sergeant William McCarty,

16  and Lieutenant Glen Rahn, R-A-H-N.

17      Q    Okay.

18      A    And myself.

19      Q    With regard to determination on any action to take as

20  a result of your investigation, how does -- how does that

21  proceed?  What I mean is: How does the investigation move from

22  being an internal affairs investigation to being a piece of

23  information provided to a decision maker with regard to forms

24  of punishment or employee -- or employment decisions and things

25  like that?

                                                                11

1      A     Well, after we conclude our investigation, we provide

2  the sheriff, the colonel, or the chief our notes from the

3  interview -- a synopsis of that.  And also there are times that

4  we may give a recommendation, but -- and oftentimes we just

5  give them the information and they will come up with whatever

6  sanction, if any.

7      Q     And how -- how are the -- how is the investigation --

8  how are the documents for the investigation stored?

9      A     In our file room.

10      Q     Okay.  Are they stored by paper or are they

11  electronically stored?

12      A     Paper.

13      Q     Okay.  And how long are the -- how long are the

14  documents kept?

15      A     They're kept through the employees -- to the end of

16  their employment.  I believe it's -- the retention is maybe

17  seven years.  I'm not sure.  It's either five or seven years

18  until -- after they leave.

19      Q     Okay.  So if -- so if there's an investigation and

20  there's a punishment of some kind, that just stays in their

21  employment file?

22      A     It will stay in their internal affairs file.

23      Q     In their internal affairs file, okay.

24      A     Correct.

25      Q     How many -- and -- and it -- I don't -- I don't know

1    if you have to estimate or not, but how many use of force

2    investigations have been conducted and -- in the sheriff's

3    department in -- in your internal affairs unit in the last five

4    years?

5          A    I -- I don't know, and I wouldn't be able to estimate

6    that.

7          Q    Okay.  I mean more than -- more than ten?

8          A    I -- I -- I don't know.

9          Q    Okay, okay.  How would you be able to find the answer

10   to that question?

11         A    I would have to do a search to find that answer.

12         Q    What kind of -- what kind of search?  How would the

13   search happen?

14         A    I would either do it through logs or through the file

15   room.

16         Q    Okay.  So, I mean, literally going through paper, or

17   is there any kind of electronic stored information that can be

18   searched?

19         A    We do have a log -- have to be searched -- but also,

20   like I said, through -- to double check the --

21         Q    Okay.  You broke up just a little bit there, so I'm

22   gonna kind of try --

23         A    Okay.

24         Q    -- to paraphrase what you said and -- and -- and --

25   and -- and see if that's what you said, because I'm not

1    completely sure.  Did you say that -- that there is a log that

2    you can search that -- that would be electronic, but then you

3    would also go through paper files in a file room?

4        A    Yes, to verify the log --

5        Q    Okay.

6        A    -- and the files are in sync.

7        Q    Okay.  How many investigations have there been in the

8    last five years into a deputy's inappropriate sexual contact

9    with a person?

10       A    I don't know that answer either.  I would have to go

11   through the same process.

12       Q    Okay.  Is -- is that something where there's a bunch

13   of them or just not very many, in your experience?

14       A    It's -- well, it's something that I wouldn't feel

15   comfortable giving an estimated answer without verifying that.

16       Q    Okay, okay.  Who makes the determination on the

17   punishment or the employment termination or other actions taken

18   based on an internal affairs investigation?  Who -- who are

19   the -- the people who decide what to do with the information

20   from the investigation?

21       A    That would be either the sheriff, the colonel, or the

22   chief.

23       Q    All right.  Is it -- is it typically one person, or

24   is there a board or a committee?

25       A    The sheriff would get -- is usually the final person

14

1    to sign off on any recommendations given by the previous --

2    from -- from the command staff -- or from the ranks, because it

3    goes up the chain of command.

4        Q    Okay.  And explained to me what you mean by the

5    recommendation from the command staff.

6        A    So say we conducted an internal affairs investigation

7    and we provided -- we would provide whoever that next person --

8    like their supervisor, we would provide them the information,

9    and they would look at the -- either the recommendation, if we

10   gave it, or if we didn't, they would make a recommendation and,

11   you know, it would go up the chain from there.  So say it was a

12   lieutenant, and then it would go to the next person.  That

13   would be the captain, and it goes from there.  So that's what I

14   mean by the chain of command.  So they would have their

15   decision to agree or disagree with whatever decision that was

16   made -- or recommendation that was made.

17       Q    Okay, understood.  And then -- and then it eventually

18   would get to the sheriff who is the ultimate arbiter of the --

19   of the decision?

20       A    Yes.

21       Q    Okay.  So if you read that someone -- so -- so if --

22   if -- so if someone -- and I don't mean if you read -- but

23   if -- but if someone has been suspended, that means that the --

24   that their -- that their supervisor, and then from their

25   supervisor on up all the way to the sheriff, has looked at the

15

1   file and the investigation that internal affairs made and made

2   a recommendation.  And then when it got to the sheriff, the

3   sheriff made the ultimate decision to suspend or not suspend an

4   employee?

5        A    Correct.

6        Q    Okay.  And I -- and forgive me because I don't

7   know -- but what is the hierarchy of the -- of the Richmond

8   County Sheriff's Department?  What are the -- what are the

9   offices from sheriff all the way down to, you know, the --

10  the -- whoever is, you know, the bottom of the totem pole, so

11  to speak?

12       A    So -- so it would depend on the division here at the

13  sheriff's office.  Like if you want to just do like generals,

14  we would have the deputy, then a corporal -- sorry, I couldn't

15  remember -- deputy, corporal, sergeant, and then it's the

16  lieutenant, and then the captain, and then, like I said, it

17  would go to chief deputy, and then -- all -- it -- and, again,

18  it depends on the division too, because some don't have what --

19  that one does have.  But then it would be the colonel, chief

20  and the sheriff.

21       Q    Okay.  And --

22       A    Depending on the division.

23       Q    Understood.  I understand, you gave me just kind of a

24  general structure.

25       A    Yes.

16

1     Q    Okay.  So the direct supervisor of a deputy is --

2     is -- is -- what's their title?

3     A    It would be a colonel -- I mean -- I'm sorry, a

4     corporal.

5     Q    Okay.  And then a -- and a direct supervisor over a

6     corporal will be a sergeant?

7     A    Yes.

8     Q    Okay.  And then is the lieutenant's a direct

9     supervisor over a sergeant?

10    A    Yes.

11    Q    Okay.  And then that's when you kind of start to get,

12    depending on divisions?

13    A    Yes.

14    Q    Okay, okay.  I just wanted to make sure that I

15    understood the structure.  With regard to things like --

16    like -- like doing a private security and special duty, does

17    that have -- does that go through internal affairs, or is that

18    done at the hierarchical level?

19    A    That's not done through internal affairs.

20    Q    Okay, okay.  What does internal affairs do besides

21    investigate employee conduct?

22    A    We also are in charge of the public information

23    office.  Also open records requests and complaints and pretty

24    much record restrictions, you know, so that also goes through

25    us too.  And other duties, it just depends, but those are

                                                                17

1    basically our duties.

2          Q     Okay.

3          A     It can be outside of that, but those are what we

4    basically do.

5          Q     Okay.  How many internal investigation --

6    investigations have there been into the conduct of Charlie

7    Walker?

8          A     I believe -- I'm familiar with at least two.

9          Q     Okay.  And what two are you familiar with?

10         A     I'm familiar with this current one, and then I'm

11   familiar with the one prior to this one, in 2017.

12         Q     Okay.  And we'll talk about that one in a -- in a

13   minute.  Is that -- that's the -- that's the use of -- that's

14   the use of force with a gentleman on a bicycle?

15         A     Yes.  I was not down here at that time, so I'm not --

16   I'm aware of it.  But as in details of that one, I'm -- I don't

17   have the details on that one --

18         Q     Okay, okay.

19         A     -- because I wasn't involved in that investigation.

20         Q     Understood.  When did the -- you say the current one,

21   is there an open investigation, or is -- or is the internal

22   affairs matter with regard to the -- and I'm assuming out of

23   the -- my client's allegations, is the internal affairs matter

24   closed or is it ongoing?

25         A     Oh, when I said the current one, I was talking about

18

1    the one we're here today -- with the Roundtree versus Colon.

2    That's the one I was referring and that one is closed.

3            Q     Okay.  When did that investigation begin?

4            A     That began June the 18th or 19th.

5            Q     Okay.

6            A     The internal affairs investigation began on the 19th.

7            Q     Okay.  And what did -- what -- what was the process

8    of the internal affairs investigation?  And when you say the

9    18th and the 19th, you're talking about June 18th and 19th --

10           A     Yes.

11           Q     -- 2019?

12           A     Nineteen, yes.

13           Q     Okay, okay.  What was -- what did the internal

14   affairs office do as a part of that investigation?

15           A     We interviewed Deputy Walker.

16           Q     Okay.  Did you interview anyone else?

17           A     No.

18           Q     Okay.  What documents did y'all review?

19           A     The incident report and also an activity report.

20           Q     What's an activity report?

21           A     It's a report that a deputy or an investigator will

22   do just to show what actions they did on a particular case.

23           Q     Okay.  And who's -- who's activity report did you

24   review?

25           A     I believe it was Deputy -- or Investigator Syria.  I

                                                                    19

1   believe that was her name.  I would have to -- I would have to

2   confirm the -- that investigator.

3        Q    Okay.  And what was that -- what was the activity

4   report -- what was the -- what was in that activity report?

5        A    When Ms. Colon went to the hospital, Richmond County

6   Deputy's Office -- Richmond County Sheriff's Office was called

7   there, and the investigator spoke with her at the hospital.

8        Q    Okay.  So you mean -- you mean you read the report

9   created at the -- the medical center when -- when they called

10  the -- the sheriff's department as a result of her going in

11  there for a rape kit?

12       A    Yes.

13       Q    Okay.

14       A    I reviewed the -- I reviewed the investigator's

15  notes, which it's labeled as an activity report.  In our system

16  it's called an activity report.

17       Q    Understand, understand.  Did you -- did you interview

18  any -- anybody from the Georgia Bureau of Investigation.

19       A    No.

20       Q    Okay.  Did you interview Ms. Colon?

21       A    No.

22       Q    Okay.  Other than interviewing Deputy Walker and

23  reviewing the activity file, were there any other documents

24  reviewed or people interviewed?

25       A    No.

                                                              20

1     Q    Okay.  Was there any punishment recommended as a

2  result of -- of the allegations from June of 2019?

3     A    Yes.

4     Q    Okay.  What was that?

5     A    A year of probation, ten days suspension, no special

6  duty assignments until the criminal investigation was complete,

7  and also a class on ethics and professionalism.

8     Q    Okay, so a year of probation.  A ten day suspension?

9     A    Yes.

10    Q    Okay.  Was that with pay or without pay?

11    A    It would be without pay.

12    Q    And what else after that?  You said a year probation,

13 a ten day suspension, and what else?

14    A    No special duty assignments until the completion of

15 the criminal case and --

16    Q    What's a special duty assignment?

17    A    A special duty assignment is any assignment outside

18 of your regular duty, that you are representing the sheriff's

19 office and getting paid for.

20    Q    Okay.  Does the -- do those things have to -- do

21 special duty assignments have to run through the sheriff's

22 department?  Do they have to be approved?

23    A    They do.

24    Q    Is working security at a -- at a function like the

25 one at Julian Smith Casino in June of 2019, is that a special

21

1   duty assignment?

2       A    Yeah, that would have been a special duty assignment.

3       Q    Is there any kind of security that a -- that a

4   sheriff's deputy would be allowed to work in their own time

5   that -- that wouldn't have to be approved by the -- by the

6   sheriff's department?

7       A    No.

8       Q    Okay.  How are the special duty assignments approved?

9       A    They will go through the specialty sergeant.  That

10  request would go through them if there's something posted or a

11  need for a special duty officer.  And that sergeant will

12  approve or deny that request.

13      Q    Gotcha, okay.  All right, you mentioned -- so we --

14  you provided -- subject to our open records request, you

15  provided a file to us that was -- that was titled Deputy

16  Walker's complete personnel file and disciplinary history.

17      A    Yes.

18      Q    You sent it by email.  In that document, would the --

19  any of the actions taken as a result -- would any of the

20  actions taken as a result of the 2017 or 2019 internal affairs

21  investigations be reflected in that document?

22      A    If it was an open investigation, it would not be

23  reflected in that.  But if it -- if there was a closed

24  investigation, then, yes.

25      Q    Okay.  And how would -- how is it reflected in a

                                                              22

1   personnel file?  How is the internal affairs investigation

2   reflected in the personnel file?

3        A    It's not.  It's a separate file.

4        Q    Okay, all right.  Because I would -- I've looked

5   through this thing a bunch of times and I have yet -- I'd --

6   have not seen any -- and I'm gonna share my screen to show you.

7        A    Okay.

8        Q    This is Exhibit C to your deposition.

9             (Whereupon, Plaintiff's Exhibit C was marked for

10       identification.)

11  BY MR. CAUTHORN:   (Resuming)

12       Q    I -- I looked through this -- this document, it's 154

13  pages, and I have not -- I didn't see any documentation of any

14  kind about any internal affairs investigations at all.  And --

15  and -- and it's my understanding that I wouldn't expect to; is

16  that right?

17       A    It would depend on the open records request.  So if

18  the open records request was for the personnel file, then we

19  would provide their personnel file, which is what your Exhibit

20  is.

21       Q    Gotcha, okay, okay.  And it's my understanding that

22  Mr. Walker received -- even while he was being -- while he was

23  suspended in 2017 -- actually received good marks and received

24  a promotion -- a pay raise; is that right?

25       A    I wouldn't be familiar with that.  I don't do the

1    evaluations or raises.

2        Q    Okay, okay.  Are you aware that -- that -- if --

3    whether anybody recommended after the 2017 event that

4    Mr. Walker be terminated?

5        A    I'm not sure.  It would be reflected on his

6    disciplinary.

7        Q    Okay.  And where could I get a copy of the

8    disciplinary -- of -- of that information?  Because it's not

9    included in this document, and this was the document that we

10   received from the open records -- how -- how would I send a

11   request to you in order to get the information regarding his

12   suspension and his internal affairs investigation history?

13       A    That would be a request for his internal affairs

14   file.

15       Q    Okay.  All right, just let me see if I can share with

16   you here.  Let's see, okay.  This is a letter -- this is gonna

17   be Exhibit H.

18           (Whereupon, Plaintiff's Exhibit H was marked for

19       identification.)

20   BY MR. CAUTHORN:   (Resuming)

21       Q    And this is a letter from you to me in response to a

22   request that we made that is -- that was all -- for all records

23   reflecting any internal affairs investigation regarding Deputy

24   Charlie Walker.

25       A    Uh-huh (affirmative).

                                                              24

1      Q   And this is from March of 2021 and it -- it -- in it

2  you state that you had already transmitted that information to

3  my office.  Do recall how you transmitted that information to

4  my office?  Because I have not been able to locate it, and I --

5  and I -- and I --

6      A   Go ahead, I'm sorry.

7      Q   And I'm -- and I'm -- if it's provided -- been

8  provided, I don't wanna -- I'm not trying to make -- I just

9  haven't seen it.  And so that's why I am asking: How did you

10  provide that information to my office?

11     A   It would have been able to be sent through -- through

12  the email, like I did that one.

13     Q   Okay.  This is the -- this was the -- I'm gonna show

14  you this while I -- while we're here.  This is the -- a letter

15  from you from March of 2020, and this is where you transmitted

16  the complete personnel file and disciplinary history.

17     A   Uh-huh (affirmative).

18     Q   This is Exhibit G -- will be Exhibit H (sic) to your

19  deposition.

20     (Whereupon, Plaintiff's Exhibit G was marked for

21     identification.)

22  BY MR. CAUTHORN:  (Resuming)

23     Q   This is the only transmission that I've gotten other

24  than some -- some other employment things.  I think I'm gonna

25  probably need the -- the -- the internal affairs file for our

1    record, because we -- we haven't -- we have not received that

2    yet, okay?

3         A    Okay.

4         Q    Okay.  I want -- and I wanted to ask you about some

5    things that might be in his internal affairs file, okay?

6         A    Okay.

7         Q    So I'm gonna see if I can -- I can share a screen.

8    This is Exhibit B.  We're gonna share Exhibit B.

9              (Whereupon, Plaintiff's Exhibit B was marked for

10        identification.)

11   BY MR. CAUTHORN:   (Resuming)

12        Q    This is a newspaper -- or this is a news article that

13   I found when I Googled Charlie Walker.  It's -- and it's how I

14   found out about the 2017 incident.

15        A    Uh-huh (affirmative).

16        Q    And in the article it said that -- that Mr. Walker

17   turned -- was in trouble for turning off of his -- his -- his

18   body camera during an encounter with a man that -- that was hit

19   with a baton and was not arrested, who was dropped off at a

20   park along with his bike that eventually went missing.  My

21   understanding is that he was suspended -- well, I don't wanna

22   deal with my understanding -- what was his punishment for this?

23        A    He was -- and I don't know -- like I said, I wasn't

24   involved with that internal affairs investigation.  But to my

25   knowledge, he was suspended, he had to write a paper, and I

                                                            26

1    can't remember if there is anything else to that.  But those

2    were the two that I do remember.  I believe he may have been

3    also put on probation.

4        Q    Okay.  And forgive me -- what -- what level of

5    punishment does there have to be in order for -- for the Peace

6    Officer Standards -- the POST people to get involved in an

7    investigation into the license?

8        A    Can you ask that one more time, I'm sorry?

9        Q    Sure.  What level of punishment does there have to be

10   given out at the -- at the sheriff's office in order for an

11   incident to be investigated by the P-O-S-T organization that

12   does the licensing for police officers?

13       A    It would have to be demotion, termination is another

14   one, and -- I can't remember the -- if there was anything else,

15   but I do know demotions, terminations do have to go through

16   POST -- we do submit to POST.

17       Q    In your -- in your experience at the -- at the

18   sheriff's department, how many internal affairs investigations

19   have led to a punishment that resulted in a POST investigation?

20       A    I -- again, I couldn't answer -- I wouldn't be able

21   to answer that one --

22       Q    Have there been any?

23       A    -- so I don't know.  There have been, yes.

24       Q    Okay, okay.  I'm gonna show you Exhibit F.

25            (Whereupon, Plaintiff's Exhibit F was marked for

27

1       identification.)

2   BY MR. CAUTHORN:  (Resuming)

3       Q    This is another investigation -- this is another

4   report from the internet from Googling Charlie Walker that

5   brings up this 2017 incident.  And I'm gonna ask you a question

6   about a fact that's inserted in this.  Because I don't know --

7   you know, I don't know if the newspaper is correct or not -- or

8   if the news is correct, so I'm gonna ask you if it's correct.

9       This -- this article alleges that the 2017 incident was

10  not the first incident where Charlie Walker turned off his body

11  camera in violation of department policy.  Are you aware of

12  other times that Charlie Walker turned off his camera in

13  violation of department policy?

14      A    I am not personally aware of any other ones.  I'm not

15  saying that there aren't.  I'm not aware of the others.

16      Q    Okay.  Would there be any internal affairs

17  investigations associated with something like that, with --

18  with turning off your --

19      A    Yes.  That would be in the internal affairs file.

20      Q    Okay.  And then it looks like it was -- I'm gonna

21  read from the article.  This is the second page of the article.

22      A Richmond County lieutenant recommended seven days

23  suspension and reimbursing the man's stolen bicycle and phone,

24  but six other higher-ups have to sign off on it.

25      What does that mean that six other higher-ups --

28

1  higher-ups have to sign off on the recommendation?

2       A    That would be the same thing that I described when I

3  told you about the hierarchy and who would have to -- who looks

4  at it and who signs off on it.  And that would also depend on

5  the type of investigation.

6       Q    Okay, okay.

7       A    So that's what I previously explained.

8       Q    Okay, I understand.  And then this said the two other

9  -- two higher-ups didn't sign off on it, and that one

10  recommended twelve months of probation and the other one

11  recommended -- suggested terminating Deputy Walker.  Is that --

12  would that be reflected in his internal affairs file?

13       A    It would.

14       Q    Okay.  I'm -- so I -- so if -- so if we looked at his

15  internal affairs file, we would expect to see that the

16  individual higher-ups reviewed and then either rejected or made

17  their own recommendations for punishment?

18       A    Correct.

19       Q    Okay.  This also says that Georgia POST cannot

20  investigate if -- unless there is a -- and I believe you said

21  that termination and demotion -- right, that's firing or

22  demoting -- but it also says if they suspend a deputy for

23  at least 30 days, then POST investigates.  Is that what your

24  understanding is?

25       A    I'm not sure about the 30 days.

                                                              29

1    Q    Okay.

2    A    Without -- but that would be easy to find on POST's

3    website.

4    Q    Sure.  And I'm -- and I'm asking -- I'm asking you

5    because you're right here and I --

6    A    Yes.

7    Q    -- I don't -- I -- I am not taking the Exhibit as --

8    at face value.  That's why I wanted to kind of ask you, to make

9    sure that -- that - that -- to -- you know, there are things in

10   here that are alleged that might -- may or may not be in his

11   internal affairs file, and that's why I wanted to ask you if --

12   A    I understand.

13   Q    -- expect them to be in there.  Okay.  Have you seen

14   the video of -- of Deputy Walker's encounter of the man on the

15   bicycle?

16   A    No.

17   Q    Okay.  I'm gonna show you Exhibit A.  And this is --

18   let me see -- I'm gonna see if we can share this screen.  Okay,

19   let's see if this works.

20        (Whereupon, Plaintiff's Exhibit A was marked for

21        identification.)

22   BY MR. CAUTHORN:  (Resuming)

23   Q    Can you see this -- the -- the YouTube?

24   A    I see it now.

25   Q    Okay.  And I made it larger, so hopefully -- can you

1  see that?

2       A    I can.

3       Q    Okay, I'm just gonna let it play.  And then I'm gonna

4  ask you a couple questions about it, okay?

5       A    Okay.

6            (Whereupon, Mr. Cauthorn plays video/audio

7       recording.)

8  BY MS. HAYNES:  (Resuming)

9       A    Is yours playing through, or is it pretty skippy?

10      Q    Mine's playing through smoothly.  Are you skipping on

11 yours?

12      A    Yes.  If I -- it's looking like it's frames of video

13 instead of -- like I can hear some audio, but it looks like

14 it -- it's frames of video, if that makes sense.

15      Q    Yeah.  And that's kind of actually how your -- how

16 your picture is coming through the Zoom call right now.

17      A    Okay.

18      Q    Why don't you see if you can kill your camera real

19 quick --

20      A    Okay.

21      Q    -- and see if that helps with -- with the -- with

22 your ability to see --

23      A    -- it --

24      Q    Yeah.

25      A    Okay.

                                                            31

```
 1        Q    And if -- and if -- and if it doesn't --

 2        A    -- try to --

 3        Q    -- let me know, okay?

 4        A    Okay.

 5        Q    Okay.  Everything I'm gonna ask you about this is

 6   pretty much -- hasn't happened yet, so we're -- I'm gonna back

 7   it up to a minute twenty-seven and hit play from there, okay?

 8        A    Okay.

 9        Q    And you tell me if it's still choppy.

10             (Whereupon, Mr. Cauthorn plays video/audio

11        recording.)

12   BY MS. HAYNES:   (Resuming)

13        A    It is still choppy.  Like the audio is not choppy,

14   but the video is.

15        Q    Okay.  For the record, I'm gonna let it play through.

16        A    Okay.

17        Q    And I want you to listen as much as watch, okay?

18        A    Okay.

19        Q    Because I want you to listen to what -- what the

20   communications are between the deputies as much as I want you

21   to watch the content of the video.

22        A    Okay.

23             (Whereupon, Mr. Cauthorn plays video/audio

24        recording.)

25   BY MR. CAUTHORN:   (Resuming)
```

                                                                    32

1      Q    All right.  It ended.  Did you hear that very -- the

2  part right at the end right before he turned off his -- his --

3  his -- his recording devices?

4      A    Vaguely.

5      Q    Okay.  I want you to listen and see if you can hear

6  him say -- it sounds like he says something about the county

7  line and -- when he turns off his recording device.  Turn it up

8  as loud as you can so that you can -- so that you can hear.

9           (Whereupon, Mr. Cauthorn plays video/audio

10      recording.)

11  BY MR. CAUTHORN:  (Resuming)

12      Q    It -- it sounded like he said something about dumping

13  something at the county line.  Did -- does -- did that -- did

14  you hear that?

15      A    I heard something.  I can't say that that's what I

16  heard.

17           (Whereupon, Mr. Cauthorn plays video/audio

18      recording.)

19  BY MR. CAUTHORN:  (Resuming)

20      Q    All right.  Now, just -- and you can -- you can -- if

21  you don't mind turning your -- your -- back on.  I just got a

22  couple questions about --

23           (Whereupon, a brief interruption ensued.)

24  BY MR. CAUTHORN:  (Resuming)

25      Q    That -- oh, you know, I bet that's my YouTube.  That

                                                            33

1  would be my YouTube because of the -- because it went to the

2  next video.  There we go, okay.

3       So the -- the -- the question is: What -- what is the --

4  the policy on turning off the -- the body cameras?

5       A    The body cameras are to be turned off at the end of

6  the call.

7       Q    Okay.  So when they're done with the -- the

8  individual who they would be interacting with?

9       A    Yes.  When they've completed the call.

10      Q    Okay, so that -- in that video when they're starting

11 to talk about what they're gonna do, the video is turned off.

12 And that -- that would be the body camera violation that was

13 mentioned in the news article?

14      A    If that's what it was.  I -- I don't know if that

15 is -- that's just one video, so.

16      Q    Okay.  And do you -- do you know where Hyde Park is?

17      A    I am -- I don't know it's exact location.

18           (Whereupon, a brief interruption ensued.)

19           MS. HAYNES:  Randy, you're not on mute.  Randy,

20      you're not on mute.

21           MR. CAUTHORN:  Jennifer, let's go off the record.

22           MR. FRAILS:  I apologize, I thought I was on mute.

23           MR. CAUTHORN:  That's -- that -- I -- I was just

24      making sure we went off the record there.  Okay, we -- we

25      can go back on.

                                                              34

1          THE VIDEOGRAPHER:  We're still on the record.

2          MR. CAUTHORN:  Okay.

3          THE VIDEOGRAPHER:  I didn't actually go off the

4     record, so we're still on the record at 2:52.

5   BY MR. CAUTHORN:  (Resuming)

6     Q    Okay.  Sergeant Lee, I'd asked you if you knew where

7   Hyde Park is?

8     A    Vaguely.  I've never been there --

9     Q    Okay.

10    A    -- but I know it's in Richmond County.

11    Q    It is in Richmond County.

12    A    Yes.

13    Q    It's my understanding that's where they found that

14  man -- and they never found his bicycle -- was in Hyde Park.

15  Is -- is that what your understanding is from the internal

16  affairs file?

17    A    Again, I'm familiar with it, but I don't know the

18  details of the case.  I know that there was a bicycle that was

19  missing and they had to pay restitution.

20    Q    Okay.  I'm gonna show you another Exhibit.  This was

21  provided to me by you.  This is Charlie T. Walker's work

22  schedule for the month of June of 2019.

23          (Whereupon, Plaintiff's Exhibit D was marked for

24     identification.)

25  BY MR. CAUTHORN:  (Resuming)

                                                          35

1      Q     Now, correct me if I'm wrong, but it says right here,

2    June 14th, that he was not working.  That he used vacation

3    time; is that right?

4      A     Yes.

5      Q     Okay.  Does that mean that he got paid -- is that

6    paid vacation time that he got that day?

7      A      If he had vacation to -- if he had vacation hours,

8    yes.

9      Q     Okay.  And then he -- he used vacation the following

10   day on June 15th of 2019.  Is that the correct

11   interpretation?

12     A     Yes, that's my understanding.

13     Q     Okay.  And then he used vacation time on Sunday the

14   16th as well.  Is that a correct interpretation?

15     A     That's my understanding.

16     Q     Okay.  And that's Exhibit D to your deposition.  And

17   then I'm gonna show -- go ahead and show you Exhibit E.

18            (Whereupon, Plaintiff's Exhibit E was marked for

19            identification.)

20   BY MR. CAUTHORN:   (Resuming)

21     Q      And this is a letter from you, and it is a list of

22   all of the approved off duty private security requests made by

23   Deputy Charlie Walker during his period of employment with the

24   sheriff's department.  And there were no requests for any 25

25   Gents events -- that could have been inartfully requested --

1  but here -- here's a list of his special duty assignments in

2  2019.  It looks -- appears he had approval for one in January

3  26th of 2019, one in October 5th of 2019, and one November

4  23rd of 2019.  Is this a complete list of the special duty

5  assignments that were approved for Mr. Walker in -- or Deputy

6  Walker in 2019?

7      A   That I received, yes.

8      Q   Okay.  The reason being is because the -- the

9  security detail at the event on June 14th, 2019 was described

10  as a special duty assignment.

11     A   When I received your request, I reached out to the

12  special duty sergeant and that is the information that I

13  received.

14     Q   Okay.  So would that indicate to you that he had not

15  been approved for special duty for June 14th of 2019?

16     A   It was either that he was not approved or the request

17  did not come in for the special duty sergeant to note.

18     Q   Okay.  What is the process for special duty approval?

19     A   It's a -- they receive a written approval by the

20  special duty sergeant.  They would have to submit their

21  request, and then the special duty sergeant would approve that

22  or not.

23     Q   And do all requests have to go through the special

24  duty sergeant?

25     A   They're supposed to, yes.

1    Q    Okay.  And when you say they're supposed to, what do

2    you -- what do you mean by that?

3    A    That all requests are just supposed to go through the

4    special duty sergeant.

5    Q    Okay.  And according to the information you received

6    from the special duty sergeant, there was no request for

7    special duty or approval of special duty for June 14th of 2019

8    for Charlie Walker?

9    A    Correct.

10   Q    Okay.  The -- the district attorney's file for

11   Charlie Walker mentions that he took a lie detector test.  Do

12   you know who administered the lie detector test to Charlie

13   Walker?

14   A    That would be through the GBI.

15   Q    Okay.  Do you know if that occurred at the sheriff's

16   department or if it occurred at a GBI office?

17   A    I don't know.

18   Q    Okay.  Did you know that Charlie Walker had condoms

19   in his car on the night of the -- June 14th, 2020 (sic)?

20   A    Yes.

21   Q    Okay.  Is it appropriate for a deputy to carry

22   condoms to a -- to a job?

23        MR. FRAILS:  I object to the form of the question.

24   BY MR. CAUTHORN:  (Resuming)

25   Q    You can answer the question, Miss -- Sergeant Lee.

38

1      A    I -- I can't answer that question.  I -- I don't have

2   an answer to that question.  That would be something that an

3   individual deputy would decide to bring on their own.

4      Q    Is there a department policy about sexual intercourse

5   or sexual activity while in uniform for the sheriff's

6   department?

7      A    That would fall under manner of conduct or conduct

8   unbecoming.

9      Q    Okay.  What I mean -- what I mean is that is there

10  a -- is there a -- is there a department policy that says

11  whether it's appropriate for a sheriff's deputy to engage in

12  sexual activity while in uniform?

13     A    There is a policy.  It's about public displays of

14  affection while in uniform.

15     Q    Okay.  Let me -- let's take a break for about 10

16  minutes -- comfort break -- and we'll come back and I will --

17  and I will do my best to -- to begin wrapping up, okay,

18  Sergeant Lee?

19     A    Okay.

20          THE VIDEOGRAPHER:  We are off the record at 3:00.

21          (Whereupon, a brief recess ensued.)

22          THE VIDEOGRAPHER:  And we are back on the record at

23     5:07.

24          MR. CAUTHORN:  3:07.

25          THE VIDEOGRAPHER:  Sorry, 3:07.

                                                              39

BY MR. CAUTHORN:   (Resuming)

Q    Sergeant Lee, what was the -- the official determination that led to the -- the punishment of Deputy Walker arising out of this incident?  For -- for instance, what I mean is -- is, what did -- what was the determination of -- of what violation did he have to get punished -- to get a year probation and a ten day suspension and no special duty?

A    We looked at the policy on conduct unbecoming and we substantiated that based on the investigation.

Q    Okay, so it's the -- the departmental policy of conduct unbecoming of an officer?

A    Yes.

Q    Did anyone recommend that he be fired as a result of this?

A    No.

Q    Okay.  Did anyone recommend that he be suspended for 30 days or more as a result of this?

A    No.

Q    Okay.  Did anyone recommend that he be demoted as a result of this?

A    No.

Q    Okay.  Do -- do you have any relationship with the organization known as 25 Gents Inc.?

A    No.

1      Q     Okay.  Do you know what that is?

2      A     No.

3      Q     Okay.  Who would -- who would have been the internal

4   affairs person who investigated the 2017 incident and any

5   previous incidents before that with Deputy Walker?

6      A     I'm not sure who that investigator was.  I would have

7   to look at that file.

8      Q     Okay.  I just mean -- what I'm saying is I know it's

9   before you got there and, you know, I know that you don't have

10  any personal --

11     A     Uh-huh (affirmative).

12     Q     -- knowledge of it.  Is there anybody who is

13  currently in the internal affairs department that would have

14  had personal knowledge of -- of that investigation in 2017?

15     A     Yes, Lieutenant Rahn.

16     Q     R-A-H-N?

17     A     Lieutenant -- yes.

18     Q     Okay, okay.  Who is in charge of internal affairs at

19  the Richmond County Sheriff's Department?

20     A     We directly report to the sheriff.

21     Q     Okay.  I -- I guess what I mean is who -- is your --

22  is your direct supervisor the sheriff himself?

23     A     My direct supervisor would be Lieutenant Rahn.

24     Q     Okay.  And then immediately above your department all

25  goes straight to the sheriff?

                                                              41

1      A      So -- and -- it would be -- Captain Rollins is our

2    captain.  He's over Lieutenant Rahn.

3      Q      Okay.  Anybody above the captain?

4      A      It would be then Colonel Chew, Chief Deputy Clayton,

5    and then the sheriff.

6      Q      Okay, okay.  I do -- I do -- I am serious when I say

7    thank you for your -- your help.  You have -- I do believe

8    that, you know, when you were responding to our open records

9    request, that it was an -- less than ideal world that we were

10   in with regard to Covid and things like that.  And I know

11   that -- and I know that you had responsibilities that weren't

12   easy to fulfill, so I appreciate that.  And I don't have any

13   more questions for you other than maybe some follow up if

14   Mr. Frails or Ms. Haynes have questions.

15     A      Okay.

16            MR. FRAILS:  Let me consult Ms. Haynes and we'll be

17        right back.

18            MR. CAUTHORN:  Okay.

19            MR. FRAILS:  We -- we don't have any follow-up

20        questions.  Well, he's not there.  We don't have any

21        follow-up questions.

22            MR. CAUTHORN:  Okay.  Well, do y'all wanna read and

23        sign or do you wanna waive?

24            MR. FRAILS:  We'll waive.

25            MR. CAUTHORN:  Okay.  Thank you, Sergeant Lee, and

                                                                    42

1        you have yourself a good weekend.  Randy and Tameka, thank

2        you for your time today.  Thanks for making everybody

3        available and -- and I guess I will see one, if not both

4        of you guys on Monday.

5                (Whereupon, the deposition concluded at approximately

6        3:15 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   C E R T I F I C A T E

 2

 3   STATE OF GEORGIA       )

 4   COUNTY OF FULTON       )

 5

 6        I, JENNIFER A. GERBER, Certified Court Reporter in and
     for the State of Georgia, do hereby certify that the foregoing
 7   proceedings were taken down by me; that the foregoing
     proceedings were reduced to print by me; that the foregoing
 8   pages represent a true, correct, and complete transcript of the
     testimony given by the witness, who was first duly sworn by me;
 9   that I am not a relative, employee, attorney or counsel of any
     of the parties; that I am not a relative or employee of
10   attorney or counsel for any of said parties; nor am I
     financially or otherwise interested in the outcome of the
11   action.

12        This certification is expressly withdrawn and denied
     upon the disassembly, photocopying, reproduction of electronic
13   copies, and/or distribution of the foregoing transcript, or any
     part thereof, including exhibits, unless said disassembly,
14   photocopying, reproduction, and/or distribution is done by me
     and my signature and original seal is attached thereto.

15

16        I further certify that the original of said deposition
     shall be filed under seal with J. Wickliffe Cauthorn, Attorney
     at Law; The Cauthorn Firm, 201 Cherokee Street, Marietta,
17   Georgia.

18        This, the 14th day of February, 2022.

19

20

21        JENNIFER A. GERBER

22        CERTIFIED COURT REPORTER # 6241-2465-4151-2704

23

24

25
                                                             44
```

1              COURT REPORTER DISCLOSURE STATEMENT

2

3   STATE OF GEORGIA      )

4   COUNTY OF FULTON      )

5

6        I, JENNIFER A. GERBER, Certified Court Reporter,
    pursuant to Article 10.B of the Rules and Regulations of the
7   Board of Court Reporting of the Judicial Council of Georgia, I
    make the following disclosure:

8
    1.    I am not disqualified for a relationship of interest
9   under the provisions of O.C.G.A. Sec. 9-11-28(c).

10  2.    I am a Georgia Certified Court Reporter

11  3.    I am an independent contractor of Kellie K. Rodman, LLC,
    d/b/a Rodman Reporting.

12
    4.    Rodman Reporting was contacted by the office of the
13  deposing counsel to provide court reporting services for this
    deposition.

14
    5.    I will not be taking this deposition under any contract
15  prohibited by Georgia law, O.C.G.A. 15-14-37(a).  I will charge
    usual and customary rates to all parties in the case.

16

17

18

19             JENNIFER A. GERBER

20             CERTIFIED COURT REPORTER # 6241-2465-4151-2704

21

22

23

24

25
                                                              45

**A**

**ability (1)**
31:22
**able (6)**
5:20;13:5,9;25:4,
11;27:20
**above (2)**
41:24;42:3
**according (1)**
38:5
**action (1)**
11:19
**actions (4)**
14:17;19:22;22:19,
20
**activity (10)**
19:19,20,23;20:3,4,
15,16,23;39:5,12
**actually (4)**
8:3;23:23;31:15;
35:3
**administered (1)**
38:12
**Advocacy (1)**
7:21
**affairs (45)**
5:21;6:8,24;8:11,
24;9:1,6,7,25;10:20;
11:12,22;12:22,23;
13:3;14:18;15:6;16:1;
17:17,19,20;18:22,23;
19:6,8,14;22:20;23:1,
14,24;12,13,23;
25:25;26:5,24;27:18;
28:16,19;29:12,15;
30:11;35:16;41:4,13,
18
**affection (1)**
39:14
**affirmative (4)**
24:25;25:17;26:15;
41:11
**afternoon (2)**
5:15,17
**again (4)**
4:9;16:17;27:20;
35:17
**Agency (1)**
7:19
**agree (2)**
4:22;15:15
**agreement (1)**
5:4
**ahead (2)**
25:6;36:17
**Aiken (1)**
7:6
**allegation (1)**
10:16
**allegations (2)**
18:23;21:2

**alleged (1)**
30:10
**alleges (1)**
28:9
**allowed (1)**
22:4
**along (1)**
26:20
**apologize (1)**
34:22
**appearing (1)**
4:21
**appears (1)**
37:2
**appreciate (2)**
5:14;42:12
**appropriate (2)**
38:21;39:11
**approval (4)**
37:2,18,19;38:7
**approve (2)**
22:12;37:21
**approved (7)**
21:22;22:5,8;36:22;
37:5,15,16
**approximately (1)**
43:5
**arbiter (1)**
15:18
**areas (1)**
5:18
**arising (1)**
40:4
**arrested (1)**
26:19
**article (6)**
26:12,16;28:9,21,
21;34:13
**assign (1)**
9:3
**assigned (1)**
10:5
**assignment (6)**
21:16,17,17;22:1,2;
37:10
**assignments (6)**
21:6,14,21;22:8;
37:1,5
**associated (1)**
28:17
**assuming (1)**
18:22
**attorney's (1)**
38:10
**audio (5)**
10:21;11:8,9;31:13;
32:13
**Augusta-Richmond (1)**
6:10
**available (2)**
10:16;43:3
**aware (5)**
18:16;24:2;28:11,

14,15

**B**

**bachelor's (1)**
7:4
**back (8)**
7:22;9:9;32:6;
33:21;34:25;39:16,
22;42:17
**Based (3)**
8:6;14:18;40:10
**basically (2)**
18:1,4
**baton (1)**
26:19
**began (2)**
19:4,6
**begin (3)**
9:15;19:3;39:17
**beginning (1)**
7:11
**behalf (2)**
4:15,16
**besides (1)**
17:20
**best (2)**
7:13;39:17
**bet (1)**
33:25
**Beyond (1)**
10:8
**bicycle (5)**
18:14;28:23;30:15;
35:14,18
**big (2)**
8:17;9:10
**bike (1)**
26:20
**bit (1)**
13:21
**board (1)**
14:24
**body (5)**
26:18;28:10;34:4,5,
12
**both (1)**
43:3
**bottom (1)**
16:10
**break (2)**
39:15,16
**brief (3)**
33:23;34:18;39:21
**bring (1)**
39:3
**brings (1)**
28:5
**broad (1)**
7:12
**broke (1)**
13:21
**bunch (2)**

14,15

**B**

**C**

**Caleb (1)**
11:15
**call (3)**
31:16;34:6,9
**called (4)**
5:7;20:6,9,16
**camera (5)**
26:18;28:11,12;
31:18;34:12
**cameras (2)**
34:4,5
**can (26)**
4:11;5:24;8:18;
11:14,15;13:17;14:2;
18:3;24:15;26:7,7;
27:8;30:18,23,25;
31:2,13,18;33:5,8,8,8,
20,20;34:25;38:25
**captain (5)**
15:13;16:16;42:1,2,
3
**car (1)**
38:19
**Care (2)**
7:19,23
**Carolina (2)**
7:6,7
**carry (1)**
38:21
**case (9)**
4:11;9:2,3,4,16;
10:5;19:22;21:15;
35:18
**Casino (1)**
21:25
**Cauthorn (31)**
4:13,13,24;5:10;
23:11;24:20;25:22;
26:11;28:2;30:22;
31:6;32:10,23,25;
33:9,11,17,19,24;
34:21,23;35:2,5,25;
36:20;38:24;39:24;
40:1;42:18,22,25
**Center (2)**
7:21;20:9
**certification (1)**
8:2
**certified (1)**
8:2
**chain (3)**
15:3,11,14
**charge (2)**
17:22;41:18
**Charlie (12)**
18:6;24:24;26:13;
28:4,10,12;35:21;

14:12;23:5
**Bureau (1)**
20:18

**C**

**check (1)**
13:20
**Chew (1)**
42:4
**chief (6)**
9:1;12:2;14:22;
16:17,19;42:4
**Child (1)**
7:21
**choppy (3)**
32:9,13,13
**class (1)**
21:7
**Clayton (1)**
42:4
**client's (1)**
18:23
**closed (3)**
18:24;19:2;22:23
**collect (1)**
10:5
**Colon (5)**
4:6,11;19:1;20:5,20
**colonel (6)**
8:25;12:2;14:21;
16:19;17:3;42:4
**comfort (1)**
39:16
**comfortable (1)**
14:15
**coming (2)**
11:4;31:16
**command (4)**
15:2,3,5,14
**committee (1)**
14:24
**communicated (2)**
5:12,17
**communications (1)**
32:20
**complaints (2)**
9:8;17:23
**complete (5)**
9:22;21:6;22:16;
25:16;37:4
**completed (1)**
34:9
**completely (2)**
9:14;14:1
**completion (1)**
21:14
**complied (1)**
4:3
**conclude (1)**
12:1
**concluded (1)**
43:5
**condoms (2)**
38:18,22
**conduct (8)**
8:11,22;17:21;18:6;
39:7,7;40:9,12

conducted (4)
    10:1,19;13:2;15:6
conducts (1)
    11:11
confirm (1)
    20:2
consult (1)
    42:16
consultant (1)
    7:19
contact (1)
    14:8
content (1)
    32:21
cooperation (1)
    5:14
copy (1)
    24:7
corporal (4)
    16:14,15;17:4,6
Corrections (1)
    7:16
counsel (2)
    5:4,18
counselor (1)
    7:16
County (13)
    4:19;6:10,17;7:1;
    16:8;20:5,6;28:22;
    33:6,13;35:10,11;
    41:19
couple (2)
    31:4;33:22
court (7)
    4:3,9,20,21;5:2,3,25
Covid (1)
    42:10
created (1)
    20:9
crimes (2)
    6:21,22
criminal (10)
    9:4,6,12,13,17,21,
    23;10:11;21:6,15
CROSS-EXAMINATION (1)
    5:9
current (4)
    6:20;18:10,20,25
currently (1)
    41:13

D

date (2)
    4:7,9
day (5)
    21:8,13;36:6,10;
    40:7
days (5)
    21:5;28:22;29:23,
    25;40:18
deal (1)
    26:22

December (2)
    7:9,11
decide (2)
    14:19;39:3
decision (5)
    11:23;15:15,15,19;
    16:3
decisions (1)
    11:24
Defendants (2)
    4:16,17
defense (1)
    5:18
degree (3)
    7:4,5;8:7
demoted (1)
    40:20
demoting (1)
    29:22
demotion (2)
    27:13;29:21
demotions (1)
    27:15
deny (1)
    22:12
department (23)
    5:13,20;6:10,17;
    7:12,16;8:12;13:3;
    16:8;20:10;21:22;
    22:6;27:18;28:11,13;
    36:24;38:16;39:4,6,
    10;41:13,19,24
departmental (1)
    40:11
depend (7)
    9:16;10:10,15;11:2;
    16:12;23:17;29:4
Depending (2)
    16:22;17:12
depends (5)
    9:4,17,21;16:18;
    17:25
depose (1)
    5:19
deposed (1)
    5:8
deposition (5)
    4:5;23:8;25:19;
    36:16;43:5
deputies (1)
    32:20
deputy (26)
    9:24;10:7,8;11:4;
    16:14,15,17;17:1;
    19:15,21,25;20:22;
    22:4,15;24:23;29:11,
    22;30:14;36:23;37:5;
    38:21;39:3,11;40:4;
    41:5;42:4
deputy's (2)
    14:8;20:6
describe (1)
    8:20

described (2)
    29:2;37:9
detail (1)
    37:9
details (3)
    18:16,17;35:18
detector (2)
    38:11,12
determination (4)
    11:19;14:16;40:3,6
device (1)
    33:7
devices (1)
    33:3
different (3)
    9:16;10:15;11:7
direct (5)
    17:1,5,8;41:22,23
directly (1)
    41:20
disagree (1)
    15:15
disciplinary (4)
    22:16;24:6,8;25:16
displays (1)
    39:13
district (1)
    38:10
division (6)
    6:9;9:1;10:21;
    16:12,18,22
divisions (1)
    17:12
document (5)
    22:18,21;23:12;
    24:9,9
documentation (1)
    23:13
documented (1)
    11:9
documents (4)
    12:8,14;19:18;
    20:23
done (5)
    10:20,21;17:18,19;
    34:7
double (1)
    13:20
down (4)
    10:20;11:4;16:9;
    18:15
dropped (1)
    26:19
duly (1)
    5:7
dumping (1)
    33:12
during (2)
    26:18;36:23
duties (2)
    17:25;18:1
duty (27)
    17:16;21:6,14,16,

17,18,21;22:1,2,8,11;
36:22;37:1,4,10,12,
15,17,18,20,21,24;
38:4,6,7,7;40:8

E

easy (2)
    30:2;42:12
education (1)
    7:3
either (7)
    12:17;13:14;14:10,
    21;15:9;29:16;37:16
electronic (2)
    13:17;14:2
electronically (1)
    12:11
else (6)
    10:8;19:16;21:12,
    13;27:1,14
email (2)
    22:18;25:12
employee (3)
    11:24;16:4;17:21
employees (2)
    8:12;12:15
employee's (1)
    8:21
employment (6)
    11:24;12:16,21;
    14:17;25:24;36:23
encounter (2)
    26:18;30:14
end (3)
    12:15;33:2;34:5
ended (2)
    9:14;33:1
enforcement (4)
    6:25;7:25;9:18;
    10:14
engage (1)
    39:11
ensued (3)
    33:23;34:18;39:21
estimate (2)
    13:1,5
estimated (1)
    14:15
ethics (1)
    21:7
evaluations (1)
    24:1
even (1)
    23:22
event (2)
    24:3;37:9
events (1)
    36:25
eventually (2)
    15:17;26:20
everybody (1)
    43:2

everyone (2)
    4:12;9:20
exact (1)
    34:17
Exhibit (21)
    23:8,9,19;24:17,18;
    25:18,18,20;26:8,8,9;
    27:24,25;30:7,17,20;
    35:20,23;36:16,17,18
expect (3)
    23:15;29:15;30:13
experience (3)
    8:6;14:13;27:17
explained (2)
    15:4;29:7

F

face (1)
    30:8
fact (1)
    28:6
fall (1)
    39:7
familiar (6)
    18:8,9,10,11;23:25;
    35:17
family (1)
    7:19
far (2)
    9:10,18
February (2)
    4:7,10
feel (1)
    14:14
file (26)
    12:9,21,22,23;
    13:14;14:3;16:1;
    20:23;22:15,16;23:1,
    2,3,18,19;24:14;
    25:16,25;26:5;28:19;
    29:12,15;30:11;
    35:16;38:10;41:7
files (2)
    14:3,6
final (1)
    14:25
find (3)
    13:9,11;30:2
finished (2)
    9:19,24
fired (1)
    40:14
firing (1)
    29:21
first (4)
    5:7;6:1;9:6;28:10
five (3)
    12:17;13:3;14:8
follow (1)
    42:13
following (1)
    36:9

**follows (1)**
  5:8
**follow-up (2)**
  42:19,21
**force (3)**
  8:15;13:1;18:14
**forensic (1)**
  7:21
**forgive (2)**
  16:6;27:4
**forgot (1)**
  8:6
**form (1)**
  38:23
**forms (1)**
  11:23
**Foster (2)**
  7:19,23
**found (4)**
  26:13,14;35:13,14
**Frails (9)**
  4:15,15;5:1;34:22;
  38:23;42:14,16,19,24
**frames (2)**
  31:12,14
**fulfill (1)**
  42:12
**full (1)**
  5:24
**function (1)**
  21:24

**G**

**Garrity (1)**
  10:13
**gave (2)**
  15:10;16:23
**GBI (2)**
  38:14,16
**general (1)**
  16:24
**generally (1)**
  8:20
**generals (1)**
  16:13
**gentleman (1)**
  18:14
**Gents (2)**
  36:25;40:24
**Georgia (4)**
  7:16;8:4;20:18;
  29:19
**Gerber (1)**
  4:21
**given (4)**
  5:14;9:18;15:1;
  27:10
**giving (1)**
  14:15
**Glen (1)**
  11:16
**goes (6)**

9:2,6;15:3,13;
  17:24;41:25
**gonna (21)**
  13:22;23:6;24:16;
  25:13,24;26:7,8;
  27:24;28:5,8,20;
  30:17,18;31:3,3;32:5,
  6,15;34:11;35:20;
  36:17
**good (3)**
  5:24;23:23;43:1
**Googled (1)**
  26:13
**Googling (1)**
  28:4
**Gotcha (2)**
  22:13;23:21
**graduate (1)**
  7:8
**graduated (1)**
  7:15
**guess (2)**
  41:21;43:3
**guessing (1)**
  8:7
**guys (1)**
  43:4

**H**

**half (1)**
  7:18
**handle (1)**
  9:8
**happen (1)**
  13:13
**happened (1)**
  32:6
**Haynes (7)**
  4:16,25;31:8;32:12;
  34:19;42:14,16
**hear (5)**
  31:13;33:1,5,8,14
**heard (2)**
  33:15,16
**help (1)**
  42:7
**helps (1)**
  31:21
**herein (1)**
  5:7
**here's (1)**
  37:1
**hierarchical (1)**
  17:18
**hierarchy (2)**
  16:7;29:3
**higher-ups (5)**
  28:24,25;29:1,9,16
**highest (1)**
  7:3
**himself (1)**
  41:22

**hired (1)**
  6:23
**history (3)**
  22:16;24:12;25:16
**hit (2)**
  26:18;32:7
**hopefully (1)**
  30:25
**hospital (2)**
  20:5,7
**hours (1)**
  36:7
**Hyde (3)**
  34:16;35:7,14

**I**

**idea (1)**
  7:14
**ideal (1)**
  42:9
**identification (8)**
  23:10;24:19;25:21;
  26:10;28:1;30:21;
  35:24;36:19
**identified (1)**
  5:19
**immediate (1)**
  9:9
**immediately (2)**
  6:19;41:24
**inappropriate (1)**
  14:8
**inartfully (1)**
  36:25
**Inc (1)**
  40:24
**incident (8)**
  19:19;26:14;27:11;
  28:5,9,10;40:4;41:4
**incidents (1)**
  41:5
**include (1)**
  8:14
**included (1)**
  24:9
**indicate (1)**
  37:14
**individual (3)**
  29:16;34:8;39:3
**information (18)**
  10:6,12,13,16;11:2,
  23;12:5;13:17;14:19;
  15:8;17:22;24:8,11;
  25:2,3,10;37:12;38:5
**initial (1)**
  8:4
**inserted (1)**
  28:6
**instance (1)**
  40:5
**instead (1)**
  31:13

**interacting (1)**
  34:8
**intercourse (1)**
  39:4
**internal (46)**
  5:21;6:8,24;8:10,
  24;9:1,5,7,25;10:20;
  11:12,22;12:22,23;
  13:3;14:18;15:6;16:1;
  17:17,19,20;18:5,21,
  23;19:6,8,13;22:20;
  23:1,14;24:12,13,23;
  25:25;26:5,24;27:18;
  28:16,19;29:12,15;
  30:11;35:15;41:3,13,
  18
**internet (1)**
  28:4
**interpretation (2)**
  36:11,14
**interruption (2)**
  33:23;34:18
**interview (8)**
  10:7,9;11:1,8;12:3;
  19:16;20:17,20
**interviewed (2)**
  19:15;20:24
**interviewer (1)**
  7:21
**interviewing (1)**
  20:22
**interviews (3)**
  9:20;10:18;11:11
**into (7)**
  8:11,21;9:7,8;14:8;
  18:6;27:7
**investigate (4)**
  9:2;10:4;17:21;
  29:20
**investigated (2)**
  27:11;41:4
**investigates (1)**
  29:23
**investigation (47)**
  8:21;9:5,6,6,7,13,
  14,17,20,21;10:1,1,6,
  11,11;11:20,21,22;
  12:1,7,8,19;14:18,20;
  15:6;16:1;18:5,19,21;
  19:3,6,8,14;20:18;
  21:6;22:22,24;23:1;
  24:12,23;26:24;27:7,
  19;28:3;29:5;40:10;
  41:14
**investigations (11)**
  5:21;8:11,25;9:10;
  13:2;14:7;18:6;22:21;
  23:14;27:18;28:17
**investigator (9)**
  6:8,21,22;9:23;
  19:21,25;20:2,7;41:6
**investigators (1)**
  10:5

**investigator's (1)**
  20:14
**involved (5)**
  8:21;9:7,22;10:7,8;
  18:19;26:24;27:6

**J**

**January (1)**
  37:2
**Jennifer (2)**
  4:20;34:21
**job (3)**
  7:15;8:1,10;38:22
**Julian (1)**
  21:25
**June (11)**
  19:4,9;21:2,25;
  35:22;36:2,10;37:9,
  15;38:7,19

**K**

**keep (1)**
  10:10
**kept (2)**
  12:14,15
**kill (1)**
  31:18
**Kimberly (3)**
  4:18;5:6;6:1
**K-I-M-B-E-R-L-Y (1)**
  6:2
**kind (14)**
  8:17,23;10:15;
  12:20;13:12,12,17,22;
  16:23;17:11;22:3;
  23:14;30:8;31:15
**kit (1)**
  20:11
**knew (1)**
  35:6
**knowledge (4)**
  5:18;26:25;41:12,
  14
**known (1)**
  40:24

**L**

**labeled (1)**
  20:15
**lands (1)**
  9:18
**larger (1)**
  30:25
**last (3)**
  6:2;13:3;14:8
**law (4)**
  6:25;7:25;9:18;
  10:13
**least (3)**
  9:20;18:8;29:23

**leave (1)**
12:18
**led (2)**
27:19;40:3
**Lee (11)**
4:6,18;5:6,11;6:2;
11:15;35:6;38:25;
39:18;40:2;42:25
**L-E-E (1)**
6:2
**less (1)**
42:9
**letter (4)**
24:16,21;25:14;
36:21
**level (4)**
7:3;17:18;27:4,9
**license (1)**
27:7
**licensing (2)**
7:23;27:12
**lie (2)**
38:11,12
**lieutenant (10)**
9:3;11:13,16;15:12;
16:16;28:22;41:15,
17,23;42:2
**lieutenant's (1)**
17:8
**line (2)**
33:7,13
**list (3)**
36:21;37:1,4
**listen (3)**
32:17,19;33:5
**literally (1)**
13:16
**little (1)**
13:21
**living (1)**
7:10
**locate (1)**
25:4
**location (1)**
34:17
**log (3)**
13:19;14:1,4
**logs (1)**
13:14
**long (6)**
6:12,16,22,25;
12:13,13
**look (3)**
9:8;15:9;41:7
**looked (5)**
15:25;23:4,12;
29:14;40:9
**looking (1)**
31:12
**looks (4)**
28:20;29:3;31:13;
37:2
**loud (1)**

33:8

**M**

**maker (1)**
11:23
**makes (1)**
14:16;31:14
**making (2)**
34:24;43:2
**man (3)**
26:18;30:14;35:14
**manager (1)**
7:23
**manner (1)**
39:7
**man's (1)**
28:23
**many (6)**
12:25;13:1;14:7,13;
18:5;27:18
**March (4)**
6:13,14;25:1,15
**marked (8)**
23:9;24:18;25:20;
26:9;27:25;30:20;
35:23;36:18
**marks (1)**
23:23
**matter (3)**
4:6;18:22,23
**may (6)**
9:8;11:3;12:4;27:2;
30:10,10
**maybe (3)**
7:20;12:16;42:13
**McCarty (1)**
11:15
**mean (19)**
9:13;10:14;11:21;
13:7,16;15:4,14,22;
17:3;20:8,8;28:25;
36:5;38:2;39:9,9;
40:5;41:8,21
**means (1)**
15:23
**medical (1)**
20:9
**mentioned (2)**
22:13;34:13
**mentions (1)**
38:11
**middle (2)**
6:3,5
**might (2)**
26:5;30:10
**mind (1)**
33:21
**Mine's (1)**
31:10
**minute (2)**
18:13;32:7
**minutes (1)**

39:16
**Miss (1)**
38:25
**missing (2)**
26:20;35:19
**Monday (1)**
43:4
**month (1)**
35:22
**months (1)**
29:10
**more (5)**
13:7,7;27:8;40:18;
42:13
**move (1)**
11:21
**much (4)**
17:24;32:6,17,20
**mute (3)**
34:19,20,22
**myself (1)**
11:18

**N**

**name (10)**
4:12,13,20;5:24;
6:1,2,3,5;11:14;20:1
**need (3)**
10:6;22:11;25:25
**needed (1)**
5:19
**news (3)**
26:12;28:8;34:13
**newspaper (2)**
26:12;28:7
**next (3)**
15:7,12;34:2
**night (1)**
38:19
**Nineteen (1)**
19:12
**note (1)**
37:17
**Notes (3)**
11:10;12:2;20:15
**notice (1)**
10:3
**November (2)**
6:18;37:3

**O**

**object (1)**
38:23
**occupation (1)**
6:7
**occurred (2)**
38:15,16
**OCGA (1)**
4:4
**October (1)**
37:3

**off (20)**
15:1;26:17,19;
28:10,12,18,24;29:1,
4,9;33:2,7;34:4,5,11,
21,24;35:3;36:22;
39:20
**Office (14)**
4:19;7:2,24;16:13;
17:23;19:14;20:6,6;
21:19;25:3,4,10;
27:10;38:16
**officer (3)**
22:11;27:6;40:12
**officers (1)**
27:12
**offices (1)**
16:9
**official (1)**
40:2
**officially (1)**
4:8
**oftentimes (1)**
12:4
**one (29)**
10:4,15;11:7,12;
14:23;16:19;18:10,
11,11,12,16,17,20,25;
19:1,2,2;21:25;25:12;
27:8,14,21;29:9,10;
34:15;37:2,3,3;43:3
**ones (1)**
28:14
**ongoing (1)**
18:24
**only (1)**
25:23
**open (9)**
5:12;17:23;18:21;
22:14,22;23:17,18;
24:10;42:8
**order (3)**
24:11;27:5,10
**organization (2)**
27:11;40:24
**others (1)**
28:15
**otherwise (1)**
11:9
**out (5)**
18:22;26:14;27:10;
37:11;40:4
**outside (3)**
11:5;18:3;21:17
**over (3)**
17:5,9;42:2
**own (3)**
22:4;29:17;39:3

**P**

**page (1)**
28:21
**pages (1)**

23:13
**paid (3)**
21:19;36:5,6
**paper (5)**
12:10,12;13:16;
14:3;26:25
**paraphrase (1)**
13:24
**park (4)**
26:20;34:16;35:7,
14
**part (3)**
8:10;19:14;33:2
**particular (1)**
19:22
**parties (1)**
4:22
**pay (5)**
21:10,10,11;23:24;
35:19
**Peace (1)**
27:5
**people (5)**
5:19;11:14;14:19;
20:24;27:6
**per (1)**
5:4
**period (1)**
36:23
**person (6)**
14:9,23,25;15:7,12;
41:4
**personal (2)**
41:10,14
**personally (1)**
28:14
**personnel (6)**
22:16;23:1,2,18,19;
25:16
**phone (1)**
28:23
**picture (3)**
8:18,18;31:16
**piece (1)**
11:22
**Plaintiff (1)**
4:14
**Plaintiff's (8)**
23:9;24:18;25:20;
26:9;27:25;30:20;
35:23;36:18
**play (3)**
31:3;32:7,15
**playing (2)**
31:9,10
**plays (5)**
31:6;32:10,23;33:9,
17
**please (1)**
4:12
**pm (4)**
4:2,8,10;43:6
**point (1)**

9:23

pole (1)
16:10

police (1)
27:12

policy (10)
5:21;8:11;28:11,13;
34:4;39:4,10,13;40:9,
11

portion (2)
9:19,24

position (3)
6:12,19,20

POST (8)
8:2,4;27:6,16,16,
19;29:19,23

P-O-S-T (1)
27:11

posted (1)
22:10

POST's (1)
30:2

pretty (3)
17:23;31:9;32:6

previous (2)
15:1;41:5

previously (1)
29:7

prior (3)
6:19;11:4;18:11

private (2)
17:16;36:22

probably (2)
5:11;25:25

probation (6)
21:5,8,12;27:3;
29:10;40:7

proceed (2)
10:2;11:21

proceeds (1)
8:22

process (4)
8:23;14:11;19:7;
37:18

professionalism (1)
21:7

promoted (1)
6:23

promotion (1)
23:24

prompts (1)
8:20

prosecution (1)
9:14

provide (5)
12:1;15:7,8;23:19;
25:10

provided (8)
11:6,23;15:7;22:14,
15;25:7,8;35:21

psychology (2)
8:8,9

public (2)

17:22;39:13

punished (1)
40:7

punishment (10)
11:24;12:20;14:17;
21:1;26:22;27:5,9,19;
29:17;40:3

put (1)
27:3

**Q**

quick (1)
31:19

**R**

Rahn (4)
11:16;41:15,23;
42:2

R-A-H-N (2)
11:16;41:16

raise (1)
23:24

raises (1)
24:1

Randy (4)
4:15;34:19,19;43:1

ranks (1)
15:2

rape (1)
20:11

reached (1)
37:11

read (5)
15:21,22;20:8;
28:21;42:22

real (1)
31:18

really (1)
9:4

reason (3)
10:25;11:6;37:8

recall (1)
25:3

receive (4)
10:3,12;11:3;37:19

received (12)
7:15;8:2;11:3;
23:22,23,23;24:10;
26:1;37:7,11,13;38:5

recess (1)
39:21

recommend (3)
40:14,17,20

recommendation (7)
12:4;15:5,9,10,16;
16:2;29:1

recommendations (2)
15:1;29:17

recommended (5)
21:1;24:3;28:22;
29:10,11

record (13)
4:8;5:25;11:7;
17:24;26:1;32:15;
34:21,24;35:1,4,4;
39:20,22

recorded (4)
10:18,23,24;11:9

recording (9)
10:21,25;31:7;
32:11,24;33:3,7,10,18

records (8)
5:13;17:23;22:14;
23:17,18;24:10,22;
42:8

recruiting (1)
7:23

referring (1)
19:2

reflected (6)
22:21,23,25;23:2;
24:5;29:12

reflecting (1)
24:23

regard (5)
11:19,23;17:15;
18:22;42:10

regarding (2)
24:11,23

regular (1)
21:18

reimbursing (1)
28:23

rejected (1)
29:16

relationship (1)
40:23

remember (4)
16:15;27:1,2,14

remotely (2)
4:23;5:3

report (12)
19:19,19,20,21,23;
20:4,4,8,15,16;28:4;
41:20

reporter (7)
4:3,9,20,21;5:2,4,25

represent (2)
4:12,13

representing (1)
21:18

request (13)
22:10,12,14;23:17,
18;24:11,13,22;37:11,
16,21;38:6;42:9

requested (1)
36:25

requests (6)
5:13;17:23;36:22,
24;37:23;38:3

requirements (1)
4:4

responded (1)
5:12

responding (1)
42:8

response (1)
24:21

responsibilities (1)
42:11

restitution (1)
35:19

restrictions (1)
17:24

result (8)
11:20;20:10;21:2;
22:19,20;40:14,18,21

resulted (1)
27:19

Resuming (17)
23:11;24:20;25:22;
26:11;28:2;30:22;
31:8;32:12,25;33:11,
19,24;35:5,25;36:20;
38:24;40:1

retention (1)
12:16

review (3)
11:5;19:18,24

reviewed (4)
20:14,14,24;29:16

reviewing (1)
20:23

Richmond (10)
4:19;6:16;7:1;16:7;
20:5,6;28:22;35:10,
11;41:19

right (20)
6:19;7:10;8:10;
11:14;14:23;22:13;
23:4,16,24;24:15;
29:21;30:5;31:16;
33:1,2,2,20;36:1,3;
42:17

Rollins (1)
42:1

room (3)
12:9;13:15;14:3

Roundtree (3)
4:6,11;19:1

run (1)
21:21

**S**

same (2)
14:11;29:2

sanction (1)
12:6

saying (2)
28:15;41:8

schedule (1)
35:22

screen (3)
23:6;26:7;30:18

search (4)
13:11,12,13;14:2

searched (2)
13:18,19

second (1)
28:21

security (5)
17:16;21:24;22:3;
36:22;37:9

send (1)
24:10

sense (1)
31:14

sent (3)
5:13;22:18;25:11

separate (2)
10:11;23:3

Sergeant (23)
4:6,18;5:11;6:8;
11:15,15;16:15;17:6,
9;22:9,11;35:6;37:12,
17,20,21,24;38:4,6,
25;39:18;40:2;42:25

sergeants (1)
11:12

serious (1)
42:6

seven (3)
12:17,17;28:22

several (1)
5:12

sexual (4)
14:8;39:4,5,12

share (6)
10:13;23:6;24:15;
26:7,8;30:18

sheriff (15)
8:25;9:11;12:2;
14:21,25;15:18,25;
16:2,3,9,20;41:20,22,
25;42:5

Sheriff's (25)
4:19;5:13,20;6:10,
17;7:1,11,24;8:12;
13:2;16:8,13;20:6,10;
21:18,21;22:4,6;
27:10,18;36:24;
38:15;39:5,11;41:19

show (8)
19:22;23:6;25:13;
27:24;30:17;35:20;
36:17,17

sic (2)
25:18;38:19

sign (5)
15:1;28:24;29:1,9;
42:23

signs (1)
29:4

six (3)
7:22;28:24,25

skipping (1)
31:10

skippy (1)
31:9

small (1)
8:18
Smith (1)
21:25
smoothly (1)
31:10
social (1)
8:8
someone (4)
5:19;15:21,22,23
Sometimes (1)
11:3
sorry (6)
6:14;16:14;17:3;
25:6;27:8;39:25
sounded (1)
33:12
sounds (1)
33:6
South (2)
7:6,6
speak (1)
16:11
special (25)
17:16;21:5,14,16,
17,21,25;22:2,8,11;
37:1,4,10,12,15,17,18,
20,21,23;38:4,6,7,7;
40:8
specialty (1)
22:9
specific (1)
5:18
spell (1)
5:25
spoke (1)
20:7
staff (2)
15:2,5
Standards (1)
27:6
start (2)
9:19;17:11
started (3)
7:1,17,24
starting (1)
34:10
state (2)
4:12;25:2
statement (1)
11:4
statements (1)
9:18
stay (1)
12:22
stayed (1)
7:17
stays (1)
12:20
still (4)
32:9,13;35:1,4
stolen (1)
28:23

stored (4)
12:8,10,11;13:17
straight (1)
41:25
structure (2)
16:24;17:15
subject (1)
22:14
submit (2)
27:16;37:20
substantiated (1)
40:10
suggested (1)
29:11
Sunday (1)
36:13
supervisor (9)
9:10;15:8,24,25;
17:1,5,9;41:22,23
supposed (3)
37:25;38:1,3
sure (10)
12:17;14:1;17:14;
24:5;27:9;29:25;30:4,
9;34:24;41:6
suspend (3)
16:3,3;29:22
suspended (5)
15:23;23:23;26:21,
25;40:17
suspension (6)
21:5,8,13;24:12;
28:23;40:7
sworn (3)
4:23;5:3,8
sync (1)
14:6
synopsis (1)
12:3
Syria (1)
19:25
system (1)
20:15

### T

talk (2)
18:12;34:11
talking (2)
18:25;19:9
Tameka (2)
4:16;43:1
ten (5)
13:7;21:5,8,13;40:7
terminated (1)
24:4
terminating (1)
29:11
termination (3)
14:17;27:13;29:21
terminations (1)
27:15
test (2)

38:11,12
testified (1)
5:8
testify (2)
5:20,22
Thanks (1)
43:2
Therapeutic (2)
7:18,23
thought (1)
34:22
three (3)
7:20;10:4;11:12
times (3)
12:3;23:5;28:12
title (1)
17:2
titled (1)
22:15
today (4)
4:22;5:22;19:1;
43:2
Today's (2)
4:7,9
told (2)
9:11;29:3
took (1)
38:11
totally (1)
9:22
totem (1)
16:10
training (3)
7:25;8:3,5
transmission (1)
25:23
transmitted (3)
25:2,3,15
trouble (1)
26:17
try (2)
13:22;32:2
trying (2)
7:13;25:8
Turn (1)
33:7
turned (6)
26:17;28:10,12;
33:2;34:5,11
turning (4)
26:17;28:18;33:21;
34:4
turns (1)
33:7
twelve (1)
29:10
twenty-seven (1)
32:7
two (6)
7:20;18:8,9;27:2;
29:8,9
type (1)
29:5

types (1)
8:5
typically (2)
10:2;14:23

### U

ultimate (1)
15:18;16:3
unbecoming (3)
39:8;40:9,12
under (2)
10:13;39:7
undergraduate (1)
8:7
understood (4)
15:17;16:23;17:15;
18:20
uniform (3)
39:5,12,14
unit (1)
13:3
University (1)
7:6
unless (1)
29:20
up (10)
12:5;13:21;15:3,11,
25;28:5;32:7;33:7;
39:17;42:13
use (4)
8:14;13:1;18:13,14
used (3)
36:2,9,13
usually (6)
9:2,9;10:6,21;
11:11;14:25

### V

vacation (6)
36:2,6,7,7,9,13
Vaguely (2)
33:4;35:8
value (1)
30:8
various (1)
8:5
verify (1)
14:4
verifying (1)
14:15
versus (3)
4:6,11;19:1
via (1)
4:21
video (9)
30:14;31:12,14;
32:14,21;34:2,10,11,
15
video/audio (5)
31:6;32:10,23;33:9,
17

VIDEOGRAPHER (6)
4:5;35:1,3;39:20,
22,25
violation (4)
28:11,13;34:12;
40:6
violations (2)
8:11,15
violent (1)
6:21,22

### W

wait (2)
9:12,13
waive (2)
42:23,24
walk (1)
8:23
Walker (21)
18:7;19:15;20:22;
23:22;24:4,24;26:13,
16;28:4,10,12;29:11;
36:23;37:5,6;38:8,11,
13,18;40:4;41:5
Walker's (3)
22:16;30:14;35:21
wanna (5)
8:17;25:8;26:21;
42:22,23
Washonda (1)
6:6
W-A-S-H-O-N-D-A (1)
6:6
watch (2)
32:17,21
way (2)
15:25;16:9
website (1)
30:3
weekend (1)
43:1
welcome (1)
5:16
weren't (1)
42:11
What's (4)
6:5;17:2;19:20;
21:16
Whereupon (20)
4:3;5:3,5;23:9;
24:18;25:20;26:9;
27:25;30:20;31:6;
32:10,23;33:9,17,23;
34:18;35:23;36:18;
39:21;43:5
who's (3)
10:16;19:23,23
Wick (1)
4:13
William (1)
11:15
without (4)

14:15;21:10,11;
30:2
**WITNESS (4)**
4:18,22;5:3,7
**work (3)**
8:8;22:4;35:21
**worked (4)**
7:18,19,21,22
**working (2)**
21:24;36:2
**works (1)**
30:19
**world (1)**
42:9
**wrapping (1)**
39:17
**write (1)**
26:25
**written (2)**
11:4;37:19
**wrong (1)**
36:1

**Y**

**y'all (2)**
19:18;42:22
**year (5)**
7:18;21:5,8,12;40:7
**years (6)**
7:20,22;12:17,17;
13:4;14:8
**YouTube (3)**
30:23;33:25;34:1

**Z**

**Zoom (2)**
4:22;31:16

**1**

**10 (1)**
39:15
**14th (5)**
36:2;37:9,15;38:7,
19
**154 (1)**
23:12
**15th (1)**
36:10
**16th (1)**
36:14
**18th (3)**
19:4,9,9
**19th (4)**
19:4,6,9,9

**2**

**2:00 (2)**
4:2,8
**2:01 (1)**

4:10
**2:52 (1)**
35:4
**2000 (2)**
7:9,11
**2001 (1)**
7:17
**2013 (2)**
6:18;7:2
**2014 (1)**
8:3
**2017 (10)**
6:14;18:11;22:20;
23:23;24:3;26:14;
28:5,9;41:4,14
**2018 (3)**
6:13,14,15
**2019 (14)**
19:11;21:2,25;
22:20;35:22;36:10;
37:2,3,3,4,6,9,15;38:7
**2020 (2)**
25:15;38:19
**2021 (1)**
25:1
**2022 (2)**
4:7,10
**23rd (1)**
37:4
**25 (2)**
36:24;40:24
**26th (1)**
37:3
**27th (1)**
6:13

**3**

**3:00 (1)**
39:20
**3:07 (2)**
39:24,25
**3:15 (1)**
43:6
**30 (3)**
29:23,25;40:18

**4**

**4th (2)**
4:7,10

**5**

**5:07 (1)**
39:23
**5th (1)**
37:3

**9**

**9-11-28c (1)**
4:4

**9th (1)**
6:18