# In The Matter Of:

*Valencia Colon v.*
*Richard Roundtree et al*

---

*Capt Allan Rollins*
*February 7, 2022*

---

*Kellie K. Rodman, LLC*
*Certified Court Reporters*
*P. O. Box 500*
*Homer, Georgia  30547*
*678-614-8109*

Original File 020722Cauthorn_CaptRollins.prn
Min-U-Script® with Word Index

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF GEORGIA

3                      AUGUSTA DIVISION

4   VALENCIA COLON              )
                                )
5   Plaintiff,                  )
                                )
6   vs.                         )  CAFN: 1:21-CV-00149-JRH-BKE
                                )
7   RICHARD ROUNDTREE, ET AL.   )
                                )
8       Defendants.             )
                                )

9

10

11              _____

12         The videotaped 30(B)(6) deposition of CAPTAIN ALLAN

13   D. ROLLINS taken via remote teleconference before Kellie

14   A. Jones, CCR, CVR-M, B-1671, Certified Court Reporter,

15   commencing at 11:00 a.m. on Monday, February 7, 2022, in

16   Augusta, Georgia.  The reading and signing of the

17   deposition was waived.

18

19

20              _____

                 Kellie K. Rodman, LLC
21               Certified Court Reporters
                  krodmanccr@gmail.com
22                  678-614-8109

23

24

25

```
 1                APPEARANCES (via Teleconference)

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4   J. WICKLIFFE CAUTHORN, ATTORNEY AT LAW
     The Cauthorn Firm
 5   1984 Howell Mill Road
     P.O. Box 20059
 6   Atlanta, Georgia 30325

 7
     ON BEHALF OF THE DEFENDANTS:
 8
     TAMEKA HAYNES, ATTORNEY AT LAW
 9   RANDOLPH FRAILS, ATTORNEY AT LAW
     Frails & Wilson, LLC
10   211 Pleasant Home Road
     Suite A1
11   Augusta, Georgia 30907

12
     ALSO PRESENT:
13
     Chris Bennett, Videographer
14   Metro Legal Video Services

15

16

17

18

19

20

21

22

23

24

25
                                                        2
```

I N D E X

CROSS-EXAMINATION

By Mr. Cauthorn . . . . . . . . . . . . . . . . . Page 5

E X H I B I T S

| EXHIBIT NUMBER | DESCRIPTION | PAGE MARKED/ IDENTIFIED |
|---|---|---|
| A | Body Cam Video | 45 |
| B | News Article | 46 |
| C | News Article | 54 |

TRANSCRIPT LEGEND

| | |
|---|---|
| . . .(ellipsis) | Halting speech or an unfinished sentence in dialogue or an omission when reading written material |
| -- (dashes) | Break in speech continuity |
| (ph) | Spelled phonetically |
| (sic) | In its original form |

3

1                    P R O C E E D I N G S

2                                              11:00 a.m.

3          (Whereupon, the court reporter complied with

4     the requirements of O.C.G.A. 9-11-28(d).)

5          THE VIDEOGRAPHER:  Today's date is

6     February 7th, 2022.  The time is 11:00 a.m. We

7     are on the record.  Would the court reporter

8     please swear in the witness?

9          THE COURT REPORTER:  This is the

10    deposition of Captain Rollins in the case of

11    Colon v Roundtree in the United States District

12    Court for the Southern District of Georgia,

13    Augusta Division.  Would everyone present state

14    your name and who you represent?

15         MR. CAUTHORN:  This is Wick Cauthorn.  I

16    represent the Plaintiff, Ms. Colon.

17         MS. HAYNES:  Tameka Haynes and Randolph

18    Frails for the Defendant.  We also have a

19    paralegal, Ebony Simon.

20         THE VIDEOGRAPHER:  Wick, are you okay with

21    them being in the video?

22         MR. CAUTHORN:  Yes, that's fine.

23         THE WITNESS:  I'm Captain Allan Rollins

24    with the Richmond County Sheriff's Office,

25    Training Division.

1          THE COURT REPORTER:  And do you spell

2      Allan, A-l-l-e-n or A-l-a-n?

3          THE WITNESS:  A-l-l-a-n.

4          THE COURT REPORTER:  This deposition is

5      being conducted via Zoom teleconference.  Do

6      all parties agree to have the witness sworn

7      remotely?

8          MR. CAUTHORN:  Yes.

9          MS. HAYNES:  Yes.

10         (Whereupon, the witness was sworn remotely

11     by the court reporter per agreement of

12     counsel.)

13  Whereupon,

14                CAPTAIN ALLAN ROLLINS

15     was called as a witness herein and, having been

16     first duly sworn, was deposed and testified as

17     follows:

18                CROSS-EXAMINATION

19  BY MR. CAUTHORN:

20     Q.   Captain Rollins, my name is Wick Cauthorn.  I

21  represent Valencia Colon in the matter that was

22  previously identified by the court reporter.  And I've

23  traded some -- you're here today because I've traded

24  emails with Ms. Haynes.  And, you know, a county can't --

25  an entity can't speak for itself, so to speak.  So people

                                                         5

1    have to be identified to speak on behalf of an entity.

2    And we traded emails about several topics.  And one of

3    the topics was the Sheriff's Department office policies

4    and practices related to professional standards and

5    training.  And you were the individual identified by

6    Defense Counsel as the appropriate representative for me

7    to speak to about those -- about those issues.  Is that

8    what your understanding is why you're here today?

9          A.    Yes, sir, it is.

10         Q.    Okay.  Good.  What is your full name?

11         A.    It is Allan Dewey Rollins.

12         Q.    Okay.  What is your occupation?

13         A.    I am Captain with Richmond County Sheriff's

14   Office, Training Division.

15         Q.    How long have you been a Captain with the

16   Richmond County Sheriff's Office?

17         A.    I think four years now as Captain.

18         Q.    Okay.  What was your job prior to being

19   Captain?

20         A.    I was Lieutenant of Internal Affairs.  Prior

21   to that, I was a Sergeant over the Narcotics Division.

22   And before that I was an investigator in the Narcotics

23   Division.

24         Q.    Okay.  How long were you a lieutenant in

25   Internal Affairs?

6

1          A.     Three years.

2          Q.     How long were you a sergeant in the Narcotics

3    Division?

4          A.     A long time.  I can't exactly remember if it

5    was 2001 to like -- I actually forget.  It was like

6    ten/eleven years.

7          Q.     Okay.  But it was somewhere around the --

8    around 2001 is when you first worked there?

9          A.     Correct.

10         Q.     Okay.

11         A.     As a sergeant in narcotics.

12         Q.     Okay.  And how long have you been with the

13   Richmond County Sheriff's Department?

14         A.     I just passed my 40th anniversary in July.

15         Q.     Okay.  Have you ever -- have you worked as a

16   -- did you start as a deputy and work your way up to

17   captain?  How did your career progress with them?

18         A.     Well, I started with -- well, full disclosure.

19   I worked with the Augusta Police Department.  And I came

20   to the sheriff's office in 1981.  I became a CID

21   investigator in narcotics in 1989.

22         Q.     Okay.  Prior to the -- I guess you just said

23   that.  You worked in law enforcement with the Augusta

24   Police Department.  Other than the Augusta Police

25   Department, have you ever worked in law enforcement

                                                              7

1  anywhere else?

2       A.   No, I have not.

3       Q.   Okay.  Running up against time on that one, I

4  guess, right, at some point.

5            Have you ever had any other career other than

6  law enforcement?

7       A.   Yes. I was a plumber before I was a police

8  officer.

9       Q.   Okay.  How long were you a plumber?

10      A.   Off and on for years.

11      Q.   Okay.  What is your highest level of

12  education?

13      A.   I have an associate's degree from Brenau

14  University.

15      Q.   Okay.  What is that degree in?

16      A.   It's in general studies.

17      Q.   When did you get that?

18      A.   Two years ago.

19      Q.   What is your -- and I -- and because I know

20  that being a law enforcement officer requires additional

21  training.  So what is -- what professional training have

22  you had, licensing and things like that?

23      A.   I'm a graduate of the police academy.  I have

24  a couple thousand hours of additional training.  I have

25  both my management and my supervisory certificates in law

8

1    enforcement.  And I also attended the Southern Police

2    Institute and graduated from it.

3        Q.   All right.  Well, what is the Southern Police

4    Institute?

5        A.   It is out of the University of Louisville,

6    Kentucky.  It is the command development course that they

7    put on for senior officers that aren't executive level

8    yet.

9        Q.   And how -- how does that process work?  What's

10   the process for getting that certification?

11       A.   That certification is two weeks on two weeks

12   off; it's a ten week course.  I took it in Florida, so it

13   was back and forth.  And it entails all the things you

14   need to know as a mid-level manager as far as budgets,

15   personnel, handling personnel.  All the stuff you would

16   get in basic business classes, but it's for law

17   enforcement.

18       Q.   When did you complete that program?

19       A.   That would have been I think three, maybe four

20   years ago now.  As a matter of fact, it was four years

21   ago.

22       Q.   Okay.  And you said you've got some kind of

23   certification in management?

24       A.   Yes.   When -- Georgia Peace Officers and

25   Standards Training Council, when you graduate from the

9

1    SPI courses or one from Northwest or Columbus State

2    University, they give you the management certificate.

3    It's basically like taking their classes, but you do it

4    at a college level.

5        Q.    Okay.  And how long did that last?  What was

6    that -- what was that program?

7        A.    Well, actually, I went through the SPI

8    program, and it was ten weeks of classroom time; about

9    twenty weeks all told with the time in between.

10       Q.    Okay.  When did you finish that program?

11       A.    That would have been the one I finished four

12   years ago.

13       Q.    Okay.  All right.  So that was the -- what is

14   the difference in the SPI -- and what does SPI stand for?

15       A.    Southern Police Institute.

16       Q.    Okay.  And so the SPI program is what you were

17   referring to about your management certification?

18       A.    As the management certification.  I was

19   grandfathered in by P.O.S.T. because I did take those

20   courses.

21       Q.    Okay.  And P.O.S.T. is the state licensing

22   wing for law enforcement?

23       A.    Technically, yes.

24       Q.    Okay.  What is -- can you just explain, for

25   the record, what P.O.S.T. is and what it does?

1      A.   Georgia P.O.S.T. is the one that sets the

2  standards for police officers; therefore, it's the Peace

3  Officer Standards and Training Council.  It's made up by

4  many members throughout the state.  Some of them

5  appointed by the governor, some of them appointed at

6  local levels and through P.O.S.T.  They're the ones that

7  determine the standards for training.  What is the bare

8  minimums and what classes you have to take in order to

9  get advanced certifications.

10     Q.   Okay.  And have you ever worked as a P.O.S.T.

11  instructor or with P.O.S.T. in any way shape or form?

12     A.   I am an instructor with the State of Georgia,

13  yes.

14     Q.   Okay.  And what is that? Can you explain what

15  that means that you're an instructor with the State of

16  Georgia?

17     A.   Well, as an instructor in law enforcement, you

18  attend the academy, which in my case was a two week class

19  that you take and you are certified by, at that time was

20  GPSTC, and P.O.S.T. accepts it.  And you become a

21  P.O.S.T. instructor.  And you fall under their guidelines

22  for conducting classes, what the method of teaching is,

23  whether you can log the classes in or not.  It's also

24  in-service training.  Any training you basically do in

25  the general sense.  And there are advanced certifications

11

1   past that.

2        Q.   Okay.  Do you have any advanced certifications

3   past that?

4        A.   Yes, I do.  I'm a firearms instructor as well.

5   And I have several other schools that allow me to teach

6   materials on behalf of -- like the private companies that

7   do certifications.

8        Q.   Other than P.O.S.T., with P.O.S.T. and the

9   academy, have you ever been an instructor anywhere else?

10       A.   Have I been an instructor anywhere else?

11  Well, I do teach other classes.  I have taught as guest

12  instructor at other locations.  But all that generally

13  would have been because I was a P.O.S.T. instructor.

14       Q.   Okay.  So you may go somewhere and teach a

15  class based on your relationship with P.O.S.T.?

16       A.   Yes.  I'm state certified.

17       Q.   Okay.  Is that a -- is the P.O.S.T. position a

18  compensated position in addition to working for the

19  Sheriff's Department or are they part of the same job?

20       A.   It is part of the same job.  They have to

21  certify you in order to be an instructor.

22       Q.   Okay.  So are you on -- when you're doing

23  instruction work at the academy, are you still

24  essentially on the -- for lack of a better term --  on

25  the clock for Augusta?

1          A.    Yes.

2          Q.    Okay.  That's what I was getting at.  I didn't

3    know -- I didn't know if you had a full time job and then

4    something that sounds like it amounts to another full

5    time job on the side.  And so -- but it's one full time

6    job and they're all interrelated?  That's my

7    understanding.

8          A.    Correct.

9          Q.    Okay.  How long have you been a P.O.S.T.

10   instructor?

11         A.    Thirty-six years.

12         Q.    Okay.  Other than what we've already talked

13   about, do you have any other professional training

14   related to law enforcement?

15         A.    I can't really think of any right now.

16         Q.    Okay.  If you think of something, let me know.

17   Just, you know, just put it out there.  I'm not gonna --

18   I'm not trying to hold you to it.  I know that forty

19   years, there's a lot of little certifications and classes

20   that you took here and there.  And I don't need to know

21   all that.  I was just -- if there's anything big that

22   pops in your head, let me know.  Okay?

23         A.    Okay.

24         Q.    All right.  So what written policies does the

25   Augusta Sheriff's Department have on use of force?  And

                                                        13

1    when I say that, what I mean is, are there documents that

2    are written down that everyone knows exists that are

3    department policies on the when, what, why and how for

4    using force against a person in custody?

5         A.    There is a written policy on the use of

6    force.  It covers several chapters.  It has different

7    rules kind of to them, but you can't go scenario by

8    scenario because every scenario will be different.  But

9    there are general rules, yes.

10        Q.    What's the name of that document?

11        A.    That would be the Policy and Procedure Manual

12   on Use of Force.

13        Q.    Okay.  How long is that document?

14        A.    It's several chapters, I believe.

15        Q.    Okay.  Do all of the sheriff's deputies

16   receive a copy of that document when they go to work for

17   the department?

18        A.    Yes, they do.

19        Q.    Okay.  Is that document part of their

20   training that they had before they go to work for the

21   department?

22        A.    Yes, it is.

23        Q.    Okay.  Explain how that document is used in

24   the training and then how you instruct and then how it

25   guides your education of deputies.

                                                              14

1          A.    They are originally given a copy of the Policy

2    and Procedure Manual; quite often now it's done on CD

3    format because it's just easier.  They're given a copy of

4    it.  We cover some of the materials in the classroom for

5    their orientation part for coming to work with us.  There

6    is going to work in most cases into the jail where they

7    will have kind of like a senior person walk them through

8    and what they're supposed to do.

9                When they go to the police academy and

10   graduate from the police academy, they will go into a

11   field training officer program and those materials will

12   be covered with different scenarios and can you do things

13   and can you do such things. And a large part of it is

14   simply for them to read and know what the policies are on

15   the use of force.

16         Q.    Okay.  Is there any difference in the Policy

17   Manual and any kind of training manuals?   What I mean is

18   that are there training documents that are not included

19   in the Policy Manual?

20         A.    I don't believe so.  I don't believe so.

21         Q.    And if I -- if I just said Use of Force Policy

22   Manual, would anybody at the Sheriff's Department

23   understand what I was talking about and what document I

24   was referring to?

25         A.    If you put it in that context, they'll know

                                                              15

1    what you're talking about.

2          Q.    Okay.   Is there any written policy on the use

3    of a body camera, when to use it, how to use it and what

4    the rules are with regard to use of an individual body

5    camera?

6          A.    Yes, there is.

7          Q.    All right.   What's the -- what is the name of

8    that written policy?

9          A.    The Policy and Procedure Manual Body Worn

10   Camera Policy.

11         Q.    Okay.   And what's that document?   I'm

12   assuming that's probably a little smaller than the use of

13   force document?

14         A.    It's in the Policy and Procedure Manual with

15   all the other policies and procedures.

16         Q.    Okay.   So there is a -- so what you're telling

17   me now is -- so what I'm getting then is there's actually

18   a broad Policy and Procedure Manual.

19         A.    Yes.

20         Q.    Okay.   And so would the use of force policy be

21   set out in that manual?

22         A.    Yes.

23         Q.    Okay.   And then the body worn camera policy

24   would be set out in that manual?

25         A.    Yes.

                                                              16

1        Q.   Okay.  What is the large manual?  What's the
2   title of the big document that includes all the
3   individual policies?
4        A.   The Policy and Procedure Manual.
5        Q.   Okay.  And I'm gonna ask you a couple more --
6   in the Policy and Procedure Manual, is there a written
7   policy about providing special duty security by deputies?
8        A.   Yes, there is.
9        Q.   Okay.  Is there a -- is there a written policy
10  in that manual about the way to conduct oneself in
11  uniform with -- for instance, like, with specifically the
12  appropriateness of sexual contact with people while
13  you're in a uniform and things like that?  I think
14  Sergeant Lee described it as the conduct of an officer,
15  the conduct unbecoming.  Is that addressed in the manual?
16       A.   Yes, it is.
17       Q.   Okay.  What's the title of the section that
18  that's in?
19       A.   I would be hard pressed to say the exact
20  section, but I think it's officer conduct.
21       Q.   Okay.  Is there a written policy on use of
22  Sheriff's Department vehicles and things like that?
23       A.   Yes, there is.
24       Q.   Okay.  Does it cover use of vehicles while on
25  duty and while off duty?

                                                    17

1        A.   I believe it does, yes.

2        Q.   Is there any kind of written policy

3   specifically with regard to how to conduct special duty

4   security assignments?

5        A.   I believe there is a -- excuse me.  I believe

6   there is a section on that, yes.

7        Q.   Okay.  And I had a bunch of -- I had a bunch

8   of similar questions about written training manuals.  Are

9   there written training manuals that are different than

10  the Policy Manual?

11       A.   I don't believe there is.  We would pull the

12  training manuals from the Policy and Procedure Manual.

13       Q.   Okay.  Is there a training manual in the --

14  are there training documents in the Policy and Procedure

15  Manual?

16       A.   Training documents?  No, there are not.

17       Q.   Okay.  For instance, I'm thinking about, you

18  know, a manual that would have a chapter and then maybe

19  in the back of the chapter have worksheets or PowerPoint

20  slides or things like that that are used for training.

21  Are there any documents in addition to the Policy Manual

22  that are used in the training process?

23       A.   Oh, yes.

24       Q.   Okay.  Do y'all have -- are they standard or

25  are they -- are they created depending on a particular

                                                          18

1    class?

2         A.   They are pretty much standardized.  Some of

3    the ones we use are even from the Georgia Sheriff's

4    Association and some from the Augusta Police Academy,

5    Augusta Technical College Police Academy.  And we just

6    use the same lesson plans over and over.

7         Q.   No reason to reinvent the wheel every time?

8         A.   No.

9         Q.   Okay.  How often are those policies -- how

10   often are those training documents updated?

11        A.   Generally we look at them annually. Whether

12   there's a need to upgrade them or not would be determined

13   at the time we look at them.  Some of these classes are

14   several years old because they haven't changed.  So --

15   but they are looked at annually and discussed annually

16   about updates.

17        Q.   Can you explain to me what the police academy

18   is or the sheriff's academy is or what the academy is?

19   We talked about an academy.  What is the academy?

20        A.   In order to be a certified police officer in

21   the State of Georgia, you have to attend a certified

22   academy that is certified through P.O.S.T. and they go

23   over the very basic parts of being a police officer.

24   They cover things such as use of force, driving,

25   firearms, legal issues, legal updates, defensive tactics.

19

1   All that would be covered in the basic academy.  It has

2   to be certified through P.O.S.T.

3        Q.   Does Augusta-Richmond County have its own

4   academy or do the deputies go to a specific academy

5   anywhere?

6        A.   They go to two academies here in Augusta.  One

7   of them is the Augusta Technical College Police Academy.

8   And the other one is the Georgia Public Safety Training

9   Center Academy that is remotely held at Columbia County.

10       Q.   Which one is the one that you instruct at?

11       A.   I instruct generally at the one from Augusta

12   Tech.

13       Q.   Okay.  Is that put on any specific time of

14   year or is it going on all the time?

15       A.   It kind of goes on all the time.  Augusta Tech

16   does two classes a year that falls on the quarters for

17   college.  And the one from GPSTC, they do according to

18   when they have enough people to put into the class.

19       Q.   How long is the Augusta Tech program?  How

20   many --

21       A.   It's eighteen weeks.  Eighteen weeks I

22   believe.

23       Q.   Okay.  What is the -- how does it proceed? Is

24   it -- how much classroom work and then how much out of

25   classroom work?  And then I'll have some follow up

1    questions.

2              So how does -- what is the process for the

3    academy?

4         A.   The process of the academy is and both of them

5    have different itineraries as far as the way they

6    schedule things.  The first part of Augusta Tech is

7    mainly focused on law and legal issues.  They will go

8    into the other classes after that; the investigative,

9    crime scene; just a progression of things.  And towards

10   the end of it, they will do their firearms and learn how

11   to enter buildings and that kind of behavior.

12             And one of the last parts they'll do is the

13   driving academy where they will learn how to drive in

14   pursuits and precision driving.  And then after that,

15   they get into reviews of everything they've done over the

16   entire academy.

17        Q.   Is the -- and I guess you say that the

18   academies are approved by P.O.S.T.  Is it an

19   accreditation process?  How does the P.O.S.T. approval

20   work for an academy?

21        A.   P.O.S.T. approval for an academy comes down to

22   a need; of whether you need to have an academy at your

23   location, whether it's being met by other agencies and

24   other academies.  There is a certification process.

25             It goes through a inspection process where

                                                        21

1    they check and make sure you have the classroom

2    facilities, you have the driving facilities, you have the

3    firearms facilities, you have defensive tactics

4    facilities.  All the stuff you need to actually host an

5    academy.  They make sure of that and they do it on a vote

6    basis of whether or not you should have an academy.

7         Q.    How often do they review that decision?

8         A.    Whenever somebody applies for one.

9         Q.    For a new academy?

10        A.    For a new academy.

11        Q.    Okay.  So once they've accredited, for

12   instance, the Augusta Tech program, do they go back and

13   do any review of the Augusta Tech program for any kind of

14   updates on the approval or is it just a one-off deal?

15        A.    My understanding is that is a continuing basis

16   kind of thing.  Where they do reports; they do back and

17   forth.  There's inspections and they have training they

18   have to do as the director of the academy to keep

19   P.O.S.T. happy with the certification.

20        Q.    Who runs the academy at Augusta Tech?  And

21   what I mean is, is it done through a combination of local

22   law enforcement working with Augusta Tech?  Is it just

23   Augusta Tech?  Is it local law enforcement?  How does  --

24   how is the academy put on?

25        A.     Director Snowberger, Eric Snowberger, is the

                                                        22

1   director of the police academy at Augusta Tech.  And he

2   falls under a dean at Augusta Tech.  The part where we

3   support Augusta Tech, we supply them instructors.

4   Augusta Tech uses our training facility for driving and

5   firearms.

6           And in that it's kind of an exchange of how do

7   we pay for students to go through the academy because we

8   do an in kind service to earn that.  So he gets

9   instructors; he gets driving ranges; he gets firing

10  ranges and it kind of works out, but there is tuition

11  involved as well.

12      Q.  Okay.  So you got people like you who go over

13  there and do instruction to sort of counterbalance the

14  fact that Richmond County is getting a lot of their

15  sheriff's deputies educated over there?

16      A.  That's correct.

17      Q.  Okay.  Is Augusta Tech, is that -- is that a

18  state school?  Is that a part of the Board of Regents?

19      A.  Yes, it is.

20      Q.  Okay.  What percentage of the students at

21  Augusta Tech go on to be -- and sorry -- strike that;

22  I'll ask it a different way.

23          What percentage of the successful graduates of

24  the program at Augusta Tech go on to work for the Augusta

25  Richmond County Sheriff?

                                                         23

1          A.    When we send them, they're already police

2    officers, so one hundred percent of them will come to us

3    that we sent there.   The other part we may -- it's hard

4    to say.   Other agencies around the area send people, so

5    out of the free ones that are there and are what we call

6    pre-service -- they pay their own way through the academy

7    -- I would venture to say we probably get fifty percent

8    of them.

9          Q.    Okay.   How many -- how many students are in

10   the program at the academy at any given time?

11         A.    Anywhere from, I would say, twelve to maybe

12   twenty-four. I think twenty-four is the max they can have

13   for the classroom.

14         Q.    Okay.   You said that the ones that you guys

15   send over there are already law enforcement officers.

16   Explain to me how that process works and what you meant

17   by that.   I mean, I think I understand.   But I kind of

18   want to know, for the record, what you meant by that.

19         A.    As a general rule, when we hire you, you are

20   sent into the jail to work as a deputy jailer until the

21   next academy classes come up and we go through a vetting

22   process for who's gonna go through the academy.   But once

23   we make a determination you're going to the academy, you

24   already work for us.   So you're on our payroll while

25   you're at the academy.

                                                           24

1           And generally our people when they go to the
2    academy, they graduate from the academy.  We work real
3    hard at it.  They graduate from the academy and they come
4    back to work for us and they go on patrol duty.
5           Q.   Okay.  When you say y'all work real hard at
6    it, what do you mean?
7           A.   We put a lot of time and effort into it.  I
8    mean, we put people in the classrooms; we teach the
9    classes; we bring them out, we teach them how to shoot.
10   It's not just come out and do whatever you want to.
11          We have -- we spend time with them, teaching
12   them how to shoot and how to drive, which are two of the
13   largest failures in the class.  So we take care of that
14   part of it.  But we spend a lot of time in the classroom
15   teaching people.
16          Q.   And I mean, I guess that makes sense.  You've
17   got an economic investment in a person that you need to
18   be trained up to be ready to do the job they're hired to
19   do.  I mean, is that fair to say?
20          A.   That's fair to say.
21          Q.   Who does the -- so there's classroom work and
22   then there's firearm training and there's driving.  Other
23   than firearm training and driving and the classroom work,
24   what other evaluations do they have?
25          A.   Well, I mean, there's -- there's several

                                                          25

1   other.  But I mean, it's all about the broad spectrum of

2   law enforcement.

3           So when they're like at Augusta Tech, they

4   will get Taser training, which we do at the Sheriff's

5   Office before they go, so they don't have to actually do

6   that.  But they do OC spray.  They do defensive tactics.

7   They do -- they do PT virtually every day and they're

8   evaluated on that.  There are -- like I said, it covers

9   the broad spectrum of law enforcement.  It's a little bit

10  of everything in there.

11      Q.   And PT you mean physical training, like

12  physical fitness and weightlifting and running and

13  climbing and jumping and?

14      A.   Well, yes, but it's more running and pushups

15  and situps than anything else.

16      Q.   Understood.  I just wanted to -- I just want

17  to make sure that, for the record, we got PT described as

18  -- I know what it is, but it's physical training?

19      A.   Correct.

20      Q.   Okay.  Who does -- as far as the classroom

21  work goes, who grades the tests and decides whether the

22  whether the students pass?

23      A.   That would be the director.

24      Q.   All right.  Who's the director?

25      A.   At Augusta Tech, it's Eric Snowberger.

                                                          26

1      Q.    Okay.  And he's the Dean you were speaking of?

2      A.    He works under a Dean, but he is the director

3   of the program.

4      Q.    Okay.  And is he the ultimate arbiter of

5   whether people pass or do individual instructors speak

6   with him about classroom work and things like that?

7      A.    I believe he is the ultimate authority.

8      Q.    Okay.  Has he ever worked for the Augusta-

9   Richmond County Sheriff's Department?

10     A.    He used to work for the Columbia County

11  Sheriff's Office.  I cannot say if he worked with

12  Richmond County.  I think he did.  But I can't say that

13  for certain.

14     Q.    How long has he been running the academy at

15  Augusta Tech?

16     A.    Maybe ten years.

17     Q.    Okay.  So I'm here to -- I got some questions

18  about Charlie Walker.  When did Charlie Walker first come

19  to work for the Sheriff's Department?

20     A.    I do not know.

21     Q.    Okay.  Do you know him?

22     A.    No, I do not.

23     Q.    Okay.  Have you ever had any -- and I don't

24  mean personally.  I mean, have you ever had any

25  professional interaction with Deputy Walker?

                                                        27

1        A.    I can't say for certain.  I might have taught

2    a class or something along those lines, but I couldn't

3    say for certain for him.

4        Q.    Okay.  Do you know where he went for his --

5    for his training?  Do you know if he went to Augusta Tech

6    or to the other one?

7        A.    I do not recall.

8        Q.    Okay.  With regard to the Policy Manual that

9    the Richmond County Sheriff's Department has, is that

10   document used at Augusta Tech as a training document or

11   is that document in addition to training materials used

12   at Augusta Tech?

13       A.     I don't believe they use it at Augusta Tech

14   at all, but it is given to the officers for their

15   training and knowledge.

16       Q.    Okay. Do y'all go through it with the

17   individual officers or is it just expected that they're

18   gonna read it and understand it?

19       A.    Well, it's expected they're gonna read it and

20   understand it and go through -- we tell them to at least

21   go through and read the highlights to it.   There's an

22   awful lot in the book, but it takes a long time to go

23   through it.

24       Q.    Okay.  What is the hiring process for the

25   Richmond County Sheriff's Department?  What I mean is how

28

1   do you get new officers and how are they -- how's the

2   application process work?  How is it decided that you're

3   gonna hire them?  And then once you hire them, how is it

4   decided where they're gonna work and if they get an

5   opportunity to go to the academy?

6        A.    The process is, of course, you have to apply

7   for the job and we are always advertising and there's

8   other jobs available -- administrative jobs, such as

9   Records Bureau.  You pretty much put in for the job that

10  you're looking for.

11            There is -- if you're coming to the road

12  patrol, to the field services or the detention center,

13  there is a physical assessment test that's given.  And we

14  take the applicants and the physical assessment is given.

15  If they pass it, we continue on with the process.

16            If they don't pass it, they're eliminated.  We

17  do that early on.   Rather than invest a lot of time in

18  them; if they can't pass the PT, they can't work here.

19            After that is done, it is forwarded through.

20  We begin a background investigation, including polygraph.

21  If they pass the polygraph test, we move on from there.

22  They are interviewed by -- sometimes a board; sometimes

23  it's gonna be the supervisors.  Ultimately they will talk

24  to the Sheriff before they are hired.  He will make the

25  decision whether they are hired or not.

1              Most everyone will go into the jail in that

2    process.  They will become Detention Center officers.

3    And once they're in the detention center, they can apply

4    for a position on patrol.

5              Every so often, somebody will come through

6    that is former military; got experience, a little on the

7    older side.  They will have college experience.  In some

8    cases, they're given an opportunity to go directly to the

9    academy without having to go into the detention services.

10   But the majority will go to detention services and apply

11   for a job out in field operations.

12        Q.   Okay.  And detention services, that's the

13   jailer position.  And how do you decide whether a jailer

14   is -- whether it's appropriate to give a jailer the

15   opportunity to apply -- to go into the field or go to the

16   academy?

17        A.   After they're in the detention center, we put

18   out a memorandum that says if you're interested apply for

19   the job, and they apply for it.  It's reviewed by the

20   Colonel and the Colonel makes the decision whether they

21   go to the academy or not.

22        Q.   Okay.  So it's just -- they apply for the job

23   as a jailer and then they get the job as a jailer.  And

24   then they would apply -- after they've been working for

25   the Sheriff's Department, they would apply to get an

1    opportunity to go to the academy?

2        A.   Correct.

3        Q.   Okay.   What's the typical -- what is the

4    typical timeframe from becoming a jailer to becoming a

5    deputy?

6        A.   Generally, it's in the six to eight month

7    range.   I've seen it up to a couple of years.

8        Q.   Okay.  What percentage of your jailers go on

9    to become deputies?

10       A.   I don't know the percentage, but I would say

11   it's a pretty good number.

12       Q.   Is that sort of if you don't have prior

13   experience or military or college, is that the -- is that

14   the typical way is you become a jailer and then you move

15   up; the academy would be your next step after being a

16   jailer?

17       A.   Yes, it would.

18       Q.   Okay.  What percent do the military and

19   college people, do they just go directly to the academy

20   if they have the proper experience, or do they have to --

21   or do they have some other process?

22       A.   That is a decision that is made on a case-by-

23   case basis.  It would be kind of a blend, I guess, the

24   best way to put it.

25       Q.   Okay.  And I guess what I mean, for instance,

                                                              31

1   if -- I guess if somebody worked at another Sheriff's

2   Department and was already P.O.S.T. certified, they

3   probably wouldn't need to be going to the academy.  But

4   maybe a military person might need to go to the academy

5   to learn proper procedures for law enforcement work?

6        A.   Yeah, military people would have to go to the

7   academy.  You have to be a Georgia State Certified Police

8   Officer to be on patrol duties, yes.

9        Q.   Do you have to go to the academy to get

10  P.O.S.T. licensing?

11       A.   Yes.

12       Q.   Okay.  And can you explain to me what the --

13  what P.O.S.T. licensing is and what it allows someone to

14  do professionally once they've met the qualifications for

15  P.O.S.T.?

16       A.   Well, the certification process is your basic

17  police officer certification and it gives you the power

18  to arrest.

19       Q.   Okay.  So before you have that, you can't be

20  out on the street doing law enforcement because you can't

21  arrest people?

22       A.   Correct.

23       Q.   Okay.  How does P.O.S.T. review licensing?

24  How are certifications reviewed?  And what is -- what

25  types of review processes are there to decide whether to

1  revoke a certification or to require additional training
2  or something like that?
3      A.   It's a pretty confusing process in my opinion
4  sometimes.   Their process for certification is the
5  academy directors certify them.   And that's P.O.S.T.
6  approval because it was through the academy and the
7  academy director has the authority to make that
8  certification.
9          As far as reviews by P.O.S.T., they can do it
10  under any arrest that you may have been arrested, they
11  will come in and do a review.   If they learn about an
12  event, they can make a decision.
13          When you apply for the academy, if there's
14  anything in your background that they find that they
15  don't like, they can conduct an investigation.   They have
16  broad authority to conduct investigations into candidates
17  and officers.
18      Q.   How does P.O.S.T. find out about an event that
19  they may want to investigate?
20      A.   If you're arrested, you are required to
21  report it to P.O.S.T. and you're supposed to do that
22  online on your own account that you have.   The other
23  parts of it, it could be they just got information; they
24  knew about it; they may have read something in a news
25  article; somebody may call them up and tell them what

33

1   happened.  And they have the authority to do an

2   investigation.

3        Q.   Is there any -- is there any circumstance

4   where a law enforcement agency is required to report

5   something to P.O.S.T.?

6        A.   I would be hard pressed to say yes, there is,

7   because they have to report their own arrest.  It's not

8   the agency's responsibility.

9        Q.   Other than reporting their own arrests, are

10  there other any other instances where a law enforcement

11  officer is required to report something to P.O.S.T.?

12       A.   I don't believe so.

13       Q.   Okay.  Is there any kind of amount of

14  suspension or -- or anything like that that would require

15  reporting to P.O.S.T.?

16       A.   I don't believe there is.

17       Q.   Okay.  With Sergeant Lee, we discussed some of

18  that a little bit because she's with Internal Affairs.

19  And she mentioned demotion or termination would be

20  reported to P.O.S.T.  Is that right?

21       A.   Yes.  We would change their records and

22  P.O.S.T. would pick it up.

23       Q.   Okay.  So that would be -- that might trigger

24  P.O.S.T. to look at something as opposed to -- as opposed

25  to no information; is that right?

                                                      34

1        A.    Yes.

2        Q.    Okay.  What about a suspension of more than

3    thirty days?  Would that -- would that trigger P.O.S.T.

4    to do anything?

5        A.    I don't believe it would, but I don't know for

6    certain.

7        Q.    Okay.  Do you know who would know?

8        A.    Sergeant Lee would know because she's in

9    Internal Affairs.  And I simply don't recall at this

10   point.

11       Q.    No, I understand.  You're in the business of

12   getting people certified; not getting people de-

13   certified.  I understand that.  You're on the -- you're

14   on the opposite end of the thing.  I mean, I think that's

15   fair to say, right?

16       A.    Well, that's pretty fair to say, yeah.

17       Q.    You did work in Internal Affairs, though.  I

18   do know it's been a little bit of time since you worked

19   in Internal Affairs.

20       A.    As -- you need to know, I'm the Captain of

21   Internal Affairs as well.  I have a lieutenant of a

22   Training and a lieutenant of Internal Affairs and they

23   handle the day-to-day operations.

24       Q.    I understand; you're management?

25       A.    Correct.

                                                        35

1          Q.   Okay.  What is the -- you said there is a

2     written policy for special duty assignments and security

3     jobs for deputies.  What is the policy and the process

4     for getting approved for special duty?

5          A.   We have a sergeant that's in charge of special

6     duties.  And all specials are routed through him.  And he

7     is the one that gets people to work at it, approves it.

8     Makes sure that people get paid; they're on schedule.  If

9     there's any complaints that come in, he knows who was

10    working where.

11         Q.   How is the record -- how is there a record

12    made of special duty assignments and who is working

13    where?

14         A.   Outside of what Sergeant Morrison would have,

15    I do not know.

16         Q.   Okay.  And Sergeant Morrison is the special

17    duty sergeant you were just referring to?

18         A.   Yes.

19         Q.   Okay.  Is anyone allowed to do special duty

20    security without Sergeant Morrison's approval?

21         A.   I don't believe so.

22         Q.   Okay.  Do you know how Charlie Walker was

23    hired?  If he was -- if he filled out an application or

24    if he knew somebody and then was invited to fill out an

25    application.  Do you have any idea how he was hired?

                                                        36

1      A.   No, I do not.

2           MR. CAUTHORN:  Okay.  All right, let's

3      take about five.  And then I'm gonna come back

4      and we're gonna go through a couple of exhibits

5      and I'm gonna ask you some questions about

6      that.  Okay?  So let's take a five minute

7      bathroom break, so to speak.

8           THE WITNESS:  Okay.

9           THE VIDEOGRAPHER:  Off the record at

10     11:46.

11          (Whereupon, a brief recess ensued.)

12          THE VIDEOGRAPHER:  Back on the record at

13     11:50 a.m.

14     BY MR. CAUTHORN:  (Resuming)

15     Q.   Okay.  Captain Rollins, I was just looking

16     through Charlie Walker's file.  And I note that he went

17     to the GPSTC Police Academy, Athens/Augusta.  Do you know

18     what -- do you know what that police academy is?

19     A.   That is the Georgia Public Safety Training

20     Center Academy that they held in Columbia County through

21     Athens.

22     Q.   Okay.  And who -- so we talked all about the

23     Augusta Tech Academy.  And now I got to ask you some

24     questions about that one.  Who runs that academy and puts

25     on that academy?

1        A.    That would be Major Richard Dixon; he is the

2   director of those academies.

3        Q.    Okay.  Are they done through a university or

4   are they independent of -- are they an independent

5   academy?

6        A.    They're an approved academy through P.O.S.T.

7   and that is the Georgia Public Safety Training Center.

8        Q.    Okay.  How is that different than Augusta

9   Tech?

10        A.    Augusta Tech is -- I don't know the best way

11   to say it.  At one point in time when it got to funding

12   issues, they made it college level courses and put them

13   at the regional technical colleges.  They kind of divided

14   the training up, but GPSTC decided to start exporting

15   more classes and move back out of their academies.  And

16   that's how they wound up with one in Columbia County was

17   simple expansion.

18        Q.    Okay.  Do Richmond County jailers typically go

19   to the Columbia County Academy or do they tend to go to

20   the Augusta Tech Academy?

21        A.    It's a mix.  Both academies are opened up for

22   training for you to send police officers for

23   certification.  So it's a mix.  Which ever one's having a

24   class is where they go.

25        Q.    Okay.  And does -- so is it a similar

                                                        38

1   relationship with the one in Columbia County and the one

2   at Augusta Tech, or is there a difference in the -- in

3   the relationship that the Sheriff's Department has?

4        A.   We have a different relationship with them.

5   They conduct all of their own training.  They have their

6   own driving courses, their own firing lines, and they

7   generally do not use Richmond County Personnel for

8   training out there.  They conduct it all themselves.

9        Q.   Okay.  Is there a reason why they don't use

10  any Richmond County personnel?

11       A.    They have their own personnel for it.  They

12  have a much larger staff than Augusta Tech does.

13       Q.   Gotcha.  How big are the classes, the cadet

14  classes, at the Columbia County facility?

15       A.   The Columbia County facility is a ten week

16  class is roughly four hundred and eight hours I believe

17  it is.

18       Q.   Okay.  How many cadets would be in that class

19  at a given time?

20       A.   It would be the same thing.  It would be

21  anywhere -- twelve is the minimum size class.  That's

22  what you have to have in order to conduct a class.  And

23  it would generally be about twenty-four.

24       Q.   So you said that it's a ten-week program.  I

25  thought earlier you said the Augusta Tech was an

39

1    eighteen-week program.

2         A.    It is.

3         Q.    What's the difference in the two programs?

4         A.    The difference in programs is -- and I know

5    this might sound kind of strange.  They spend more time

6    on the track and on takedowns and learning about driving

7    cars at Augusta Tech.  They learn more about firearms,

8    they have more practice, they get more opportunities.

9    They spend more time on those kinds of scenarios and de-

10   escalation.  They spend a lot more time on those at

11   Augusta Tech.

12          Augusta Tech also does the OC spray classes.

13   They do the Taser classes.  All that's included in their

14   course and they're not included -- those aren't included

15   at the GPSTC course.

16          And at GPSTC you get one week to drive and one

17   week to shoot.  So it's a little bit more expanded with

18   the Augusta Tech classes.

19        Q.    Okay.  And GPSTC -- I'm looking at a document

20   now and I'm guessing GPSTC stands for GPSTC Police

21   Academy?

22        A.    Correct.

23        Q.    Okay.  And GPSTC stands for --

24        A.    That's the police lingo for the academy.

25        Q.    Say that again.

                                                        40

1        A.    That's the police lingo for that academy.

2   You're going to GPSTC.

3        Q.    Right.   That's -- that's what I was -- I

4   thought I recognized that from something you said

5   earlier.   And GPSTC means the Georgia Public Safety

6   Training Center.   And that's the one we're talking about

7   that's in Columbia County?

8        A.    Correct.

9        Q.    Okay.   All right.   Is there any reason why

10  someone would choose to go to GPSTC instead of going to

11  Augusta Tech?

12       A.    I don't -- well, in our case, they don't get

13  to choose.   They go to the academy we send them to.   If

14  you're talking about if you're pre-service or pre-hire,

15  Augusta Tech is -- falls under Hope Grants as does

16  Columbia County, but Augusta Tech helps you a whole lot

17  more with the paperwork.   It's like going to college.

18       Q.    Okay.   How do you decide which academy to send

19  a jailer to?

20       A.    As they're picking through where they're going

21  to send them to, it'll depend on when the classes are

22  starting.   They don't have the exact same schedule of

23  starting because it's a shorter academy.   And they

24  generally do four a year at Columbia County.

25       Q.    Okay.   And I guess -- and you're kind of stuck

                                                              41

1   with the academic year for Augusta Tech?

2        A.   Correct.

3        Q.   Okay.  So if they were starting one that would

4   be in the middle of the semester, if they were starting,

5   you would send them to GPSTC to go ahead and get them

6   started instead of waiting until the next semester at

7   Augusta Tech?

8        A.   Correct.

9        Q.   Okay.  Other than -- other than timing, is

10  there any other consideration about why you might send

11  someone to GPSTC versus Augusta Tech?

12       A.   Timing is generally it.

13       Q.   Okay.  What is the E-V-O-C written exam?

14       A.   That is the Emergency Vehicle Operations

15  Course.  And there's a written exam that goes to that

16  when you're in the police academy.

17       Q.   Okay.  And is that, are you required to make a

18  minimum score on that?

19       A.   Yes.

20       Q.   Okay.  How many opportunities does a cadet

21  typically get to hit the minimum score on their exams and

22  on their field qualifications like firearms training and

23  things like that?

24       A.   All told you get two chances.  If you can't

25  pass after the second chance, after a review and a three

                                                          42

1    day wait period, after a second fail you're dismissed

2    from the academy.  If you cannot qualify on the

3    qualification courses on qualification day, you're

4    dismissed from the academy.  If you can't drive on

5    driving day and pass the cone courses and the threshold

6    braking, you are dismissed from the academy.

7         Q.   What percentage of people get dismissed from

8    the academy?

9         A.   I would probably say, just taking a guess at

10   it, depending on classes, ten to twenty percent.

11        Q.    Okay.  So most people don't but usually

12   there's -- there's a couple of people per class maybe

13   that don't make it through?

14        A.   Yes.

15        Q.   Okay.  What percentage of the Richmond County

16   employees make it through the academy? Is there a

17   difference?

18        A.   No. I think it's gonna be in the ninety

19   percentile range.

20        Q.   Okay.  You understand what I mean? I mean are

21   Richmond County jailers better at getting through the

22   academy or worse or the same as just someone who went to

23   Augusta Tech, paid tuition and got in the program?

24        A.   I'm gonna say it's about the same actually.

25        Q.   Okay.  I'm gonna show you a video, and then

43

1    I'm gonna ask you some questions about that video.  Okay?

2         A.   Okay.

3         Q.   How are you set up right now?  Are you looking

4    at a larger conference room monitor?

5         A.   Yes.

6         Q.   Okay.  Good.  Because I don't know -- I can't

7    tell because all I know is I see you on my laptop, so I

8    just wanted to see.  So I'm gonna attempt to share a

9    screen and show a video and then I'm gonna ask you some

10   questions about it.  Okay?

11        A.   Okay.

12             THE COURT REPORTER:  Wick, you don't want

13        me to -- I'm just off the transcript record,

14        right?

15             MR. CAUTHORN:  That's right, yeah.  I'm

16        trusting that this is getting picked up on the

17        video.

18             THE VIDEOGRAPHER:  It is.

19             MR. CAUTHORN:  Okay.  I'm gonna hit play.

20             (Whereupon, a video was played off the

21        transcript record.)

22   BY MR. CAUTHORN:  (Resuming)

23        Q.   All right.  That was an incident involving --

24   and I let this thing play last time and it wound up

25   playing another video, so I'm gonna stop that real quick.

                                                        44

1              That was an incident involving Deputy Walker

2    from 2017.  And right at the end right there, he turned

3    off his body camera.  And it's my understanding that they

4    found that guy in Hyde Park and they never found his

5    bicycle.  And then Mr. Walker had to pay to buy him a new

6    bicycle.

7              My question is, do you remember, from being in

8    Internal Affairs?  Do you remember that incident at all?

9         A.   I remember a little bit of it, yes.

10        Q.   Okay.  What do you remember from it?

11        A.   I do remember that there was a video and that

12   he, in fact, turned it off.  I do recall that.  The

13   investigation was handled, I believe, by his supervisors

14   who made the determinations on what to do.  And -- but I

15   basically remember that he had turned his camera off and

16   we thought that was a violation of policy.

17             (Whereupon, a video was marked and

18        identified as Plaintiff's Exhibit A.)

19   BY MR. CAUTHORN:   (Resuming)

20        Q.   Okay.  And that's gonna be exhibit -- I mean,

21   I call it Exhibit A, but it's really just a part of the

22   deposition because it's part of this video.  I don't have

23   the ability to download anything off of YouTube.  But

24   that's the -- that was the video.

25             There were some online newspaper articles

45

1    written about the video and I've kind of got some

2    questions because reporters don't always get things right

3    about policies and things like that.  So you're here and

4    you can kind of answer some of those questions.

5            So I'm gonna show you -- I'm gonna share my

6    screen again, and I'm gonna show you an article that I --

7    sorry, I've got to get -- there we go.  Now, let me see

8    if I can share it.

9            (Whereupon, a document was marked and

10            identified as Plaintiff's Exhibit B.)

11   BY MR. CAUTHORN:   (Resuming)

12       Q.   Okay.  And this is -- this is an article that

13   I pulled off the internet by Googling Charlie Walker;

14   really sort of high-end legal research.  And I Googled

15   Charlie Walker, and this article came up and I kind of

16   want to ask you a couple questions about it.

17            This article is from 12 NBC, WRDW/WAGT.  I

18   think that's local news to Augusta.  Are you familiar

19   with those networks?

20       A.   Yes, I am.

21       Q.   Okay.  And it says that -- the first sentence

22   is that Mr. Walker, Deputy Walker, and who appears to be

23   Deputy Christopher Moore, were suspended for that

24   incident.  Do you recall how long the deputies were

25   suspended for that incident?

46

1        A.    I do not.

2        Q.    Okay.  What was your involvement in the

3   investigation into that incident?

4        A.    Initially, when we got some information on it,

5   we checked into it to see that it was being handled by

6   the road patrol supervisors; they would have more first

7   hand knowledge about it and ability to download the

8   cameras.

9        Q.    Gotcha.  This bottom paragraph on the first

10  page says that they failed to write a Use of Force

11  report.  What is a Use of Force report?  And what are the

12  policies on writing a Use of Force report?

13       A.    Use of Force report is a report that we file

14  whenever we have to use force other than a soft-hand

15  technique where you're just arresting somebody and have

16  to put your hands on them, put their hands behind their

17  back and handcuff them.  This is where you may have to

18  actually struggle with them or force them a little more

19  than just a simple engagement.

20            If you were to use your Taser, if you were to

21  use a baton, if you were to use a firearm; any of those

22  would bring up a use of force.

23            It would also be -- now -- I'm not sure

24  exactly when it kicked in.  But if you actually have to

25  draw your weapon and point it at somebody, that would be

47

1    considered a use of force even though -- even though you

2    didn't actually fire the weapon.  You did present the

3    weapon, so we require that.

4            But a Use of Force report is just a simple

5    filing of a report, explaining the circumstances behind

6    it; much like you would do an incident report.

7        Q.   Okay.  And is it -- is it a form report that

8    someone would fill in on a computer at the -- at their

9    office or at a desk when they got back from their patrol?

10       A.   (No audible answer.)

11       Q.   I didn't hear that.  I'm sorry.

12            MR. CAUTHORN:  Kellie, did you hear

13       Captain Rollins?

14            THE COURT REPORTER:  No, I didn't.

15            THE VIDEOGRAPHER:  I can't hear him

16       either.

17            MR. CAUTHORN:  He clicked out right

18       there. All right, he's muted.  I see where it's

19       muted at Frails and Wilson, the microphone mute

20       logo or icon is on.

21            THE COURT REPORTER:  Yeah, he didn't -- I

22       didn't hear an answer.

23            THE VIDEOGRAPHER:   You want to go off

24       until they fix that?

25            MR. CAUTHORN:  Yeah, let's go off the

                                                        48

1      record until they -- until they can -- it looks

2      like it's muted.  That's all.  Everything else

3      is fine.

4              THE VIDEOGRAPHER:  Off the record at

5      12:09.

6              (Whereupon, a brief recess was held while

7      technical issues were addressed.)

8              THE VIDEOGRAPHER:  Back on the record at

9      12:12.

10   BY MR. CAUTHORN:  (Resuming)

11      Q.   Okay.  Captain Rollins, we just confirmed that

12   the last question asked about filling out the report, the

13   answer was yes.

14      A.   That is correct, yes.

15      Q.   Okay.  And then there were -- according to

16   this article, another policy violation is that they

17   didn't arrest the man that they encountered.

18              What is the policy on arresting someone in a

19   situation like we looked at on the video?

20      A.   You're asking me to go on specifics.  Every

21   case has a different set of circumstances.  I didn't see

22   everything that was there, anything they knew from the

23   past.  I really wouldn't know.

24              Would you arrest every single person?  Not

25   necessarily.  Would you arrest them?  Possibly.  I mean,

                                                         49

1    it goes case by case.

2        Q.   What would be the policy on taking an

3    intoxicated person to a park and just leaving them at a

4    park instead of -- instead of taking them in or taking

5    them to seek medical care?

6        A.   Again, you're asking for something on a case

7    by case basis without me knowing the entire circumstance.

8    Do you take them and just drop them off, no.  If they

9    were drunk and asked to be dropped off and had someplace

10   to stay, yes.  It would be circumstances on that one

11   again.

12       Q.   Okay.  Now, there's another violation, too.

13   So the one violation was not using -- not filling out a

14   report, and the other violation was not arresting.  And

15   then it looks like there's another violation that they

16   turned off -- at least we have Charlie Walker's body

17   camera right there.  And it looks like it got turned in

18   -- turned off right at the very end.

19            What is the policy on use of body camera?

20   When is it supposed to come on? And when is it supposed

21   to be turned off?

22       A.   At one point in time, we were turning it off

23   when we were finished basically with what we thought was

24   important, but we've expanded that.  You turn it on when

25   you become involved; you turn it off when you are done.

1    No time in between.

2         Q.    Okay.   What's the -- what's the philosophy

3    behind that?

4         A.    Well, the philosophy behind that is we want to

5    see everything that happened; that there's very little

6    discretion involved in it; you must turn it on, you must

7    turn it off.   That would just be the logic behind that.

8    That's the reason we got them so we could see the entire

9    event as it occurred.

10        Q.    Okay.   When did the Sheriff's Department adopt

11   the use of the body cameras?

12        A.    I would be hard pressed to say on that one.   I

13   want to say it was like eight years ago, maybe, in the

14   second administration.   So I would be hard pressed to say

15   exactly when that was.

16        Q.    Okay.   And when it -- when the policy on body

17   cameras was adopted, did the deputies have training on

18   the body cameras and how to use them and when to use

19   them?

20        A.    Yes, they did.

21        Q.    Okay.   How was that training conducted?

22        A.    That training was conducted by the person that

23   was issuing them out at the time because there was

24   computer programs and all that had to be involved with

25   it.   I don't recall who that was at the time, but

                                                              51

1    everybody received training as you were going through on

2    how to use the camera.

3        Q.   You say you start the camera -- my

4    understanding is you start the camera, from what you

5    said, at the beginning of the action.  Can you explain

6    how a deputy would be able to determine when they need to

7    turn their camera on?

8        A.   When you are en route to a call and you have

9    time before you get to the call to turn it on.  When you

10   first encounter something -- I'm talking about simply a

11   what-if scenario.  If you became involved in something,

12   if you were inside getting a cup of coffee and you became

13   involved, then you would turn it on at the first

14   opportunity.  But generally, as you're going to the call

15   before you arrive at the scene, you would turn it on.

16       Q.   Okay.  And then when you say you turn it off

17   when everything's over, like, literally, you're getting

18   back in your car and leaving everything and you've

19   already done all the talking and all the stuff you're

20   gonna do.  And that would be when you turn the camera

21   off?

22       A.   That is correct.

23       Q.   Okay.  Would there be a use of force

24   requirement in 2017?  Would they -- would they need to

25   fill out the form for pulling the Taser out?

                                                         52

1        A.    At the time, I'm not sure simply presenting

2    the Taser would have been automatically reportable.  It

3    is now, but then I'm not sure.

4        Q.    Okay.  But in any event, the using the baton

5    to strike the suspect, that's definitely a use of force

6    that would require the report?

7        A.    That would be correct.

8        Q.    Okay.  What is the -- what's the policy on

9    using force in a situation like we just saw in that

10   encounter?  Is there any policy on whether you use the

11   Taser with a baton or a gun and when one is appropriate

12   or when the other one is appropriate?

13       A.    That becomes, again, on a case by case.  It's

14   always an escalating type of thing, from where you go

15   from soft hand techniques to hard hand techniques to

16   using a baton to using a taser up to using a firearm.

17   There's an escalation period in there.  But you can't

18   always say that because it could be automatically you

19   have to go to a baton.  So it's a case by case basis.

20       Q.    What are the factors taken into consideration

21   by the deputy who's -- I mean, obviously, it's different

22   when you're standing there with the suspect versus when

23   you're watching a video.  So I do understand that.

24            What are the factors that the deputy is

25   considering when they're deciding whether to use a baton

53

1    for -- that was used in this case?

2         A.    And, again, from what I saw, I really don't

3    know because it doesn't show everything with the camera

4    going everywhere.  It's case by case basis.  And would be

5    if you're using soft hands, hard hand techniques,

6    wrestling with the person and it becomes to where you

7    need to strike a blow or to use it as a lever to put arms

8    behind their back.

9         Q.    Okay.  Is it appropriate to hit somebody with

10   a baton who's laying on the ground?

11        A.    Again, on a case by case basis.  From what I

12   saw simply laying there, no.  If there was a struggle, if

13   there was some kind of resistance involved, there's a

14   possibility.

15             (Whereupon, a document was marked and

16             identified as Plaintiff's Exhibit C.)

17   BY MR. CAUTHORN:   (Resuming)

18        Q.    All right.  I'm gonna go ahead and click on

19   another online article about this 2017 incident.  This is

20   Exhibit C to the deposition, the previous one is gonna be

21   Exhibit B.

22             Do you see the new article or are you still

23   looking at the old article?

24        A.    I think I'm looking at the new article.

25        Q.    Okay.  And it says, this is also WRDW/WAGT.  I

                                                          54

1    think that's the same networks we just talked about, the

2    same news network.

3         A.    It is.

4         Q.    Okay.  I got a question to ask you about this

5    -- that's in this article.  This addresses the P.O.S.T.

6    investigations and there's a sentence here on the second

7    page that says the Georgia P.O.S.T. can only investigate

8    if the agency terminates, demotes or suspends a deputy

9    for at least thirty days.  We talked about that a few

10   minutes ago.

11         Does this help refresh your memory about

12   P.O.S.T. investigations or can you say whether that's

13   true or not?

14         A.    To be honest with you, I can't say whether

15   that's true or not.

16         Q.    Okay.  What is the department policy on

17   investigating -- on Internal Affairs investigating a

18   failure to fill out a Use of Force report or a failure to

19   use a body camera or turning off a body camera?  How does

20   that -- what's the policy on when to conduct an

21   investigation and how to conduct an investigation?

22         A.    On those kinds of things it would be up to the

23   line level supervisors to determine what had happened and

24   to follow up on the investigative part of it.

25         The line level supervisors would do that if it

1  was found out by upper level administration -- captain/

2  lieutenant.  It would go back down the line level

3  supervisors to be investigated, and then forwarded up

4  through the chain of command.

5       Q.  Okay.  And what types of things are taken into

6  consideration when deciding how to treat, for instance,

7  the turning off of the body camera?

8       A.  I didn't quite catch that part.

9       Q.  Does context matter when investigating the

10 turning off of a body camera?  For instance, turning off

11 a body camera while giving someone a speeding ticket

12 versus turning off a body camera while talking to another

13 deputy about what you're gonna do with a guy who you're

14 not going to arrest?

15      A.  If they're police interactions, there wouldn't

16 be any difference.  They would be required to record it.

17      Q.  Yeah, and I mean, as far as any kind of

18 punishment decisions go.  For instance -- and we'll play

19 the video again.  But at the end of that video it sounds

20 like he's talking about getting rid of the guy.  And

21 that's when he turns off his body cam video; versus, say,

22 giving someone a speeding ticket and turning it off a

23 little early.

24          Is there a -- is there a culpability

25 difference with regard to the investigation?

1      A.   As I said before, it's gonna be a case by case

2   basis.  You would have to make an assumption there would

3   be, but it's case by case.

4      Q.   Gotcha.  Is there any written policy that has

5   any sort of three strikes and you're out with regard to

6   body cameras or anything like that?

7      A.   Well, as I said earlier, there is the -- a

8   continuation to where you build upon.  And in this case,

9   would be the same thing to build upon it as you went

10  along.

11          But every circumstance is different.  So there

12  wouldn't necessarily be an escalation in punishment if --

13  I don't know the best way to put this.  If it was an

14  inadvertent turn off, but it got turned off, or if there

15  was a failure of some kind, that would have to be

16  explained as well.  So every case would be different.

17     Q.   Okay.  So there's no rule that says that if

18  this same thing is done more than one time, then that's

19  gonna lead to a punishment, a specific punishment, that's

20  written down or that's understood among the deputies or

21  the officers?

22     A.   Not one that's written down, no.  That I'm

23  aware.

24     Q.   I'm gonna try to share my screen again.

25          This says that two of the people who were

                                                         57

1   responsible for reviewing the punishment of Deputy Walker

2   did not agree with it.  And that one recommended twelve

3   months probation.  And then another, a captain, suggested

4   terminating the deputies.  Do you know who those two

5   officers were?

6       A.   No, I don't.  I mean ...

7       Q.   Okay.  What type of -- what type of policy

8   guidelines would a captain be using when they decided

9   something like someone should be terminated for a

10   particular violation?

11       A.   I would have to go by past offenses, personnel

12   record, personal knowledge.  Anything they may have

13   written down or had just personal knowledge of.  They

14   would have to go through that; same as it would anyplace

15   else.

16       Q.   Okay.  And would any of that information be in

17   the Internal Affairs file?

18       A.    It would be Internal Affairs files; it would

19   be personnel files.

20       Q.   I'm gonna share the screen again.

21       And just -- I'm gonna scroll through the same

22   story.  According to this story on page three of five

23   down here, the last sentence of this -- or the second to

24   last sentence of the article is that this was the third

25   body camera violation for Deputy Moore and Deputy Walker.

1    Is there -- and they got a seven day suspension.

2                   Again, kind of going back to what I said

3    before, is there any kind of department policy or

4    guideline when it comes to punishing the same conduct

5    over and over?  For instance, how does -- how are higher

6    ups guided by department policy when it comes to the same

7    thing happening over and over again?

8         A.   There is a violations matrix in the Policy and

9    Procedure Manual.  And when you can -- when you commit a

10   violation, it's categorized, and there are steps to it

11   and it gives -- guides line supervisors on what the

12   punishment should be in the policy and procedures.

13        Q.   Okay.  And how is the categorization done of

14   the violation?  You said it's categorized.  Who decides

15   how to categorize it and how do they get categorized?

16        A.   Well, it's in the Policy and Procedure Manual.

17   It was adopted by the Sheriff's office.  And there is

18   leeway in each one of those.  So a violation for being

19   late for work could be a Class C violation, especially if

20   it's your first time, and that wouldn't even -- that

21   would be -- that probably wouldn't even be in the matrix

22   of writing them up.  And it would build up from there.

23   But there is a matrix for it.

24        Q.   Okay.  And that's in the policy -- that's in

25   that manual, the written document?

                                                        59

1      A.   Yes, it is.

2      Q.   Okay.  And I believe you said that each

3   incident is gonna be different.  There's some

4   subjectiveness to it.  So does that mean that someone

5   would look at a violation like a body camera violation

6   and then categorize that differently within that matrix?

7      A.   They could, yes.

8      Q.   Okay.  So every body camera violation would

9   not be categorized in the matrix in the same way?

10      A.   That is correct.

11      Q.   Okay.  Is the body camera specifically even

12   mentioned in the matrix or does it -- does that fall into

13   another category?

14      A.   I can't really answer that question for you.

15   It may be in the policy, but I can't tell you exactly

16   where.

17      Q.   Okay.  What type of -- I mean, how would you,

18   if you were categorizing it, how would you look -- where

19   would you look in the manual to find your guidance on a

20   body camera violation?

21      A.   I would look under the disciplinary actions

22   and I would find it in there and see what it could be

23   classified as.  Some of them can be classified as ABC,

24   some are AB, some are A, some are C.  It's by the

25   violations that you find according to the Policy and

60

1   Procedure Manual.

2        Q.   Okay.  Could two higher ups look in that

3   Manual and disagree about what category it went?  One

4   might be on a A or a B and one might be on a different

5   level?

6        A.   Yes, they could.

7        Q.   Is this -- the violations that were discussed

8   in that article that were in that video, is that the type

9   of thing that a deputy would have to report to P.O.S.T.?

10       A.   No.

11       Q.   Okay.  So the only way P.O.S.T. would find out

12   about it is if they happen to Google like I did?

13       A.   Well, that would be one of the ways, yes.

14       Q.   Okay.  I guess -- so it kind of goes like

15   this.  And you know, y'all have an ethics rule, you know,

16   ethics barrier, just like lawyers and doctors and we all

17   have different professional ethics levels.  And we're

18   required to post -- you know, a lawyer would be required

19   to report a certain thing to to the Bar, for instance.

20   And you guys are required to report at least arrests is

21   what you said earlier to P.O.S.T.

22            And I believe you said that you're not -- you

23   don't think there's anything else that's mandatory to

24   report besides an arrest.  Is that still -- is there

25   anything besides an arrest that might be reportable to

1    P.O.S.T.?

2         A.   They are required to self report to P.O.S.T.

3    for an arrest.  As an agency, we would change their

4    status.  If they're terminated, demoted, if they -- even

5    promoted, it goes in there.  And they would question the

6    change in status; that would be a computer type of thing.

7    But as far as their self reporting, that would be an

8    arrest.

9         Q.   Okay.  So if nothing changed with regard to

10   their employment status with the Sheriff's Department,

11   then the Sheriff's Department wouldn't have anything that

12   it needed to do with P.O.S.T. as far as reporting that

13   employment status?

14        A.   Not that I'm aware of.

15        Q.   Okay.  So the subject matter of this lawsuit

16   is a -- my client alleges that she was raped by Charlie

17   Walker after he pulled her over after a party at Julian

18   Smith Casino where he was working special duty security.

19   Have you read the -- have you read the complaint in this

20   case?

21        A.   I glanced over it, yes.

22        Q.   Okay.  And Charlie Walker -- and I'll

23   represent to you that Charlie Walker does not -- has not

24   -- at least he didn't in his interview with the GBI

25   contest whether the sex actually happened.  He said it

                                                           62

1   was consensual sex.  My understanding is he was wearing a
2   sheriff's deputy uniform and he was working or had just
3   finished working private security.
4           What is the Sheriff's Department's policy with
5   regard to that type of a sexual encounter with an
6   individual?  Is that appropriate?  Is it inappropriate?
7   And then if it is inappropriate, what steps would the
8   Sheriff's Department -- what's the policy on
9   investigating an incident like that?
10      A.   The policy isn't (audio failure) on accusation
11  that we would go check and we would look into it.  We
12  would talk to the person making the allegation.  And like
13  I said before, this would be a case by case basis; the
14  circumstances behind the case, what cooperation -- and I
15  really don't know anything about it outside of what the
16  written documentation provided me for the suit itself.  I
17  have no direct knowledge of this.
18      Q.   I understand that.  I'm really asking
19  generally policy -- department policy on even having
20  consensual sex with someone in that type of an event,
21  that type of situation.  And then what actions would have
22  -- what actions the Sheriff's Department would take to
23  investigate and then whether or not there's any kind of
24  specific punishment criteria and things like that that
25  would be a result of that investigation.  Do you

63

1   understand what I'm talking about?

2          I'm not talking about specifically this case.

3   I'm talking about a deputy, even under his story, says

4   that he had consensual sex with a woman that he followed

5   out of a party where he was working private security.

6          And what would -- is that a policy violation

7   and, if so, what is the name of the violation and how

8   would you investigate that violation?

9          A.   I'm hard pressed to think of what that policy

10   violation would be.  I'm sure that it's covered somewhere

11   in there in the ethics and professionalism.  But to say a

12   specific part of the policy, no, I don't.

13          Q.   Okay.  Would conduct unbecoming of an officer

14   be sort of a --

15          A.   A broad range one, yes.

16          Q.   Okay.  Are there subcategories under that

17   conduct unbecoming of an officer or is that just a big

18   catch all?

19          A.   That's pretty much a big catch all.

20          Q.   Okay.  What happens when -- when an

21   investigation -- when the department looks into conduct

22   unbecoming of an officer, what is the process for that?

23          A.   When they look into conduct unbecoming, they

24   get the facts of the case together.  In many cases, it's

25   investigated by a line level supervisor.  It could

                                                            64

1    possibly be Internal Affairs.  And it can be founded; it

2    can be unfounded or sustained or not sustained.  There

3    are several categories.  And if it's not sustained, it

4    simply -- the notes would be kept and nothing would

5    occur.

6         Q.   Does Internal Affairs have any policies or

7    guidelines about how to conduct an investigation?

8         A.   It's in the Policy and Procedure Manual.

9         Q.   And would that give guidance on which -- what

10   needs to be looked at and who needs to be talked to and

11   things like that?

12        A.   That would be under basic investigations.

13   That's the reason everybody in Internal Affairs is an

14   investigator; they've been trained for that.

15        Q.   Is it a violation of department policy to work

16   a -- to do a special duty security job without going

17   through Sergeant Morrison?

18        A.   I would say that it's under the guidelines and

19   that you're supposed to do it.  I'm not sure what the

20   policy violation would be.  But I'm sure that if we had

21   to look, we could find that.

22        Q.   Okay.  Do deputies regularly do special duty

23   security jobs without going through Sergeant Morrison?

24        A.   That would be speculation on my part and I do

25   not know.

1         Q.   Okay.  Is it any kind of -- I mean, is it any

2    kind of offense that would cause Internal Affairs to get

3    involved and lead to any kind of punishment for doing a

4    special duty security assignment without going through

5    Sergeant Morrison?

6         A.   No, that wouldn't rise to the level of an

7    Internal Affairs investigation.

8         Q.   Okay.  So it's -- would there be any sort of

9    reprimand or any sort of punishment associated with doing

10   a special duty assignment that had not been approved by

11   Sergeant Morrison?

12        A.   Yes, there could be.

13        Q.   Okay.  What types of things would be -- would

14   be considered for -- for dealing with a deputy who was

15   doing something like that?

16        A.   Well, speculation would be that you weren't at

17   an assignment that you were supposed to be at; that you

18   didn't show up.  Those are the general complaints we do

19   get.  As far as somebody being there that's not supposed

20   to be there, that's not the kind of complaint we

21   ordinarily get.

22             But there would be -- you are required to get

23   with Sergeant Morrison, let them know that you're going

24   to be working a special or request a special for a

25   special duty officer.  And the latest policy we have that

66

1    was most recently enforced or reminded that you go out on

2    the radio when you go to work a special.

3         Q.   Say that again.

4         A.   That you go out on the radio when you go to

5    work a special.  We were recently reminded of that.

6         Q.   What does that mean that you go out on the

7    radio?

8         A.   You're letting dispatch know where you are.

9         Q.   Okay.  So the Sheriff's -- and that presumably

10   is so that the Sheriff's Department knows that there's a

11   deputy over here at this thing?

12        A.   That's correct.

13        Q.   Okay.  Is that a written policy?

14        A.   I want to say it is, yes.

15        Q.   Okay.  If it's not a written policy, it's at

16   least a policy that everybody agrees upon that's

17   unwritten?

18        A.   Well, it would have been a General Oder coming

19   down reminding people they are supposed to follow it.

20   That's the reason I say I think it's a policy.

21        Q.   Okay.  Do you know what prompted the order,

22   the order coming down on that?

23        A.   I do not.

24        Q.   Okay.  Does that indicate to you that there

25   were people doing special duty assignments without

67

1   letting the Sheriff's Department know?

2       A.   Yes.

3       Q.   Okay.  What are the guides -- are there any

4   guidelines about who is permitted to do special duty

5   assignments or how they are assigned to individual

6   deputies?

7       A.   Not sure about how they're assigned.  Most all

8   of them are volunteer, but you have to be a certified

9   police officer to work a special.

10      Q.   Okay.  You mean you got to be -- you got to go

11  through the academy?  A jailer can't do a special, but a

12  deputy can do a special?

13      A.   That's correct.

14      Q.   Okay.  So you've got to be P.O.S.T. certified

15  to do a -- to do a special duty assignment?

16      A.   Correct.

17      Q.   Okay.  Are there any deputies to your

18  knowledge who are not permitted to do special duty

19  assignments?

20      A.   Yes, there is come to think of it.

21      Q.   Okay.

22      A.   It would be if you did not pass the annual

23  physical assessment test where you're under a doctor's

24  restrictions from full service duty, but as far as any

25  punishment, no, except for you didn't pass the PAT.

                                                          68

1       Q.   Okay.  And I'm guessing the theory on that is

2  that you could be running instead of taking a special

3  duty assignment?

4       A.   That might be it.

5       Q.   Is there a policy on whether deputies are

6  permitted to take vacation leave when they're working on

7  special duty assignments?

8       A.   Take vacation leave?  I don't know.

9       Q.   Okay.  The reason I'm asking is because a

10 review of Deputy Walker's record shows that he was on

11 vacation at the time he was working security at this

12 event.  So he's -- I read it to mean that he was getting

13 paid twice to be there.  But that's an interpretation.

14 I'm not asking you about that.

15          I just didn't know if there's a policy that

16 says that if you're on special duty that you -- you know,

17 that you can't take vacation time, you know, if you're on

18 special duty.

19      A.   That's incorrect.

20      Q.   Say it again.  There is no policy is what you

21 --

22      A.   There's -- there is no policy to keep you from

23 working a special if you are on vacation.

24      Q.   Understood.  That's what I was asking you.

25      A.   Okay.

                                                         69

1      Q.    Do deputies get paid vacation?

2      A.    Yes.

3      Q.    How many hours of paid vacation do they get a

4  year?

5      A.    It accrues differently according to how many

6  hours you work.  If you're a twelve-hour employee, you

7  accrue differently than a seven and a half hour employee.

8  If you have ten years, you get more time than you did if

9  you were 9.5 years.  It's a variable scale.

10      Q.    Okay.  What is the difference in a deputy C

11  and a deputy B?

12      A.    Deputy C and deputy B is just a payroll

13  classification, length of service, and you've been

14  through enough classes to get moved up in the ranks.

15      Q.    Okay.  What's the highest level of deputy you

16  can achieve?

17      A.    That would be master deputy.

18      Q.    What's -- what is deputy first class?

19      A.    Deputy first class, that would be like deputy

20  A.

21      Q.    Okay.  And those are just tenure -- are those

22  tenure-based classifications?

23      A.    They're tenure-based classifications or

24  putting it in to where you have to have X number of

25  service schools in order to do it, but it is basically

                                                        70

1   based on tenure at this point.

2        Q.   Okay.  What is the department's policy in

3   regard to promotion and advancement of deputies who have

4   been punished or are on probation?

5        A.   There are policies set on that; they're in the

6   Policy and Procedure Manual.  I'd have to look at it.

7   Other than that, I really couldn't specify.

8        Q.   Okay.  Are deputies who are on probation, do

9   they -- do they regularly get promoted?

10       A.   Not that I'm aware of, no.

11       Q.   Is there any policy that says a deputy that's

12  on probation is not supposed to get promoted?

13       A.   I want to say yes it is under the promotions

14  policy in the Policy and Promotion -- Policy and

15  Procedure Manual.

16       Q.   Okay.  Is there a PDF copy of the Policy and

17  Procedure Manual?

18       A.   Yes, there is.

19       Q.   Okay.  And is it -- would it be easier to get

20  a copy of it electronically than to get it -- I mean,

21  than to get it in paper?

22       A.   Yeah, it'd be easier.

23       Q.   How do y'all typically provide it to your new

24  employees?

25       A.   It is on a CD.  It is in a PDF format.  And it

71

1   is also on the portal that officers have access to read

2   documents.

3        Q.    How often is it updated?

4        A.    Annually.

5        Q.    Who does the review of it and makes decisions

6   on what and how to update it?

7        A.    Everything is forwarded to the Sheriff for his

8   decision before anything is changed.  But it is reviewed

9   annually for necessary changes.

10       Q.    Is there a committee that reviews it or does

11  the Sheriff review it?

12       A.    Not so much as a committee as the Chief Deputy

13  makes a determination, along with the command staff, and

14  we'll discuss it over and somebody will be assigned to

15  make changes in the policy or research any changes.  And

16  it'll be forwarded to the executive staff and they'll

17  make a decision with the Sheriff.

18       Q.    Is the whole thing reviewed or does it tend to

19  be done in piecemeal, depending on what comes to light

20  with an individual, you know, analysis of it?

21       A.    There are certain points in it that have to be

22  done under the accreditation process.  We look at all of

23  it, but it is kind of just like a quick review until we

24  get to a part that needs to be addressed.  And that's

25  what's actually taken into consideration.

1        Q.    When you look at the manual, can you tell when
2   something was updated by looking at it?
3        A.    Yes, you can.
4        Q.    How do you tell that?
5        A.    It has a date on it.
6        Q.    Okay.  So it'll say at the bottom or it'll say
7   somewhere in there that it was updated thus and such
8   year?
9        A.    It will say it in the chapter section; it will
10  say updated or when adopted.
11       Q.    Okay.  What's the source material for the
12  manual?  Where do y'all go when you want to update it to
13  get the new material?
14       A.    We do much like research on paperwork, we go
15  through executive management courses, we look at the
16  Police Executive Research Forum.  We look at other
17  agencies and their policies; we ask them for copies of
18  theirs to see it and compare and make the best decision,
19  what's best for our agency.  Because not everything is
20  going to be best for our agency that may be best at -- I
21  don't know -- Miami, Florida.
22            So there is a review process but it's a
23  research process.  And changes are delineated when we go
24  into the policy and show them what we want to change.
25       Q.    Is there any kind of national organization or

73

1    state organization that you guys use as your go-to for

2    adopting standards and practices?

3         A.    I'm not really gonna put us down on that one

4    outside of legal updates that we get through Georgia

5    P.O.S.T. and through the classes and the information that

6    comes to us from court decisions.  And I mean, we run

7    past it with our legal assistants; we make sure that

8    we're not doing anything wrong when we do it.

9         Q.    When interpreting the Policy Manual -- you

10   know, looking at a written policy and then interpreting

11   how that gets applied in the department, how are you

12   guided in that application of the language in the Policy

13   Manual?

14        A.    Guided in language? I'm not sure of the

15   question.

16        Q.    Yeah.  So for instance, let's say that --

17   let's say that someone's looking at the policy and they

18   know that -- they think it applies in a certain

19   situation, but they want to kind of get guidance on how

20   this policy would apply to this set of facts.  So they

21   look at a training manual or they look at -- I mean, I

22   don't know.  I'm asking.  They look at a decision that

23   another department did or they look at a guidance handed

24   down in a policy update from somebody like P.O.S.T. or

25   something like that.

                                                          74

1            I mean, I don't know.  I'm asking is -- is it

2  just that the Sheriff's Department reads the manual and

3  interprets it the way it wants to or is there -- or is it

4  guided by the way that it interprets the manual?

5       A.   I'm guessing in here you're asking would your

6  ethics and professionalism guide you into making those

7  decisions or if you question the policy itself, would you

8  not go to a higher authority.  And I would hope they

9  would.

10      Q.   Yeah, well, I mean, that is sort of an angle

11  on the question.  I'm really just saying that, you know,

12  three people can read a sentence and disagree about what

13  the sentence said.  And you could have two Captains in

14  the Sheriff's Department that disagree about what this

15  policy means and what it says.

16           And I was really just saying, what is the --

17  what is the -- not whether to apply it, but literally,

18  you know, what it says? Is there any kind of guidance

19  that is used in that area or does it just ultimately lie

20  upon the higher-ups, the supervisors, to interpret the

21  Policy Manual the way that they think it should be?

22      A.   If there's any ambiguity in the policy or a

23  different way to read it, that would be something you

24  would bring up in command staff.  And then we would go to

25  the part of do we address this and the Chief Deputy would

1   say, do research and see what it says or have somebody

2   take a look at it, such as the attorneys for an

3   interpretation.  But that is something that we would do

4   in command staff to make a decision on whether to change

5   a policy because of ambiguity.

6        Q.   I see.  Okay.  So that's one of the ways that

7   you guys will update a policy is you'll decide that the

8   way it's written is too ambiguous and it's become a

9   problem and it needs to be addressed?

10       A.   Yes.

11       Q.   Okay.  And that's a perfect example of what

12  I'm talking about, so thank you.

13            Is there a date or a time of year typically

14  where the Policy Manual's updated or is it a rolling

15  process?

16       A.   It is a rolling process because it is a huge

17  policy.  And it is followed through but it is -- whenever

18  an issue comes up and we need to address it is when it's

19  done.  It is done throughout the year.

20       Q.   Based on your experience, is y'all's Policy

21  Manual similar to ones used by other sheriff's

22  departments?

23       A.   Yes.

24            MR. CAUTHORN:  Okay.  All right.  Let me

25       look over my notes really quick.  Give me five

                                                    76

1          or ten minutes, and I'm gonna look over my

2          notes and I will come back.  I'll have a few

3          more questions and hopefully we'll get this

4          wrapped up.  Okay?

5                    THE WITNESS:  Okay.

6                    THE VIDEOGRAPHER:  Off the record at

7          12:55.

8                    (Whereupon, a brief recess ensued.)

9                    THE VIDEOGRAPHER:  Back on the record at

10         1:00 p.m.

11    BY MR. CAUTHORN: (Resuming)

12         Q.   Are there categories of interactions with a

13    civilian that a deputy is trained in?  For instance --

14    and I want to kind of qualify that.

15              For instance, what type of training do

16    sheriff's deputies have with regard to their interaction

17    with the public as a uniform -- you know, while they're

18    wearing their uniform and their badge to put those

19    interactions into different categories?

20         A.   Those would be done in tiers via Tier 1 and

21    Tier 2 and Tier 3 interaction.

22         Q.   Okay.  What's a Tier 1 interaction?

23         A.   A Tier 1 interaction is where you simply walk

24    up and talk to somebody and they are free to walk away at

25    any moment.

1      Q.    How do they know they're free to walk away?

2      A.    You simply say, may I speak to you for a

3  moment.   If they keep walking, they can keep walking.

4      Q.    Okay.

5      A.    If they say no, I don't, they can keep

6  walking.

7      Q.    Gotcha.  And what's a Tier 2?

8      A.    A Tier 2 would be where you are not free to

9  walk away; that we have established reasonable

10 articulable suspicion in order to make a stop or even

11 probable cause  and we conduct our investigation

12 according to those rules.

13     Q.    And then what's a Tier 3?

14     A.    A Tier 3 would be you are not free to go, that

15 you are being detained and you are possibly being -- up

16 to an arrest.

17     Q.    Okay. How are these three tiers communicated

18 by a deputy to a civilian or a person who is being

19 contacted?

20     A.    I mean, we aren't going to sit there and

21 explain a Tier 1, Tier 2 and Tier 3 stop.  You will be --

22 I mean, you will simply be telling them you are not free

23 to leave, I'm conducting an investigation or you're under

24 arrest and are not free to leave.

25          But the other part would be is you just simply

                                                      78

1    ignore us and walk away and we got nothing, we got

2    nothing.  You're allowed to freely leave.  There would

3    not be a interaction.

4         Q.   Okay.  Is there a department policy on having

5    sex with someone in a Tier 1 encounter?

6         A.   You know, in a written policy, I would say

7    that it wouldn't be defined as a Tier 1.  But there would

8    be a defining policy about any stop.

9         Q.   Okay.  What's the policy about any stop?

10        A.   Having sex with them, don't do it.

11        Q.   Okay.  And I'm gonna ask you -- I'm gonna ask

12   the same question two more times and I know what the

13   answer is gonna be, but I'm gonna ask it anyway for the

14   record.

15             Okay.  What is the department policy for

16   having sex with someone in a Tier 2 -- Tier 2 stop?

17        A.   Don't do it.

18        Q.   What is the department policy on having sex

19   with someone under a Tier 3 stop?

20        A.   Don't do it.

21        Q.   Okay.  Is there a department policy about in

22   any way related to carrying condoms in a police cruiser?

23        A.   No, not that I'm aware of.

24        Q.   Okay.  And I understand, you know, if someone

25   has a condom, they may need to transport it from point A

79

1    to point B, and that may include work.  So I do get that.

2    But I didn't know if there was any policy about having

3    anything like a condom in a police cruiser driving

4    around?

5         A.   Not that I'm aware of.

6         Q.   Okay.  Are you aware of any -- other than this

7    incident where there was a allegation of rape, but just

8    in general, sex between a deputy and a member of the

9    public -- and I'm not talking, you know -- I'm not

10   talking about on their own time.  I'm talking about when

11   they got a uniform on, you know.

12              Are you aware of any other incidents in

13   Richmond County in the last ten years of a deputy having

14   sex with a member of the public?

15        A.   You're saying in the wearing a uniform

16   category is what you're saying?

17        Q.   Well, I mean, wearing it up to the point where

18   you got to take it off to have sex, but yeah.

19        A.   Oh, I don't recall to be honest with you, no.

20        Q.   Okay.  What type of training do deputies

21   receive with regard to encounters with the opposite sex?

22   You know, like, I mean, just, you know, just for

23   instance, you know, HR departments have rules about, you

24   know, have another person there type of thing.  And I

25   know that's not practical with a, you know, law

1    enforcement scenario.

2            But is there any kind of training that a

3    deputy would receive before they go out into the street

4    and they're gonna encounter members of the opposite sex

5    as a part of their job about any sort of don't dos or

6    always dos or, you know, any kind of guidelines on any

7    kind of situation like that?

8        A.    That would be covered in the basic police

9    academy classes when you're there as to what's against

10   the law, what's not proper with ethics and

11   professionalism, the standards that you'll be held to;

12   that's all taught at the police academy.

13       Q.    Okay.  Are there any written materials where

14   those standards and ethical guidelines would be found?

15       A.    I would have to assume in the academy lesson

16   plans and classes,

17       Q.    Okay.  You said that there was an Order that

18   came down from up top with regard to calling into

19   dispatch for special duty assignments.  Are there any

20   rules about using a body camera or a camera from a car or

21   something like that while on special duty assignment?

22       A.    It would still be under the policy for the

23   body worn cameras; that if you're going to have an

24   engagement or a Tier 1, 2 or 3 level engagement to turn

25   the cameras on.

1     Q.   So the camera's required under Tier 1?

2     A.   Generally not because that would be -- there's

3  not going to be an interaction.  You may turn it on but

4  as soon as they walk away you just turn it right back

5  off.

6     Q.   Understood, understood.  Is there a policy

7  regarding use of a Sheriff's Department vehicle for

8  special duty assignments?

9     A.   Yes, there is.

10     Q.   What's that policy?

11     A.   That is in the Policy and Procedure Manual

12  under vehicle use.  And it would be that you're allowed

13  to use it when working a special.  It may be required at

14  some specials -- be one of the requirements such as at a

15  parade, so that would be covered in the policies as well.

16     Q.   Okay.  Other than a parade, can you think of

17  any other assignment where they would need to use a

18  sheriff's department vehicle?

19     A.   Well, I mean there's an entire group of them.

20  When you're working special duty, you're a law

21  enforcement officer, and you may have to arrest somebody;

22  you may have to transport; you may need your computer;

23  all that would be in the police car itself.  And if

24  you're working special duties to keep from having a road

25  officer that's working to have to come to that location.

82

1      Q.    Okay.   Is there any special exception for

2   special duty policies when it comes to working at an

3   event at an Augusta park or something like that?   Are

4   there any exceptions to the special duty rules?

5      A.    Not that I'm aware of.   Not that I'm aware of.

6   I'm just not familiar enough with it.

7      Q.    Okay.   Would that be written down in the

8   Policy and Procedure Manual?

9      A.    Possibly.

10     Q.    If it's not written down in the Policy and

11  Procedure Manual, would it be written down in any kind of

12  separate special duty manual?

13     A.    I don't think maybe a special duty manual, but

14  possibly under a General Order.

15     Q.    Okay.   Is there any location where you can --

16  where the General Orders are found, where you can find

17  General Orders so you can read them?

18     A.    Until they're incorporated in the Policy and

19  Procedure Manual and that would be in the accreditation

20  manager's office.

21     Q.    Okay. How often are General Orders issued

22  typically?

23     A.    As needed.

24     Q.    I mean, is it twenty a year?   Is it six a

25  year?

                                                        83

1        A.   I don't recall to be honest with you.  It'd

2   probably be somewhere in between those two.

3        Q.   Okay.  And are the General Orders made a part

4   of the Policy Manual during those update periods when

5   y'all are working on updating?

6        A.   Generally they are because the General Order

7   comes out when there needs to be a change in policy.

8        Q.   Okay. Who issues General Orders?

9        A.   That would be the Sheriff.

10       Q.   Who was the Sheriff in January of 2017?

11       A.   Sheriff Roundtree.

12       Q.   Okay.  How long has Sheriff Roundtree been

13   Sheriff?

14       A.   Third term, thirteen years ago.  Or this is

15   his fourth term.

16       Q.   It doesn't matter.  You covered the whole time

17   period I was concerned about anyway.

18       A.   He's been in three terms.  It's the second

19   year of his third, so ten years.

20       Q.   Has Sheriff Roundtree made any significant

21   policy changes since he took over?

22       A.   Since he took over, yes, sir.

23       Q.   Okay.  With regard to use of force, has he

24   made any significant policy changes?

25       A.   Yes, sir.  I would say he has.

                                                        84

1      Q.   Okay.  What policy changes has he made that

2  you feel are significant?

3      A.   The ones I feel are significant are the fact

4  that he actually wrote them down and put them in a Policy

5  and Procedure Manual.

6      Q.   So he created a policy, written policy?

7      A.   The current one, yes.

8      Q.   Did he come up with the body camera policy?

9      A.   With the advice and consent of his command

10  staff, yes.

11      Q.   Yes, sir.  And I don't mean him obviously, you

12  know --

13      A.   Yes, he came up with the body worn camera

14  policy.

15      Q.   Okay.  How long has the policy with regard to

16  special duty assignments been in place?

17      A.   I'm going to say since Sheriff Roundtree took

18  over.

19      Q.    Okay.  What was the situation with the prior

20  Sheriff with regard to special duty assignments?

21      A.   They would come from somebody on the command

22  staff or you would negotiate your own.  But the only

23  thing they cared about was how much you got paid.

24      Q.   Okay.  And so Sheriff Roundtree created

25  someone dedicated to handling special duty and that's

85

1  Sergeant Morrison?

2       A.   Yes.

3       Q.   Okay.  How long has Sergeant Morrison been in

4  charge of special duty?

5       A.   I'm gonna say five or six years now.  I would

6  be hard pressed to say exactly when he took over that

7  job.

8            MR. CAUTHORN:  Okay.  Well, I think I'm

9       -- I think that I'm good for now.  I may have a

10      couple follow-ups depending on if Mr. Frails or

11      Ms. Haynes have any questions, but I think

12      right now I'm finished.

13           MR. FRAILS:  I don't have anything.

14           MR. CAUTHORN:  Thank you, Captain

15      Rollins.  Thank you for your time today.

16           THE WITNESS:  Yes, sir.

17           THE VIDEOGRAPHER:  Off the record at

18      1:50.

19           MR. CAUTHORN:  Are y'all gonna read and

20      sign or y'all gonna --

21           MR. FRAILS:  We'll waive.

22           (Whereupon, the above-entitled matter was

23      concluded at 1:15 p.m.)

24                         o0o

25

```
 1                 C E R T I F I C A T E
 2   STATE OF GEORGIA      )
 3   COUNTY OF BANKS       )
 4        I hereby certify that the foregoing deposition was
 5   taken down by me, as stated in the caption; and the
 6   questions and answers were reduced to print by me; that
 7   the foregoing pages 4 through 86 represent a true,
 8   correct, and complete transcript of the evidence given on
 9   February 7, 2022 by the witness, CAPTAIN ALLAN D.
10   ROLLINS, who was first duly sworn by me; that I am not a
11   relative, employee, attorney or counsel of any of the
12   parties; am not a relative or employee of attorney or
13   counsel for any of said parties; nor am I financially
14   interested in the action.  The reading and signing of the
15   transcript was waived.
16        This certification is expressly withdrawn and denied
17   upon the disassembly or photocopying of the foregoing
18   transcript of proceedings or any part thereof, including
19   exhibits, unless said disassembly or photocopying is done
20   by the undersigned certified court reporter and/or under
21   the auspices of Rodman Reporting, and the signature and
22   original seal is attached thereto.
23        Pursuant to Article 8.B of the Rules and Regulations
24   of the Board of Court Reporting of the Judicial Council
25   of Georgia, I make the following disclosure:
```

1          I am a Georgia Certified Court Reporter.  I am here

2     as an independent contractor of Rodman Reporting.  The

3     firm was contacted by the offices of THE CAUTHORN LAW

4     FIRM to provide court reporting services for this

5     deposition.  I will not be taking this deposition under

6     any contract that is prohibited by O.C.G.A. 15-14-37(a)

7     and (b).

8          I do not have a contract to provide reporting

9     services with any party to the case, any counsel in the

10    case, or any reporter or reporting agency from whom a

11    referral might have been made to cover this deposition.

12    I will charge the usual and customary rates of Rodman

13    Reporting to all parties in the case.

14         I further certify that the original deposition shall

15    be filed under seal with J. Wickliffe Cauthorn, 1984

16    Howell Mill Road, P.O. Box 20059, Atlanta, Georgia 30325

17         This 9th day of March 2022.

18

19                         _Kellie A. Jones_

20                         _____

21                         Kellie A. Jones, CCR, CVR-M

22                         Certified Court Reporter

23                         No. B-1671

24

25

                                                              88

# A

**AB (1)**
60:24
**ABC (1)**
60:23
**ability (2)**
45:23;47:7
**able (1)**
52:6
**above-entitled (1)**
86:22
**academic (1)**
42:1
**academies (6)**
20:6;21:18,24;38:2,
15,21
**academy (87)**
8:23;11:18;12:9,23;
15:9,10;19:4,5,17,18,
18,19,19,22;20:1,4,4,
7,9;21:3,4,13,16,20,
21,22;22:5,6,9,10,18,
20,24;23:1,7;24:6,10,
21,22,23,25;25:2,2,3;
27:14;29:5;30:9,16,
21;31:1,15,19;32:3,4,
7,9;33:5,6,7,13;37:17,
18,20,23,24,25;38:5,
6,19,20;40:21,24;
41:1,13,18,23;42:16;
43:2,4,6,8,16,22;
68:11;81:9,12,15
**accepts (1)**
11:20
**access (1)**
72:1
**according (6)**
20:17;49:15;58:22;
60:25;70:5;78:12
**account (1)**
33:22
**accreditation (3)**
21:19;72:22;83:19
**accredited (1)**
22:11
**accrue (1)**
70:7
**accrues (1)**
70:5
**accusation (1)**
63:10
**achieve (1)**
70:16
**action (1)**
52:5
**actions (3)**
60:21;63:21,22
**actually (12)**
7:5;10:7;16:17;
22:4;26:5;43:24;
47:18,24;48:2;62:25;

72:25;85:4
**addition (3)**
12:18;18:21;28:11
**additional (3)**
8:20,24;33:1
**address (2)**
75:25;76:18
**addressed (4)**
17:15;49:7;72:24;
76:9
**addresses (1)**
55:5
**administration (2)**
51:14;56:1
**administrative (1)**
29:8
**adopt (1)**
51:10
**adopted (3)**
51:17;59:17;73:10
**adopting (1)**
74:2
**advanced (3)**
11:9,25;12:2
**advancement (1)**
71:3
**advertising (1)**
29:7
**advice (1)**
85:9
**Affairs (17)**
6:20,25;34:18;35:9,
17,19,21,22;45:8;
55:17;58:17,18;65:1,
6,13;66:2,7
**again (14)**
40:25;46:6;50:6,11;
53:13;54:2,11;56:19;
57:24;58:20;59:2,7;
67:3;69:20
**against (3)**
8:3;14:4;81:9
**agencies (3)**
21:23;24:4;73:17
**agency (5)**
34:4;55:8;62:3;
73:19,20
**agency's (1)**
34:8
**ago (7)**
8:18;9:20,21;10:12;
51:13;55:10;84:14
**agree (2)**
5:6;58:2
**agreement (1)**
5:11
**agrees (1)**
67:16
**ahead (2)**
42:5;54:18
**A-l-a-n (1)**
5:2
**Allan (4)**

4:23;5:2,14;6:11
**A-l-l-a-n (1)**
5:3
**allegation (2)**
63:12;80:7
**alleges (1)**
62:16
**A-l-l-e-n (1)**
5:2
**allow (1)**
12:5
**allowed (3)**
36:19;79:2;82:12
**allows (1)**
32:13
**along (3)**
28:2;57:10;72:13
**always (5)**
29:7;46:2;53:14,18;
81:6
**ambiguity (2)**
75:22;76:5
**ambiguous (1)**
76:8
**among (1)**
57:20
**amount (1)**
34:13
**amounts (1)**
13:4
**analysis (1)**
72:20
**angle (1)**
75:10
**anniversary (1)**
7:14
**annual (1)**
68:22
**annually (5)**
19:11,15,15;72:4,9
**anyplace (1)**
58:14
**appears (1)**
46:22
**applicants (1)**
29:14
**application (4)**
29:2;36:23,25;
74:12
**applied (1)**
74:11
**applies (2)**
22:8;74:18
**apply (12)**
29:6;30:3,10,15,18,
19,22,24,25;33:13;
74:20;75:17
**appointed (2)**
11:5,5
**appropriate (6)**
6:6;30:14;53:11,12;
54:9;63:6
**appropriateness (1)**

17:12
**approval (5)**
21:19,21;22:14;
33:6;36:20
**approved (4)**
21:18;36:4;38:6;
66:10
**approves (1)**
36:7
**arbiter (1)**
27:4
**area (2)**
24:4;75:19
**arms (1)**
54:7
**around (4)**
7:7,8;24:4;80:4
**arrest (15)**
32:18,21;33:10;
34:7;49:17,24,25;
56:14;61:24,25;62:3,
8;78:16,24;82:21
**arrested (2)**
33:10,20
**arresting (3)**
47:15;49:18;50:14
**arrests (2)**
34:9;61:20
**arrive (1)**
52:15
**article (13)**
33:25;46:6,12,15,
17;49:16;54:19,22,23,
24;55:5;58:24;61:8
**articles (1)**
45:25
**articulable (1)**
78:10
**assessment (3)**
29:13,14;68:23
**assigned (3)**
68:5,7;72:14
**assignment (7)**
66:4,10,17;68:15;
69:3;81:21;82:17
**assignments (11)**
18:4;36:2,12;67:25;
68:5,19;69:7;81:19;
82:8;85:16,20
**assistants (1)**
74:7
**associated (1)**
66:9
**associate's (1)**
8:13
**Association (1)**
19:4
**assume (1)**
81:15
**assuming (1)**
16:12
**assumption (1)**
57:2

**Athens (1)**
37:21
**Athens/Augusta (1)**
37:17
**attempt (1)**
44:8
**attend (2)**
11:18;19:21
**attended (1)**
9:1
**attorneys (1)**
76:2
**audible (1)**
48:10
**audio (1)**
63:10
**Augusta (54)**
4:13;7:19,23,24;
12:25;13:25;19:4,5;
20:6,7,11,15,19;21:6;
22:12,13,20,22,23;
23:1,2,3,4,17,21,24,
24;26:3,25;27:15;
28:5,10,12,13;37:23;
38:8,10,20;39:2,12,
25;40:7,11,12,18;
41:11,15,16;42:1,7,
11;43:23;46:18;83:3
**Augusta- (1)**
27:8
**Augusta-Richmond (1)**
20:3
**authority (5)**
27:7;33:7,16;34:1;
75:8
**automatically (2)**
53:2,18
**available (1)**
29:8
**aware (9)**
57:23;62:14;71:10;
79:23;80:5,6,12;83:5,
5
**away (5)**
77:24;78:1,9;79:1;
82:4
**awful (1)**
28:22

# B

**back (18)**
9:13;18:19;22:12,
16;25:4;37:3,12;
38:15;47:17;48:9;
49:8;52:18;54:8;56:2;
59:2;77:2,9;82:4
**background (2)**
29:20;33:14
**badge (1)**
77:18
**Bar (1)**
61:19

Case 1:21-cv-00149-JRH-BKE   Document 22-14   Filed 06/17/22   Page 91 of 101
Valencia Colon v.
Richard Roundtree et al

Capt Allan Rollins
February 7, 2022

**bare (1)**
11:7
**barrier (1)**
61:16
**based (3)**
12:15;71:1;76:20
**basic (6)**
9:16;19:23;20:1;
32:16;65:12;81:8
**basically (5)**
10:3;11:24;45:15;
50:23;70:25
**basis (9)**
22:6,15;31:23;50:7;
53:19;54:4,11;57:2;
63:13
**bathroom (1)**
37:7
**baton (7)**
47:21;53:4,11,16,
19,25;54:10
**became (3)**
7:20;52:11,12
**become (6)**
11:20;30:2;31:9,14;
50:25;76:8
**becomes (2)**
53:13;54:6
**becoming (2)**
31:4,4
**begin (1)**
29:20
**beginning (1)**
52:5
**behalf (2)**
6:1;12:6
**behavior (1)**
21:11
**behind (7)**
47:16;48:5;51:3,4,
7;54:8;63:14
**besides (2)**
61:24,25
**best (7)**
31:24;38:10;57:13;
73:18,19,20,20
**better (2)**
12:24;43:21
**bicycle (2)**
45:5,6
**big (5)**
13:21;17:2;39:13;
64:17,19
**bit (5)**
26:9;34:18;35:18;
40:17;45:9
**blend (1)**
31:23
**blow (1)**
54:7
**Board (2)**
23:18;29:22
**body (27)**

16:3,4,9,23;45:3;
50:16,19;51:11,16,18;
55:19,19;56:7,10,11,
12,21;57:6;58:25;
60:5,8,11,20;81:20,
23;85:8,13
**book (1)**
28:22
**both (3)**
8:25;21:4;38:21
**bottom (2)**
47:9;73:6
**braking (1)**
43:6
**break (1)**
37:7
**Brenau (1)**
8:13
**brief (3)**
37:11;49:6;77:8
**bring (3)**
25:9;47:22;75:24
**broad (5)**
16:18;26:1,9;33:16;
64:15
**budgets (1)**
9:14
**build (3)**
57:8,9;59:22
**buildings (1)**
21:11
**bunch (2)**
18:7,7
**Bureau (1)**
29:9
**business (2)**
9:16;35:11
**buy (1)**
45:5

**C**

**cadet (2)**
39:13;42:20
**cadets (1)**
39:18
**call (6)**
24:5;33:25;45:21;
52:8,9,14
**called (1)**
5:15
**calling (1)**
81:18
**cam (1)**
56:21
**came (4)**
7:19;46:15;81:18;
85:13
**camera (29)**
16:3,5,10,23;45:3,
15;50:17,19;52:2,3,4,
7,20;54:3;55:19,19;
56:7,10,11,12;58:25;

60:5,8,11,20;81:20,
20;85:8,13
**cameras (3)**
47:8;51:11,17,18;
57:6;81:23,25
**camera's (1)**
82:1
**can (33)**
10:24;11:14,23;
15:12,13;19:17;
24:12;30:3;32:12;
33:9,12,15;46:4,8;
49:1;52:5;55:7,12;
59:9;60:23;65:1,2;
68:12;70:16;73:1,3;
75:12;78:3,5;82:16;
83:15,16,17
**candidates (1)**
33:16
**Captain (16)**
4:10,23;5:14,20;
6:13,15,17,19;7:17;
35:20;37:15;48:13;
49:11;58:3,8;86:14
**captain/ (1)**
56:1
**Captains (1)**
75:13
**car (3)**
52:18;81:20;82:23
**care (2)**
25:13;50:5
**cared (1)**
85:23
**career (2)**
7:17;8:5
**carrying (1)**
79:22
**cars (1)**
40:7
**case (30)**
4:10;11:18;31:23;
41:12;49:21;50:1,1,6,
7;53:13,13,19,19;
54:1,4,4,11,11;57:1,1,
3,3,8,16;62:20;63:13,
13,14;64:2,24
**case-by- (1)**
31:22
**cases (3)**
15:6;30:8;64:24
**Casino (1)**
62:18
**catch (3)**
56:8;64:18,19
**categories (3)**
65:3;77:12,19
**categorization (1)**
59:13
**categorize (2)**
59:15;60:6
**categorized (4)**
59:10,14,15;60:9

**categorizing (1)**
60:18
**category (3)**
60:13;61:3;80:16
**cause (2)**
66:2;78:11
**CAUTHORN (23)**
4:15,15,22;5:8,19,
20;37:2,14;44:15,19,
22;45:19;46:11;
48:12,17,25;49:10;
54:17;76:24;77:11;
86:8,14,19
**CD (2)**
15:2;71:25
**Center (8)**
20:9;29:12;30:2,3,
17;37:20;38:7;41:6
**certain (7)**
27:13;28:1,3;35:6;
61:19;72:21;74:18
**certificate (1)**
10:2
**certificates (1)**
8:25
**certification (13)**
9:10,11,23;10:17,
18;21:24;22:19;
32:16,17;33:1,4,8;
38:23
**certifications (6)**
11:9,25;12:2,7;
13:19;32:24
**certified (12)**
11:19;12:16;19:20,
21,22;20:2;32:2,7;
35:12,13;68:8,14
**certify (2)**
12:21;33:5
**chain (1)**
56:4
**chance (1)**
42:25
**chances (1)**
42:24
**change (6)**
34:21;62:3,6;73:24;
76:4;84:7
**changed (3)**
19:14;62:9;72:8
**changes (7)**
72:9,15,15;73:23;
84:21,24;85:1
**chapter (3)**
18:18,19;73:9
**chapters (2)**
14:6,14
**charge (2)**
36:5;86:4
**Charlie (10)**
27:18,18;36:22;
37:16;46:13,15;
50:16;62:16,22,23

**check (2)**
22:1;63:11
**checked (1)**
47:5
**Chief (2)**
72:12;75:25
**choose (2)**
41:10,13
**Christopher (1)**
46:23
**CID (1)**
7:20
**circumstance (1)**
34:3;50:7;57:11
**circumstances (4)**
48:5;49:21;50:10;
63:14
**civilian (2)**
77:13;78:18
**class (15)**
11:18;12:15;19:1;
20:18;25:13;28:2;
38:24;39:16,18,21,22;
43:12;59:19;70:18,19
**classes (24)**
9:16;10:3;11:8,22,
23;12:11;13:19;
19:13;20:16;21:8;
24:21;25:9;38:15;
39:13,14;40:12,13,18;
41:21;43:10;70:14;
74:5;81:9,16
**classification (1)**
70:13
**classifications (2)**
70:22,23
**classified (2)**
60:23,23
**classroom (11)**
10:8;15:4;20:24,25;
22:1;24:13;25:14,21,
23;26:20;27:6
**classrooms (1)**
25:8
**click (1)**
54:18
**clicked (1)**
48:17
**client (1)**
62:16
**climbing (1)**
26:13
**clock (1)**
12:25
**coffee (1)**
52:12
**college (9)**
10:4;19:5;20:7,17;
30:7;31:13,19;38:12;
41:17
**colleges (1)**
38:13
**Colon (3)**

4:11,16;5:21
**Colonel (2)**
   30:20,20
**Columbia (11)**
   20:9;27:10;37:20;
   38:16,19;39:1,14,15;
   41:7,16,24
**Columbus (1)**
   10:1
**combination (1)**
   22:21
**coming (4)**
   15:5;29:11;67:18,
   22
**command (7)**
   9:6;56:4;72:13;
   75:24;76:4;85:9,21
**commit (1)**
   59:9
**committee (2)**
   72:10,12
**communicated (1)**
   78:17
**companies (1)**
   12:6
**compare (1)**
   73:18
**compensated (1)**
   12:18
**complaint (2)**
   62:19;66:20
**complaints (2)**
   36:9;66:18
**complete (1)**
   9:18
**complied (1)**
   4:3
**computer (1)**
   48:8;51:24;62:6;
   82:22
**concerned (1)**
   84:17
**concluded (1)**
   86:23
**condom (2)**
   79:25;80:3
**condoms (1)**
   79:22
**conduct (19)**
   17:10,14,15,20;
   18:3;33:15,16;39:5,8,
   22;55:20,21;59:4;
   64:13,17,21,23;65:7;
   78:11
**conducted (3)**
   5:5;51:21,22
**conducting (2)**
   11:22;78:23
**cone (1)**
   43:5
**conference (1)**
   44:4
**confirmed (1)**

49:11
**confusing (1)**
   33:3
**consensual (3)**
   63:1,20;64:4
**consent (1)**
   85:9
**consideration (4)**
   42:10;53:20;56:6;
   72:25
**considered (2)**
   48:1;66:14
**considering (1)**
   53:25
**contact (1)**
   17:12
**contacted (1)**
   78:19
**contest (1)**
   62:25
**context (2)**
   15:25;56:9
**continuation (1)**
   57:8
**continue (1)**
   29:15
**continuing (1)**
   22:15
**cooperation (1)**
   63:14
**copies (1)**
   73:17
**copy (5)**
   14:16;15:1,3;71:16,
   20
**Council (2)**
   9:25;11:3
**counsel (2)**
   5:12;6:6
**counterbalance (1)**
   23:13
**County (29)**
   4:24;5:24;6:13,16;
   7:13;20:3,9;23:14,25;
   27:9,10,12;28:9,25;
   37:20;38:16,18,19;
   39:1,7,10,14,15;41:7,
   16,24;43:15,21;80:13
**couple (7)**
   8:24;17:5;31:7;
   37:4;43:12;46:16;
   86:10
**course (6)**
   9:6,12;29:6;40:14,
   15;42:15
**courses (7)**
   10:1,20;38:12;39:6;
   43:3,5;73:15
**court (12)**
   4:3,7,9,12;5:1,4,11,
   22;44:12;48:14,21;
   74:6
**cover (3)**

15:4;17:24;19:24
**covered (6)**
   15:12;20:1;64:10;
   81:8;82:15;84:16
**covers (2)**
   14:6;26:8
**created (3)**
   18:25;85:6,24
**crime (1)**
   21:9
**criteria (1)**
   63:24
**CROSS-EXAMINATION (1)**
   5:18
**cruiser (2)**
   79:22;80:3
**culpability (1)**
   56:24
**cup (1)**
   52:12
**current (1)**
   85:7
**custody (1)**
   14:4

**D**

**date (3)**
   4:5;73:5;76:13
**day (5)**
   26:7;43:1,3,5;59:1
**days (2)**
   35:3;55:9
**day-to-day (1)**
   35:23
**de- (2)**
   35:12;40:9
**deal (1)**
   22:14
**dealing (1)**
   66:14
**dean (3)**
   23:2;27:1,2
**decide (4)**
   30:13;32:25;41:18;
   76:7
**decided (4)**
   29:2,4;38:14;58:8
**decides (2)**
   26:21;59:14
**deciding (2)**
   53:25;56:6
**decision (10)**
   22:7;29:25;30:20;
   31:22;33:12;72:8,17;
   73:18;74:22;76:4
**decisions (4)**
   56:18;72:5;74:6;
   75:7
**dedicated (1)**
   85:25
**Defendant (1)**
   4:18

**Defense (1)**
   6:6
**defensive (3)**
   19:25;22:3;26:6
**defined (1)**
   79:7
**defining (1)**
   79:8
**definitely (1)**
   53:5
**degree (2)**
   8:13,15
**delineated (1)**
   73:23
**demoted (1)**
   62:4
**demotes (1)**
   55:8
**demotion (1)**
   34:19
**Department (42)**
   6:3;7:13,19,24,25;
   12:19;13:25;14:3,17,
   21;15:22;17:22;27:9,
   19;28:9,25;30:25;
   32:2;39:3;51:10;
   55:16;59:3,6;62:10,
   11;63:8,19,22;64:21;
   65:15;67:10;68:1;
   74:11,23;75:2,14;
   79:4,15,18,21;82:7,18
**departments (2)**
   76:22;80:23
**Department's (2)**
   63:4;71:2
**depend (1)**
   41:21
**depending (4)**
   18:25;43:10;72:19;
   86:10
**deposed (1)**
   5:16
**deposition (4)**
   4:10;5:4;45:22;
   54:20
**deputies (20)**
   14:15,25;17:7;20:4;
   23:15;31:9;36:3;
   46:24;51:17;57:20;
   58:4;65:22;68:6,17;
   69:5;70:1;71:3,8;
   77:16;80:20
**deputy (39)**
   7:16;24:20;27:25;
   31:5;45:1;46:22,23;
   52:6;53:21,24;55:8;
   56:13;58:1,25,25;
   61:9;63:2;64:3;66:14;
   67:11;68:12;69:10;
   70:10,11,12,12,15,17,
   18,19,19;71:11;
   72:12;75:25;77:13;
   78:18;80:8,13;81:3

**described (2)**
   17:14;26:17
**desk (1)**
   48:9
**detained (1)**
   78:15
**detention (7)**
   29:12;30:2,3,9,10,
   12,17
**determination (2)**
   24:23;72:13
**determinations (1)**
   45:14
**determine (3)**
   11:7;52:6;55:23
**determined (1)**
   19:12
**development (1)**
   9:6
**Dewey (1)**
   6:11
**difference (9)**
   10:14;15:16;39:2;
   40:3,4;43:17;56:16,
   25;70:10
**different (17)**
   14:6,8;15:12;18:9;
   21:5;23:22;38:8;39:4;
   49:21;53:21;57:11,
   16;60:3;61:4,17;
   75:23;77:19
**differently (3)**
   60:6;70:5,7
**direct (1)**
   63:17
**directly (2)**
   30:8;31:19
**director (8)**
   22:18,25;23:1;
   26:23,24;27:2;33:7;
   38:2
**directors (1)**
   33:5
**disagree (3)**
   61:3;75:12,14
**disciplinary (1)**
   60:21
**disclosure (1)**
   7:18
**discretion (1)**
   51:6
**discuss (1)**
   72:14
**discussed (3)**
   19:15;34:17;61:7
**dismissed (4)**
   43:1,4,6,7
**dispatch (2)**
   67:8;81:19
**District (2)**
   4:11,12
**divided (1)**
   38:13

**Division (6)**
4:13,25;6:14,21,23;
7:3
**Dixon (1)**
38:1
**doctors (1)**
61:16
**doctor's (1)**
68:23
**document (16)**
14:10,13,16,19,23;
15:23;16:11,13;17:2;
28:10,10,11;40:19;
46:9;54:15;59:25
**documentation (1)**
63:16
**documents (7)**
14:1;15:18;18:14,
16,21;19:10;72:2
**done (14)**
15:2;21:15;22:21;
29:19;38:3;50:25;
52:19;57:18;59:13;
72:19,22;76:19,19;
77:20
**dos (2)**
81:5,6
**down (16)**
14:2;21:21;56:2;
57:20,22;58:13,23;
67:19,22;74:3,24;
81:18;83:7,10,11;
85:4
**download (2)**
45:23;47:7
**draw (1)**
47:25
**drive (4)**
21:13;25:12;40:16;
43:4
**driving (12)**
19:24;21:13,14;
22:2;23:4,9;25:22,23;
39:6;40:6;43:5;80:3
**drop (1)**
50:8
**dropped (1)**
50:9
**drunk (1)**
50:9
**duly (1)**
5:16
**during (1)**
84:4
**duties (3)**
32:8;36:6;82:24
**duty (37)**
17:7,25,25;18:3;
25:4;36:2,4,15,17,19;
62:18;65:16,22;66:4,
10,25;67:25;68:4,15,
18,24;69:3,7,16,18;
81:19,21;82:8,20;

83:2,4,12,13;85:16,
20,25;86:4

**E**

**earlier (4)**
39:25;41:5;57:7;
61:21
**early (2)**
29:17;56:23
**earn (1)**
23:8
**easier (3)**
15:3;71:19,22
**Ebony (1)**
4:19
**economic (1)**
25:17
**educated (1)**
23:15
**education (2)**
8:12;14:25
**effort (1)**
25:7
**eight (3)**
31:6;39:16;51:13
**eighteen (2)**
20:21,21
**eighteen-week (1)**
40:1
**either (1)**
48:16
**electronically (1)**
71:20
**eliminated (1)**
29:16
**else (7)**
8:1;12:9,10;26:15;
49:2;58:15;61:23
**emails (2)**
5:24;6:2
**Emergency (1)**
42:14
**employee (2)**
70:6,7
**employees (2)**
43:16;71:24
**employment (2)**
62:10,13
**en (1)**
52:8
**encounter (5)**
52:10;53:10;63:5;
79:5;81:4
**encountered (1)**
49:17
**encounters (1)**
80:21
**end (5)**
21:10;35:14;45:2;
50:18;56:19
**enforced (1)**
67:1

**enforcement (20)**
7:23,25;8:6,20;9:1,
17;10:22;11:17;
13:14;22:22,23;
24:15;26:2,9;32:5,20;
34:4,10;81:1;82:21
**engagement (3)**
47:19;81:24,24
**enough (3)**
20:18;70:14;83:6
**ensued (2)**
37:11;77:8
**entails (1)**
9:13
**enter (1)**
21:11
**entire (4)**
21:16;50:7;51:8;
82:19
**entity (2)**
5:25;6:1
**Eric (2)**
22:25;26:25
**escalating (1)**
53:14
**escalation (3)**
40:10;53:17;57:12
**especially (1)**
59:19
**essentially (1)**
12:24
**established (1)**
78:9
**ethical (1)**
81:14
**ethics (6)**
61:15,16,17;64:11;
75:6;81:10
**evaluated (1)**
26:8
**evaluations (1)**
25:24
**even (10)**
19:3;48:1,1;59:20,
21;60:11;62:4;63:19;
64:3;78:10
**event (7)**
33:12,18;51:9;53:4;
63:20;69:12;83:3
**everybody (3)**
52:1;65:13;67:16
**everyone (3)**
4:13;14:2;30:1
**everything's (1)**
52:17
**everywhere (1)**
54:4
**E-V-O-C (1)**
42:13
**exact (2)**
17:19;41:22
**exactly (5)**
7:4;47:24;51:15;

60:15;86:6
**exam (2)**
42:13,15
**example (1)**
76:11
**exams (1)**
42:21
**except (1)**
68:25
**exception (1)**
83:1
**exceptions (1)**
83:4
**exchange (1)**
23:6
**excuse (1)**
18:5
**executive (4)**
9:7;72:16;73:15,16
**Exhibit (7)**
45:18,20,21;46:10;
54:16,20,21
**exhibits (1)**
37:4
**exists (1)**
14:2
**expanded (2)**
40:17;50:24
**expansion (1)**
38:17
**expected (2)**
28:17,19
**experience (5)**
30:6,7;31:13,20;
76:20
**explain (8)**
10:24;11:14;14:23;
19:17;24:16;32:12;
52:5;78:21
**explained (1)**
57:16
**explaining (1)**
48:5
**exporting (1)**
38:14

**F**

**facilities (4)**
22:2,2,3,4
**facility (3)**
23:4;39:14,15
**fact (4)**
9:20;23:14;45:12;
85:3
**factors (2)**
53:20,24
**facts (2)**
64:24;74:20
**fail (1)**
43:1
**failed (1)**
47:10

**failure (1)**
55:18,18;57:15;
63:10
**failures (1)**
25:13
**fair (4)**
25:19,20;35:15,16
**fall (2)**
11:21;60:12
**falls (3)**
20:16;23:2;41:15
**familiar (2)**
46:18;83:6
**far (9)**
9:14;21:5;26:20;
33:9;56:17;62:7,12;
66:19;68:24
**February (1)**
4:6
**feel (2)**
85:2,3
**few (2)**
55:9;77:2
**field (5)**
15:11;29:12;30:11,
15;42:22
**fifty (1)**
24:7
**file (3)**
37:16;47:13;58:17
**files (2)**
58:18,19
**filing (1)**
48:5
**fill (4)**
36:24;48:8;52:25;
55:18
**filled (1)**
36:23
**filling (1)**
49:12;50:13
**find (8)**
33:14,18;60:19,22,
25;61:11;65:21;83:16
**fine (1)**
4:22;49:3
**finish (1)**
10:10
**finished (4)**
10:11;50:23;63:3;
86:12
**fire (1)**
48:2
**firearm (3)**
25:22,23;47:21;
53:16
**firearms (7)**
12:4;19:25;21:10;
22:3;23:5;40:7;42:22
**firing (2)**
23:9;39:6
**first (12)**
5:16;7:8;21:6;

27:18;46:21;47:6,9;
52:10,13;59:20;
70:18,19
**fitness (1)**
26:12
**five (5)**
37:3,6;58:22;76:25;
86:5
**fix (1)**
48:24
**Florida (2)**
9:12;73:21
**focused (1)**
21:7
**follow (3)**
20:25;55:24;67:19
**followed (2)**
64:4;76:17
**follows (1)**
5:17
**follow-ups (1)**
86:10
**force (23)**
13:25;14:4,6,12;
15:15,21;16:13,20;
19:24;47:10,11,12,13,
14,18,22;48:1,4;
52:23;53:5,9;55:18;
84:23
**forget (1)**
7:5
**form (3)**
11:11;48:7;52:25
**format (2)**
15:3;71:25
**former (1)**
30:6
**forth (2)**
9:13;22:17
**forty (1)**
13:18
**Forum (1)**
73:16
**forwarded (4)**
29:19;56:3;72:7,16
**found (5)**
45:4,4;56:1;81:14;
83:16
**founded (1)**
65:1
**four (6)**
6:17;9:19,20;10:11;
39:16;41:24
**fourth (1)**
84:15
**Frails (5)**
4:18;48:19;86:10,
13,21
**free (7)**
24:5;77:24;78:1,8,
14,22,24
**freely (1)**
79:2

**full (6)**
6:10;7:18;13:3,4,5;
68:24
**funding (1)**
38:11

**G**

**GBI (1)**
62:24
**general (14)**
8:16;11:25;14:9;
24:19;66:18;67:18;
80:8;83:14,16,17,21;
84:3,6,8
**generally (13)**
12:12;19:11;20:11;
25:1;31:6;39:7,23;
41:24;42:12;52:14;
63:19;82:2;84:6
**Georgia (14)**
4:12;9:24;11:1,12,
16;19:3,21;20:8;32:7;
37:19;38:7;41:5;55:7;
74:4
**gets (5)**
23:8,9,9;36:7;74:11
**given (8)**
15:1,3;24:10;28:14;
29:13,14;30:8;39:19
**gives (2)**
32:17;59:11
**giving (2)**
56:11,22
**glanced (1)**
62:21
**goes (7)**
20:15;21:25;26:21;
42:15;50:1;61:14;
62:5
**gonna (43)**
13:17;17:5;24:22;
28:18,19;29:3,4,23;
37:3,4,5;43:18,24,25;
44:1,8,9,19,25;45:20;
46:5,5,6;52:20;54:18,
20;56:13;57:1,19,24;
58:20,21;60:3;74:3;
77:1;79:11,11,13,13;
81:4;86:5,19,20
**Good (4)**
6:10;31:11;44:6;
86:9
**Google (1)**
61:12
**Googled (1)**
46:14
**Googling (1)**
46:13
**Gotcha (4)**
39:13;47:9;57:4;
78:7
**go-to (1)**

74:1
**governor (1)**
11:5
**GPSTC (15)**
11:20;20:17;37:17;
38:14;40:15,16,19,20,
20,23;41:2,5,10;42:5,
11
**grades (1)**
26:21
**graduate (5)**
8:23;9:25;15:10;
25:2,3
**graduated (1)**
9:2
**graduates (1)**
23:23
**grandfathered (1)**
10:19
**Grants (1)**
41:15
**ground (1)**
54:10
**group (1)**
82:19
**guess (10)**
7:22;8:4;21:17;
25:16;31:23,25;32:1;
41:25;43:9;61:14
**guessing (3)**
40:20;69:1;75:5
**guest (1)**
12:11
**guidance (5)**
60:19;65:9;74:19,
23;75:18
**guide (1)**
75:6
**guided (4)**
59:6;74:12,14;75:4
**guideline (1)**
59:4
**guidelines (7)**
11:21;58:8;65:7,18;
68:4;81:6,14
**guides (3)**
14:25;59:11;68:3
**gun (1)**
53:11
**guy (3)**
45:4;56:13,20
**guys (4)**
24:14;61:20;74:1;
76:7

**H**

**half (1)**
70:7
**hand (4)**
47:7;53:15,15;54:5
**handcuff (1)**
47:17

**handed (1)**
74:23
**handle (1)**
35:23
**handled (2)**
45:13;47:5
**handling (2)**
9:15;85:25
**hands (3)**
47:16,16;54:5
**happen (1)**
61:12
**happened (4)**
34:1;51:5;55:23;
62:25
**happening (1)**
59:7
**happens (1)**
64:20
**happy (1)**
22:19
**hard (11)**
17:19;24:3;25:3,5;
34:6;51:12,14;53:15;
54:5;64:9;86:6
**Haynes (5)**
4:17,17;5:9,24;
86:11
**head (1)**
13:22
**hear (4)**
48:11,12,15,22
**held (4)**
20:9;37:20;49:6;
81:11
**help (1)**
55:11
**helps (1)**
41:16
**herein (1)**
5:15
**high-end (1)**
46:14
**higher (3)**
59:5;61:2;75:8
**higher-ups (1)**
75:20
**highest (2)**
8:11;70:15
**highlights (1)**
28:21
**hire (3)**
24:19;29:3,3
**hired (5)**
25:18;29:24,25;
36:23,25
**hiring (1)**
28:24
**hit (3)**
42:21;44:19;54:9
**hold (1)**
13:18
**honest (3)**

55:14;80:19;84:1
**Hope (1)**
41:15;75:8
**hopefully (1)**
77:3
**host (1)**
22:4
**hour (1)**
70:7
**hours (4)**
8:24;39:16;70:3,6
**how's (1)**
29:1
**HR (1)**
80:23
**huge (1)**
76:16
**hundred (2)**
24:2;39:16
**Hyde (1)**
45:4

**I**

**icon (1)**
48:20
**idea (1)**
36:25
**identified (6)**
5:22;6:1,5;45:18;
46:10;54:16
**ignore (1)**
79:1
**important (1)**
50:24
**inadvertent (1)**
57:14
**inappropriate (2)**
63:6,7
**incident (11)**
44:23;45:1,8;46:24,
25;47:3;48:6;54:19;
60:3;63:9;80:7
**incidents (1)**
80:12
**include (1)**
80:1
**included (4)**
15:18;40:13,14,14
**includes (1)**
17:2
**including (1)**
29:20
**incorporated (1)**
83:18
**incorrect (1)**
69:19
**independent (2)**
38:4,4
**indicate (1)**
67:24
**individual (8)**
6:5;16:4;17:3;27:5;

28:17;63:6;68:5;
72:20
**information (5)**
33:23;34:25;47:4;
58:16;74:5
**Initially (1)**
47:4
**in-service (1)**
11:24
**inside (1)**
52:12
**inspection (1)**
21:25
**inspections (1)**
22:17
**instance (13)**
17:11;18:17;22:12;
31:25;56:6,10,18;
59:5;61:19;74:16;
77:13,15;80:23
**instances (1)**
34:10
**instead (5)**
41:10;42:6;50:4,4;
69:2
**Institute (3)**
9:2,4;10:15
**instruct (3)**
14:24;20:10,11
**instruction (2)**
12:23;23:13
**instructor (12)**
11:11,12,15,17,21;
12:4,9,10,12,13,21;
13:10
**instructors (3)**
23:3,9;27:5
**interaction (7)**
27:25;77:16,21,22,
23;79:3;82:3
**interactions (3)**
56:15;77:12,19
**interested (1)**
30:18
**Internal (17)**
6:20,25;34:18;35:9,
17,19,21,22;45:8;
55:17;58:17,18;65:1,
6,13;66:2,7
**internet (1)**
46:13
**interpret (1)**
75:20
**interpretation (2)**
69:13;76:3
**interpreting (2)**
74:9,10
**interprets (2)**
75:3,4
**interrelated (1)**
13:6
**interview (1)**
62:24

**interviewed (1)**
29:22
**into (25)**
15:6,10;20:18;21:8,
15;24:20;25:7;30:1,9,
15;33:16;47:3,5;
53:20;56:5;60:12;
63:11;64:21,23;
72:25;73:24;75:6;
77:19;81:3,18
**intoxicated (1)**
50:3
**invest (1)**
29:17
**investigate (4)**
33:19;55:7;63:23;
64:8
**investigated (2)**
56:3;64:25
**investigating (4)**
55:17,17;56:9;63:9
**investigation (14)**
29:20;33:15;34:2;
45:13;47:3;55:21,21;
56:25;63:25;64:21;
65:7;66:7;78:11,23
**investigations (4)**
33:16;55:6,12;
65:12
**investigative (2)**
21:8;55:24
**investigator (3)**
6:22;7:21;65:14
**investment (1)**
25:17
**invited (1)**
36:24
**involved (8)**
23:11;50:25;51:6,
24;52:11,13;54:13;
66:3
**involvement (1)**
47:2
**involving (2)**
44:23;45:1
**issue (1)**
76:18
**issued (1)**
83:21
**issues (6)**
6:7;19:25;21:7;
38:12;49:7;84:8
**issuing (1)**
51:23
**itineraries (1)**
21:5

## J

**jail (3)**
15:6;24:20;30:1
**jailer (11)**
24:20;30:13,13,14,

23,23;31:4,14,16;
41:19;68:11
**jailers (3)**
31:8;38:18;43:21
**January (1)**
84:10
**job (16)**
6:18;12:19,20;13:3,
5,6;25:18;29:7,9;
30:11,19,22,23;65:16;
81:5;86:7
**jobs (4)**
29:8,8;36:3;65:23
**Julian (1)**
62:17
**July (1)**
7:14
**jumping (1)**
26:13

## K

**keep (6)**
22:18;69:22;78:3,3,
5;82:24
**Kellie (1)**
48:12
**Kentucky (1)**
9:6
**kept (1)**
65:4
**kicked (1)**
47:24
**kind (41)**
9:22;14:7;15:7,17;
18:2;20:15;21:11;
22:13,16;23:6,8,10;
24:17;31:23;34:13;
38:13;40:5;41:25;
46:1,4,15;54:13;
56:17;57:15;59:2,3;
61:14;63:23;66:1,2,3,
20;72:23;73:25;
74:19;75:18;77:14;
81:2,6,7;83:11
**kinds (2)**
40:9;55:22
**knew (3)**
33:24;36:24;49:22
**knowing (1)**
50:7
**knowledge (6)**
28:15;47:7;58:12,
13;63:17;68:18
**knows (3)**
14:2;36:9;67:10

## L

**lack (1)**
12:24
**language (2)**
74:12,14

**laptop (1)**
44:7
**large (2)**
15:13;17:1
**larger (2)**
39:12;44:4
**largest (1)**
25:13
**last (7)**
10:5;21:12;44:24;
49:12;58:23,24;80:13
**late (1)**
59:19
**latest (1)**
66:25
**law (22)**
7:23,25;8:6,20,25;
9:16;10:22;11:17;
13:14;21:7;22:22,23;
24:15;26:2,9;32:5,20;
34:4,10;80:25;81:10;
82:20
**lawsuit (1)**
62:15
**lawyer (1)**
61:18
**lawyers (1)**
61:16
**laying (2)**
54:10,12
**lead (2)**
57:19;66:3
**learn (5)**
21:10,13;32:5;
33:11;40:7
**learning (1)**
40:6
**least (5)**
28:20;50:16;55:9;
61:20;62:24;67:16
**leave (5)**
69:6,8;78:23,24;
79:2
**leaving (2)**
50:3;52:18
**Lee (3)**
17:14;34:17;35:8
**leeway (1)**
59:18
**legal (6)**
19:25;25:21;7;
46:14;74:4,7
**length (1)**
70:13
**lesson (2)**
19:6;81:15
**letting (2)**
67:8;68:1
**level (13)**
8:11;9:7;10:4;
38:12;55:23,25;56:1,
2;61:5;64:25;66:6;
70:15;81:24

**levels (2)**
11:6;61:17
**lever (1)**
54:7
**licensing (5)**
8:22;10:21;32:10,
13,23
**lie (1)**
75:19
**Lieutenant (5)**
6:20,24;35:21,22;
56:2
**light (1)**
72:19
**line (5)**
55:23,25;56:2;
59:11;64:25
**lines (2)**
28:2;39:6
**lingo (2)**
42:40;24:1
**literally (2)**
52:17;75:17
**little (11)**
13:19;16:12;26:9;
30:6;34:18;35:18;
40:17;45:9;47:18;
51:5;56:23
**local (4)**
11:6;22:21,23;
46:18
**location (3)**
21:23;82:25;83:15
**locations (1)**
12:12
**log (1)**
11:23
**logic (1)**
51:7
**logo (1)**
48:20
**long (16)**
6:15,24;7:2,4,12;
8:9;10:5;13:9;14:13;
20:19;27:14;28:22;
46:24;84:12;85:15;
86:3
**look (23)**
19:11,13;34:24;
60:5,18,19,21;61:2;
63:11;64:23;65:21;
71:6;72:22;73:1,15,
16;74:21,21,22,23;
76:2,25;77:1
**looked (3)**
19:15;49:19;65:10
**looking (9)**
29:10;37:15;40:19;
44:3;54:23,24;73:2;
74:10,17
**looks (4)**
49:1;50:15,17;
64:21

**lot (8)**
13:19;23:14;25:7,
14;28:22;29:17;
40:10;41:16
**Louisville (1)**
9:5

# M

**mainly (1)**
21:7
**Major (1)**
38:1
**majority (1)**
30:10
**makes (5)**
25:16;30:20;36:8;
72:5,13
**making (2)**
63:12;75:6
**man (1)**
49:17
**management (7)**
8:25;9:23;10:2,17,
18;35:24;73:15
**manager (1)**
9:14
**manager's (1)**
83:20
**mandatory (1)**
61:23
**Manual (49)**
14:11;15:2,17,19,
22;16:9,14,18,21,24;
17:1,4,6,10,15;18:10,
12,13,15,18,21;28:8;
59:9,16,25;60:19;
61:1,3;65:8;71:6,15,
17;73:1,12;74:9,13,
21;75:2,4,21;76:21;
82:11;83:8,11,12,13,
19;84:4;85:5
**manuals (4)**
15:17;18:8,9,12
**Manual's (1)**
76:14
**many (9)**
11:4;20:20;24:9,9;
39:18;42:20;64:24;
70:3,5
**marked (3)**
45:17;46:9;54:15
**master (1)**
70:17
**material (2)**
73:11,13
**materials (5)**
12:6;15:4,11;28:11;
81:13
**matrix (6)**
59:8,21,23;60:6,9,
12
**matter (6)**

5:21;9:20;56:9;
62:15;84:16;86:22
**max (1)**
24:12
**may (19)**
12:14;24:3;33:10,
19,24,25;47:17;
58:12;60:15;73:20;
78:2;79:25;80:1;82:3,
13,21,22,22;86:9
**maybe (8)**
9:19;18:18;24:11;
27:16;32:4;43:12;
51:13;83:13
**mean (41)**
14:1;15:17;22:21;
24:17;25:6,8,16,19,
25;26:1,11;27:24,24;
28:25;31:25;35:14;
43:20;20;45:20;
49:25;53:21;56:17;
58:6;60:4,17;66:1;
67:6;68:10;69:12;
71:20;74:6,21;75:1,
10;78:20,22;80:17,
22;82:19;83:24;85:11
**means (3)**
11:15;41:5;75:15
**meant (2)**
24:16,18
**medical (1)**
50:5
**member (2)**
80:8,14
**members (2)**
11:4;81:4
**memorandum (1)**
30:18
**memory (1)**
55:11
**mentioned (2)**
34:19;60:12
**met (2)**
21:23;32:14
**method (1)**
11:22
**Miami (1)**
73:21
**microphone (1)**
48:19
**middle (1)**
42:4
**mid-level (1)**
9:14
**might (9)**
28:1;32:4;34:23;
40:5;42:10;61:4,4,25;
69:4
**military (5)**
30:6;31:13,18;32:4,
6
**minimum (3)**
39:21;42:18,21

**minimums (1)**
11:8
**minute (1)**
37:6
**minutes (2)**
55:10;77:1
**mix (2)**
38:21,23
**moment (2)**
77:25;78:3
**monitor (1)**
44:4
**month (1)**
31:6
**months (1)**
58:3
**Moore (2)**
46:23;58:25
**more (18)**
17:5;26:14;35:2;
38:15;40:5,7,8,8,9,10,
17;41:17;47:6,18;
57:18;70:8;77:3;
79:12
**Morrison (9)**
36:14,16;65:17,23;
66:5,11,23;86:1,3
**Morrison's (1)**
36:20
**most (5)**
15:6;30:1;43:11;
67:1;68:7
**move (3)**
29:21;31:14;38:15
**moved (1)**
70:14
**much (10)**
19:2;20:24,24;29:9;
39:12;48:6;64:19;
72:12;73:14;85:23
**must (2)**
51:6,6
**mute (1)**
48:19
**muted (3)**
48:18,19;49:2

# N

**name (6)**
4:14;5:20;6:10;
14:10;16:7;64:7
**Narcotics (5)**
6:21,22;7:2,11,21
**national (1)**
73:25
**NBC (1)**
46:17
**necessarily (2)**
49:25;57:12
**necessary (1)**
72:9
**need (17)**

9:14;13:20;19:12;
21:22,22;22:4;25:17;
32:3,4;35:20;52:6,24;
54:7;76:18;79:25;
82:17,22
**needed (2)**
62:12;83:23
**needs (5)**
65:10,10;72:24;
76:9;84:7
**negotiate (1)**
85:22
**network (1)**
55:2
**networks (2)**
46:19;55:1
**new (8)**
22:9,10;29:1;45:5;
54:22,24;71:23;73:13
**news (3)**
33:24;46:18;55:2
**newspaper (1)**
45:25
**next (3)**
24:21;31:15;42:6
**ninety (1)**
43:18
**Northwest (1)**
10:1
**note (1)**
37:16
**notes (3)**
65:4;76:25;77:2
**number (2)**
31:11;70:24

# O

**o0o (1)**
86:24
**obviously (2)**
53:21;85:11
**OC (2)**
26:6;40:12
**occupation (1)**
6:12
**occur (1)**
65:5
**occurred (1)**
51:9
**OCGA (1)**
4:4
**Oder (1)**
67:18
**Off (37)**
8:10;9:12;17:25;
37:9;44:13,20;45:3,
12,15,23;46:13;48:23,
25;49:4;50:8,9,16,18,
21,22,25;51:7;52:16,
21;55:19;56:7,10,10,
12,21,22;57:14,14;
77:6;80:18;82:5;

86:17
**offense (1)**
66:2
**offenses (1)**
58:11
**Office (10)**
4:24;6:3,14,16;
7:20;26:5;27:11;48:9;
59:17;83:20
**officer (18)**
8:8,20;11:3;15:11;
17:14,20;19:20,23;
32:8,17;34:11;64:13,
17,22;66:25;68:9;
82:21,25
**officers (14)**
9:7,24;11:2;24:2,
15;28:14,17;29:1;
30:2;33:17;38:22;
57:21;58:5;72:1
**often (7)**
15:2;19:9,10;22:7;
30:5;72:3;83:21
**old (2)**
19:14;54:23
**older (1)**
30:7
**once (5)**
22:11;24:22;29:3;
30:3;32:14
**one (45)**
6:2;8:3;10:1,11;
11:1;13:5;20:6,8,10,
10,11,17;21:12;22:8;
24:2;28:6;36:7;37:24;
38:11,16;39:1,1;
40:16,16;41:6;42:3;
50:10,13,22;51:12;
53:11,12;54:20;
57:18,22;58:2;59:18;
61:3,4,13;64:15;74:3;
76:6;82:14;85:7
**one-off (1)**
22:14
**ones (6)**
11:6;19:3;24:5,14;
76:21;85:3
**one's (1)**
38:23
**oneself (1)**
17:10
**online (3)**
33:22;45:25;54:19
**only (3)**
55:7;61:11;85:22
**opened (1)**
38:21
**operations (3)**
30:11;35:23;42:14
**opinion (1)**
33:3
**opportunities (2)**
40:8;42:20

**opportunity (5)**
29:5;30:8,15;31:1;
52:14
**opposed (2)**
34:24,24
**opposite (3)**
35:14;80:21;81:4
**order (11)**
11:8;12:21;19:20;
39:22;67:21,22;
70:25;78:10;81:17;
83:14;84:6
**Orders (5)**
83:16,17,21;84:3,8
**ordinarily (1)**
66:21
**organization (2)**
73:25;74:1
**orientation (1)**
15:5
**originally (1)**
15:1
**out (33)**
9:5;13:17;16:21,24;
20:24;23:10;24:5;
25:9,10;30:11,18;
32:20;33:18;36:23,
24;38:15;39:8;48:17;
49:12;50:13;51:23;
52:25,25;55:18;56:1;
57:5;61:11;64:5;67:1,
4,6;81:3;84:7
**Outside (3)**
36:14;63:15;74:4
**over (23)**
6:21;19:6,6,23;
21:15;23:12,15;
24:15;52:17;59:5,5,7,
7;62:17,21;67:11;
72:14;76:25;77:1;
84:21,22;85:18;86:6
**own (11)**
20:3;24:6;33:22;
34:7,9;39:5,6,6,11;
80:10;85:22

**P**

**page (3)**
47:10;55:7;58:22
**paid (6)**
36:8;43:23;69:13;
70:1,3;85:23
**paper (1)**
71:21
**paperwork (2)**
41:17;73:14
**parade (2)**
82:15,16
**paragraph (1)**
47:9
**paralegal (1)**
4:19

**Park (4)**
45:4;50:3,4;83:3
**part (21)**
12:19,20;14:19;
15:5,13;21:6;23:2,18;
24:3;25:14;45:21,22;
55:24;56:8;64:12;
65:24;72:24;75:25;
78:25;81:5;84:3
**particular (2)**
18:25;58:10
**parties (1)**
5:6
**parts (3)**
19:23;21:12;33:23
**party (2)**
62:17;64:5
**pass (10)**
26:22;27:5;29:15,
16,18,21;42:25;43:5;
68:22,25
**passed (1)**
7:14
**past (5)**
12:1,3;49:23;58:11;
74:7
**PAT (1)**
68:25
**patrol (6)**
25:4;29:12;30:4;
32:8;47:6;48:9
**pay (3)**
23:7;24:6;45:5
**payroll (2)**
24:24;70:12
**PDF (2)**
71:16,25
**Peace (2)**
9:24;11:2
**people (23)**
5:25;17:12;20:18;
23:12;24:4;25:1,8,15;
27:5;31:19;32:6,21;
35:12,12;36:7,8;43:7,
11,12;57:25;67:19,
25;75:12
**per (2)**
5:11;43:12
**percent (4)**
24:2,7;31:18;43:10
**percentage (6)**
23:20,23;31:8,10;
43:7,15
**percentile (1)**
43:19
**perfect (1)**
76:11
**period (3)**
43:1;53:17;84:17
**periods (1)**
84:4
**permitted (3)**
68:4,18;69:6

**person (11)**
14:4;15:7;25:17;
32:4;49:24;50:3;
51:22;54:6;63:12;
78:18;80:24
**personal (2)**
58:12,13
**personally (1)**
27:24
**personnel (7)**
9:15,15;39:7,10,11;
58:11,19
**philosophy (2)**
51:2,4
**physical (6)**
26:11,12,18;29:13,
14;68:23
**pick (1)**
34:22
**picked (1)**
44:16
**picking (1)**
41:20
**piecemeal (1)**
72:19
**place (1)**
85:16
**Plaintiff (1)**
4:16
**Plaintiff's (3)**
45:18;46:10;54:16
**plans (2)**
19:6;81:16
**play (3)**
44:19,24;56:18
**played (1)**
44:20
**playing (1)**
44:25
**please (1)**
4:8
**plumber (2)**
8:7,9
**pm (2)**
77:10;86:23
**point (9)**
8:4;35:10;38:11;
47:25;50:22;71:1;
79:25;80:1,17
**points (1)**
72:21
**Police (36)**
7:19,24,24;8:7,23;
9:1,3;10:15;11:2;
15:9,10;19:4,5,17,20,
23;20:7;23:1;24:1;
32:7,17;37:17,18;
38:22;40:20,24;41:1;
42:16;56:15;68:9;
73:16;79:22;80:3;
81:8,12;82:23
**policies (14)**
6:3;13:24;14:3;

15:14;16:15;17:3;
19:9;46:3;47:12;65:6;
71:5;73:17;82:15;
83:2
**policy (117)**
14:5,11;15:1,16,19,
21;16:2,8,9,10,14,18,
20,23;17:4,6,7,9,21;
18:2,10,12,14,21;
28:8;36:2,3;45:16;
49:16,18;50:2,19;
51:16;53:8;10;55:16,
20;57:4;58:7;59:3,6,
8,12,16,24;60:15,25;
63:4,8,10,19,19;64:6,
9,12;65:8,15,20;
66:25;67:13,15,16,20;
69:5,15,20,22;71:2,6,
11,14,14,14,16;72:15;
73:24;74:9,10,12,17,
20,24;75:7,15,21,22;
76:5,7,14,17,20;79:4,
6,8,9,15,18,21;80:2;
81:22;82:6,10,11;
83:8,10,18;84:4,7,21,
24;85:1,4,6,6,8,14,15
**polygraph (2)**
29:20,21
**pops (1)**
13:22
**portal (1)**
72:1
**position (4)**
12:17,18;30:4,13
**possibility (1)**
54:14
**Possibly (5)**
49:25;65:1;78:15;
83:9,14
**POST (51)**
10:19,21,25;11:1,6,
10,11,20,21;12:8,8,
13,15,17;13:9;19:22;
20:2;21:18,19,21;
22:19;32:2,10,13,15,
23;33:5,9,18,21;34:5,
11,15,20,22,24;35:3;
38:6;55:5,7,12;61:9,
11,18,21;62:1,2,12;
68:14;74:5,24
**power (1)**
32:17
**PowerPoint (1)**
18:19
**practical (1)**
80:25
**practice (1)**
40:8
**practices (2)**
6:4;74:2
**precision (1)**
21:14
**pre-hire (1)**

41:14
**present (2)**
4:13;48:2
**presenting (1)**
53:1
**pre-service (2)**
24:6;41:14
**pressed (6)**
17:19;34:6;51:12,
14;64:9;86:6
**presumably (1)**
67:9
**pretty (6)**
19:2;29:9;31:11;
33:3;35:16;64:19
**previous (1)**
54:20
**previously (1)**
5:22
**prior (5)**
6:18,20;7:22;31:12;
85:19
**private (3)**
12:6;63:3;64:5
**probable (1)**
78:11
**probably (6)**
16:12;24:7;32:3;
43:9;59:21;84:2
**probation (4)**
58:3;71:4,8,12
**problem (1)**
76:9
**Procedure (21)**
14:11;15:2;16:9,14,
18;17:4,6;18:12,14;
59:9,16;61:1;65:8;
71:6,15,17;82:11;
83:8,11,19;85:5
**procedures (3)**
16:15;32:5;59:12
**proceed (1)**
20:23
**process (26)**
9:9,10;18:22;21:2,
4,19,24,25;24:16,22;
28:24;29:2,6,15;30:2;
31:21;32:16;33:3,4;
36:3;64:22;72:22;
73:22,23;76:15,16
**processes (1)**
32:25
**professional (5)**
6:4;8:21;13:13;
27:25;61:17
**professionalism (1)**
64:11;75:6;81:11
**professionally (1)**
32:14
**program (15)**
9:18;10:6,8,10,16;
15:11;20:19;22:12,
13;23:24;24:10;27:3;

39:24;40:1;43:23
**programs (3)**
40:3,4;51:24
**progress (1)**
7:17
**progression (1)**
21:9
**promoted (3)**
62:5;71:9,12
**promotion (2)**
71:3,14
**promotions (1)**
71:13
**prompted (1)**
67:21
**proper (3)**
31:20;32:5;81:10
**provide (1)**
71:23
**provided (1)**
63:16
**providing (1)**
17:7
**PT (4)**
26:7,11,17;29:18
**Public (7)**
20:8;37:19;38:7;
41:5;77:17;80:9,14
**pull (1)**
18:11
**pulled (2)**
46:13;62:17
**pulling (1)**
52:25
**punished (1)**
71:4
**punishing (1)**
59:4
**punishment (10)**
56:18;57:12,19,19;
58:1;59:12;63:24;
66:3,9;68:25
**pursuits (1)**
21:14
**pushups (1)**
26:14
**put (19)**
9:7;13:17;15:25;
20:13,18;22:24;25:7,
8;29:9;30:17;31:24;
38:12;47:16,16;54:7;
57:13;74:3;77:18;
85:4
**puts (1)**
37:24
**putting (1)**
70:24

**Q**

**qualification (2)**
43:3,3
**qualifications (2)**

**qualify (2)**
43:2;77:14
**quarters (1)**
20:16
**quick (3)**
44:25;72:23;76:25
**quite (2)**
15:2;56:8

**R**

**radio (3)**
67:2,4,7
**Randolph (1)**
4:17
**range (3)**
31:7;43:19;64:15
**ranges (2)**
23:9,10
**ranks (1)**
70:14
**rape (1)**
80:7
**raped (1)**
62:16
**Rather (1)**
29:17
**read (13)**
15:14;28:18,19,21;
33:24;62:19,19;
69:12;72:1;75:12,23;
83:17;86:19
**reads (1)**
75:2
**ready (1)**
25:18
**real (3)**
25:2,5;44:25
**really (13)**
13:15;45:21;46:14;
49:23;54:2;60:14;
63:15,18;71:7;74:3;
75:11,16;76:25
**reason (7)**
19:7;39:9;41:9;
51:8;65:13;67:20;
69:9
**reasonable (1)**
78:9
**recall (7)**
28:7;35:9;45:12;
46:24;51:25;80:19;
84:1
**receive (3)**
14:16;80:21;81:3
**received (1)**
52:1
**recently (2)**
67:1,5
**recess (3)**
37:11;49:6;77:8
**recognized (1)**

41:4
**recommended (1)**
58:2
**record (20)**
4:7;10:25;24:18;
26:17;36:11,11;37:9,
12;44:13,21;49:1,4,8;
56:16;58:12;69:10;
77:6,9;79:14;86:17
**Records (2)**
29:9;34:21
**referring (3)**
10:17;15:24;36:17
**refresh (1)**
55:11
**regard (14)**
16:4;18:3;28:8;
56:25;57:5;62:9;63:5;
71:3;77:16;80:21;
81:18;84:23;85:15,20
**regarding (1)**
82:7
**Regents (1)**
23:18
**regional (1)**
38:13
**regularly (2)**
65:22;71:9
**reinvent (1)**
19:7
**related (3)**
6:4;13:14;79:22
**relationship (4)**
12:15;39:1,3,4
**remember (7)**
7:4;45:7,8,9,10,11,
15
**reminded (2)**
67:1,5
**reminding (1)**
67:19
**remotely (3)**
5:7,10;20:9
**report (22)**
33:21;34:4,7,11;
47:11,11,12,13,13;
48:4,5,6,7;49:12;
50:14;53:6;55:18;
61:9,19,20,24;62:2
**reportable (2)**
53:2;61:25
**reported (1)**
34:20
**reporter (10)**
4:3,7,9;5:1,4,11,22;
44:12;48:14,21
**reporters (1)**
46:2
**reporting (4)**
34:9,15;62:7,12
**reports (1)**
22:16
**represent (4)**

4:14,16;5:21;62:23
**representative (1)**
6:6
**reprimand (1)**
66:9
**request (1)**
66:24
**require (4)**
33:1;34:14;48:3;
53:6
**required (12)**
33:20;34:4,11;
42:17;56:16;61:18,
18,20;62:2;66:22;
82:1,13
**requirement (1)**
52:24
**requirements (2)**
4:4;82:14
**requires (1)**
8:20
**research (6)**
46:14;72:15;73:14,
16,23;76:1
**resistance (1)**
54:13
**responsibility (1)**
34:8
**responsible (1)**
58:1
**restrictions (1)**
68:24
**result (1)**
63:25
**Resuming (7)**
37:14;44:22;45:19;
46:11;49:10;54:17;
77:11
**review (11)**
22:7,13;32:23,25;
33:11;42:25;69:10;
72:5,11,23;73:22
**reviewed (4)**
30:19;32:24;72:8,
18
**reviewing (1)**
58:1
**reviews (3)**
21:15;33:9;72:10
**revoke (1)**
33:1
**Richard (1)**
38:1
**Richmond (16)**
4:24;6:13,16;7:13;
23:14,25;27:9,12;
28:9;25;38:18;39:7,
10;43:15,21;80:13
**rid (1)**
56:20
**right (28)**
8:4;9:3;10:13;
13:15,24;16:7;26:24;

34:20,25;35:15;37:2;
41:3;9;44:3,14,15,23;
45:2,2;46:2;48:17,18;
50:17,18;54:18;
76:24;82:4;86:12
**rise (1)**
66:6
**road (3)**
29:11;47:6;82:24
**rolling (2)**
76:14,16
**Rollins (9)**
4:10,23;5:14,20;
6:11;37:15;48:13;
49:11;86:15
**room (1)**
44:4
**roughly (1)**
39:16
**Roundtree (6)**
4:11;84:11,12,20;
85:17,24
**route (1)**
52:8
**routed (1)**
36:6
**rule (3)**
24:19;57:17;61:15
**rules (7)**
14:7;9;16:4;78:12;
80:23;81:20;83:4
**run (1)**
74:6
**Running (5)**
8:3;26:12,14;27:14;
69:2
**runs (2)**
22:20;37:24

**S**

**Safety (4)**
20:8;37:19;38:7;
41:5
**same (17)**
12:19,20;19:6;
39:20;41:22;43:22,
24;55:1,2;57:9,18;
58:14,21;59:4,6;60:9;
79:12
**saw (3)**
53:9;54:2,12
**saying (4)**
75:11,16;80:15,16
**scale (1)**
70:9
**scenario (5)**
14:7,8,8;52:11;81:1
**scenarios (2)**
15:12;40:9
**scene (2)**
21:9;52:15
**schedule (3)**

21:6;36:8;41:22
**school (1)**
23:18
**schools (2)**
12:5;70:25
**score (2)**
42:18,21
**screen (4)**
44:9;46:6;57:24;
58:20
**scroll (1)**
58:21
**second (6)**
42:25;43:1;51:14;
55:6;58:23;84:18
**section (4)**
17:17,20;18:6;73:9
**security (11)**
17:7;18:4;36:2,20;
62:18;63:3;64:5;
65:16,23;66:4;69:11
**seek (1)**
50:5
**self (2)**
62:2,7
**semester (2)**
42:4,6
**send (9)**
24:1,4,15;38:22;
41:13,18,21;42:5,10
**senior (2)**
9:7;15:7
**sense (2)**
11:25;25:16
**sent (2)**
24:3,20
**sentence (6)**
46:21;55:6;58:23,
24;75:12,13
**separate (1)**
83:12
**Sergeant (18)**
6:21;7:2,11;17:14;
34:17;35:8;36:5,14,
16,17,20;65:17,23;
66:5,11,23;86:1,3
**service (4)**
23:8;68:24;70:13,
25
**services (4)**
29:12;30:9,10,12
**set (6)**
16:21,24;44:3;
49:21;71:5;74:20
**sets (1)**
11:1
**seven (2)**
59:1;70:7
**several (7)**
6:2;12:5;14:6,14;
19:14;25:25;65:3
**sex (13)**
62:25;63:1,20;64:4;

79:5,10,16,18;80:8,
14,18,21;81:4
**sexual (2)**
17:12;63:5
**shape (1)**
11:11
**share (5)**
44:8;46:5,8;57:24;
58:20
**Sheriff (14)**
23:25;29:24;72:7,
11,17;84:9,10,11,12,
13,20;85:17,20,24
**Sheriff's (40)**
4:24;6:3,13,16;
7:13,20;12:19;13:25;
14:15;15:22;17:22;
19:3;18;23:15;26:4;
27:9,11,19;28:9,25;
30:25;32:1;39:3;
51:10;59:17;62:10,
11;63:2,4,8,22;67:9,
10;68:1;75:2,14;
76:21;77:16;82:7,18
**shoot (3)**
25:9,12;40:17
**shorter (1)**
41:23
**show (7)**
43:25;44:9;46:5,6;
54:3;66:18;73:24
**shows (1)**
69:10
**side (2)**
13:5;30:7
**sign (1)**
86:20
**significant (4)**
84:20,24;85:2,3
**similar (3)**
18:8;38:25;76:21
**Simon (1)**
4:19
**simple (3)**
38:17;47:19;48:4
**simply (10)**
15:14;35:9;52:10;
53:1;54:12;65:4;
77:23;78:2,22,25
**single (1)**
49:24
**sit (1)**
78:20
**situation (6)**
49:19;53:9;63:21;
74:19;81:7;85:19
**situps (1)**
26:15
**six (3)**
31:6;83:24;86:5
**size (1)**
39:21
**slides (1)**

18:20
**smaller (1)**
16:12
**Smith (1)**
62:18
**Snowberger (3)**
22:25,25;26:25
**soft (2)**
53:15;54:5
**soft-hand (1)**
47:14
**somebody (15)**
22:8;30:5;32:1;
33:25;36:24;47:15,
25;54:9;66:19;72:14;
74:24;76:1;77:24;
82:21;85:21
**someone (16)**
32:13;41:10;42:11;
43:22;48:8;49:18;
56:11,22;58:9;60:4;
63:20;79:5,16,19,24;
85:25
**someone's (1)**
74:17
**someplace (1)**
50:9
**sometimes (3)**
29:22,22;33:4
**somewhere (5)**
7:7;12:14;64:10;
73:7;84:2
**soon (1)**
82:4
**sorry (3)**
23:21;46:7;48:11
**sort (9)**
23:13;31:12;46:14;
57:5;64:14;66:8,9;
75:10;81:5
**sound (1)**
40:5
**sounds (2)**
13:4;56:19
**source (1)**
73:11
**Southern (4)**
4:12;9:1,3;10:15
**speak (7)**
5:25,25;6:1,7;27:5;
37:7;78:2
**speaking (1)**
27:1
**special (45)**
17:7;18:3;36:2,4,5,
12,16,19;62:18;65:16,
22;66:4,10,24,24,25;
67:2,5,25;68:4,9,11,
12,15,18;69:2,7,16,
18,23;81:19,21;82:8,
13,20,24;83:1,2,4,12,
13;85:16,20,25;86:4
**specials (2)**

36:6;82:14
**specific (5)**
20:4,13;57:19;
63:24;64:12
**specifically (4)**
17:11;18:3;60:11;
64:2
**specifics (1)**
49:20
**specify (1)**
71:7
**spectrum (2)**
26:1,9
**speculation (2)**
65:24;66:16
**speeding (2)**
56:11,22
**spell (1)**
5:1
**spend (5)**
25:11,14;40:5,9,10
**SPI (5)**
10:1,7,14,14,16
**spray (2)**
26:6;40:12
**staff (7)**
39:12;72:13,16;
75:24;76:4;85:10,22
**stand (1)**
10:14
**standard (1)**
18:24
**standardized (1)**
19:2
**standards (8)**
6:4;9:25;11:2,3,7;
74:2;81:11,14
**standing (1)**
53:22
**stands (2)**
40:20,23
**start (4)**
7:16;38:14;52:3,4
**started (2)**
7:18;42:6
**starting (4)**
41:22,23;42:3,4
**state (11)**
4:13;10:1,21;11:4,
12,15;12:16;19:21;
23:18;32:7;74:1
**States (1)**
4:11
**status (4)**
62:4,6,10,13
**stay (1)**
50:10
**step (1)**
31:15
**steps (2)**
59:10;63:7
**still (4)**
12:23;54:22;61:24;

81:22
**stop (7)**
44:25;78:10,21;
79:8,9,16,19
**story (3)**
58:22,22;64:3
**strange (1)**
40:5
**street (2)**
32:20;81:3
**strike (3)**
23:21;53:5;54:7
**strikes (1)**
57:5
**struggle (2)**
47:18;54:12
**stuck (1)**
41:25
**students (4)**
23:7,20;24:9;26:22
**studies (1)**
8:16
**stuff (3)**
9:15;22:4;52:19
**subcategories (1)**
64:16
**subject (1)**
62:15
**subjectiveness (1)**
60:4
**successful (1)**
23:23
**suggested (1)**
58:3
**suit (1)**
63:16
**supervisor (1)**
64:25
**supervisors (8)**
29:23;45:13;47:6;
55:23,25;56:3;59:11;
75:20
**supervisory (1)**
8:25
**supply (1)**
23:3
**support (1)**
23:3
**supposed (9)**
15:8;33:21;50:20,
20;65:19;66:17,19;
67:19;71:12
**sure (13)**
22:1,5;26:17;36:8;
47:23;53:1,3;64:10;
65:19,20;68:7;74:7,
14
**suspect (2)**
53:5,22
**suspended (2)**
46:23,25
**suspends (1)**
55:8

suspension (3)
34:14;35:2;59:1
suspicion (1)
78:10
sustained (3)
65:2,2,3
swear (1)
4:8
sworn (3)
5:6,10,16

**T**

tactics (3)
19:25;22:3;26:6
takedowns (1)
40:6
talk (3)
29:23;63:12;77:24
talked (6)
13:12;19:19;37:22;
55:1,9;65:10
talking (15)
15:23;16:1;41:6,14;
52:10,19;56:12,20;
64:1,2,3;76:12;80:9,
10,10
Tameka (1)
4:17
Taser (7)
26:4;40:13;47:20;
52:25;53:2,11,16
taught (3)
12:11;28:1;81:12
teach (5)
12:5,11,14;25:8,9
teaching (3)
11:22;25:11,15
Tech (41)
20:12,15,19;21:6;
22:12,13,20,22,23;
23:1,2,3,4,17,21,24;
26:3,25;27:15;28:5,
10,12,13;37:23;38:9,
10,20;39:2,12,25;
40:7,11,12,18;41:11,
15,16;42:1,7,11;43:23
Technical (4)
19:5;20:7;38:13;
49:7
Technically (1)
10:23
technique (1)
47:15
techniques (3)
53:15,15;54:5
teleconference (1)
5:5
telling (2)
16:16;78:22
ten (9)
9:12;10:8;27:16;
39:15;43:10;70:8;

77:1;80:13;84:19
ten/eleven (1)
7:6
tend (2)
38:19;72:18
tenure (2)
70:21;71:1
tenure-based (2)
70:22,23
ten-week (1)
39:24
term (3)
12:24;84:14,15
terminated (2)
58:9;62:4
terminates (1)
55:8
terminating (1)
58:4
termination (1)
34:19
terms (1)
84:18
test (3)
29:13,21;68:23
testified (1)
5:16
tests (1)
26:21
theirs (1)
73:18
theory (1)
69:1
therefore (1)
11:2
thinking (1)
18:17
third (3)
58:24;84:14,19
thirteen (1)
84:14
thirty (2)
35:3;55:9
Thirty-six (1)
13:11
though (3)
35:17;48:1,1
thought (4)
39:25;41:4;45:16;
50:23
thousand (1)
8:24
Three (8)
7:1;9:19;42:25;
57:5;58:22;75:12;
78:17;84:18
threshold (1)
43:5
throughout (2)
11:4;76:19
thus (1)
73:7
ticket (2)

56:11,22
Tier (19)
77:20,21,21,22,23;
78:7,8,13,14,21,21,
21;79:5,7,16,16,19;
81:24;82:1
tiers (2)
77:20;78:17
timeframe (1)
31:4
times (1)
79:12
timing (2)
42:9,12
title (2)
17:2,17
today (3)
5:23;6:8;86:15
Today's (1)
4:5
together (1)
64:24
told (2)
10:9;42:24
took (6)
9:12;13:20;84:21,
22;85:17;86:6
top (1)
81:18
topics (2)
6:2,3
towards (1)
21:9
track (1)
40:6
traded (3)
5:23,23;6:2
trained (3)
25:18;65:14;77:13
Training (56)
4:25;6:5,14;8:21,
21,24;9:25;11:3,7,24,
24;13:13;14:20,24;
15:11,17,18;18:8,9,
12,13,14,16,20,22;
19:10;20:8;22:17;
23:4;25:22,23;26:4,
11,18;28:5,10,11,15;
33:1;35:22;37:19;
38:7,14,22;39:5,8;
41:6;42:22;51:17,21,
22;52:1;74:21;77:15;
80:20;81:2
transcript (2)
44:13,21
transport (2)
79:25;82:22
treat (1)
56:6
trigger (2)
34:23;35:3
true (2)
55:13,15

trusting (1)
44:16
try (1)
57:24
trying (1)
13:18
tuition (2)
23:10;43:23
turn (14)
50:24,25;51:6,7;
52:7,9,13,15,16,20;
57:14;81:24;82:3,4
turned (8)
45:2,12,15;50:16,
17,18,21;57:14
turning (7)
50:22;55:19;56:7,
10,10,12,22
turns (1)
56:21
twelve (3)
24:11;39:21;58:2
twelve-hour (1)
70:6
twenty (3)
10:9;43:10;83:24
twenty-four (3)
24:12,12;39:23
twice (1)
69:13
Two (15)
8:18;9:11,11;11:18;
20:6,16,25;51:2;40:3;
42:24;57:25;58:4;
61:2;75:13;79:12;
84:2
type (12)
53:14;58:7,7;60:17;
61:8;62:6;63:5,20,21;
77:15;80:20,24
types (3)
32:25;56:5;66:13
typical (3)
31:3,4,14
typically (5)
38:18;42:21;71:23;
76:13;83:22

**U**

ultimate (2)
27:4,7
Ultimately (2)
29:23;75:19
unbecoming (5)
17:15;64:13,17,22,
23
under (19)
11:21;23:2;27:2;
33:10;41:15;60:21;
64:3,16;65:12,18;
68:23;71:13;72:22;
78:23;79:19;81:22;

82:1,12;83:14
Understood (5)
26:16;57:20;69:24;
82:6,6
unfounded (1)
65:2
uniform (7)
17:11,13;63:2;
77:17,18;80:11,15
United (1)
4:11
University (4)
8:14;9:5;10:2;38:3
unwritten (1)
67:17
up (35)
7:16;8:3;11:3;
20:25;24:21;25:18;
31:7,15;33:25;34:22;
38:14,16,21;44:3,16,
24;46:15;47:22;
53:16;55:22,24;56:3;
59:22,22;66:18;
70:14;75:24;76:18;
77:4,24;78:15;80:17;
81:18;85:8,13
update (5)
72:6;73:12;74:24;
76:7;84:4
updated (6)
19:10;72:3;73:2,7,
10;76:14
updates (4)
19:16,25;22:14;
74:4
updating (1)
84:5
upgrade (1)
19:12
upon (4)
57:8,9;67:16;75:20
upper (1)
56:1
ups (2)
59:6;61:2
use (48)
13:25;14:5,12;
15:15,21;16:2,3,3,4,
12,20;17:21,24;19:3,
6,24;28:13;39:7,9;
47:10,11,12,13,14,20,
21,21,22;48:1,4;
50:19;51:11,18,18;
52:2,23;53:5,10,25;
54:7;55:18,19;74:1;
82:7,12,13,17;84:23
used (9)
14:23;18:20,22;
27:10;28:10,11;54:1;
75:19;76:21
uses (1)
23:4
using (10)

14:4;50:13;53:4,9,
16,16,16;54:5;58:8;
81:20
**usually (1)**
43:11

**V**

**vacation (7)**
69:6,8,11,17,23;
70:1,3
**Valencia (1)**
5:21
**variable (1)**
70:9
**Vehicle (4)**
42:14;82:7,12,18
**vehicles (2)**
17:22,24
**venture (1)**
24:7
**versus (4)**
42:11;53:22;56:12,
21
**vetting (1)**
24:21
**via (2)**
5:5;77:20
**video (18)**
4:21;43:25;44:1,9,
17,20,25;45:11,17,22,
24;46:1;49:19;53:23;
56:19,19,21;61:8
**VIDEOGRAPHER (12)**
4:5;20;37:9,12;
44:18;48:15,23;49:4,
8;77:6,9;86:17
**violation (22)**
45:16;49:16;50:12,
13,14,15;58:10,25;
59:10,14,18,19;60:5,
5,8,20;64:6,7,8,10;
65:15,20
**violations (3)**
59:8;60:25;61:7
**virtually (1)**
26:7
**volunteer (1)**
68:8
**vote (1)**
22:5

**W**

**wait (1)**
43:1
**waiting (1)**
42:6
**waive (1)**
86:21
**walk (7)**
15:7;77:23,24;78:1,
9;79:1;82:4

**Walker (15)**
27:18,18,25;36:22;
45:1,5;46:13,15,22,
22;58:1,25;62:17,22,
23
**Walker's (1)**
37:16;50:16;69:10
**walking (3)**
78:3,3,6
**wants (1)**
75:3
**watching (1)**
53:23
**way (18)**
7:16;11:11;17:10;
21:5;23:22;24:6;
31:14,24;38:10;
57:13;60:9;61:11;
75:3,4,21,23;76:8;
79:22
**ways (2)**
61:13;76:6
**weapon (3)**
47:25;48:2,3
**wearing (4)**
63:1;77:18;80:15,
17
**week (5)**
9:12;11:18;39:15;
40:16,17
**weeks (6)**
9:11,11;10:8,9;
20:21,21
**weightlifting (1)**
26:12
**weren't (1)**
66:16
**what-if (1)**
52:11
**What's (25)**
9:9;14:10;16:7,11;
17:1,17;31:3;40:3;
51:2,2;53:8;55:20;
63:8;70:15,18;72:25;
73:11,19;77:22;78:7,
13;79:9;81:9,10;
82:10
**wheel (1)**
19:7
**Whenever (3)**
22:8;47:14;76:17
**Whereupon (11)**
4:3;5:10,13;37:11;
44:20;45:17;46:9;
49:6;54:15;77:8;
86:22
**whole (3)**
41:16;72:18;84:16
**who's (4)**
24:22;26:24;53:21;
54:10
**Wick (4)**
4:15,20;5:20;44:12

**Wilson (1)**
48:19
**wing (1)**
10:22
**within (1)**
60:6
**without (7)**
30:9;36:20;50:7;
65:16,23;66:4;67:25
**witness (9)**
4:8,23;5:3,6,10,15;
37:8;77:5;86:16
**woman (1)**
64:4
**work (35)**
7:16;9:9;12:23;
14:16,20;15:5,6;
20:24,25;21:20;
23:24;24:20,24;25:2,
4,5,21,23;26:21;27:6,
10,19;29:2,4,18;32:5;
35:17;36:7;59:19;
65:15;67:2,5;68:9;
70:6;80:1
**worked (10)**
7:8,15,19,23,25;
11:10;27:8,11;32:1;
35:18
**working (19)**
12:18;22:22;30:24;
36:10,12;62:18;63:2,
3;64:5;66:24;69:6,11,
23;82:13,20,24,25;
83:2;84:5
**works (3)**
23:10;24:16;27:2
**worksheets (1)**
18:19
**Worn (4)**
16:9,23;81:23;
85:13
**worse (1)**
43:22
**wound (2)**
38:16;44:24
**wrapped (1)**
77:4
**WRDW/WAGT (2)**
46:17;54:25
**wrestling (1)**
54:6
**write (1)**
47:10
**writing (2)**
47:12;59:22
**written (31)**
13:24;14:2,5;16:2,
8;17:6,9,21;18:2,8,9;
36:2;42:13,15;46:1;
57:4,20,22;58:13;
59:25;63:16;67:13,
15;74:10;76:8;79:6;
81:13;83:7,10,11;

85:6
**wrong (1)**
74:8
**wrote (1)**
85:4

**Y**

**y'all (9)**
18:24;25:5;28:16;
61:15;71:23;73:12;
84:5;86:19,20
**y'all's (1)**
76:20
**year (11)**
20:14,16;41:24;
42:1;70:4;73:8;76:13,
19;83:24,25;84:19
**years (20)**
6:17;7:1,6;8:10,18;
9:20,20;10:12;13:11,
19;19:14;27:16;31:7;
51:13;70:8,9;80:13;
84:14,19;86:5
**YouTube (1)**
45:23

**Z**

**Zoom (1)**
5:5

**1**

**1 (8)**
77:20,22,23;78:21;
79:5,7;81:24;82:1
**1:00 (1)**
77:10
**1:15 (1)**
86:23
**1:50 (1)**
86:18
**11:00 (2)**
4:2,6
**11:46 (1)**
37:10
**11:50 (1)**
37:13
**12 (1)**
46:17
**12:09 (1)**
49:5
**12:12 (1)**
49:9
**12:55 (1)**
77:7
**1981 (1)**
7:20
**1989 (1)**
7:21

**2**

**2 (7)**
77:21;78:7,8,21;
79:16,16;81:24
**2001 (2)**
7:5,8
**2017 (2)**
45:2;52:24;54:19;
84:10
**2022 (1)**
4:6

**3**

**3 (6)**
77:21;78:13,14,21;
79:19;81:24

**4**

**40th (1)**
7:14

**7**

**7th (1)**
4:6

**9**

**9.5 (1)**
70:9
**9-11-28d (1)**
4:4