# In The Matter Of:

*Valencia Colon v.*
*Richard Roundtree et al*

---

*Chrislynne Kuhlke*
*February 4, 2022*

---

*Kellie K. Rodman, LLC*
*Certified Court Reporters*
*P. O. Box 500*
*Homer, Georgia  30547*
*678-614-8109*

Original File 020422Cauthorn_Kuhlke.txt
Min-U-Script® with Word Index

Page 3

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                        AUGUSTA DIVISION

 3
   Valencia Colon,              )
 4                              )
   Plaintiff,                   )
 5                              )
                                )    Civil Action File No.
 6   v.                         )    1:21-cv-00149-JRH-BKE
                                )
 7                              )
   Richard Roundtree, et al.,   )
 8                              )
   Defendants.                  )
 9

10

11

12        The videotaped videoconference deposition of

13   CHRISLYNNE KUHLKE, taken for purposes of discovery,

14   cross-examination, and all other purposes allowed

15      under the Civil Practice Act of Georgia; all

16   formalities waived; the reading and signing of the

17   deposition waived; before Jennifer A. Gerber, CCR

18   6241-2465-4151-2704, Certified Court Reporter, in

19    and for the State of Georgia; commencing at

20    9:13 a.m., February 4th, 2022, Augusta, Georgia.

21

22

23              Kellie K. Rodman, LLC
                Certified Court Reporters
24           rodmanreporting@gmail.com
                  678-614-8109
25
```

Page 2

```
 1              APPEARANCES (Remote)

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4   J. WICKLIFFE CAUTHORN, ATTORNEY AT LAW
     The Cauthorn Firm
 5   201 Cherokee Street
     Marietta, Georgia 30060
 6   404-991-2700

 7

 8   ON BEHALF OF THE DEFENDANTS:

 9   TAMEKA HAYNES & RANDOLPH FRAILS, ATTORNEYS AT LAW
     Frails & Wilson, LLC
10   211 Pleasant Home Road, Suite A1
     Augusta, Georgia 30907
11   800-413-9005

12

13   ALSO IN ATTENDANCE:

14   ERIC GEORGE, VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                    I N D E X

 2

 3   CROSS-EXAMINATION BY MR. CAUTHORN . . . . . . . . . . Page 5

 4   DIRECT EXAMINATION BY MS. HAYNES . . . . . . . . . . Page 50

 5

 6

 7

 8                    E X H I B I T S

 9

10   EXHIBIT          DESCRIPTION                    PAGE MARKED/
     NUMBER                                          IDENTIFIED

11

12   D                Event Contract 1/31/22            20/20

13   E                Event Contract 1/16/19            24/24

14   A                Open Records Request Production    25/26

15   C                Title 6 License and Business
                      Regulations                       39/39
16
```

```
17

18

19

20                   TRANSCRIPT LEGEND

21   . . . (ellipsis)  Halting speech or an unfinished sentence
                       in dialogue or an omission when reading
22                     written material
     --     (dashes)   Break in speech continuity
23   (ph)              Spelled phonetically
     (sic)             In its original form
24

25
```

Page 4

```
 1              P R O C E E D I N G S

 2                   9:13 a.m.

 3        (Whereupon, the court reporter complied with the

 4   requirements of O.C.G.A. 9-11-28(c).)

 5        BY THE VIDEOGRAPHER: This is the deposition of

 6   Chrislynne Kuhlke for Colon versus Roundtree.  Today's

 7   date is February 4th, 2022.  The time is 9:13 and we are

 8   on the record.

 9        THE COURT REPORTER: Okay.  And, again, today's date

10   is February 4th, 2022 and the time is 9:13.  This is the

11   case of Colon versus Roundtree.  At this time, can

12   everyone state their name and who they represent, please?

13        MR. CAUTHORN: Yes.  My name is Wick Cauthorn.  I

14   represent the Plaintiff, Valencia Colon.

15        MS. HAYNES: Tameka Haynes.  I'm from Frails and

16   Wilson representing the Defendant.

17        THE WITNESS: Oh, Chrislynne Kuhlke.  I represent the

18   City of Augusta.

19        THE COURT REPORTER: Thank you very much.  And my

20   name is Jennifer Gerber.  I am the court reporter.  We are

21   all appearing via Zoom today.  Do all parties agree to

22   have the witness sworn remotely?

23        MR. CAUTHORN: Yes.

24        MS. HAYNES: Yes.

25        THE COURT REPORTER: Thank you.
```

Page 5

1    (Whereupon, the witness was sworn remotely by the court
2        reporter per agreement of counsel.)
3    Whereupon,
4            CHRISLYNNE KUHLKE
5    Was called as a witness herein and, having been first duly
6    sworn, was deposed and testified as follows:
7            CROSS-EXAMINATION
8    BY MR. CAUTHORN:
9    Q    Ms. Kuhlke, can you, for the record, say your full
10   name and -- and spell it for me?
11   A    Mary, M-A-R-Y, Chrislynne, C-H-R-I-S-L-Y-N-N-E,
12   Kuhlke, K-U-H-L-K-E.
13   Q    Okay.  And where are you employed?
14   A    I'm employed with Augusta Recreation and Parks
15   Department.
16   Q    What is your position with the -- with the -- with
17   the parks department?
18   A    I'm with -- the rentals and facilities coordinator.
19   Q    How long have you been there?
20   A    I got my pin yesterday, 35 years.
21   Q    Oh, my God.  That's -- that's fantastic.
22   A    Yes.
23   Q    Not a lot of people have been anywhere for 35 years
24   nowadays, so that's -- that's --
25   A    Yes, uh-huh (affirmative).

Page 6

1    Q    It must be a good environment to work in.
2    A    Uh-huh (affirmative), okay.
3    Q    So you were identified by defense counsel in this
4    case as someone -- we discussed some topics that would be --
5    that would be covered during some depositions.  And, you know,
6    when you take a deposition of an -- of an entity -- you know,
7    Augusta doesn't have a mouth and it can't talk for itself, so
8    it has to have -- have people designated to speak for it.
9    And -- and so you have been identified by defense counsel as
10   someone who is authorized to talk about the parks and
11   recreation department policies with regard to planning of
12   events and the planning of events at the public facilities.  Is
13   that -- is that your understanding about what you're here for?
14   A    Correct.
15   Q    Okay, okay.  And so we'll -- we'll stick to that, and
16   specifically I wanna talk -- we'll talk generally about --
17   about planning of events, and then specifically I would like
18   to -- I'm gonna have some questions about an event that was
19   June 14th of 2019 at the Julian Smith Casino.  And then --
20   and then we'll talk about -- about policies and ordinances and
21   how they -- how the parks department interacts with other
22   departments and things like that with regard to the planning
23   and permitting process, okay?
24   A    Okay.
25   Q    Okay.  So can -- if -- let's say that I wanted to

Page 7

1    have an event at Julian Smith Casino.  Well -- well, let me ask
2    you first: Has the process changed today -- is the process any
3    different today than it was in -- in June of 2019?
4    A    No.
5    Q    Okay.  So let's suppose I wanted to have an event at
6    Julian Smith Casino where I was gonna have -- rent the -- rent
7    the place from the county and I was gonna serve beer and wine
8    to my guests and things like that.  How would I approach the
9    county?  And walk me through that process with -- with the
10   parks department and how -- how we get that planned and done
11   and scheduled.
12   A    Okay.  Basically, you would come straight to me.  And
13   I have a contract and -- we do a lot of this now online, so
14   I -- I don't know if you consider that a change, but it --
15   it -- we do some of this online, but I still go through the
16   policies and procedures with whoever's renting.
17       When it comes to alcohol, the first question I ask: Are
18   you -- are you -- are you giving this alcohol away?  Are you
19   selling it?  Because you have to have a day license if you're
20   selling that alcohol or, you know, in any way selling it to the
21   people that are coming.
22       And once they tell me, no, I'm -- I'm giving it away, or I
23   am, you know, selling it; I direct them to either the -- the
24   license department -- which they have to have in writing with
25   the license department that they are having to go get a one-day

Page 8

1    license -- or, no, we're giving it away.  So I go from there
2    and I -- and I let them know that they will have to have a
3    police officer if you are having alcohol on the premises.  It
4    doesn't matter if you have 150 people, 200 people, or 2 people.
5    You still will have to have a police officer if you are having
6    alcohol.
7    Q    Okay.  And when you say a police officer, is that --
8    do they -- is that -- can it be a -- a special duty off duty
9    police officer, or did they have to be on the clock and in
10   uniform and -- and all of that?
11   A    What we do is we contact the police department and --
12   and we give them a copy of the contract and tell them that --
13   whatever that -- they are -- need for that event.  And they
14   email us back in -- in writing.  They let us know who -- who is
15   needed and they give us the name of the person that will be
16   working that event.  We have contacts with the police
17   department that we go to.
18   Q    Understood, because they have people that they --
19   they will -- all that kind of scheduling on their side; is --
20   A    Correct, correct.
21   Q    Okay.  And -- and when you say the police department,
22   do you work with just the police department, or do you also
23   work with the sheriff's office?
24   A    Well, I work with the sheriff's office -- I mean, the
25   police department, and we do have some marshals that do work

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

Page 9

1  the events also, along with firemen. You know, we have firemen
2  that you have to get to -- also. And I have a --
3      Q    So you work --
4      A    So I --
5      Q    You broke up.
6      A    -- contacts with the firemen and the police officers
7  and the marshals.
8      Q    Understood.
9      A    Yeah, I --
10     Q    Okay. How -- how long does that process take? Let's
11  say that from contacting you, and then you helping them
12  understand what they need to do as far as licensing and
13  approval goes, how long does that process typically take?
14     A    Well, I mean, if you have to get a license, you --
15  for -- you know, if you're selling, it takes about -- at least
16  three months in advance to get one. Now, if you've already got
17  a license to sell alcohol, you have -- still have to get a day
18  license. And -- and if you have a license, you can get that
19  real quick. You can get that within a week. But if you're
20  like giving it away or -- you know, or bringing it yourselves,
21  then -- then you don't have to have anything --
22     Q    Okay.
23     A    -- far as license-wise.
24     Q    Okay. So if you're giving it away, that would be
25  like a wedding reception without -- it doesn't have a cash bar?

Page 10

1      A    Correct.
2      Q    Okay. Or a -- or a --
3      A    -- anything like that.
4      Q    Okay. And they -- they don't have to get a day
5  license -- can you explain to me what a day license is, when
6  you say a day license?
7      A    Basically -- basically it's -- it's -- we've been
8  working with the licensing department a long time. So it's --
9  basically, it is if they're selling on the premises and money
10  is being exchanged, they have to have a day license showing
11  that they have bought a day license for that actual event. It
12  has to be out on the wall showing that they have a day license.
13  In that case -- inspection department, so I don't understand
14  the whole thing about it, but that's -- you have to have one.
15     Q    Okay, understood.
16         MR. CAUTHORN: And -- and I actually -- Jennifer, did
17  we swear in the witness?
18         THE COURT REPORTER: (Nods head.)
19  BY THE WITNESS: (Resuming)
20     A    Yeah.
21     Q    I'm sorry, I was looking at my notes, I think, when
22  you were getting sworn in. Okay.
23     A    Yeah.
24     Q    So I -- I wanna make sure that I understand this.
25  Okay, so -- so there is just a general county license that

Page 11

1  allows someone to sell alcohol, correct? And that's just a
2  general license where they can sell it at their location,
3  right?
4      A    Right, correct.
5      Q    Okay. But if they're using a park property for a
6  single event for one day, even if they've got one of those
7  licenses to sell alcohol generally, they still have to get a
8  day license to serve it at the --
9      A    Right.
10     Q    -- at the event at the park property?
11     A    Right. It has to have Julian Smith Casino on the
12  license.
13     Q    Okay, okay. And so that's what you mean, when you
14  say a day license, you're talking literally about the same type
15  of a license that a restaurant or bar would have except that it
16  is specifically for one day at a park property?
17     A    Correct. At a -- at a building.
18     Q    Okay. And if you don't have a general bigger
19  license, that means you have to go through the whole process
20  of -- of -- and that's why you said it would take three months
21  or so, because you've got to go through a whole licensing
22  process --
23     A    Right. You have to be a nonprofit -- you have to be
24  a nonprofit to get a -- to get a day license if you don't have
25  another license. You cannot just -- you know, Joe Smith can go

Page 12

1  out there and get a day license. You can't do that. It has to
2  be a nonprofit.
3      Q    Okay.
4      A    Correct.
5      Q    So if my daughter was getting married -- if my
6  daughter was getting married at Julian Smith, we'd have to have
7  a -- an open bar. We couldn't have a cash bar if we wanted
8  to --
9      A    Pretty much. Pretty much.
10     Q    -- because -- because --
11     A    Unless you've got someone --
12     Q    -- nobody --
13     A    -- who already had an alcohol license. Like let's
14  say -- alcohol license --
15     Q    Okay.
16     A    And so they could serve alcohol and sell it.
17     Q    So a caterer could do it?
18     A    A caterer, correct.
19     Q    Okay. So I could have an event where I had a caterer
20  running the bar, and the caterer could get the license -- the
21  day license --
22     A    Correct, correct.
23     Q    -- using their own license?
24     A    Correct.
25     Q    Okay, understood. And who has to sign off on that

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

Page 13

1  license? Does the sheriff have to review that license and sign
2  off on it?
3      A   No, the sheriff does not. The -- the license
4  inspection gives them a day license and it has to be signed and
5  put on the wall -- and we have to have it on the wall before
6  they can sell.
7      Q   Okay. And is -- is that something that would be in a
8  file for a -- for an event?
9      A   Not necessarily, no. We don't -- we don't file them,
10  no. We just have to have them on the wall before they -- we --
11  to be honest with you, we don't have a lot of -- of cash bars.
12  We really don't.
13      Q   Understood, understood. If -- let's say an event is
14  selling tickets and giving out wristbands for drinks, does that
15  count as selling alcohol?
16      A   It is -- it does. If -- if the ticket includes
17  alcohol, that -- that -- that is -- is -- is a -- is a selling
18  event, so, yeah -- yes, that is.
19      Q   Okay, okay. So that's -- that -- that's kind of what
20  I was asking. Because, you know, I know a lot of people would
21  say, okay, well, it's gonna be $20 a ticket and we've got a
22  plate of barbeque and -- and you get a beer -- you know, two --
23  two beer coupons with it. So that would be a -- that would be
24  a selling event?
25      A   Correct.

Page 14

1      Q   Okay, okay.
2      A   Now, if you bring your own or whatever, that is not
3  selling. We do have BYOB, bring your own.
4      Q   And that's where the individual guests bring their
5  own?
6      A   Correct.
7      Q   Okay. The -- if individual guests are bringing their
8  own alcohol, does -- do they still have to get all the approval
9  for alcohol, or -- or is that just a -- just it -- it -- go
10  ahead and explain that.
11      A   It should -- you don't have to have a license if
12  you're bringing your own.
13      Q   Okay. What if the alcohol is free? What's the
14  process that has to -- has to be gone through if you're just
15  providing alcohol for free at your event?
16      A   You just -- I just have to -- I have to assign a
17  police officer. They cannot, I do. I go through my --
18      Q   Okay. And that --
19      A   I send the contract. They send me a person. And
20  then we -- we have the police officer.
21      Q   Okay. Who pays -- who pays for the police officer?
22      A   The -- the people that are renting.
23      Q   Okay, all right. And my understanding is Julian
24  Casino -- Julian Smith Casino is -- is an Augusta parks and rec
25  property where there are these types of events.

Page 15

1      A   Right.
2      Q   Okay. Do you know, or have you ever heard of 25
3  Gents?
4      A   I sure have.
5      Q   Okay.
6      A   Twenty-five Gents has been with us over 30 years.
7      Q   Okay.
8      A   So --
9      Q   What is 25 Gents?
10      A   It's -- it's a club. I mean, it's -- it's like a --
11  it's like any of the fraternity-type -- it's just a club.
12      Q   Okay. Just a social club?
13      A   Yes.
14      Q   Okay. Who were the people that -- or your contacts
15  at 25 Gents?
16      A   For a long time I've worked with Willie Washington.
17  And he's gotten a little bit older, so I work a little bit with
18  Randy Knox now. And I'm very close to that group because I've
19  been with them that long.
20      Q   And when you say that long, is that -- are -- are you
21  a member of 25 Gents, or do --
22      A   Oh, no.
23      Q   -- they use the property all the time?
24      A   They have used that facility as long as I have been
25  in my position. Every year pretty much at the same time.

Page 16

1      Q   Okay, okay. And what type of -- of an event do they
2  have. You just said they use it every year. What's the event
3  that they have?
4      A   I mean, they have an event right before Father's Day
5  and it's just a Father's Day get together. And then they have
6  one in November. I think it's something like a white party.
7  They're just parties.
8      Q   Okay, okay.
9      A   Yeah, parties -- get together --
10      Q   Do they have a standing permit or any kind of
11  standing application with the parks department, or do they get
12  a -- they go through the process individually each time they
13  wanna --
14      A   No. Everybody has to go through the process each
15  time -- each time, every time.
16      Q   Okay. Do they usually sell alcohol, or do they just
17  provide it for free?
18      A   They -- they -- they -- well, they have a BYOB, which
19  is bring their own.
20      Q   Okay. Is sheriff or police security required at a
21  BYOB?
22      A   Yes, sir. Anytime alcohol is on the premises you
23  have to have police officers.
24      Q   Okay. So they have to go through you to get the
25  security, but they -- they don't go through that licensing

Page 17

1  process when they have their event?
2     A   Correct.
3     Q   Okay.  Do you know if they sell tickets to their
4  event?
5     A   I don't -- I -- I am not sure.  I don't -- I don't --
6  I think they -- I'm not sure.  I'm not positive.  I would have
7  to go back.  Some of -- they have before in the past, but -- I
8  think they do.
9     Q   Okay.  Do you know what's included in the ticket?
10    A   I -- I think just the -- just the food and the -- and
11 they have to pay for the building and all that, but it sure --
12 it's not -- I know it's not alcohol because the people bring
13 their own alcohol.
14    Q   Okay.  And you -- by the people -- when you say the
15 people, you mean the individual guests to the event?
16    A   Correct, correct.
17    Q   Okay.  And I looked -- I was provided from you
18 guys -- y'all provided a pretty substantial open records
19 response to me.  I sent an open records request to -- to y'all
20 and it's a pretty substantial response.  And it -- the -- the
21 request was for documents related to the permitting of events
22 in the year of 2019.
23    A   Uh-huh (affirmative).
24    Q   And I did not see any -- any paperwork related to any
25 event at -- for the 25 Gents or for Julian Smith Casino on June

Page 18

1  14th of 2019.  Do you know where that paperwork would be?
2     A   Are you speaking of the contract?
3     Q   Yes.  Whatever documents would be in a file at
4  Augusta -- at -- with you guys.  I didn't get -- in the -- in
5  the documents produced, I didn't see anything related to an
6  event at Julian Smith Casino.  And -- and -- and the reason I'm
7  asking about this is because I'm getting ready to start asking
8  you about a specific event on June 14th of 2019.
9     A   Uh-huh (affirmative).
10    Q   And I didn't see anything related to an event that
11 day at all.  And then I didn't see any paperwork related to 25
12 Gents at all.  And I was --
13    A   I did -- I can -- I can give you that contract right
14 now.  It's in my --
15    Q   Okay.
16    A   -- computer.
17    Q   Okay.
18    A   Yeah, uh-huh (affirmative).
19    Q   Okay.  In about -- in -- in -- in -- I'm gonna ask
20 you some questions in about -- and then -- can we take a five
21 minute break and you -- and you can email Tameka that -- that
22 contract?  And then I -- and then -- because I'm -- because I'd
23 like to talk to you.
24    A   Okay, sure.
25    Q   Okay.  And I'm not -- you know, I -- y'all produced

Page 19

1  like a hundred and -- almost 200 pages worth of -- worth of
2  documents that -- I went through it multiple times and I never
3  saw anything about 25 Gents or an event at -- on June 14th,
4  2019 or anything at Julian Smith Casino with 25 Gents or
5  June 14th, 2019.  So if you could find that -- those documents
6  and email them to Tameka and she can email them to me.
7     A   Okay.
8     Q   We can take a few minutes to do that and then I can
9  ask you questions about that and I'll have those documents in
10 front of us.
11    A   Sure.
12    Q   Okay.
13    A   Yes, June 14th, two thousand -- what was is,
14 nineteen?
15    Q   Nineteen.
16    A   Okay.
17    THE VIDEOGRAPHER:  And we were off --
18    MR. CAUTHORN:  All right --
19    THE VIDEOGRAPHER:  Off --
20    MR. CAUTHORN:  Let's --
21    THE VIDEOGRAPHER:  I'm sorry, go ahead.
22    MR. CAUTHORN:  Yeah, let's -- let's mute up until
23 about 9:45, and then we'll come back and -- and -- and --
24 and look at these documents.
25    THE VIDEOGRAPHER: And we are off the record at 9:33.

Page 20

1     (Whereupon, a brief recess ensued.)
2     THE VIDEOGRAPHER: And we are back on the record at
3  9:48.
4  BY MR. CAUTHORN: (Resuming)
5     Q   Okay.  Ms. Kuhlke, you just -- my understanding is
6  you just provided your -- well, you just provided defense
7  counsel with a copy of a document that's in the parks and
8  recreation department's computer files; is that right?
9     A   (No audible response.)
10    Q   You're muted.
11    A   That's correct.
12    Q   Okay.  And this is a document that reflects the --
13 the event held by 25 Gents Inc. at the Julian Smith Casino on
14 June 14th of 2019; is that correct?
15    (Whereupon, Plaintiff's Exhibit D was marked for
16 identification.)
17 BY THE WITNESS: (Resuming)
18    A   Correct, correct.
19    Q   All right.  I'm -- I'm gonna share my screen and
20 we'll -- let me see -- okay, can you see this?
21    A   Yes -- well --
22    Q   It sometimes takes a second.
23    A   Okay, I see it on --
24    Q   Okay.  It looks like it's two pages long; is that
25 right?

Page 21

1     A   Correct.
2     Q   Okay.  And this is a true and accurate copy of the --
3 of the contract between 25 Gents Inc. and Augusta-Richmond
4 County for the event that we have been talking about?
5     A   Correct.
6     Q   Okay.  Can you walk me through -- just kind of walk
7 me through the first page, what everything means and -- and --
8 and how the information in it is created?
9     A   Okay.  First off, I get -- I already have all the
10 information -- we -- we use -- it's called ACTIVE Net -- and I
11 already have all the information for the organization of the
12 25 Gents.  And I go in and put their name in, which you see on
13 the left here, organization name.  And then the agent's name,
14 which is Willie Washington, who I was telling you about.  And
15 then I go in -- down -- and I put the date, which is June
16 14th, 2019 -- down there, and I put what time they wanna come
17 in, and what time they wan to end the party.  Now -- now,
18 it's -- it's not 11:30 because -- because our computer does
19 not -- it goes up to 11:30, but the party -- it should have
20 probably ended at 12 midnight -- because our computer doesn't
21 go up to 12 midnight -- I don't know why, but it doesn't.
22     Q   Okay.
23     A   And then it -- huh?
24     Q   I just said okay.
25     A   Okay.  And then how many are attending.  And then

Page 22

1 that -- that -- that might not be accurate either, because once
2 they come in and they -- and I put this in, which I -- I -- I
3 have a contract -- yeah, it's -- where it says -- where I put
4 it in -- January 16, 2019 -- which I don't know why that other
5 one doesn't say that -- that I sent you -- but I've got the
6 original one here in front of me.  I found it.  And if that
7 changes, then -- then, basically, what they do is tell the --
8 the guy that's over the casino, look, I said I was having 300,
9 but I'm having 250 -- or I'm having 215, or something like
10 that.
11     And then once you go down under customer questions, are
12 you selling tickets -- and they did sell tickets to this event,
13 and it -- they sold advance tickets -- and are you having
14 alcohol, yes.  And then it says here, are you -- requires a
15 security officer, and it says, yes.  And then -- and then --
16 then they have to pay.  And if you see on the back, you see
17 that March 22nd they paid the full amount, eleven --
18     Q   I'm scrolling to the second page because I think
19 you're now talking about something on the second page.
20     A   Oh, yes.  Then you'll see where they paid the check
21 March the 22nd, 2019.
22     Q   Okay.  And what's the June 21st, 2019 entry in
23 there?  What does that mean?
24     A   That is when the -- that is after their event, they
25 are given back the deposit if they cleaned up.  That's what

Page 23

1 that means.  They cleaned up, so I gave them back --
2     Q   But --
3     A   The deposit.
4     Q   Understood.  So -- so -- so if they clean up their
5 own events and there's no problem, they get their deposit back
6 just like any other kind of a --
7     A   Correct, correct.
8     Q   Okay.  Can you explain -- I'm gonna just ask you --
9 under the -- it says contract number R4769 and then status
10 completed up in the right hand corner.  And then it's got a
11 date of January 31st, 2022 at 12:23 p.m.
12     A   I -- I have -- I'm gonna be honest with you, I have
13 no idea.  I have the original contract here and it says date,
14 January 16th, 2019, if -- if you'd like me to send you that.
15 I have -- I --
16     Q   Yeah, can -- yeah, let's take another break so you
17 can scan that original contract and --
18     A   It'll take a few seconds, I'm sorry.
19     Q   I -- no, I appreciate it, thank you.
20     A   Okay.
21     THE VIDEOGRAPHER: Would you like to go off the
22 record?
23     MR. CAUTHORN: Yeah.  Let's -- We'll -- we'll just
24 meet up for about five minutes.  This is not gonna take
25 long.

Page 24

1     THE VIDEOGRAPHER: Excellent.  And we are off the
2 record at 9:53.
3     (Whereupon, a brief recess ensued after which
4 Mr. Randolph Frails joined the proceedings.)
5     THE VIDEOGRAPHER: All right, and we are back on the
6 record at 9:58.
7 BY MR. CAUTHORN: (Resuming)
8     Q   I'm gonna share my screen again.
9     A   Okay.
10     Q   And this is gonna be Exhibits E to this deposition.
11     (Whereupon, Plaintiff's Exhibit E was marked for
12 identification.)
13 BY MR. CAUTHORN: (Resuming)
14     Q   And this is the document you just sent me here with a
15 different -- and -- and it appears to be the same document
16 except for the fact that instead of having a date of January
17 31st of 2022, it's got a date of January 16th of 2019.
18     A   Correct.
19     Q   Okay.  Do you know why the first document you
20 produced to me had a date of January 31st of 2022?
21     A   I have no earthly idea.
22     Q   Okay.  And it wasn't -- it wasn't created on January
23 31st of 2022, was it?
24     A   No, sir, it sure wasn't.  It was created on -- on
25 January's the 16th, 2019.

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

---

Page 25

1  Q   Okay.  Well, I -- that's -- let's talk about Exhibit
2  E.  That's the one you just sent that's dated January 16th,
3  2019.  How did -- how did the -- how did the date populate --
4  how does the date populate in the -- in this contract when
5  you -- when you fill it out?
6  A   That -- that means -- that means when it was formed.
7  I -- I -- I put this in the computer on January the 16th, 2019.
8  And I have no idea why it has that two thousand --
9  Q   Okay.
10  A   -- January -- I have no idea.
11  Q   Okay.  But for some reason for this event on January
12  14th -- or June the 14th of 2019, you have two contracts with
13  the same number and one of them is dated January 16th of 2019
14  and the other one is dated January 31st of 2022?
15  A   I -- yes.
16  Q   Okay.  I'm gonna show you Exhibit A that I have right
17  here.
18        (Whereupon, Plaintiff's Exhibit A was marked for
19   identification.)
20  BY MR. CAUTHORN: (Resuming)
21  Q   And I sent this to your attorney.  And this is why,
22  to be honest with you, I -- if I'd known that those two
23  contracts -- the one from January -- from last week and the one
24  from 2019 existed, we would've -- I would've -- I would've
25  asked you for them before.  But we had -- we sent an open

---

Page 26

1  records request to the parks department some time ago and got
2  139 pages back, and that -- that contract wasn't in it.
3  Neither one of those contracts -- the one from January 31st,
4  2022 or January of 2019 -- neither -- are you there?  Your
5  phone --
6  A   Yeah.  I -- I don't know what I did.
7  Q   Oh, you might have accidentally hit the -- hit the --
8  the -- the -- there's a camera logo.
9  A   Yeah, but it's saying --
10  Q   Let's go off the record for technical issues.
11        THE VIDEOGRAPHER: And we are off the record at
12   10:01.
13        (Whereupon, a brief recess ensued.)
14        THE VIDEOGRAPHER: All right, and we're back on the
15   record at 10:03.
16  BY MR. CAUTHORN: (Resuming)
17  Q   Okay, all right.  Do you -- I'm gonna show you --
18  A   Okay.
19  Q   -- Exhibit A.  This is what we received in -- more
20  than a year ago from the parks department as part of an open
21  records request.  Do you know who fulfills the parks
22  departments open records requests?
23  A   I was just told to get all the contracts I had --
24  from the director, my boss, of all I had in 2019 at the casino.
25  Q   Okay, so you -- so you're the one --

---

Page 27

1  A   I --
2  Q   -- prepared --
3  A   I -- yeah -- so I did.  I got all the ones that I
4  had.
5  Q   Okay.  And do you know why the -- the one -- the --
6  the -- the one from -- that we just looked at for Exhibit D and
7  Exhibit E, do you know why that wasn't in the production?
8  A   I -- I -- I -- I have no idea.  I -- you know, I told
9  them that, you know -- I mean, we didn't know what we were
10  doing it for, and I don't know why that one wasn't in there.
11  But it's -- it's been in the computer.  I -- I don't -- I don't
12  know.  See, I file them.  I -- I don't know why it wasn't in
13  there.
14  Q   Okay.  Did you -- did you pull paper files out and
15  copy them --
16  A   Yes --
17  Q   -- and scan them --
18  A   Yes, correct.
19  Q   Let me -- let me finish my question.  Just --
20  A   Okay.
21  Q   Okay.  I'm not -- I don't wanna be rude.  I'm just
22  trying to make sure that I finish my question, so that when
23  you're answer --
24  A   Yeah.
25  Q   -- is made, it's the answer that needs to go to my

---

Page 28

1  question.  I know that we're -- that you're anticipating what
2  I'm asking, but some -- but for deposition purposes, I need --
3  need it to be pretty clear in the transcript, okay?
4  A   Uh-huh (affirmative).
5  Q   Okay.  So when you created the open records request
6  that you provided to our law firm, did you pull paper files and
7  scan them, or did you print from a computer electronically
8  stored documents from a computer?
9  A   I pulled all my paper files.  I did not go to the
10  computer.
11  Q   Okay.  So does that mean that there was not a paper
12  file related to the June 14th 25 Gents event?
13  A   There was -- there was one in the computer.  I don't
14  know why it wasn't in my file, if you did not receive it.  But
15  there was one in the computer.
16  Q   Okay.  Did you -- and when you just produced
17  Exhibit D and Exhibit E to me, how did you produce those?
18  A   You mean the one I just gave you?
19  Q   Yes, ma'am, the ones --
20  A   I -- yeah -- I went on the computer and -- I went to
21  June 14th in -- on my computer on the Julian Smith Casino
22  page -- and I went to June 14th, 2019, and it's right there.
23  Q   Okay.  And there --
24  A   And it has the --
25  Q   Okay.  And it -- so there's -- there are two separate

---

Kellie K. Rodman, LLC

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

---

Page 29

1  documents stored in that computer for June 14th, 2019?

2  A   No.  I just printed you the one out -- the first
3  one -- I printed it off the computer.  And then I had another
4  copy of it in a file -- when all this was going on I had
5  another copy of it because -- I don't know how that date
6  changed.  I'm -- I -- I have no idea.

7  Q   Okay.  Did -- did you print a copy of it on January
8  31st of 2022?

9  A   It's -- I have -- I -- I don't think I did.  Somebody
10  else could have, but I -- I don't think I did.

11  Q   When did you create the paper file for the June
12  14th, 2019 event?

13  A   When did I do the -- do the contract?

14  Q   No.  You just said that you had one that's on the
15  computer and one that's on paper.  And I was gonna ask -- and I
16  was asking you --

17  A   Oh, Oh.  I -- when -- when all this was going on and
18  we had to have all the -- all the things, I just -- I just -- I
19  had -- I had one in my -- in a -- in a file.

20  Q   All right.  And when you say all this was going on,
21  are you talking about this lawsuit?

22  A   It was in the paper.  They asked us about the
23  situation that was in the paper, and they wanted to know what
24  went on June 14th.  So I -- I made a copy of that -- of that
25  contract when -- when it was first in the paper.  Because when

---

Page 30

1  you look in the paper and it says Julian Smith Casino, you're a
2  little concerned about what's going on at Julian Smith
3  Casino -- which it didn't have anything really to do with us,
4  because this thing -- you know, this thing happened off our
5  grounds -- so they asked us to get all the information.  So I
6  made a copy of the contract from the computer so I could have a
7  file of what was in the paper.  I have copies of what was in
8  the paper about Julian Smith Casino.

9  Q   Okay.  And who asked you about -- about what was in
10  the paper?

11  A   My boss --

12  Q   Okay.  And what was in the paper?  I don't -- I don't
13  know --

14  A   Augusta Press -- Augusta Press -- let me get -- I
15  don't even know where my file is -- Augusta Press had it in
16  there, and then a couple of days later it was in the -- this is
17  it -- this was August 2021.  It says, lawsuit claims deputy off
18  book detail rape.  And he was not off book, so that -- and then
19  I had another one that was in the Augusta -- it was from the
20  Augusta Press.  It says, Richmond County Sheriff assaulted
21  woman at Julian Smith Casino.

22  Q   Gotcha, okay.

23  A   And that was a big concern with us that it was at
24  Julian Smith Casino.  And then if you read the article, it says
25  it did not happen at Julian Smith Casino.

---

Page 31

1  Q   Okay, okay.  Now, when I -- have you read the
2  complaint in this case?

3  A   Yes.

4  Q   Okay.  And I don't think we allege that the -- that
5  the rape happened at Julian Smith, did we?

6  A   No, you did not.  But it was all in the paper that it
7  happened at Julian Smith in the big -- in the big headlines, so
8  I had to look into it.

9  Q   Okay.  So did -- did you guys -- with this event on
10  June 14th of 2019, did you guys -- and I say you guys, I
11  mean -- I mean the parks and recreation department -- did y'all
12  have any communications with Deputy Charlie Walker?

13  A   I didn't.  I don't even know who he is.

14  Q   Okay, okay.  And I think I may have asked this
15  before, but I wasn't -- I'm not sure the answer was clear to
16  me.  When a sheriff's deputy provides security at an event at
17  Julian Smith Casino, does -- is -- is that sheriff's deputy
18  supposed to be -- is -- is that sheriff's deputy working, or is
19  that extra duty, like private security duty that the sheriff's
20  deputy provides on his own time?

21  A   Well, they're getting paid, so I'm just assuming it's
22  extra duty because I -- you can't get -- you can't get paid
23  twice.

24  Q   Okay.  Does the parks department communicate with the
25  sheriff's office to find out who is gonna be the -- the officer

---

Page 32

1  providing security?

2  A   Yes.  They send us a name back and let us know by
3  email.

4  Q   Okay.  And do y'all have emails from June 14th
5  from -- for this event?

6  A   That -- that's something that I wouldn't receive.  It
7  would be Darrell Mayle.  He receives that.

8  Q   Can you spell that name for me?

9  A   D-A-R-R-E-L (sic) M-A-Y-L-E.  He is over the Julian
10  Smith Casino.

11  Q   So for -- and I'm gonna ask a general question, and
12  then I'm gonna ask a smaller -- a more -- more refined
13  question.  So generally, when there is -- there is security
14  provided by the sheriff's department at a parks and recreation
15  facility where there is a private event being held, the
16  communications about the -- who the officer is gonna be and all
17  that is transmitted directly to the person who's in charge of
18  that facility?

19  A   Correct.

20  Q   Okay.  So was -- specifically to Julian Smith Casino,
21  when there is an event where the sheriff's department is
22  providing security, the sheriff's department communicates
23  directly with Darrell Mayle -- Mayle?

24  A   Correct.

25  Q   Did you say correct to Darrell Mayle, or correct that

---

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

Page 33

1  they communicate directly with him?
2      A   They -- correct -- they -- they communicate directly
3  with him.  It is his job to make sure that he communicates with
4  the police officers and the firemen.
5      Q   Okay, understood.  At the actual event, are there any
6  parks department people at the -- who -- who are required to
7  attend events at the -- at the facilities?
8      A   Yes.
9      Q   Okay.  And how -- how does that work?  Explain to me
10  how that -- how that works and -- and -- and what the
11  department does with regard to their personnel being at events.
12      A   Every one of our buildings that are indoor buildings
13  does have to have a staff person, or more than one staff
14  person, there during the event.  That's to make sure everybody
15  is doing what they're supposed to be doing, you know.  And if
16  there's lights or anything that needs to be done there, they
17  have to be there during the entire event, even setting up and
18  cleaning up.  This event with the 25 Gents was over 200 people,
19  so it would require two staff people to be there.
20      Q   Okay.  Do you know who was working there on June
21  14th?
22      A   I do.
23      Q   Who was working there?
24      A   Alzater Johnson and Gerald Smith.
25      Q   How do I spell Alzater?

Page 34

1      A   A-L-Z-A-T-E-R.
2      Q   And Gerald Smith?
3      A   Gerald Smith.
4      Q   Okay.  Who is Alzater Johnson?
5      A   She works with us part time at the Julian Smith
6  Casino.
7      Q   Okay.  Who is Gerald Smith?
8      A   Gerald Smith is a full-time employee with us that
9  works at McDuffie Woods and he helps out with rentals.
10      Q   And when you say he helps out with rentals, what --
11  can you -- can you be -- can you elaborate on that?
12      A   You can -- you can assign any staff.  They don't
13  necessarily have to work at Julian Smith Casino.
14      Q   You just have to fill in with coverage?
15      A   Correct.
16      Q   Okay, I understand.  So when there's an event that's
17  big and you have two people, you gotta find two people to -- to
18  work at it?
19      A   Correct.
20      Q   Okay, all right.  So Alzater Johnson and Gerald Smith
21  were at Julian Smith Casino working for the parks department on
22  June 14th, 2019?
23      A   Correct.
24      Q   Okay.  Is it -- do you know if anybody that works in
25  the parks department is a member of 25 Gents?

Page 35

1      A   Of my knowledge, no.
2      Q   Okay.  Do you know if anybody that works at the parks
3  department goes to the 25 Gents events as a -- as a guest, not
4  working, but as a participant in the festivities?
5      A   I -- I have no idea, but as far as I know, no.  But
6  I -- I do not know.
7      Q   Okay.  What is Darrell Mayle's email?
8      A   JMayle@augustaga.gov
9      Q   Okay.  And that's M -- J-M-A-Y-L-E?
10      A   Correct.
11      Q   Okay.  What is your email -- your work email?
12      A   CKuhlke@augustaga.gov
13      Q   Okay.  When did -- when did the parks department
14  first find out about the -- the allegations made by Ms. Colon?
15      A   When it was in -- I -- I found out when it was in the
16  Augusta Press, and it said rape -- I'm not sure, but it -- it
17  listed Julian Smith Casino.  And that's when we -- that's when
18  they wanted to know who -- who was that date and everything.
19  That's -- that's how I got that contract.
20      Q   Okay.  Were you ever made aware of a -- of a -- of
21  a -- of a letter sent to the county commissioners and the
22  sheriff and the -- and the mayor back in 2020 -- in April
23  of 2020?
24      A   No, sir.
25      Q   Have there ever been any other allegations of any

Page 36

1  kind of improper behavior or injury of a guest at a Julian
2  Smith Casino event?
3      A   Not of my knowledge.
4      Q   Are the -- are the people who rent the facilities
5  required to purchase any kind of insurance for the event?
6      A   No, sir.
7      Q   Okay.
8      A   I mean, it all depends on what kind of event, which
9  we -- they can't have over a certain amount of -- of people at
10  the casino because it only holds 350.
11      Q   So 350 is the maximum number of -- of --
12      A   Well, you can have -- you can have up to 400, but we
13  say 350.
14      Q   Okay.  But what I mean is the -- is the -- the county
15  doesn't require any kind of certificate of insurance for
16  hosting any -- any events at Julian Smith Casino?
17      A   If you are selling tickets and you are having a huge
18  event, at the door you would have to have insurance.  But we
19  don't have very many of them because you have to have four
20  police officers, two firemen, and four staff members --
21      Q   How many --
22      A   -- contract.
23      Q   How many -- how many -- how many law enforcement
24  officers -- police or sheriff -- were working at the June
25  14th event?

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

Page 37

1   A   One.
2   Q   Okay.  And how do you decide how many are supposed to
3   work a particular event?
4   A   You would have to have -- you would have to have --
5   it's -- it's over 300, you would have to have two police
6   officers.
7   Q   Okay, so if it's under 300, it's one?  And if it's
8   over 200, its two?
9   A   Correct.
10  Q   And if you're --
11  A   Over 300.
12  Q   Okay, over 300 its two, right?
13  A   Yes.
14  Q   And if you're selling tickets at the door, it's four?
15  A   Correct.  And it all depends on what kind of event it
16  is really.  That's when the director decides, if you're selling
17  tickets at the door.  Because if it's a bridal show and you're
18  selling tickets at the door, you don't need four police
19  officers.  So it's basically up to the director.  He has to --
20  he has to tell you exactly how many people you would have to
21  have.
22  Q   And you mean -- are you referring to the director of
23  the parks and recreation department?
24  A   Correct, uh-huh (affirmative).
25  Q   What's that person's name?

Page 38

1   A   Maurice McDowell.
2   Q   Who was the director in -- on June 14th of 2019?
3   A   Oh, what's his name -- I'm sorry, I'm -- I'm going
4   blank -- I'm going blank -- you're gonna have to give me -- I
5   can't remember his name.  Can I call somebody?
6   Q   Phone a friend?  No, that's --
7   A   I -- can I phone a friend?
8   Q   No, that's okay.  That's okay.  That's a piece of
9   information I can get somewhere else.  If you knew it, I was
10  gonna --
11  A   We've had -- we've has so many, so.
12  Q   How long has the current director been in their
13  position?
14  A   About two years.
15  Q   Okay.  So -- so the director in June of 2019 was the
16  immediate predecessor of the current director?
17  A   Correct, correct.
18  Q   Do you know why the director left the parks
19  department?
20  A   I have -- no, sir.
21  Q   Okay.  Any rumors about why the director left?
22  A   No, sir.  No, sir.
23  Q   Okay.  I'm gonna share my screen again.  Let's see.
24  This has been labeled Exhibit C for this deposition.
25      (Whereupon, Plaintiff's Exhibit C was marked for

Page 39

1   identification.)
2   BY MR. CAUTHORN: (Resuming)
3   Q   This is a -- Title 6 of the Augusta-Richmond County
4   Code of Ordinances, and I wanted to just kind of -- just point
5   out a couple of things and see if that is consistent with the
6   park's policies.  And I believe they are, because what you
7   described to me in general terms earlier appear to be what is
8   included in these regulations.  Are you there?
9   A   Yes, God, darn it.
10  Q   Okay.  All right, first I wanna -- these are Bates
11  numbered.  Richmond Code Title 60001, do you see that on the
12  bottom right of that first page?
13  A   Yes -- 001 -- I see that, yes.
14  Q   We're gonna go to page 43, and this is Section
15  6-2-77.  Do you see that on there?
16  A   Wait a minute.
17  Q   Uh-huh (affirmative).
18  A   Wait -- I'm sorry, I'm making it bigger --
19  information provided -- no -- which number is it -- four,
20  five --
21  Q   6-2-77.  Do you see that?
22  A   Hold on a second.
23  Q   Uh-huh (affirmative).
24  A   It's not -- I can't see it -- I --
25  Q   Are you on your phone?

Page 40

1   A   I'm on my phone.
2   Q   All right.  Well, I will -- what I'll do is I'll just
3   represent to you that this reads to me like what you were
4   talking about as the application for an occasional, single
5   event license for on-premises consumption of alcoholic
6   beverages.
7   A   Uh-huh (affirmative).
8   Q   And it says that a nonprofit may apply for a license
9   whether or not they possess a -- an alcohol license.  And
10  that's -- that's what you were talking about before, that a
11  nonprofit --
12  A   That's what --
13  Q   -- a license?
14  A   Uh-huh (affirmative), correct.
15  Q   Right?
16  A   Right.
17  Q   Okay.
18  A   You have to be nonprofit, yes.
19  Q   Okay.  And then I'm gonna go to page 21 real quick.
20  Do you see right here where it says Section 6-2-4 -- sorry,
21  Section 6-2-5?
22  A   Yes.  I see it in -- in general, okay.
23  Q   Okay.  And this is about -- this is a part of the
24  code of ordinances.
25  A   Okay.

Page 41

1    Q   Are you familiar with this part of the code of
2  ordinances where it's -- it's the -- the -- the consumption of
3  alcohol at public parks and public areas?
4    A   No -- to sell or offer to sell -- are you talking
5  about number B?
6    Q   No. I'm talking about Section 6-2-5, sorry.
7    A   Oh, okay.
8    Q   Do you see that section?
9    A   Uh-huh (affirmative).
10    Q   Okay.
11    A   That means outdoor, correct?
12    Q   I -- well, I read it as all -- as public space. It
13  says, it shall be unlawful for any one -- any person to serve
14  or consume alcohol or offer for the purpose of consumption to
15  anyone else or to be in possession of beer, wine, or any type
16  of intoxicating liquor or beverage, in and on any public park,
17  playground, or public building thereon, or other public area
18  owned or operated by Augusta, at any time whatsoever, with the
19  exception of -- and the first one there listed is Julian Smith
20  Casino. Do you see that?
21    A   Where -- where are you? Okay, I --
22    Q   I'm at the top right. Do you see that?
23    A   I don't -- okay, yeah -- okay --
24    Q   Okay.
25    A   Yes, I see.

Page 42

1    Q   And is that consistent with what you understand the
2  park policies to -- the parks and recreation policies to be,
3  that -- that --
4    A   Correct.
5    Q   Okay, okay. And then if you look at subsection (B)
6  down here it says that, prior written approval must be obtained
7  from the Sheriff of Richmond County, Georgia, and the Director
8  of the Recreation Department, when alcoholic beverages are
9  served or consumed at Julian Smith Casino. Do you see that?
10    A   Uh-huh (affirmative).
11    Q   Okay. And that seems consistent with the park
12  policy -- or with the parks and rec policy that you were just
13  describing to me; is that -- is that right? Is that the park
14  policy that y'all have to get approval from the sheriff and
15  from the director of the recreation department before there can
16  be alcoholic beverages consumed or served at Julian Smith
17  Casino?
18    A   Correct.
19    Q   Okay. Now I'm gonna show you page 105 here. Okay,
20  and this is about -- this is Chapter 8 -- this is Attendance of
21  Deputies and Firefighters, Section 6-8-1 --
22    A   Uh-huh (affirmative).
23    Q   -- and it's when they're required. And it says, the
24  manager of, or any person giving, any public amusement show,
25  exhibition or performance, any public ball, any dances either

Page 43

1  public or private, or any gathering at public facilities when
2  alcohol is being served, or any occasion where the chief of the
3  fire department and/or sheriff determine in their sole
4  discretion that due to the nature of the function and/or
5  facility, attendance of sheriff's deputies and/or firefighters
6  is necessary, shall have in attendance such number of deputies
7  and/or firefighters as shall be assigned by the chiefs of the
8  respective departments.
9    I read that to say that if you're having a dance where
10  there's alcohol, you are required to provide firefighters and
11  deputies as -- as designated by the -- by the sheriff's
12  department and the fire department. Is that consistent with
13  what you understand parks and recreational policy to be?
14    A   Yes.
15    Q   Okay. And it says that the person -- the manager or
16  other person mentioned in the preceding section shall apply to
17  the sheriff's department and the fire department to learn
18  whether or not the attendance of deputies and/or firefighters
19  is required.
20    Now, you said they -- they -- that -- that you talk to the
21  fire department. Do you talk to the fire department and the
22  sheriff's office -- or the police on their behalf, or do they
23  talk directly to the sheriff's office and the fire department
24  on their own behalf as a part of the application process?
25    A   They don't call, but we do. We -- we -- we get it

Page 44

1  assigned.
2    Q   Okay. And then you find out about the assignment of
3  the police and then you let the person planning the event know?
4    A   Correct.
5    Q   Okay. This says -- on Section 6-8-3 it says
6  generally that the -- that the person who's hosting the event
7  is responsible for paying the sheriff's deputy and the -- and
8  the firefighter. Do they -- do they pay the -- the sheriff's
9  deputy through the parks department, or do they pay them
10  directly?
11    A   They pay them directly. They pay them cash the day
12  of.
13    Q   Okay. So literally when a -- when a sheriff's deputy
14  provides security at an event at Julian Smith Casino, at the
15  end of the event whoever is in charge of the event gives them a
16  check or -- or cash?
17    A   No. They get cash. And they get it before the event
18  is over.
19    Q   Okay, okay. And they get it right there, like at the
20  event at the facility?
21    A   Right, correct.
22    Q   Okay. Do you know who would have paid Charlie Walker
23  on June 14th of 2019?
24    A   I -- I have no idea.
25    Q   Okay. And do you know if Charlie Walker was there

Page 45

1  providing security on June 14th of 2019 at the 25 Gents
2  event?
3    A   I was told he was, but I wasn't there.
4    Q   I understand.  And that would be -- Darrell Mayle
5  would have been the one who -- who -- who got that -- received
6  that information, correct?
7    A   Correct.
8    Q   Okay.  So somewhere Darrell Mayle would have an email
9  from the sheriff's department saying that Charlie Walker is
10  gonna be assigned security at the June 14th, 2019 event at
11  Julian Smith Casino?
12    A   He should have -- he -- he should have had an email,
13  or he could have talked to him.  I don't know.  You'd have to
14  ask him.
15    Q   Understood.
16    A   But you're supposed to get an email, yes.
17    Q   Understood.  You don't -- you don't get in the weeds
18  at that level?
19    A   I mean, I -- I do if I have to because I'm his
20  supervisor.  But he -- he does a good job and I let him do
21  that.
22    Q   Understood.  So this is gonna be Exhibit C to the --
23  to the deposition, this 105 pages that is -- that is Title 6 of
24  the Richmond County Code.  We're gonna have an Exhibit A, C, D,
25  and E.  I don't believe we're gonna have an Exhibit B.

Page 46

1    So I'm gonna show you page 44 of this same Title --
2  Title 6.  And this is -- this is from Section 62-77 (sic) --
3  6-277 (sic) and it's the -- and -- and I wanna show you
4  subparagraph (9).  And a. under a subparagraph (9) -- can you
5  see what I'm looking at?  And I'll read it and see if -- see if
6  that's consistent with y'all's policy.
7    A   I see that, yeah.  I see that nine,
8  uh-huh (affirmative).
9    Q   It says, the Director of License and Inspection shall
10  forward the application to the Recreation Department Director,
11  if applicable, then forward to the Richmond County Sheriff, who
12  shall indicate his approval or disapproval of the application.
13    And with the application, they're talking about the
14  application for the alcohol permit.
15    A   Okay.
16    Q   Is that consistent with your understanding of how
17  that works?
18    A   Well, I know that we received it before the event,
19  yes.
20    Q   Okay.  And --
21    A   And that would be -- who received it, if they need
22  one.
23    Q   And -- and the approval comes through the director of
24  license and inspection and the sheriff's department, not
25  through the parks department, right?

Page 47

1    A   Correct.
2    Q   Okay.
3    A   If -- if they -- permit.
4    Q   That's -- I --
5    A   I --
6    Q   Correct.  Yeah, I -- I'm not --
7    A   -- need it, yes.
8    Q   Yeah.  And -- and it's the parks department position
9  that the 25 Gents did not need a permit because they were
10  having a bring your own alcohol event?
11    A   Correct.
12    Q   Okay, okay.  And that's the parks department
13  understanding for decades, that the 25 Gents events has been a
14  bring your own alcohol event?
15    A   Correct.
16    Q   Okay.  So they never -- so y'all didn't -- so y'all
17  didn't ask for any kind of permit, and no permit was applied
18  for, and no permit was given; is that right?
19    A   Correct.
20    Q   Okay.  What is the significance of the -- the
21  permitting process?  And -- and -- and let me explain to you
22  what I mean.  So you've got a bring your own beer event versus
23  a -- versus a provided alcohol event.
24    A   Uh-huh (affirmative).
25    Q   Why does the parks department distinguish between a

Page 48

1  bring your own beer event versus a provide alcohol event?
2    A   If you're providing alcohol and there's -- there is
3  money on the premises and they are selling it, that goes to a
4  whole 'nother level.  You will have to have a permit.  If you
5  bring your own and they have it, you know, right there at the
6  table and everything else, then -- and you're not exchanging
7  money, it's totally different.  Now, that's what is -- was
8  explained to us from the license and inspection department.
9    Q   Okay.  Are there any security requirements that are
10  different if you are providing alcohol versus if you are
11  bringing your own?
12    A   No.
13    Q   Okay.  So if you have fewer than 300 people and
14  you're providing alcohol, you're still only going to have one
15  sheriff's deputy working security?
16    A   Correct.
17    Q   Okay.  Let me look at my notes real quick and -- and
18  we'll take ten.  And then I'll have a few more question, but
19  we're approaching the end of -- the end of my questioning.  So
20  just give me a few minutes, Ms. Kuhlke, and -- and I'll come
21  back and we'll finish this thing up, okay?
22    A   Okay, thank you.
23    THE VIDEOGRAPHER:  We are off the record at 10:37.
24    (Whereupon, a brief recess ensued.)
25    THE VIDEOGRAPHER:  We are back on the record at

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

Page 49

10:41.

1    10:41.
2       THE WITNESS: Okay.
3    BY MR. CAUTHORN: (Resuming)
4       Q    I've got follow-up -- a couple of follow-up questions
5    just to clarify some things.  When -- when you -- you've used
6    the phrase bring your own alcohol a couple of times in this
7    deposition.  And you have said that when you bring your own
8    alcohol, you don't have to apply for a permit or license for
9    alcohol.  That's -- that's my understanding.  Is that -- is
10   that a fair statement of what -- of what you have -- you said?
11      A    Correct.
12      Q    Okay.  So when you say bring your own alcohol, who
13   are you referring to bringing their own alcohol?  Are you
14   referring to the host of the event, or are you referring to the
15   individual guests of the event?
16      A    Individual guest.
17      Q    Okay.  Do you understand why I'm trying to
18   distinguish that?
19      A    Correct.
20      Q    Okay.
21      A    Uh-huh (affirmative).
22      Q    So if I'm hosting a -- if I am hosting a party like
23   the one on June 14th and I've got an open bar --
24      A    That's --
25      Q    -- I'm not selling alcohol -- just a minute -- I'm

Page 50

1    not selling alcohol --
2       A    Right.
3       Q    -- but I am providing alcohol.  Would I be required
4    to get a permit?
5       A    If you are providing alcohol and you do not charge
6    for that alcohol, you would not need a permit.  But if you are
7    charging and you're charging -- even in -- let's say a
8    ticket -- you would have to have alcohol -- I mean, an alcohol
9    license because you are selling that alcohol.  And that person
10   that's giving the party is providing it, and it is provided on
11   that ticket.
12      Q    Okay, thank you.  I think that's -- I think that's
13   all the questions I have for you, Ms. Kuhlke, subject to any
14   kind of follow ups if -- if Ms. Haynes or Mr. Frails have any
15   questions.
16      A    Okay.
17            DIRECT EXAMINATION
18   BY MS. HAYNES:
19      Q    I just have one question, Ms. Kuhlke, I just want to
20   clarify.  You've been using like the word police and police
21   department.  When you say that, are you referring to the
22   Richmond County Sheriff's Office?
23      A    Correct, correct, yes.
24      Q    Okay, thank you.
25      MR. CAUTHORN: Thanks for clearing that up because I

Page 51

1    actually was -- I trying to figure out if she meant both
2    of them or the sheriff.  Because the ordinance says
3    sheriff, not police, and I -- and there is a difference,
4    so thanks.
5       MS. HAYNES: Yeah.  We don't have police.
6       MR. CAUTHORN: I -- I -- I -- I didn't -- I was
7    wondering.
8       THE WITNESS: It's the same.
9       MR. CAUTHORN: No, I mean, I understand for purposes
10   of someone who lives in Augusta-Richmond County, that's
11   basically the same thing.  Because when the sheriff
12   provides the police protection, that -- the -- in your --
13   in the -- in an individual's mind, there's not much of a
14   difference.  But for purposes of this lawsuit, there is
15   a -- there is a difference.
16      THE WITNESS: Okay.
17      MR. CAUTHORN: Okay.  So thank you for clarifying.
18   And I hope that you have a good weekend and thank you for
19   your time.
20      THE WITNESS: Okay, thank you.
21      MR. CAUTHORN: We are -- do y'all -- Ms. Haynes, are
22   y'all gonna read and sign?
23      MS. HAYNES: No.  And I will call Ms. Johnson and see
24   if she can come early.
25      THE WITNESS: I don't know how to turn this off.

Page 52

1       MR. CAUTHORN: Okay.  Let me -- I'm gonna email you
2    my cell phone --
3       THE COURT REPORTER: Ms. Kuhlke --
4       MR. CAUTHORN: -- because I'm -- I'm gonna step away
5    from my desk for about 15 minutes or so.  So I'm gonna
6    email you my cell phone, and you can call me or text me --
7    or whatever you wanna do -- and let me know if she's gonna
8    be ready by -- say like 11:30 or 11:15 or 11:00.
9       MS. HAYNES: Okay.
10      MR. CAUTHORN: Okay?
11      MS. HAYNES: All right.
12      MR. CAUTHORN: All right, thank you.
13      MS. HAYNES: Uh-huh (affirmative).
14      THE VIDEOGRAPHER: We are off the record at 10:45.
15   (Whereupon, the deposition concluded at 10:45 a.m.)

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

Page 53

1                    C E R T I F I C A T E

2

3   STATE OF GEORGIA        )

4   COUNTY OF FULTON        )

5

6       I, JENNIFER A. GERBER, Certified Court Reporter in and
    for the State of Georgia, do hereby certify that the foregoing
7   proceedings were taken down by me; that the foregoing
    proceedings were reduced to print by me; that the foregoing
8   pages represent a true, correct, and complete transcript of the
    testimony given by the witness, who was first duly sworn by me;
9   that I am not a relative, employee, attorney or counsel of any
    of the parties; that I am not a relative or employee of
10  attorney or counsel for any of said parties; nor am I
    financially or otherwise interested in the outcome of the
11  action.

12      This certification is expressly withdrawn and denied
    upon the disassembly, photocopying, reproduction of electronic
13  copies, and/or distribution of the foregoing transcript, or any
    part thereof, including exhibits, unless said disassembly,
14  photocopying, reproduction, and/or distribution is done by me
    and my signature and original seal is attached thereto.

15
        I further certify that the original of said deposition
16  shall be filed under seal with J. Wickliffe Cauthorn, Attorney
    at Law; The Cauthorn Firm, 201 Cherokee Street, Marietta,
17  Georgia.

18      This, the 14th day of February, 2022.

19

20

21          JENNIFER A. GERBER

22          CERTIFIED COURT REPORTER # 6241-2465-4151-2704

23

24

25

Page 54

1           COURT REPORTER DISCLOSURE STATEMENT

2

3   STATE OF GEORGIA        )

4   COUNTY OF FULTON        )

5

6       I, JENNIFER A. GERBER, Certified Court Reporter,
    pursuant to Article 10.B of the Rules and Regulations of the
7   Board of Court Reporting of the Judicial Council of Georgia, I
    make the following disclosure:

8
    1.    I am not disqualified for a relationship of interest
9   under the provisions of O.C.G.A. Sec. 9-11-28(c).

10  2.    I am a Georgia Certified Court Reporter

11  3.    I am an independent contractor of Kellie K. Rodman, LLC,
    d/b/a Rodman Reporting.

12
    4.    Rodman Reporting was contacted by the office of the
13  deposing counsel to provide court reporting services for this
    deposition.

14
    5.    I will not be taking this deposition under any contract
15  prohibited by Georgia law, O.C.G.A. 15-14-37(a).  I will charge
    usual and customary rates to all parties in the case.

16

17

18

19          JENNIFER A. GERBER

20          CERTIFIED COURT REPORTER # 6241-2465-4151-2704

21

22

23

24

25

Valencia Colon v.
Richard Roundtree et al

Chrislynne Kuhlke
February 4, 2022

**$**

**$20 (1)**
　13:21

**A**

**accidentally (1)**
　26:7
**accurate (2)**
　21:2;22:1
**ACTIVE (1)**
　21:10
**actual (2)**
　10:11;33:5
**actually (2)**
　10:16;51:1
**advance (2)**
　9:16;22:13
**affirmative (18)**
　5:25;6:2;17:23;18:9,
　18;28:4;37:24;39:17,
　23;40:7,14;41:9;42:10,
　22;46:8;47:24;49:21;
　52:13
**again (3)**
　4:9;24:8;38:23
**agent's (1)**
　21:13
**ago (2)**
　26:1,20
**agree (1)**
　4:21
**agreement (1)**
　5:2
**ahead (2)**
　14:10;19:21
**alcohol (48)**
　7:17,18,20;8:3,6;
　9:17;11:1,7;12:13,14,
　16;13:15,17;14:8,9,13,
　15;16:16,22;17:12,13;
　22:14;40:9;41:3,14;
　43:2,10;46:14;47:10,
　14,23;48:1,2,10,14;
　49:6,8,9,12,13,25;50:1,
　3,5,6,8,8,9
**alcoholic (3)**
　40:5;42:8,16
**allegations (2)**
　35:14,25
**allege (1)**
　31:4
**allows (1)**
　11:1
**almost (1)**
　19:1
**along (1)**
　9:1
**Alzater (4)**
　33:24,25;34:4,20
**A-L-Z-A-T-E-R (1)**

　34:1
**amount (2)**
　22:17;36:9
**amusement (1)**
　42:24
**and/or (5)**
　43:3,4,5,7,18
**anticipating (1)**
　28:1
**appear (1)**
　39:7
**appearing (1)**
　4:21
**appears (1)**
　24:15
**applicable (1)**
　46:11
**application (7)**
　16:11;40:4;43:24;
　46:10,12,13,14
**applied (1)**
　47:17
**apply (3)**
　40:8;43:16;49:8
**appreciate (1)**
　23:19
**approach (1)**
　7:8
**approaching (1)**
　48:19
**approval (6)**
　9:13;14:8;42:6,14;
　46:12,23
**April (1)**
　35:22
**area (1)**
　41:17
**areas (1)**
　41:3
**article (1)**
　30:24
**assaulted (1)**
　30:20
**assign (2)**
　14:16;34:12
**assigned (3)**
　43:7;44:1;45:10
**assignment (1)**
　44:2
**assuming (1)**
　31:21
**attend (1)**
　33:7
**Attendance (4)**
　42:20;43:5,6,18
**attending (1)**
　21:25
**attorney (1)**
　25:21
**audible (1)**
　20:9
**August (1)**
　30:17

**Augusta (12)**
　4:18;5:14;6:7;14:24;
　18:4;30:14,14,15,19,
　20;35:16;41:18
**Augusta-Richmond (3)**
　21:3;39:3;51:10
**authorized (1)**
　6:10
**aware (1)**
　35:20
**away (6)**
　7:18,22;8:1;9:20,24;
　52:4

**B**

**back (15)**
　8:14;17:7;19:23;
　20:2;22:16,25;23:1,5;
　24:5;26:2,14;32:2;
　35:22;48:21,25
**ball (1)**
　42:25
**bar (6)**
　9:25;11:15;12:7,7,
　20;49:23
**barbeque (1)**
　13:22
**bars (1)**
　13:11
**Basically (7)**
　7:12;10:7,7,9;22:7;
　37:19;51:11
**Bates (1)**
　39:10
**beer (6)**
　7:7;13:22,23;41:15;
　47:22;48:1
**behalf (2)**
　43:22,24
**behavior (1)**
　36:1
**beverage (1)**
　41:16
**beverages (3)**
　40:6;42:8,16
**big (4)**
　30:23;31:7,7;34:17
**bigger (2)**
　11:18;39:18
**bit (2)**
　15:17,17
**blank (2)**
　38:4,4
**book (2)**
　30:18,18
**boss (2)**
　26:24;30:11
**both (1)**
　51:1
**bottom (1)**
　39:12
**bought (1)**

　10:11
**break (2)**
　18:21;23:16
**bridal (1)**
　37:17
**brief (4)**
　20:1;24:3;26:13;
　48:24
**bring (13)**
　14:2,3,4;16:19;
　17:12;47:10,14,22;
　48:1,5;49:6,7,12
**bringing (5)**
　9:20;14:7,12;48:11;
　49:13
**broke (1)**
　9:5
**building (3)**
　11:17;17:11;41:17
**buildings (2)**
　33:12,12
**BYOB (3)**
　14:3;16:18,21

**C**

**call (4)**
　38:5;43:25;51:23;
　52:6
**called (2)**
　5:5;21:10
**camera (1)**
　26:8
**can (37)**
　4:11;5:9;6:25;8:8;
　9:18,19;10:5;11:2,25;
　13:6;18:13,13,20,21;
　19:6,8,8;20:20;21:6;
　23:8,16,17;32:8;34:11,
　11,11,12,12;36:12,12;
　38:5,7,9;42:15;46:4;
　51:24;52:6
**case (4)**
　4:11;6:4;10:13;31:2
**cash (6)**
　9:25;12:7;13:11;
　44:11,16,17
**Casino (34)**
　6:19;7:1,6;11:11;
　14:24,24;17:25;18:6;
　19:4;20:13;22:8;26:24;
　28:21;30:1,3,8,21,24,
　25;31:17;32:10,20;
　34:6,13,21;35:17;36:2,
　10,16;41:20;42:9,17;
　44:14;45:11
**caterer (4)**
　12:17,18,19,20
**Cauthorn (25)**
　4:13,13,23;5:8;
　10:16;19:18,20,22;
　20:4;23:23;24:7,13;
　25:20;26:16;39:2;49:3;

**cell (2)**
　52:2,6
**certain (1)**
　36:9
**certificate (1)**
　36:15
**change (1)**
　7:14
**changed (2)**
　7:2;29:6
**changes (1)**
　22:7
**Chapter (1)**
　42:20
**charge (3)**
　32:17;44:15;50:5
**charging (2)**
　50:7,7
**Charlie (4)**
　31:12;44:22,25;45:9
**check (2)**
　22:20;44:16
**chief (1)**
　43:2
**chiefs (1)**
　43:7
**Chrislynne (4)**
　4:6,17;5:4,11
**C-H-R-I-S-L-Y-N-N-E (1)**
　5:11
**City (1)**
　4:18
**CKuhlke@augustagagov (1)**
　35:12
**claims (1)**
　30:17
**clarify (2)**
　49:5;50:20
**clarifying (1)**
　51:17
**clean (1)**
　23:4
**cleaned (2)**
　22:25;23:1
**cleaning (1)**
　33:18
**clear (2)**
　28:3;31:15
**clearing (1)**
　50:25
**clock (1)**
　8:9
**close (1)**
　15:18
**club (3)**
　15:10,11,12
**Code (5)**
　39:4,11;40:24;41:1;
　45:24
**Colon (4)**
　4:6,11,14;35:14

**coming (1)**
7:21
**commissioners (1)**
35:21
**communicate (3)**
31:24;33:1,2
**communicates (2)**
32:22;33:3
**communications (2)**
31:12;32:16
**complaint (1)**
31:2
**completed (1)**
23:10
**complied (1)**
4:3
**computer (17)**
18:16;20:8;21:18,20;
25:7;27:11;28:7,8,10,
13,15,20,21;29:1,3,15;
30:6
**concern (1)**
30:23
**concerned (1)**
30:2
**concluded (1)**
52:15
**consider (1)**
7:14
**consistent (6)**
39:5;42:1,11;43:12;
46:6,16
**consume (1)**
41:14
**consumed (2)**
42:9,16
**consumption (3)**
40:5;41:2,14
**contact (1)**
8:11
**contacting (1)**
9:11
**contacts (3)**
8:16;9:6;15:14
**contract (18)**
7:13;8:12;14:19;
18:2,13,22;21:3;22:3;
23:9,13,17;25:4;26:2;
29:13,25;30:6;35:19;
36:22
**contracts (4)**
25:12,23;26:3,23
**coordinator (1)**
5:18
**copies (1)**
30:7
**copy (9)**
8:12;20:7;21:2;
27:15;29:4,5,7,24;30:6
**corner (1)**
23:10
**counsel (4)**
5:2;6:3,9;20:7

**count (1)**
13:15
**county (13)**
7:7,9;10:25;21:4;
30:20;35:21;36:14;
39:3;42:7;45:24;46:11;
50:22;51:10
**couple (4)**
30:16;39:5;49:4,6
**coupons (1)**
13:23
**court (8)**
4:3,9,19,20,25;5:1;
10:18;52:3
**coverage (1)**
34:14
**covered (1)**
6:5
**create (1)**
29:11
**created (4)**
21:8;24:22,24;28:5
**CROSS-EXAMINATION (1)**
5:7
**current (2)**
38:12,16
**customer (1)**
22:11

**D**

**dance (1)**
43:9
**dances (1)**
42:25
**darn (1)**
39:9
**D-A-R-R-E-L (1)**
32:9
**Darrell (6)**
32:7,23,25;35:7;
45:4,8
**date (12)**
4:7,9;21:15;23:11,
13;24:16,17,20;25:3,4;
29:5;35:18
**dated (3)**
25:2,13,14
**daughter (2)**
12:5,6
**day (20)**
7:19;9:17;10:4,5,6,
10,11,12;11:6,8,14,16,
24;12:1,21;13:4;16:4,
5;18:11;44:11
**days (1)**
30:16
**decades (1)**
47:13
**decide (1)**
37:2
**decides (1)**
37:16

**Defendant (1)**
4:16
**defense (3)**
6:3,9;20:6
**Department (50)**
5:15,17;6:11,21;
7:10,24,25;8:11,17,21,
22,25;10:8,13;16:11;
26:1,20;31:11,24;
32:14,21,22;33:6,11;
34:21,25;35:3,13;
37:23;38:19;42:8,15;
43:3,12,12,17,17,21,21,
23;44:9;45:9;46:10,24,
25;47:8,12,25;48:8;
50:21
**departments (3)**
6:22;26:22;43:8
**department's (1)**
20:8
**depends (2)**
36:8;37:15
**deposed (1)**
5:6
**deposit (3)**
22:25;23:3,5
**deposition (8)**
4:5;6:6;24:10;28:2;
38:24;45:23;49:7;
52:15
**depositions (1)**
6:5
**Deputies (5)**
42:21;43:5,6,11,18
**deputy (10)**
30:17;31:12,16,17,
18,20;44:7,9,13;48:15
**described (1)**
39:7
**describing (1)**
42:13
**designated (2)**
6:8;43:11
**desk (1)**
52:5
**detail (1)**
30:18
**determine (1)**
43:3
**difference (3)**
51:3,14,15
**different (4)**
7:3;24:15;48:7,10
**direct (2)**
7:23;50:17
**directly (7)**
32:17,23;33:1,2;
43:23;44:10,11
**director (15)**
26:24;37:16,19,22;
38:2,12,15,16,18,21;
42:7,15;46:9,10,23
**disapproval (1)**

**46:12
**discretion (1)**
43:4
**discussed (1)**
6:4
**distinguish (2)**
47:25;49:18
**document (5)**
20:7,12;24:14,15,19
**documents (9)**
17:21;18:3,5;19:2,5,
9,24;28:8;29:1
**done (2)**
7:10;33:16
**door (4)**
36:18;37:14,17,18
**down (4)**
21:15,16;22:11;42:6
**drinks (1)**
13:14
**due (1)**
43:4
**duly (1)**
5:5
**during (3)**
6:5;33:14,17
**duty (5)**
8:8,8;31:19,19,22

**E**

**earlier (1)**
39:7
**early (1)**
51:24
**earthly (1)**
24:21
**either (3)**
7:23;22:1;42:25
**elaborate (1)**
34:11
**electronically (1)**
28:7
**eleven (1)**
22:17
**else (4)**
29:10;38:9;41:15;
48:6
**email (13)**
8:14;18:21;19:6,6;
32:3;35:7,11,11;45:8,
12,16;52:1,6
**emails (1)**
32:4
**employed (2)**
5:13,14
**employee (1)**
34:8
**end (4)**
21:17;44:15;48:19,
19
**ended (1)**
21:20

**enforcement (1)**
36:23
**ensued (4)**
20:1;24:3;26:13;
48:24
**entire (1)**
33:17
**entity (1)**
6:6
**entry (1)**
22:22
**environment (1)**
6:1
**even (5)**
11:6;30:15;31:13;
33:17;50:7
**event (68)**
6:18;7:1,5;8:13,16;
10:11;11:6,10;12:19;
13:8,13,18,24;14:15;
16:1,2,4;17:1,4,15,25;
18:6,8,10;19:3;20:13;
21:4;22:12,24;25:11;
28:12;29:12;31:9,16;
32:5,15,21;33:5,14,17,
18;34:16;36:2,5,8,18,
25;37:3,15;40:5;44:3,
6,14,15,15,17,20;45:2,
10;46:18;47:10,14,22,
23;48:1,1;49:14,15
**events (12)**
6:12,12,17;9:1;
14:25;17:21;23:5;33:7,
11;35:3;36:16;47:13
**Everybody (2)**
16:14;33:14
**everyone (1)**
4:12
**exactly (1)**
37:20
**EXAMINATION (1)**
50:17
**Excellent (1)**
24:1
**except (2)**
11:15;24:16
**exception (1)**
41:19
**exchanged (1)**
10:10
**exchanging (1)**
48:6
**Exhibit (15)**
20:15;24:11;25:1,16,
18;26:19;27:6,7;28:17,
17;38:24,25;45:22,24,
25
**exhibition (1)**
42:25
**Exhibits (1)**
24:10
**existed (1)**
25:24

Kellie K. Rodman, LLC

**explain (5)**
10:5;14:10;23:8;
33:9;47:21
**explained (1)**
48:8
**extra (2)**
31:19,22

**F**

**facilities (5)**
5:18;6:12;33:7;36:4;
43:1
**facility (5)**
15:24;32:15,18;43:5;
44:20
**fact (1)**
24:16
**fair (1)**
49:10
**familiar (1)**
41:1
**fantastic (1)**
5:21
**far (3)**
9:12,23;35:5
**Father's (2)**
16:4,5
**February (2)**
4:7,10
**festivities (1)**
35:4
**few (4)**
19:8;23:18;48:18,20
**fewer (1)**
48:13
**figure (1)**
51:1
**file (11)**
13:8,9;18:3;27:12;
28:12,14;29:4,11,19;
30:7,15
**files (4)**
20:8;27:14;28:6,9
**fill (2)**
25:5;34:14
**find (5)**
19:5;31:25;34:17;
35:14;44:2
**finish (3)**
27:19,22;48:21
**fire (6)**
43:3,12,17,21,21,23
**firefighter (1)**
44:8
**Firefighters (5)**
42:21;43:5,7,10,18
**firemen (5)**
9:1,1,6;33:4;36:20
**firm (1)**
28:6
**first (12)**
5:5;7:2,17;21:7,9;

24:19;29:2,25;35:14;
39:10,12;41:19
**five (3)**
18:20;23:24;39:20
**follow (1)**
50:14
**follows (1)**
5:6
**follow-up (2)**
49:4,4
**food (1)**
17:10
**formed (1)**
25:6
**forward (2)**
46:10,11
**found (2)**
22:6;35:15
**four (5)**
36:19,20;37:14,18;
39:19
**Frails (3)**
4:15;24:4;50:14
**fraternity-type (1)**
15:11
**free (3)**
14:13,15;16:17
**friend (2)**
38:6,7
**front (2)**
19:10;22:6
**fulfills (1)**
26:21
**full (2)**
5:9;22:17
**full-time (1)**
34:8
**function (1)**
43:4

**G**

**gathering (1)**
43:1
**gave (2)**
23:1;28:18
**general (6)**
10:25;11:2,18;32:11;
39:7;40:22
**generally (4)**
6:16;11:7;32:13;
44:6
**Gents (19)**
15:3,6,9,15,21;
17:25;18:12;19:3,4;
20:13;21:3,12;28:12;
33:18;34:25;35:3;45:1;
47:9,13
**Georgia (1)**
42:7
**Gerald (2)**
33:24;34:2,3,7,8,20
**Gerber (1)**

4:20
**given (2)**
22:25;47:18
**gives (2)**
13:4;44:15
**giving (8)**
7:18,22;8:1;9:20,24;
13:14;42:24;50:10
**God (2)**
5:21;39:9
**goes (4)**
9:13;21:19;35:3;
48:3
**gonna (34)**
6:18;7:6,7;13:21;
18:19;20:19;23:8,12,
24;24:8,10;25:16;
26:17;29:15;31:25;
32:11,12,16;38:4,10,
23;39:14;40:19;42:19;
45:10,22,24,25;46:1;
51:22;52:1,4,5,7
**good (3)**
6:1;45:20;51:18
**Gotcha (1)**
30:22
**gotta (1)**
34:17
**grounds (1)**
30:5
**group (1)**
15:18
**guest (3)**
35:3;36:1;49:16
**guests (5)**
7:8;14:4,7;17:15;
49:15
**guy (1)**
22:8
**guys (5)**
17:18;18:4;31:9,10,
10

**H**

**hand (1)**
23:10
**happen (1)**
30:25
**happened (3)**
30:4;31:5,7
**HAYNES (11)**
4:15,15,24;50:14,18;
51:5,21,23;52:9,11,13
**head (1)**
10:18
**headlines (1)**
31:7
**heard (1)**
15:2
**held (2)**
20:13;32:15
**helping (1)**

9:11
**helps (2)**
34:9,10
**herein (1)**
5:5
**hit (2)**
26:7,7
**Hold (1)**
39:22
**holds (1)**
36:10
**honest (3)**
13:11;23:12;25:22
**hope (1)**
51:18
**host (1)**
49:14
**hosting (4)**
36:16;44:6;49:22,22
**huge (1)**
36:17
**huh (1)**
21:23
**hundred (1)**
19:1

**I**

**idea (8)**
23:13;24:21;25:8,10;
27:8;29:6;35:5;44:24
**identification (4)**
20:16;24:12;25:19;
39:1
**identified (2)**
6:3,9
**immediate (1)**
38:16
**improper (1)**
36:1
**Inc (2)**
20:13;21:3
**included (2)**
17:9;39:8
**includes (1)**
13:16
**indicate (1)**
46:12
**individual (5)**
14:4,7;17:15;49:15,
16
**individually (1)**
16:12
**individual's (1)**
51:13
**indoor (1)**
33:12
**information (7)**
21:8,10,11;30:5;
38:9;39:19;45:6
**injury (1)**
36:1
**inspection (5)**

10:13;13:4;46:9,24;
48:8
**instead (1)**
24:16
**insurance (3)**
36:5,15,18
**interacts (1)**
6:21
**into (1)**
31:8
**intoxicating (1)**
41:16
**issues (1)**
26:10

**J**

**January (17)**
22:4;23:11,14;24:16,
17,20,22;25:2,7,10,11,
13,14,23;26:3,4;29:7
**January's (1)**
24:25
**Jennifer (2)**
4:20;10:16
**J-M-A-Y-L-E (1)**
35:9
**JMayle@augustagagov (1)**
35:8
**job (2)**
33:3;45:20
**Joe (1)**
11:25
**Johnson (4)**
33:24;34:4,20;51:23
**joined (1)**
24:4
**Julian (34)**
6:19;7:1,6;11:11;
12:6;14:23,24;17:25;
18:6;19:4;20:13;28:21;
30:1,2,8,21,24,25;31:5,
7,17;32:9,20;34:5,13,
21;35:17;36:1,16;
41:19;42:9,16;44:14;
45:11
**June (28)**
6:19;7:3;17:25;18:8;
19:3,5,13;20:14;21:15;
22:22;25:12;28:12,21,
22;29:1,11,24;31:10;
32:4;33:20;34:22;
36:24;38:2,15;44:23;
45:1,10;49:23

**K**

**kind (13)**
8:19;13:19;16:10;
21:6;23:6;36:1,5,8,15;
37:15;39:4;47:17;
50:14
**knew (1)**

38:9
**knowledge (2)**
  35:1;36:3
**known (1)**
  25:22
**Knox (1)**
  15:18
**Kuhlke (10)**
  4:6,17;5:4,9,12;20:5;
  48:20;50:13,19;52:3
**K-U-H-L-K-E (1)**
  5:12

**L**

**labeled (1)**
  38:24
**last (1)**
  25:23
**later (1)**
  30:16
**law (2)**
  28:6;36:23
**lawsuit (3)**
  29:21;30:17;51:14
**learn (1)**
  43:17
**least (1)**
  9:15
**left (3)**
  21:13;38:18,21
**letter (1)**
  35:21
**level (2)**
  45:18;48:4
**license (43)**
  7:19,24,25;8:1;9:14,
  17,18,18;10:5,5,6,10,
  11,12,25;11:2,8,12,14,
  15,19,24,25;12:1,13,
  14,20,21,23;13:1,1,3,4;
  14:11;40:5,8,9,13;46:9,
  24;48:8;49:8;50:9
**licenses (1)**
  11:7
**license-wise (1)**
  9:23
**licensing (4)**
  9:12;10:8;11:21;
  16:25
**lights (1)**
  33:16
**liquor (1)**
  41:16
**listed (2)**
  35:17;41:19
**literally (2)**
  11:14;44:13
**little (3)**
  15:17,17;30:2
**lives (1)**
  51:10
**location (1)**

11:2
**logo (1)**
  26:8
**long (11)**
  5:19;9:10,13;10:8;
  15:16,19,20,24;20:24;
  23:25;38:12
**look (6)**
  19:24;22:8;30:1;
  31:8;42:5;48:17
**looked (2)**
  17:17;27:6
**looking (2)**
  10:21;46:5
**looks (1)**
  20:24
**lot (4)**
  5:23;7:13;13:11,20

**M**

**ma'am (1)**
  28:19
**making (1)**
  39:18
**manager (2)**
  42:24;43:15
**many (9)**
  21:25;36:19,21,23,
  23,23;37:2,20;38:11
**March (2)**
  22:17,21
**marked (4)**
  20:15;24:11;25:18;
  38:25
**married (2)**
  12:5,6
**marshals (2)**
  8:25;9:7
**Mary (1)**
  5:11
**M-A-R-Y (1)**
  5:11
**matter (1)**
  8:4
**Maurice (1)**
  38:1
**maximum (1)**
  36:11
**may (2)**
  31:14;40:8
**Mayle (6)**
  32:7,23,23,25;45:4,8
**M-A-Y-L-E (1)**
  32:9
**Mayle's (1)**
  35:7
**mayor (1)**
  35:22
**McDowell (1)**
  38:1
**McDuffie (1)**
  34:9

**mean (19)**
  8:24;9:14;11:13;
  15:10;16:4;17:15;
  22:23;27:9;28:11,18;
  31:11,11;36:8,14;
  37:22;45:19;47:22;
  50:8;51:9
**means (6)**
  11:19;21:7;23:1;
  25:6,6;41:11
**meant (1)**
  51:1
**meet (1)**
  23:24
**member (2)**
  15:21;34:25
**members (1)**
  36:20
**mentioned (1)**
  43:16
**midnight (2)**
  21:20,21
**might (2)**
  22:1;26:7
**mind (1)**
  51:13
**minute (3)**
  18:21;39:16;49:25
**minutes (4)**
  19:8;23:24;48:20;
  52:5
**money (3)**
  10:9;48:3,7
**months (2)**
  9:16;11:20
**more (5)**
  26:19;32:12,12;
  33:13;48:18
**mouth (1)**
  6:7
**much (5)**
  4:19;12:9,9;15:25;
  51:13
**multiple (1)**
  19:2
**must (2)**
  6:1;42:6
**mute (1)**
  19:22
**muted (1)**
  20:10

**N**

**name (13)**
  4:12,13,20;5:10;
  8:15;21:12,13,13;32:2,
  8;37:25;38:3,5
**nature (1)**
  43:4
**necessarily (2)**
  13:9;34:13
**necessary (1)**

43:6
**need (9)**
  8:13;9:12;28:2,3;
  37:18;46:21;47:7,9;
  50:6
**needed (1)**
  8:15
**needs (2)**
  27:25;33:16
**Neither (2)**
  26:3,4
**Net (1)**
  21:10
**nine (1)**
  46:7
**nineteen (2)**
  19:14,15
**nobody (1)**
  12:12
**Nods (1)**
  10:18
**nonprofit (6)**
  11:23,24;12:2;40:8,
  11,18
**notes (2)**
  10:21;48:17
**nother (1)**
  48:4
**November (1)**
  16:6
**nowadays (1)**
  5:24
**number (6)**
  23:9;25:13;36:11;
  39:19;41:5;43:6
**numbered (1)**
  39:11

**O**

**obtained (1)**
  42:6
**occasion (1)**
  43:2
**occasional (1)**
  40:4
**OCGA (1)**
  4:4
**off (18)**
  8:8;12:25;13:2;
  19:17,19,25;21:9;
  23:21;24:1;26:10,11;
  29:3;30:4,17,18;48:23;
  51:25;52:14
**offer (2)**
  41:4,14
**office (6)**
  8:23,24;31:25;43:22,
  23;50:22
**officer (10)**
  8:3,5,7,9;14:17,20,
  21;22:15;31:25;32:16
**officers (7)**

9:6;16:23;33:4;
  36:20,24;37:6,19
**older (1)**
  15:17
**once (3)**
  7:22;22:1,11
**one (39)**
  9:16;10:14;11:6,6,
  16;16:6;22:5,6;25:2,
  13,14,23,23;26:3,3,25;
  27:5,6,10;28:13,15,18;
  29:2,3,14,15,19;30:19;
  33:12,13;37:1,7;41:13,
  19;45:5;46:22;48:14;
  49:23;50:19
**one-day (1)**
  7:25
**ones (2)**
  27:3;28:19
**online (2)**
  7:13,15
**only (2)**
  36:10;48:14
**on-premises (1)**
  40:5
**open (8)**
  12:7;17:18,19;25:25;
  26:20,22;28:5;49:23
**operated (1)**
  41:18
**ordinance (1)**
  51:2
**ordinances (4)**
  6:20;39:4;40:24;
  41:2
**organization (2)**
  21:11,13
**original (3)**
  22:6;23:13,17
**out (14)**
  10:12;12:1;13:14;
  25:5;27:14;29:2;31:25;
  34:9,10;35:14,15;39:5;
  44:2;51:1
**outdoor (1)**
  41:11
**over (10)**
  15:6;22:8;32:9;
  33:18;36:9;37:5,8,11,
  12;44:18
**own (21)**
  12:23;14:2,3,5,8,12;
  16:19;17:13;23:5;
  31:20;43:24;47:10,14,
  22;48:1,5,11;49:6,7,12,
  13
**owned (1)**
  41:18

**P**

**page (9)**
  21:7;22:18,19;28:22;

**Valencia Colon v.**
**Richard Roundtree et al**

**Chrislynne Kuhlke**
**February 4, 2022**

39:12,14;40:19;42:19;
46:1
**pages (4)**
19:1;20:24;26:2;
45:23
**paid (5)**
22:17,20;31:21,22;
44:22
**paper (15)**
27:14;28:6,9,11;
29:11,15,22,23,25;
30:1,7,8,10,12;31:6
**paperwork (3)**
17:24;18:1,11
**park (7)**
11:5,10,16;41:16;
42:2,11,13
**Parks (30)**
5:14,17;6:10,21;
7:10;14:24;16:11;20:7;
26:1,20,21;31:11,24;
32:14;33:6;34:21,25;
35:2,13;37:23;38:18;
41:3;42:2,12;43:13;
44:9;46:25;47:8,12,25
**park's (1)**
39:6
**part (5)**
26:20;34:5;40:23;
41:1;43:24
**participant (1)**
35:4
**particular (1)**
37:3
**parties (3)**
4:21;16:7,9
**party (5)**
16:6;21:17,19;49:22;
50:10
**past (1)**
17:7
**pay (6)**
17:11;22:16;44:8,9,
11,11
**paying (1)**
44:7
**pays (2)**
14:21,21
**people (22)**
5:23;6:8;7:21;8:4,4,
4,18;13:20;14:22;
15:14;17:12,14,15;
33:6,18,19;34:17,17;
36:4,9;37:20;48:13
**per (1)**
5:2
**performance (1)**
42:25
**permit (11)**
16:10;46:14;47:3,9,
17,17,18;48:4;49:8;
50:4,6
**permitting (3)**

6:23;17:21;47:21
**person (12)**
8:15;14:19;32:17;
33:13,14;41:13;42:24;
43:15,16;44:3,6;50:9
**personnel (1)**
33:11
**person's (1)**
37:25
**phone (7)**
26:5;38:6,7;39:25;
40:1;52:2,6
**phrase (1)**
49:6
**piece (1)**
38:8
**pin (1)**
5:20
**place (1)**
7:7
**Plaintiff (1)**
4:14
**Plaintiff's (4)**
20:15;24:11;25:18;
38:25
**planned (1)**
7:10
**planning (5)**
6:11,12,17,22;44:3
**plate (1)**
13:22
**playground (1)**
41:17
**please (1)**
4:12
**pm (1)**
23:11
**point (1)**
39:4
**police (27)**
8:3,5,7,9,11,16,21,
22,25;9:6;14:17,20,21;
16:20,23;33:4;36:20,
24;37:5,18;43:22;44:3;
50:20,20;51:3,5,12
**policies (6)**
6:11,20;7:16;39:6;
42:2,2
**policy (5)**
42:12,12,14;43:13;
46:6
**populate (2)**
25:3,4
**position (4)**
5:16;15:25;38:13;
47:8
**positive (1)**
17:6
**possess (1)**
40:9
**possession (1)**
41:15
**preceding (1)**

43:16
**predecessor (1)**
38:16
**premises (4)**
8:3;10:9;16:22;48:3
**prepared (1)**
27:2
**Press (5)**
30:14,14,15,20;
35:16
**Pretty (6)**
12:9,9;15:25;17:18,
20;28:3
**print (2)**
28:7;29:7
**printed (2)**
29:2,3
**prior (1)**
42:6
**private (3)**
31:19;32:15;43:1
**probably (1)**
21:20
**problem (1)**
23:5
**procedures (1)**
7:16
**proceedings (1)**
24:4
**process (14)**
6:23;7:2,2,9,9:10,13;
11:19,22;14:14;16:12,
14;17:1;43:24;47:21
**produce (1)**
28:17
**produced (4)**
18:5,25;24:20;28:16
**production (1)**
27:7
**property (5)**
11:5,10,16;14:25;
15:23
**protection (1)**
51:12
**provide (3)**
16:17;43:10;48:1
**provided (9)**
17:17,18;20:6,6;
28:6;32:14;39:19;
47:23;50:10
**provides (4)**
31:16,20;44:14;
51:12
**providing (10)**
14:15;32:1,22;45:1;
48:2,10,14;50:3,5,10
**public (11)**
6:12;41:3,3,12,16,17,
17;42:24,25;43:1,1
**pull (2)**
27:14;28:6
**pulled (1)**
28:9

**purchase (1)**
36:5
**purpose (1)**
41:14
**purposes (3)**
28:2;51:9,14
**put (7)**
13:5;21:12,15,16;
22:2,3;25:7

**Q**

**quick (3)**
9:19;40:19;48:17

**R**

**R4769 (1)**
23:9
**Randolph (1)**
24:4
**Randy (1)**
15:18
**rape (3)**
30:18;31:5;35:16
**read (3)**
30:24;31:1;41:12;
43:9;46:5;51:22
**reads (1)**
40:3
**ready (2)**
18:7;52:8
**real (3)**
9:19;40:19;48:17
**really (3)**
13:12;30:3;37:16
**reason (2)**
18:6;25:11
**rec (2)**
14:24;42:12
**receive (2)**
28:14;32:6
**received (4)**
26:19;45:5;46:18,21
**receives (1)**
32:7
**reception (1)**
9:25
**recess (4)**
20:1;24:3;26:13;
48:24
**record (13)**
4:8;5:9;19:25;20:2;
23:22;24:2,6;26:10,11,
15;48:23,25;52:14
**records (6)**
17:18,19;26:1,21,22;
28:5
**Recreation (10)**
5:14;6:11;20:8;
31:11;32:14;37:23;
42:2,8,15;46:10
**recreational (1)**

43:13
**referring (5)**
37:22;49:13,14,14;
50:21
**refined (1)**
32:12
**reflects (1)**
20:12
**regard (3)**
6:11,22;33:11
**regulations (1)**
39:8
**related (6)**
17:21,24;18:5,10,11;
28:12
**remember (1)**
38:5
**remotely (2)**
4:22;5:1
**rent (3)**
7:6,6;36:4
**rentals (1)**
5:18;34:9,10
**renting (2)**
7:16;14:22
**reporter (8)**
4:3,9,19,20,25;5:2;
10:18;52:3
**represent (4)**
4:12,14,17;40:3
**representing (1)**
4:16
**request (5)**
17:19,21;26:1,21;
28:5
**requests (1)**
26:22
**require (2)**
33:19;36:15
**required (7)**
16:20;33:6;36:5;
42:23;43:10,19;50:3
**requirements (2)**
4:4;48:9
**requires (1)**
22:14
**respective (1)**
43:8
**response (3)**
17:19,20;20:9
**responsible (1)**
44:7
**restaurant (1)**
11:15
**Resuming (9)**
10:19;20:4,17;24:7,
13;25:20;26:16;39:2;
49:3
**review (1)**
13:1
**Richmond (6)**
30:20;39:11;42:7;
45:24;46:11;50:22

**right (38)**
11:3,4,9,11,23;
14:23;15:1;16:4;18:13;
19:18;20:8,19,25;
23:10;24:5;25:16;
26:14,17;28:22;29:20;
34:20;37:12;39:10,12;
40:2,15,16,20;41:22;
42:13;44:19,21;46:25;
47:18;48:5;50:2;52:11,
12
**Roundtree (2)**
4:6,11
**rude (1)**
27:21
**rumors (1)**
38:21
**running (1)**
12:20

**S**

**same (7)**
11:14;15:25;24:15;
25:13;46:1;51:8,11
**saw (1)**
19:3
**saying (2)**
26:9;45:9
**scan (3)**
23:17;27:17;28:7
**scheduled (1)**
7:11
**scheduling (1)**
8:19
**screen (3)**
20:19;24:8;38:23
**scrolling (1)**
22:18
**second (4)**
20:22;22:18,19;
39:22
**seconds (1)**
23:18
**Section (9)**
39:14;40:20,21;41:6,
8;42:21;43:16;44:5;
46:2
**security (13)**
16:20;25:22;15;
31:16,19;32:1,13,22;
44:14;45:1,10;48:9,15
**seems (1)**
42:11
**sell (11)**
9:17;11:1,2,7;12:16;
13:6;16:16;17:3;22:12;
41:4,4
**selling (20)**
7:19,20,20,23;9:15;
10:9;13:14,15,17,24;
14:3;22:12;36:17;
37:14,16,18;48:3;

49:25;50:1,9
**send (4)**
14:19,19;23:14;32:2
**sent (7)**
17:19;22:5;24:14;
25:2,21,25;35:21
**separate (1)**
28:25
**serve (4)**
7:7;11:8;12:16;
41:13
**served (3)**
42:9,16;43:2
**setting (1)**
33:17
**shall (6)**
41:13;43:6,7,16;
46:9,12
**share (3)**
20:19;24:8;38:23
**sheriff (13)**
13:1,3;16:20;30:20;
35:22;36:24;42:7,14;
43:3;46:11;51:2,3,11
**sheriff's (22)**
8:23,24;31:16,17,18,
19,25;32:14,21,22;
43:5,11,17,22,23;44:7,
8,13;45:9;46:24;48:15;
50:22
**show (7)**
25:16;26:17;37:17;
42:19,24;46:1,3
**showing (2)**
10:10,12
**sic (3)**
32:9;46:2,3
**side (1)**
8:19
**sign (3)**
12:25;13:1;51:22
**signed (1)**
13:4
**significance (1)**
47:20
**single (2)**
11:6;40:4
**situation (1)**
29:23
**smaller (1)**
32:12
**Smith (40)**
6:19;7:1,6;11:11,25;
12:6;14:24;17:25;18:6;
19:4;20:13;28:21;30:1,
2,8,21,24,25;31:5,7,17;
32:10,20;33:24;34:2,3,
5,7,8,13,20,21;35:17;
36:2,16,41:19;42:9,16;
44:14;45:11
**social (1)**
15:12
**sold (1)**

22:13
**sole (1)**
43:3
**Somebody (2)**
29:9;38:5
**someone (5)**
6:4,10;11:1;12:11;
51:10
**sometimes (1)**
20:22
**somewhere (2)**
38:9;45:8
**sorry (7)**
10:21;19:21;23:18;
38:3;39:18;40:20;41:6
**space (1)**
41:12
**speak (1)**
6:8
**speaking (1)**
18:2
**special (1)**
8:8
**specific (1)**
18:8
**specifically (4)**
6:16,17;11:16;32:20
**spell (3)**
5:10;32:8;33:25
**staff (5)**
33:13,13,19;34:12;
36:20
**standing (2)**
16:10,11
**start (1)**
18:7
**state (1)**
4:12
**statement (1)**
49:10
**status (1)**
23:9
**step (1)**
52:4
**stick (1)**
6:15
**still (6)**
7:15;8:5;9:17;11:7;
14:8;48:14
**stored (2)**
28:8;29:1
**straight (1)**
7:12
**subject (1)**
50:13
**subparagraph (2)**
46:4,4
**subsection (1)**
42:5
**substantial (2)**
17:18,20
**supervisor (1)**
45:20

**suppose (1)**
7:5
**supposed (4)**
31:18;33:15;37:2;
45:16
**sure (13)**
10:24;15:4;17:5,6,
11;18:24;19:11;24:24;
27:22;31:15;33:3,14;
35:16
**swear (1)**
10:17
**sworn (4)**
4:22;5:1,6;10:22

**T**

**table (1)**
48:6
**talk (10)**
6:7,10,16,16,20;
18:23;25:1;43:20,21,
23
**talked (1)**
45:13
**talking (9)**
11:14;21:4;22:19;
29:21;40:4,10;41:4,6;
46:13
**Tameka (3)**
4:15;18:21;19:6
**technical (1)**
26:10
**telling (1)**
21:14
**ten (1)**
48:18
**terms (1)**
39:7
**testified (1)**
5:6
**Thanks (2)**
50:25;51:4
**thereon (1)**
41:17
**thousand (2)**
19:13;25:8
**three (2)**
9:16;11:20
**ticket (5)**
13:16,21;17:9;50:8,
11
**tickets (9)**
13:14;17:3;22:12,12,
13;36:17;37:14,17,18
**times (2)**
19:2;49:6
**Title (5)**
39:3,11;45:23;46:1,2
**today (3)**
4:21;7:2,3
**Today's (2)**
4:6,9

**together (2)**
16:5,9
**told (3)**
26:23;27:8;45:3
**top (1)**
41:22
**topics (1)**
6:4
**totally (1)**
48:7
**transcript (1)**
28:3
**transmitted (1)**
32:17
**true (1)**
21:2
**trying (3)**
27:22;49:17;51:1
**turn (1)**
51:25
**Twenty-five (1)**
15:6
**twice (1)**
31:23
**two (16)**
13:22,23;19:13;
20:24;25:8,12,22;
28:25;33:19;34:17,17;
36:20;37:5,8,12;38:14
**type (3)**
11:14;16:1;41:15
**types (1)**
14:25
**typically (1)**
9:13

**U**

**under (4)**
22:11;23:9;37:7;
46:4
**Understood (11)**
8:18;9:8;10:15;
12:25;13:13,13;23:4;
33:5;45:15,17,22
**uniform (1)**
8:10
**unlawful (1)**
41:13
**Unless (1)**
12:11
**up (15)**
9:5;19:22;21:19,21;
22:25;23:1,4,10,24;
33:17,18;36:12;37:19;
48:21;50:25
**ups (1)**
50:14
**use (3)**
15:23;16:2;21:10
**used (2)**
15:24;49:5
**using (3)**

11:5;12:23;50:20
**usually (1)**
16:16

## V

**Valencia (1)**
4:14
**versus (6)**
4:6,11;47:22,23;
48:1,10
**via (1)**
4:21
**VIDEOGRAPHER (14)**
4:5;19:17,19,21,25;
20:2;23:21;24:1,5;
26:11,14;48:23,25;
52:14

## W

**Wait (2)**
39:16,18
**walk (3)**
7:9;21:6,6
**Walker (4)**
31:12;44:22,25;45:9
**wall (4)**
10:12;13:5,5,10
**wan (1)**
21:17
**wanna (8)**
6:16;10:24;16:13;
21:16;27:21;39:10;
46:3;52:7
**Washington (2)**
15:16;21:14
**way (1)**
7:20
**wedding (1)**
9:25
**weeds (1)**
45:17
**week (2)**
9:19;25:23
**weekend (1)**
51:18
**What's (7)**
14:13;16:2;17:9;
22:22;30:2;37:25;38:3
**whatsoever (1)**
41:18
**Whereupon (12)**
4:3;5:1,3;20:1,15;
24:3,11;25:18;26:13;
38:25;48:24;52:15
**white (1)**
16:6
**whoever's (1)**
7:16
**whole (4)**
10:14;11:19,21;48:4
**who's (2)**

32:17;44:6
**Wick (1)**
4:13
**Willie (2)**
15:16;21:14
**Wilson (1)**
4:16
**wine (2)**
7:7;41:15
**within (1)**
9:19
**without (1)**
9:25
**WITNESS (12)**
4:17,22;5:1,5;10:17,
19;20:17;49:2;51:8,16,
20,25
**woman (1)**
30:21
**wondering (1)**
51:7
**Woods (1)**
34:9
**word (1)**
50:20
**work (12)**
6:1;8:22,23,24,25;
9:3;15:17;33:9;34:13,
18;35:11;37:3
**worked (1)**
15:16
**working (9)**
8:16;10:8;31:18;
33:20,23;34:21;35:4;
36:24;48:15
**works (6)**
33:10;34:5,9,24;
35:2;46:17
**worth (2)**
19:1,1
**wristbands (1)**
13:14
**writing (2)**
7:24;8:14
**written (1)**
42:6

## Y

**y'all (10)**
17:18,19;18:25;
31:11;32:4;42:14;
47:16,16;51:21,22
**y'all's (1)**
46:6
**year (4)**
15:25;16:2;17:22;
26:20
**years (4)**
5:20,23;15:6;38:14
**yesterday (1)**
5:20

## Z

**Zoom (1)**
4:21

## 0

**001 (1)**
39:13

## 1

**10:01 (1)**
26:12
**10:03 (1)**
26:15
**10:37 (1)**
48:23
**10:41 (1)**
49:1
**10:45 (2)**
52:14,15
**105 (2)**
42:19;45:23
**11:00 (1)**
52:8
**11:15 (1)**
52:8
**11:30 (3)**
21:18,19;52:8
**12 (2)**
21:20,21
**12:23 (1)**
23:11
**139 (1)**
26:2
**14th (26)**
6:19;18:1,8;19:3,5,
13;20:14;21:16;25:12,
12;28:12,21,22;29:1,
12,24;31:10;32:4;
33:21;34:22;36:25;
38:2;44:23;45:1,10;
49:23
**15 (1)**
52:5
**150 (1)**
8:4
**16 (1)**
22:4
**16th (6)**
23:14;24:17,25;25:2,
7,13

## 2

**2 (1)**
8:4
**200 (4)**
8:4;19:1;33:18;37:8
**2019 (32)**
6:19;7:3;17:22;18:1,

8;19:4,5;20:14;21:16;
22:4,21,22;23:14;
24:17,25;25:3,7,12,13,
24;26:4,24;28:22;29:1,
12;31:10;34:22;38:2,
15;44:23;45:1,10
**2020 (2)**
35:22,23
**2021 (1)**
30:17
**2022 (9)**
4:7,10;23:11;24:17,
20,23;25:14;26:4;29:8
**21 (1)**
40:19
**215 (1)**
22:9
**21st (1)**
22:22
**22nd (2)**
22:17,21
**25 (18)**
15:2,9,15,21;17:25;
18:11;19:3,4;20:13;
21:3,12;28:12;33:18;
34:25;35:3;45:1;47:9,
13
**250 (1)**
22:9

## 3

**30 (1)**
15:6
**300 (6)**
22:8;37:5,7,11,12;
48:13
**31st (7)**
23:11;24:17,20,23;
25:14;26:3;29:8
**35 (2)**
5:20,23
**350 (3)**
36:10,11,13

## 4

**400 (1)**
36:12
**43 (1)**
39:14
**44 (1)**
46:1
**4th (2)**
4:7,10

## 6

**6 (3)**
39:3;45:23;46:2
**60001 (1)**
39:11
**6-2-4 (1)**

40:20
**6-2-5 (2)**
40:21;41:6
**62-77 (1)**
46:2
**6-277 (1)**
46:3
**6-2-77 (2)**
39:15,21
**6-8-1 (1)**
42:21
**6-8-3 (1)**
44:5

## 8

**8 (1)**
42:20

## 9

**9 (2)**
46:4,4
**9:13 (3)**
4:2,7,10
**9:33 (1)**
19:25
**9:45 (1)**
19:23
**9:48 (1)**
20:3
**9:53 (1)**
24:2
**9:58 (1)**
24:6
**9-11-28c (1)**
4:4